UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | |
|---|---|
| UNITED STATES OF AMERICA : | |
| - *v.* - : | 18 Cr. 567 (VSB) |
| CHRISTOPHER COLLINS, CAMERON COLLINS, and STEPHEN ZARSKY, : | |
| Defendants. : | |
| - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x | |

**GOVERNMENT'S MEMORANDUM OF LAW
IN OPPOSITION TO DEFENDANTS' PRETRIAL MOTIONS**

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York

Damian Williams
Scott Hartman
Max Nicholas
Assistant United States Attorneys
- Of Counse

# TABLE OF CONTENTS

BACKGROUND ........................................................................................................ 1

ARGUMENT ........................................................................................................ 4

POINT ONE: THE DEFENDANTS ARE NOT ENTITLED TO A BILL OF PARTICULARS ........................................................................................................ 4

A. Applicable Law ........................................................................................................ 4

B. Discussion ........................................................................................................ 8

1. The Defendants' Motion Fails as a Matter of Law ........................................................................................................ 8

2. The Government's Voluntary Disclosures Defeat the Defendants' Motion .................. 10

a. Additional Information Regarding Count Ten ........................................................................................................ 10

b. Additional Information Regarding Venue ........................................................................................................ 11

c. Identification of the "Others" Referenced in the Indictment ........................................................................................................ 13

d. Additional Information About Personal Benefit ........................................................................................................ 15

3. Conclusion ........................................................................................................ 16

POINT TWO: THE COURT SHOULD DENY THE DEFENDANTS' DISCLOSURE MOTION ........................................................................................................ 16

A. Applicable Law ........................................................................................................ 16

B. Discussion ........................................................................................................ 19

POINT THREE: CONGRESSMAN COLLINS'S MERITLESS ALLEGATIONS OF A SPEECH OR DEBATE VIOLATION DO NOT ENTITLE HIM TO A PREVIEW OF THE GOVERNMENT'S TRIAL PROOF ........................................................................................................ 27

A. Legal Principles Applicable to the Speech or Debate Clause ........................................................................................................ 28

B. Demand for Electronically Stored Information and Reports of Interviews .................. 31

C. Motion to Inspect the Grand Jury Minutes ........................................................................................................ 37

1. Applicable Law ........................................................................................................ 38

2. Discussion ........................................................................................................ 40

CONCLUSION ........................................................................................................ 42

# TABLE OF AUTHORITIES

**Cases**

*Brady v. Maryland*, 373 U.S. 83 (1963) .......... 19

*Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408 (D.C. Cir. 1995) .......... 35, 40, 42

*Costello v. United States*, 350 U.S. 359 (1956) .......... 46

*Dirks v. SEC*, 463 U.S. 646 (1983) .......... 18

*Forrester v. White*, 484 U.S. 219 (1988) .......... 36

*Gravel v. United States*, 408 U.S. 606 (1972) .......... 33, 34, 36, 49

*Hutchinson v. Proxmire*, 443 U.S. 111 (1979) .......... 36

*In re Fattah*, 802 F.3d 516 (3d Cir. 2015) .......... 35, 40

*In re Grand Jury Subpoena*, 571 F.3d 1200 (D.C. Cir. 2009) .......... 48

*In re Petition of Craig*, 131 F.3d 99 (2d Cir. 1997) .......... 45

*In re United States*, 834 F.2d 283 (2d Cir. 1987) .......... 31

*McSurely v. McClellan*, 553 F.2d 1277 (D.C. Cir. 1976) .......... 34

*MINPECO, S.A. v. Conticommodity Svcs., Inc.*, 844 F.2d 856 (D.C. Cir. 1988) .......... 39

*Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395 (1959) .......... 45

*SEC v. Warde*, 151 F.3d 42 (2d Cir. 1998) .......... 18

*SEC v. Comm. On Ways and Means*, 161 F. Supp. 3d 199 (S.D.N.Y. 2015) .......... 40

*SEC v. Dorothy Zarsky*, 18 Cv. 7130 (KPF) .......... 25

*SEC v. Dresser Industries, Inc.*, 628 F.2d 1368 (D.C. Cir. 1980) .......... 21

*SEC v. Lauren Zarsky*, 18 Cv. 7129 (KPF) .......... 25

*SEC v. Musella*, 678 F. Supp. 1060 (S.D.N.Y. 1988) .......... 17

*SEC v. Stanard*, No. 06 Civ. 7736 (GEL), 2007 WL 1834709 (S.D.N.Y. June 26, 2007) .......... 22

*SEC v. Thrasher*, 152 F. Supp. 2d 291 (S.D.N.Y. 2001) .......... 17

*United Sates v. Brewster*, 408 U.S. 501 (1972) ........................................................ 33, 36, 37, 43

*United States v. Avellino*, 136 F.3d 249 (2d Cir. 1998) ................................................... 26

*United States v. Bagley*, 473 U.S. 667 (2d Cir. 1985) ..................................................... 32

*United States v. Bellomo*, 263 F. Supp. 2d 561 (E.D.N.Y. 2003) ...................................... 8

*United States v. Blaszczak*, 308 F. Supp. 3d 736 (S.D.N.Y. 2018) ............................ 22, 24

*United States v. Bortnovsky*, 820 F.2d 572 (2d Cir. 1987) ........................................... 5, 6

*United States v. Chalmers*, 474 F. Supp. 2d 555 (S.D.N.Y. 2007) .................................. 15

*United States v. Chow*, No. 17 Cr. 667 (GHW), ECF No. 69 (S.D.N.Y. Feb. 9, 2018) ............... 22

*United States v. Copa*, 267 F.3d 132 (2d Cir. 2001) ........................................................ 19

*United States v. Coplan*, 703 F.3d 46 (2d Cir. 2012) ....................................................... 14

*United States v. Cuti*, 2009 WL 3154310 (S.D.N.Y. 2009) ............................................... 5

*United States v. D'Amico*, 734 F. Supp. 2d 321 (S.D.N.Y. 2010) ...................................... 5

*United States v. Davis*, 2018 WL 4373998 (S.D.N.Y. Sept. 13, 2018) ....................... 20, 27, 30

*United States v. DeJesus*, No. 17-CR-370 (VEC), 2017 WL 3738783 (S.D.N.Y. Aug. 30, 2017) ........................................................................................ 14

*United States v. Douglas*, 525 F.3d 225 (2d Cir. 2008) .................................................... 19

*United States v. Elie*, 10 Cr. 336 (LAK), 2012 WL 383403 (S.D.N.Y. Feb. 7, 2012) ................. 13

*United States v. Finnerty*, 411 F. Supp. 2d 428 (S.D.N.Y. 2006) ...................................... 21

*United States v. Galanis, et al.*, No. 16 Cr. 371 (RA) ........................................... 23, 26, 27

*United States v. Gallo*, 1999 WL 9848 (S.D.N.Y. Jan. 11, 1999) ............................. 20, 27, 30

*United States v. Ganias*, 824 F.3d 199 (2d Cir. 2016) ...................................................... 29

*United States v. Gibson*, 175 F. Supp. 2d 532 (S.D.N.Y. 2001) ......................................... 8

*United States v. Goffer*, No. 10 Cr. 56 (S.D.N.Y. July 29, 2010) ..................................... 24

*United States v. Gomez*, 2018 WL 501607 (S.D.N.Y. Jan. 19, 2018) ................................ 19

*United States v. Grant*, No. 16 Cr. 469 (GHW) ......................................................... 27, 28

*United States v. Gupta*, 848 F. Supp. 2d 491 (S.D.N.Y. 2012) .................................................. 21

*United States v. Helstoski*, 442 U.S. 477 (1979)............................................................ 34, 36, 41

*United States v. Henry*, 861 F. Supp. 1190 (S.D.N.Y. 1994) .................................................. 6, 9

*United States v. Johnson*, 383 U.S. 169 (1966) ............................................................ 36, 37, 48

*United States v. Johnson*, 419 F.2d 56 (4th Cir. 1969).......................................................... 48

*United States v. Kazarian*, 2012 WL 1810214 (S.D.N.Y. 2012).................................................. 6

*United States v. Kilroy*, 523 F. Supp. 206 (E.D. Wis. 1981) ...................................................... 29

*United States v. Leonelli*, 428 F. Supp. 880 (S.D.N.Y. 1977) ...................................................... 7

*United States v. Levy*, 2013 WL 664712 (S.D.N.Y. 2013)..................................................... 7, 10

*United States v. Lumiere*, No. 16 Cr. 483 (JSR), 2016 WL 7188149
(S.D.N.Y. Nov. 29, 2016) ................................................................................................ 28

*United States v. Mahabub*, 2014 WL 4243657 (S.D.N.Y. Aug. 26, 2014) ............................... 7, 8

*United States v. Mandell*, 710 F. Supp. 2d 368 (S.D.N.Y. 2010).................................................. 7

*United States v. Martoma*, 894 F.3d 64 (2d Cir. 2017) .......................................................... 17

*United States v. Martoma*, 990 F. Supp. 2d 458 (S.D.N.Y. 2014) ............................................ 22

*United States v. McDade*, 28 F.3d 283 (3rd Cir. 1994) ............................................................ 47

*United States v. McDermott*, 245 F.3d 133 (2d Cir. 2001)................................................. 16, 17

*United States v. McDow*, 206 F. Supp. 3d 829 (S.D.N.Y. 2016).............................. 19, 20, 27, 30

*United States v. Metter*, 860 F. Supp. 2d 205 (E.D.N.Y. 2012) ................................................ 28

*United States v. Middendorf*, 18 Cr. 36 (JPO), 2018 WL 3956494
(S.D.N.Y. Aug. 17, 2018) ........................................................................................ *passim*

*United States v. Mitlof*, 165 F. Supp. 2d 558 (S.D.N.Y. 2001).......................................... 7, 8, 16

*United States v. Monserrate*, 2011 WL 3480957 (S.D.N.Y. 2011)............................................... 5

*United States v. Moten*, 582 F.2d 654 (2d Cir. 1978) ......................................................... 46, 49

*United States v. Murphy*, 642 F.2d 699 (2d Cir. 1980)................................................... 44, 46, 49

*United States v. Myers*, 635 F.2d 932 (2d Cir. 1980) ......................................................... 35, 46

*United States v. Nachamie*, 91 F. Supp. 2d 565 (S.D.N.Y. 2000) ........ 6

*United States v. Ohle*, 678 F. Supp. 2d 215 (S.D.N.Y. 2010) ........ 13, 15

*United States v. Perez*, 940 F. Supp. 540 (S.D.N.Y. 1996) ........ 20, 30

*United States v. Pinto-Thomaz*, S2 18 Cr. 579 (JSR), 2018 WL 6378118 (S.D.N.Y. Dec. 6, 2018) ........ 10

*United States v. Rajaratnam*, 09 Cr. 1184 (RJH), 2010 WL 2788168 (S.D.N.Y. July 13, 2010) ........ 9

*United States v. Rayburn House Office Bldg.*, 497 F.3d 654 (D.C. Cir. 2007) ........ 40, 42

*United States v. Renzi*, 651 F.3d 1012 (9th Cir. 2011) ........ 35, 40, 41

*United States v. Rigas*, No. 02 Cr. 1236 (LBS), 2008 WL 144824 (S.D.N.Y. Jan. 15, 2008) ........ 20, 23, 24

*United States v. Rigas*, 583 F.3d 108 (2d Cir. 2009) ........ 21

*United States v. Riley*, 13 Cr. 339 (RPP), 2014 WL 53440 (S.D.N.Y. Jan. 7, 2014) ........ 13

*United States v. Rittweger*, 259 F. Supp. 2d 275 (S.D.N.Y. 2003) ........ 4, 7

*United States v. Rose*, 28 F.3d 181 (D.C. Cir. 1994) ........ 36, 48

*United States v. Rostenkowki*, 59 F.3d 1291 (D.C. Cir. 1995) ........ 44, 47

*United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 798 F. Supp. 2d 517 (S.D.N.Y. 2011) ... 15

*United States v. Ruiz*, 702 F. Supp. 1066 (S.D.N.Y. 1989) ........ 31

*United States v. Ruiz*, *aff'd*, 894 F.2d 501 (2d Cir. 1990) ........ 31

*United States v. Samsonov*, 2009 WL 176721 (S.D.N.Y. 2009) ........ 6, 12

*United States v. Stewart*, 433 F.3d 273 (2d Cir. 2006) ........ 25

*United States v. Stewart*, 513 F.2d 957 (2d Cir. 1975) ........ 31

*United States v. Stewart*, No. 15 Cr. 287 (LTS) ........ 5

*United States v. Torres*, 901 F.2d 205 (2d Cir. 1990) ........ 4, 5

*United States v. Trippe*, 171 F. Supp. 2d 230 (S.D.N.Y. 2001) ........ 6

*United States v. Vilar*, 729 F.3d 62 (2d Cir. 2013) ........ 13

*United States v. Walsh*, 194 F.3d 37 (2d Cir. 1999) ........................................................... 5

*United States v. Walters*, 16 Cr. 338 (PKC) ........................................................................ 11

*United States v. Wey*, 256 F. Supp. 3d 355 (S.D.N.Y. 2017) ......................................................... 28

*United States v. Williams*, 644 F.2d 950 (2d Cir. 1981) ................................................................ 47

*United States v. Wilson*, 512 F. App'x 75 (2d Cir. 2013)............................................................... 14

The Government respectfully submits this memorandum of law in opposition to the pretrial motions of defendants Christopher Collins, Cameron Collins, and Stephen Zarsky.

The defendants have filed three motions. *First*, they seek a seek a bill of particulars listing all interstate wires the Government intends to rely upon at trial and every act that took place in the Southern District of New York, and detailing the scope of the charged conspiracy and personal benefits that flowed to the defendants ("BOP Mot."). *Second*, they ask the Court for an order compelling the Government to review, for possible *Brady* material, documents that are in the sole possession of the United States Securities and Exchange Commission (the "SEC"); to review, for possible *Brady* and Rule 16 material, documents that the Government obtained pursuant to search warrants and determined not to be responsive to those warrants; and to produce, one year in advance of trial, the full notes of interviews with two witnesses ("Disclosure Mot."). *Third*, relying on the Speech or Debate Clause of the Constitution, Congressman Collins separately seeks an order directing the Government to produce: (1) the complete contents of electronically stored information obtained pursuant to search warrants for *personal* accounts and devices belonging to current and former congressional staffers; (2) reports of statements made by current and former staffers who were interviewed by the Government during its investigation in this case; (3) grand jury testimony and materials that reference an Office of Congressional Ethics inquiry related to Congressman Collins ("S/D Mot.").

For the reasons discussed below, each of defendants' motions is without merit, and should be denied.

**BACKGROUND**

As charged in the Indictment, in or about June 2017, Christopher Collins, who at the time was a sitting Congressman (as he still is) and a member of the Board of Directors of Innate

Immunotherapeutics Limited ("Innate"), a biotechnology company headquartered in Australia, violated the duties he owed to Innate by passing material, nonpublic information regarding the negative results of a clinical drug trial to his son, Cameron Collins, so that Cameron Collins could use that information to make timely trades in Innate stock and tip others. Cameron Collins traded on the inside information and passed it to Stephen Zarsky, the father of his current fiancée, as well as to several unindicted co-conspirators, so that they could utilize the information for the same purpose. Stephen Zarsky, in turn, traded on the information and used it to tip more unindicted co-conspirators, so that they too could engage in timely trades in Innate stock. All of the trades preceded the public release of the negative drug trial results, and were timed to avoid losses that the traders would have suffered once that news became public.

A grand jury sitting in this District returned the Indictment against the defendants on August 7, 2018. The Indictment was unsealed on August 8. The Indictment charged the defendants as follows:

| COUNT | CHARGE | DEFENDANTS |
|---|---|---|
| **1** | Conspiracy to Commit Securities Fraud (18 U.S.C. § 371) | CHRISTOPHER COLLINS<br>CAMERON COLLINS<br>STEPHEN ZARSKY |
| **2-8** | Securities Fraud (15 U.S.C. §§ 78j(b) & 78ff; 17 C.F.R. § 240.10b-5; 18 U.S.C. § 2) | CHRISTOPHER COLLINS<br>CAMERON COLLINS<br>STEPHEN ZARSKY |
| **9** | Conspiracy to Commit Wire Fraud (18 U.S.C. § 1349) | CHRISTOPHER COLLINS<br>CAMERON COLLINS<br>STEPHEN ZARSKY |
| **10** | Wire Fraud (18 U.S.C. §§ 1343 and 2) | CHRISTOPHER COLLINS<br>CAMERON COLLINS<br>STEPHEN ZARSKY |
| **11** | False Statements (18 U.S.C. §§ 1001 and 2) | CHRISTOPHER COLLINS |
| **12** | False Statements (18 U.S.C. §§ 1001 and 2) | CAMERON COLLINS |

| **13** | False Statements (18 U.S.C. §§ 1001 and 2) | STEPHEN ZARSKY |
|---|---|---|

All defendants were arrested on these charges on August 8, 2018 and released on bond later that day.

Also on August 8, the SEC filed a civil complaint against the defendants. The civil action, No. 18 Civ. 7128, is pending before the Hon. Katherine Polk Failla. On November 9, 2018, upon the Government's consent motion to intervene and for a partial stay in the civil action during the pendency of the criminal case, Judge Failla stayed proceedings in the civil action with the exception of the production of certain document discovery by the SEC to the defendants. As relevant here, upon the agreement of the Government and the defendants, Judge Failla carved out from the SEC's discovery obligations the production of "transcripts of testimony and notes of or memoranda describing interviews with; written statements made or adopted in the course of an interview by; or correspondence concerning interviews of any person whom the Government designates to the SEC as an individual who may be called as a witness in the Criminal Action" (the "Civil Discovery Carve-Out").

The Government has produced Rule 16 discovery in the criminal case. As relevant here, the Government's productions have included material that was obtained pursuant to search warrants for electronically stored information ("ESI") belonging to third parties; certain notes of interviews with potential witnesses; and summaries of portions of interviews with potential witnesses, among many other materials.

## ARGUMENT

## POINT ONE

## THE DEFENDANTS ARE NOT ENTITLED TO A BILL OF PARTICULARS

The defendants seek a bill of particulars listing all interstate wires the Government intends to rely upon at trial and every act that took place in the Southern District of New York, and detailing the scope of the charged conspiracy and personal benefits that flowed to the defendants. This request should be denied for two reasons. First, it is "an impermissible attempt to compel the Government to provide the evidentiary details of its case." *United States v. Rittweger*, 259 F. Supp. 2d 275, 292-93 (S.D.N.Y. 2003) (internal citation omitted). The 29-page indictment, as supplemented by the organized and electronically searchable Rule 16 discovery, provides the defendants with more than enough notice of the specific acts of which they are accused. Second, the Government has voluntarily disclosed (and, as set forth below, continues to voluntarily disclose) additional details to assist the defendants in the preparation of their defense. Those disclosures, which exceed what the law requires the Government to provide, supply the defendants with the information they seek in a bill of particulars.

### A. Applicable Law

The purpose of a bill of particulars under Federal Rule of Criminal Procedure 7(f) is "to provide a defendant with information about the details of the charge against him if this is *necessary* to the preparation of his defense, and to avoid prejudicial surprise at trial." *United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990) (emphasis added). "A bill of particulars is required only where the charges of the indictment are so general that they do not advise the defendant of the specific acts of which he is accused." *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999) (internal citation omitted).

In exercising its broad discretion to determine whether the charges are "so general" that they require supplementing, the Court should consider not just the text of the Indictment, but also discovery and other information supplied to the defendants to date.  *See United States v. Bortnovsky*, 820 F.2d 572, 574 (2d Cir. 1987); *see also, e.g.*, *Torres*, 901 F.2d at 234 (affirming denial of request for bill of particulars where defendants had "been provided with a wealth of evidentiary detail from the discovery to date, including electronic intercepts, search evidence and exhaustive supporting affidavits") (internal citation omitted); *United States v. Stewart*, No. 15 Cr. 287 (LTS) (S.D.N.Y. 2016) (denying request for a bill of particulars in an insider trading case where the information already proffered was sufficient to enable the defendant to prepare for trial); *United States v. Monserrate*, 2011 WL 3480957, at *4 (S.D.N.Y. 2011) (denying request for bill of particulars where discovery materials and indictment were "sufficient to apprise the defendant of the charge against him" and to allow him to prepare for trial); *United States v. D'Amico*, 734 F. Supp. 2d 321, 335 (S.D.N.Y. 2010) (denying bill of particulars request where supplementary facts were supplied to defense by way of letter); *United States v. Cuti*, 2009 WL 3154310, at *3-4 (S.D.N.Y. 2009) (in accounting fraud case, denying request for particulars identifying all fraudulent transactions, payments, and statements made in furtherance of charged scheme where Government had furnished more than a million pages of discovery and, by letter, identified a series of fraudulent transactions and payments); *United States v. Samsonov*, 2009 WL 176721, at *4 (S.D.N.Y. 2009) (denying bill of particulars request where indictment, discovery letters, and discovery materials gave defendant adequate information to prepare for trial); *United States v. Trippe*, 171 F. Supp. 2d 230, 240 (S.D.N.Y. 2001) (denying bill of particulars request in stock fraud case where indictment was 15 pages long and substantial discovery had been provided); *United States v. Henry*, 861 F. Supp. 1190, 1198 (S.D.N.Y. 1994) ("In determining whether to

grant a motion requesting a bill of particulars, the Court must ascertain whether the information sought has been provided elsewhere, such as through pre-trial discovery, voluntary disclosure by the government, or the indictment itself.").

Although the Government's provision of "mountains of documents to defense counsel who [a]re left unguided as to which documents" are relevant to the charges does not substitute for a bill of particulars where one would otherwise be required, *see Bortnovsky*, 820 F.2d at 575; *United States v. Nachamie*, 91 F. Supp. 2d 565, 571 (S.D.N.Y. 2000), the provision of voluminous discovery in combination with some guidance about what is most relevant can vitiate a need for further particulars, *see, e.g.*, *United States v. Kazarian*, 2012 WL 1810214, at *25 (S.D.N.Y. 2012); *United States v. Mandell*, 710 F. Supp. 2d 368, 385 (S.D.N.Y. 2010) (denying request for particularization of alleged misrepresentations where the indictment was 34 pages long and Government had provided voluminous, organized discovery). In no event should volume of discovery alone warrant a bill of particulars; "[w]hile [a] [c]ourt may sympathize with counsel's task of reviewing a large quantity of materials that continue to be produced," that concern is addressed by granting the defense sufficient time in which to conduct the review in advance of trial. *See United States v. Levy*, 2013 WL 664712, at *13 (S.D.N.Y. 2013).

Bills of particulars would undoubtedly be helpful to the defense in any case. But because "the law does not impose upon the Government an obligation to preview its case or expose its legal theories," *United States v. Leonelli*, 428 F. Supp. at 880 (S.D.N.Y. 1977) "[t]he ultimate test must be whether the information sought is necessary, not whether it is helpful." *United States v. Mitlof*, 165 F. Supp. 2d at 569 (S.D.N.Y. 2001); *United States v. Mahabub*, 2014 WL 4243657, at *2 (S.D.N.Y. Aug. 26, 2014) ("The purpose of a bill of particulars is to ensure that a defendant has the information necessary to prepare a defense, not to turn over all information that would aid the

defendant."); *United States v. Rittweger*, 259 F. Supp. 2d at 292-93 (denying bill of particulars request as "an impermissible attempt to compel the Government to provide the evidentiary details of its case") (citation and quotation marks omitted).  A bill of particulars should not be misused to compel the Government to disclose "the manner in which it will attempt to prove the charges, the precise manner in which the defendant committed the crime charged, or a preview of the Government's evidence or legal theories."  *Mitlof*, 165 F. Supp. 2d at 569; *see also D'Amico*, 734 F. Supp. 2d at 335 ("'A bill of particulars is not a general investigative tool, a discovery device or a means to compel the government to disclose evidence or witnesses to be offered prior to trial.'") (quoting *United States v. Gibson*, 175 F. Supp. 2d 532, 537 (S.D.N.Y. 2001)); *United States v. Bellomo*, 263 F. Supp. 2d 561, 580 (E.D.N.Y. 2003) ("A bill of particulars is not designed to: obtain the government's evidence; restrict the government's evidence prior to trial; assist the defendant's investigation; obtain the precise way in which the government intends to prove its case; interpret its evidence for the defendant, or disclose its legal theory.").

There are good reasons why bills of particulars are warranted only where the allegations in the indictment, as supplemented by discovery and elsewise, are so general as to render it impossible to prepare a defense.  Because "a bill of particulars confines the Government's proof to particulars furnished," it can "restrict unduly the Government's ability to present its case." *Id.*; *see also Mahabub*, 2014 WL 4243657, at *2 (recognizing that "care must be taken" in deciding whether to order a bill of particulars because "[t]he government's presentation of evidence at trial is limited to the particulars contained in the bill").  Moreover, the Government's provision of particulars tantamount to an itemized preview of its proof creates the very real danger that a defendant will "tailor [his] testimony to explain away the Government's case." *Henry*, 861 F. Supp. at 1197.  These concerns animate the rule that "if the defendant has been given adequate

notice of the charges against [him] and can prepare fully for trial with reasonably diligent efforts, the Government cannot be required to disclose additional details about its case." *Id.*

**B. Discussion**

**1. The Defendants' Motion Fails as a Matter of Law**

Applying these principles, the defendants are not entitled to, and should not be granted, a bill of particulars. The detailed Indictment coupled with the Government's extensive and well organized Rule 16 discovery material supply the defendants with ample notice of the acts for which they have been charged. But the Government has gone further. It provided the defendants with additional voluntary disclosures, including the names of the unindicted co-conspirators referenced in the Indictment. The defendants nonetheless rely heavily on the supposed "complexity of this securities fraud prosecution," and place great weight on *United States v. Rajaratnam*, an insider trading case where a bill of particulars was ordered, to justify their demand for more. (BOP Mot. at 6 (citing *Rajaratnam*, 09 Cr. 1184 (RJH), 2010 WL 2788168 (S.D.N.Y. July 13, 2010)). But *Rajaratnam* was "far larger" than other insider trading cases and involved trading in thirty-one securities and "dozens of co-conspirators, charged and uncharged." *Rajaratnam*, 2010 WL 2788168, *2. This case, by any objective measure, is relatively straightforward. It is a one-event, one-stock, three-defendant scheme that took place over five days. Had the defendants attempted to identify a true peer, they would have pointed the Court to *United States v. Pinto-Thomaz* et al., S2 18 Cr. 579 (JSR), another one-event, one-stock, three-defendant insider trading case that took place over a limited period of time. And just like this case, the defendants in *Pinto-Thomaz* sought a bill of particulars, relying on *Rajaratnam* and the supposed complexity of insider trading prosecutions. Judge Rakoff broadly denied the request, noting that "courts' decisions to grant bills of particulars are not predetermined by the nature of the charges filed, but [are] dependent upon

the complexity of the facts at issue and degree of disclosure already offered." *Pinto-Thomaz*, S2 18 Cr. 579 (JSR), 2018 WL 6378118, *6 (S.D.N.Y. Dec. 6, 2018). He went on to conclude that *Pinto-Thomaz* was nothing like *Rajaratnam*: "Notably, the instant case does not involve such complexities: it charges insider trading of one specific stock based on material nonpublic information exchanged during a specified period of time between Pinto-Thomaz and his co-defendants." *Id.* The only particulars the Government was required to provide, the court found, were the identities of the unindicted co-conspirators, *id.* at *7, information the Government has voluntarily provided in this case.

At bottom, the defendants confuse wanting more information with being entitled to more information. Indeed, in a December 10, 2018 letter, the defendants initially demanded a bill of particulars spanning more than *sixty* categories of information. It was the type of blunderbuss request for "evidentiary minutiae" that the law plainly forbids. *Levy*, 2013 WL 664712, at *13. The Government nonetheless responded on December 28, 2018 with a voluntary disclosure. The Government later informed defense counsel (on two separate occasions) that the Government may be willing to provide additional information on a voluntary basis if the defendants were willing to narrow their list of requested particulars. Instead, the defendants filed a motion in which they narrowed their list of requested particulars from sixty to seven. (*Compare* Ex. A *with* BOP Mot. at 5-6).

Even though the defendants' motion for a bill of particulars fails as a matter of law, the Government is willing to provide additional information, set forth below, on a voluntary basis. These voluntary disclosures are intended to, and do, defeat the defendants' motion. To the extent the defendants continue to press for more information, they would simply reveal a desire to tease out—and then pin down—the Government's trial proof nearly a year before trial. That is not the

function of the bill.

**2. The Government's Voluntary Disclosures Defeat the Defendants' Motion**

a. *Additional Information Regarding Count Ten*

The defendants claim to not understand the nature of the Government's wire fraud charge in Count 10 of the Indictment and demand particulars on that score. In support of their request, the defendants point to *United States v. Walters,* 16 Cr. 338 (PKC), as the type of insider trading indictment that provides adequate notice of the Government's wire fraud allegation. (BOP Mot. at 7). *Walters* simply listed the various securities transactions that formed the basis for the four substantive wire fraud counts; it did not list any interstate wires. To the extent the defendants seek a similar disclosure, the Government voluntarily provides it here. Set forth below are the insider trading transactions, which are charged in Counts 2 through 8, that are also charged in Count 10 as a wire fraud scheme:

| COUNT | ORDER DATES | WIRE TRANSACTIONS |
|---|---|---|
| **2** | June 23-26, 2017 | Sale of 1,391,500 shares of Innate held by Cameron Collins |
| **3** | June 23, 2017 | Sale of 303,500 shares of Innate held by Stephen Zarsky |
| **4** | June 23, 2017 | Sale of 40,464 shares of Innate held by CC-1 |
| **5** | June 22-23, 2017 | Sale of 19,750 shares of Innate held by CC-2 |
| **6** | June 23, 2017 | Sale of 4,500 shares of Innate held by CC-3 |
| **7** | June 23, 2017 | Sale of 14,800 shares of Innate held by CC-5 |
| **8** | June 25-26, 2017 | Sale of 1,600 shares of Innate held by CC-6 |

At trial, the Government will offer testimony that the transactions listed above were routed

through the Southern District of New York. The testimony will establish that the transactions listed in Counts 2, 3, 7 and 8 were routed to and executed at Manhattan-based brokerages; that the transactions listed in Counts 4 and 5 were routed through servers in Rockland County; and that the transaction listed in Count 6 was routed through a server in Staten Island, and therefore crossed the waterways in the Southern District of New York. *See* 28 U.S.C. § 112(b) (defining the Southern District of New York to include the "waters within the Eastern District [of New York]").

To be clear, the Government intends to offer additional evidence of interstate wires in support of Count 10, including phone calls, emails and text messages. For instance, the Government will establish that, on June 25, 2017, Cameron Collins, who was in Manhattan, called CC-6, who was in New Jersey, in an attempt to convey inside information to CC-6. The Government, however, will not detail, wire-by-wire, all of its trial proof for Count 10. The law recognizes that no such disclosure is required, and indeed, cases in this District caution against it. *See Samsonov*, 2009 WL 176721, at *3 ("The vehicle of a bill of particulars serves to inform a defendant of the nature of the charge, when he is otherwise insufficiently informed, and must not be misused to compel disclosure of how much the Government can prove, nor to foreclose the Government from using proof it may develop as the trial approaches."). The information provided above is more than sufficient "to inform [each] defendant of the charges he must meet and with enough detail that he may plead double jeopardy in a future prosecution based on the same set of events." *United States v. Vilar*, 729 F.3d 62, 80 (2d Cir. 2013) (internal quotation marks omitted).

b. *Additional Information Regarding Venue*

The defendants also demand the Government identify *all* acts that took place in the Southern District of New York. (BOP Mot. at 10). This overbroad request, which the defendants claim is rooted in their desire to make a pretrial venue challenge, should be denied. As an initial

matter, any pretrial motion to dismiss for lack of venue would be meritless in light of the "very well established principle [that] there is no summary judgment in criminal cases." *United States v. Elie*, 10 Cr. 336 (LAK), 2012 WL 383403, *1 (S.D.N.Y. Feb. 7, 2012). It has long been the law that "the mere allegation that an offense occurred 'in the Southern District and elsewhere' is sufficient to overcome a pretrial motion to dismiss because '[t]he question of whether there is sufficient evidence to support venue is appropriately left for trial." *United States v. Riley*, 13 Cr. 339 (RPP), 2014 WL 53440, *3 (S.D.N.Y. Jan. 7, 2014) (quoting *United States v. Ohle*, 678 F. Supp. 2d 215, 231 (S.D.N.Y. 2010)). Forcing the Government to reveal all of its venue proof in service of a doomed-to-fail pretrial motion to dismiss therefore cannot, as the defendants claim, "preserve the Court's (and the Defendants') resources in these proceedings." (BOP Mot. at 12).

In any event, the Government has now voluntarily provided the defendants with substantial details about the venue undergirding the securities and wire fraud counts in the Indictment. The false statements counts are also properly venued in the Southern District because the defendants' lies to the FBI continued to have a material effect in the Southern District, where the false statements were reviewed by law enforcement. *See, e.g.*, *United States v. Coplan*, 703 F.3d 46, 79-80 (2d Cir. 2012) (holding that, for venue purposes, false statements offenses continue into the district where material effects of the statements are felt); *United States v. Wilson*, 512 F. App'x 75, 78 (2d Cir. 2013) (statements by a defendant who lied about her identity to agents attempting to arrest her in New Jersey "were capable of distracting government investigators' attention away from a critical matter in the Southern District of New York, where they undertook to decide what steps to take to execute the arrest warrant," and venue over false statement charge was therefore proper in the Southern District); *see also United States v. DeJesus*, No. 17-CR-370 (VEC), 2017 WL 3738783, at *3 (S.D.N.Y. Aug. 30, 2017) ("[T]he Second Circuit has held that venue is proper

in a prosecution for false statements under 18 U.S.C. § 1001 in any district in which the false statement affects a government official because Section 1001 criminalizes only the making of false statements that are material and therefore have an effect on the Government official to whom they are made."); *United States v. Rubin/Chambers, Dunhill Ins. Servs.*, 798 F. Supp. 2d 517, 531 (S.D.N.Y. 2011) (explain that case law interpreting Section 1001 "does not appear to require either knowledge or intent on the part of the defendant that that the statements would be delivered to the district of prosecution."(internal citations and alterations omitted)).

In light of the above, the defendants are not entitled to a full list of the Government's venue proof to test whether it is sufficient. That remains a matter for trial. *See Ohle*, 678 F. Supp. 2d at 231 ("The question of whether there is sufficient evidence to support venue is appropriately left for trial."); *United States v. Chalmers*, 474 F. Supp. 2d 555, 575 (S.D.N.Y. 2007) (same).

c. *Identification of the "Others" Referenced in the Indictment*

The defendants also demand that the Government identify the "others" who Congressman Collins anticipated would trade based on the inside information he provided to Cameron Collins and, relatedly, to explain whether Congressman Collins knew these individuals and whether he knew they owned Innate stock. (BOP Mot. at 13). The defendants make a similar request with regard to Cameron Collins, specifically that the Government identify whether he anticipated that CC-3, CC-4 and CC-5 would trade based on the inside information he provided to Stephen Zarsky. (*Id.*).

The Indictment alleges a single insider trading conspiracy and states that Congressman Collins conveyed inside information to Cameron Collins "knowing that it was in breach of his duties to Innate and anticipating that Cameron Collins would use it to trade and tip others." (Indictment ¶ 23.) To the extent there is any ambiguity, the Government now clarifies that the

"others" referred to in the Indictment are Stephen Zarsky and the unindicted co-conspirators enumerated in the Indictment. As previously mentioned, on December 28, 2018, the Government voluntarily identified each of those unindicted co-conspirators by name. The defendants therefore are well aware of the scope of the charged conspiracy, the "others" who traded as part of the conspiratorial agreement, and the names of those individuals. Guided by this ample notice, the defendants cannot plausibly claim to need a bill of particulars to understand "the government's allegations regarding the scope of the alleged agreement(s) and whose trading was foreseeable to whom." (BOP Mot. at 15).

To the extent the defendants seek an order requiring the Government to reveal *how* it intends to prove the scope of the alleged conspiracy, that request should be denied. *See, e.g.*, *Mitlof*, 165 F. Supp. 2d at 569 (noting that a bill of particulars should not be misused to compel the Government to disclose "the manner in which it will attempt to prove the charges"). The defendants, for instance, demand answers to questions such as "whether Rep. Collins even knew [his co-conspirators] existed" and whether he knew "that they owned Innate securities." (BOP Mot. at 13). Yet the defendants fail to cite any legal authority that requires the Government to respond to what are, in essence, civil litigation interrogatories about what they knew, when they knew it and how the Government intends to prove it. Nor do the smattering of cases upon which the defendants rely do the trick. For instance, *United States v. McDermott*, 245 F.3d 133 (2d Cir. 2001), a case the defendants feature prominently in their motion, stands for the proposition that a defendant cannot be convicted for conduct that is outside the scope of the conspiratorial agreement. But that is blackletter law. At no point did *McDermott* (or any other case the Government has located) set forth the blanket rule the defendants pronounce as being "clear" in the Second Circuit, namely that "a defendant is not liable for the trading of an unknown remote tippee." (BOP Mot.

at 14). *McDermott* itself suggests the opposite. In reversing an insider trading conspiracy conviction on sufficiency grounds, *McDermott* emphasized that the Government failed to prove "an agreement to pass insider information to Gannon and possibly to another person, *even if unknown*." 245 F.3d at 138 (emphasis added). *McDermott* thus underscores a principle which the defendants resist: To be guilty of insider trading, neither the tipper, nor the tippee, need know each other's identity. The law punishes insider trading among intimates and strangers alike, so long as they are part of the same scheme. *See, e.g.*, *United States v. Martoma*, 894 F.3d 64, 74 (2d Cir. 2017) (discussing the potential disclosure of "inside information to a perfect stranger" in violation of § 10(b)); *SEC v. Thrasher*, 152 F. Supp. 2d 291, 305 (S.D.N.Y. 2001) ("Hirsh did not need to know Thrasher's identity to know that the inside source had breached his fiduciary duty"); *id.* n.6 ("[L]iability under § 10(b) is not predicated upon the trader's knowledge of the insider's identity"); *SEC v. Musella*, 678 F. Supp. 1060, 1062 (S.D.N.Y. 1988) ("Scienter in insider trading cases is not, and as a matter of public policy should not, be limited to those in direct contact with the primary tipper. Rather, the issue is whether a tippee, wherever he stood in a chain of tippees, either knew or should have known that he was trading on improperly obtained non-public information." (internal quotation marks omitted)).

d. *Additional Information About Personal Benefit*

Finally, the defendants request that the Government articulate its personal benefit theory. We voluntarily do so here. First, the defendants, by tipping inside information, intended to benefit their respective tippees. Second, the defendants personally benefitted by gifting such inside information to either their friends or relatives. Both forms of personal benefits are sufficient under controlling law. *See SEC v. Warde*, 151 F.3d 42, 48 (2d Cir. 1998) ("The 'benefit' element of §10(b) is satisfied when the tipper 'intend[s] to benefit the . . . recipient' *or* 'makes a gift of

confidential information to a trading relative or friend.'") (quoting *Dirks v. SEC*, 463 U.S. 646, 664 (1983) (emphasis added)); *Martoma*, 894 F.3d at 74 (adhering to *Warde* and holding that "intention to benefit" is a personal benefit independent of familial- and friendship-based personal benefits).

**3. Conclusion**

Taken together, these voluntary disclosures respond to the defendants' requests and defeat their motion for a bill of particulars.

## POINT TWO

## THE COURT SHOULD DENY THE DEFENDANTS' DISCLOSURE MOTION

The defendants ask the Court for an order compelling the Government to review for possible *Brady* material any documents that the SEC has withheld from discovery in the civil action pursuant to the Civil Discovery Carve-Out, or for some other reason; to review for possible *Brady* and Rule 16 material documents that the Government obtained pursuant to search warrants and determined not to be responsive to those warrants; and to immediately produce the full notes of interviews with two witnesses. For the reasons that follow, there is no basis for the relief that the defendants request, and their motion should be denied.

### A. Applicable Law

"The basic rule of *Brady* is that the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment." *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001) (quoting *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). "Favorable evidence includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the credibility of a government witness." *Id.* "With respect to *when* the prosecution must make a disclosure required by *Brady* .

. . *Brady* material must be disclosed in time for its effective use at trial or at a plea proceeding." *United States v. Douglas*, 525 F.3d 225, 245 (2d Cir. 2008) (quoting *Copa*, 267 F.3d at 135) (emphasis in original).   "[A]s a general rule, *Brady* and its progeny do not require immediate disclosure of all exculpatory and impeachment material upon request by a defendant." *Coppa*, 267 F.3d at 146; *see also United States v. Gomez*, 2018 WL 501607, at *4 (S.D.N.Y. Jan. 19, 2018) (holding that impeachment material may be produced at the same time as Jencks Act material); *United States v. McDow*, 206 F. Supp. 3d 829, 858 (S.D.N.Y. 2016) (denying pretrial motion for production of exculpatory and impeachment material, and allowing Government to produce impeachment material two weeks before trial).

Courts in this Circuit routinely deny requests that the Government be required to immediately produce *Brady* material where the Government has made a good-faith representation to the court and defense counsel that it recognizes and has complied with its disclosure obligations under *Brady*. *See, e.g.*, *McDow*, 206 F. Supp. 3d at 858 (denying motion for *Brady* material, where "[t]he Government has acknowledged its obligation and has indicated it 'will continue to provide timely disclosure of *Brady* material if and when any such material comes to light'"); *United States v. Davis*, 2018 WL 4373998, at *10 (S.D.N.Y. Sept. 13, 2018) ("The Government's good faith representation of its continuing compliance with its *Brady* obligations is sufficient."); *United States v. Gallo*, 1999 WL 9848, at *8 (S.D.N.Y. Jan. 11, 1999) (denying defendant's motion to compel production of purported *Brady* material based on Government's representations that "it is aware of its obligations under *Brady* . . . and will produce any *Brady* material to the defense well before trial"); *United States v. Perez*, 940 F. Supp. 540, 553 (S.D.N.Y. 1996) (same).

A prosecutor's duty to review files for *Brady* material extends to reviewing information in the possession, custody, or control of another agency only where the Government conducts a "joint

investigation" with that agency. *United States v. Rigas*, No. 02 Cr. 1236 (LBS), 2008 WL 144824, at *2 (S.D.N.Y. Jan. 15, 2008), *aff'd*, *United States v. Rigas*, 583 F.3d 108 (2d Cir. 2009) (holding that there was "no joint investigation with the SEC" and therefore the Government did not need to produce documents in the custody of the SEC); *United States v. Finnerty*, 411 F. Supp. 2d 428, 433 (S.D.N.Y. 2006) (Chin, J.) (holding that the Government and the NYSE, even if it were a state actor, did not conduct a joint investigation related to the policies of the NYSE).

Parallel investigations, in which the SEC and the Government share information and conduct joint witness interviews, support the "[e]ffective enforcement of the securities laws." *SEC v. Dresser Industries, Inc.*, 628 F.2d 1368, 1377 (D.C. Cir. 1980) (en banc) ("If the SEC suspects that a company has violated the securities laws, it must be able to respond quickly: it must be able to obtain relevant information concerning the alleged violation and to seek prompt judicial redress if necessary. Similarly, Justice must act quickly if it suspects that the laws have been broken. Grand jury investigations take time, as do criminal prosecutions."). Although the Second Circuit has not spoken directly to the question, the majority of district courts have concluded that, standing alone, joint fact gathering is not sufficient to trigger an extension of the Government's *Brady* obligations.[1] Instead, "[a] number of factors are relevant in determining whether the prosecution conducted a 'joint investigation,' including whether the other agency: (1) participated in the prosecution's

[1] In two cases, judges in this District have concluded that certain types of joint fact gathering may trigger a limited obligation on the Government to review the files of another agency. In *United States v. Gupta*, 848 F. Supp. 2d 491 (S.D.N.Y. 2012), Judge Rakoff ordered the Government to review for *Brady* SEC documents memorializing witness interviews that where conducted jointly by the SEC and the Government. In so doing, however, Judge Rakoff made clear that his finding did "not mean that all of the documents the SEC prepared and accumulated in its investigation are part of the joint investigation" such that they would need to be reviewed for *Brady*. *Id.* at 495. In *United States v. Martoma*, 990 F. Supp. 2d 458 (S.D.N.Y. 2014), Judge Gardephe ordered the Government to review a narrow subset of SEC memoranda relating to cooperating witnesses. *Id.* at 462. In neither case did the court conclude that joint fact gathering would give rise to an obligation by the Government to review the SEC's entire investigative file.

witness interviews, (2) was involved in presenting the case to the grand jury, (3) reviewed documents gathered by or shared documents with the prosecution, (4) played a role in the development of prosecutorial strategy, or (5) accompanied the prosecution to court proceedings." *United States v. Middendorf*, 18 Cr. 36 (JPO), 2018 WL 3956494, at *4 (S.D.N.Y. Aug. 17, 2018) (citing *United States v. Blaszczak*, 308 F.Supp.3d 736, 741-42 (S.D.N.Y. 2018)); *see also United States v. Chow*, No. 17 Cr. 667 (GHW), ECF No. 69, at 87 (S.D.N.Y. Feb. 9, 2018) (finding no joint investigation where agencies shared information but made their own determinations regarding what documents to obtain and what facts to ask a witness); *accord SEC v. Stanard*, No. 06 Civ. 7736 (GEL), 2007 WL 1834709, at *3 (S.D.N.Y. June 26, 2007) (FBI and SEC did not conduct a joint investigation despite participating in joint interviews during which only FBI took notes); *Rigas*, 2008 WL 144824, at *2 (finding that parallel civil and criminal investigations were not "joint")

With respect to materials that the Government obtains pursuant to a search warrant, "the Government need not and may not review files or emails for *Brady* or otherwise once they are deemed to be nonresponsive." *United States v. Galanis, et al.*, No. 16 Cr. 371 (RA), Aug. 3, 2017 Conf. Tr. at 14. Of course, "if the Government were to discover *Brady* material during the course of its responsiveness review, such material must be disclosed in time for its effective use." *Galanis*, No. 16 Cr. 371 (RA), Aug. 3, 2017 Conf. Tr. at 14.

**B. Discussion**

The defendants first request that the Government be compelled to search, for possible *Brady*, documents that are in the exclusive possession of the SEC and that the SEC has withheld from discovery in the civil action pursuant to the Civil Discovery Carve-Out or for some other

reason. This request is premised on the assumption that the parallel investigations conducted by the Government and the SEC were, instead, one joint investigation. That assumption is incorrect.

The defendants note that the United States Attorney's Office ("USAO") and the SEC filed charges on the same day, conducted joint interviews, and thanked each other in their press releases. (Disclosure Mot. at 8). That the USAO and the SEC filed charges on the same day and thanked each other as a courtesy, however, says nothing about the way they conducted their investigations. Conducting joint interviews reflects only a typical and unsurprising degree of coordination. Avoiding this type of overlap would require witnesses to travel for multiple interviews and subpoena recipients to produce documents to multiple agencies. Combining interviews thus promotes efficiency and reduces costs for all parties involved in an investigation. In part for this reason, several judges in this District have held that such practices are indicative of parallel as opposed to joint investigations. *See United States v. Goffer*, No. 10 Cr. 56 (RJS) (S.D.N.Y. July 29, 2010) (Dkt. No. 90); *Rigas*, 2008 WL 144824, at *2; *Stanard*, 2007 WL 1834709, at *3.[2]

While the conduct of joint interviews is one factor that favors the defendants' argument, the balance of the *Blaszczak* and *Middendorf* factors do not. As Judge Kaplan explained in *Blaszczak*:

> Although [the SEC] interviewed witnesses and gathered facts alongside the USAO, it was not present at some prosecution contacts and interviews, did not review documents gathered only by the prosecution, and did not 'develop[] prosecutorial strategy.' Representatives of the SEC have not accompanied the USAO to court proceedings in this case. Neither the Commission nor the

[2] The fact that the SEC participated in witness interviews with the USAO, however, would at most (following logic that has not been endorsed in recent cases such as *Blaszczak* and *Middendorf*) create an obligation for the Government to review SEC notes of those interviews for *Brady* evidence. *See Gupta*, 848 F. Supp. 2d at 495 (requiring Government to review notes taken by SEC in context of joint investigation, but holding that "[t]his does not mean that all of the documents the SEC prepared and accumulated in its investigation are part of the joint investigation"). But, here, the SEC did not take notes during joint interviews.

> USAO recommended action to the other or had any role in the other's decision making process. The USAO has not even seen the SEC's action memorandum.

308 F. Supp. 3d at 742 (quoting *United States v. Stewart*, 433 F.3d 273, 298 (2d Cir. 2006)); *see Middendorf*, 2018 WL 3956494, at *5 (relying on the *Blaszczak* factors and finding no joint investigation where "the SEC was not involved in [the Government's] grand jury presentation, has not reviewed documents gathered by the Government or shared the fruits of its investigation with the Government, and did not participate in the overall development of prosecutorial strategy. And beyond conducting joint interviews, the Government and SEC have not coordinated their separate fact-finding efforts"). The same facts are present here and compel a similar outcome. The USAO and the SEC made independent decisions about what charges/claims they intended to bring and which defendants they would charge/sue. Indeed, the SEC sued a broader set of defendants for participating in the insider trading scheme. *See SEC v. Lauren Zarsky*, 18 Civ. 7129 (KPF); *SEC v. Dorothy Zarsky*, 18 Civ. 7130 (KPF). Nor did the USAO or the SEC direct one another to take any particular investigative actions. Instead, each agency took the appropriate respective prosecutorial and regulatory enforcement action it deemed necessary. Put simply, the SEC and the USAO did not conduct a joint investigation. The defendants' Disclosure motion therefore should be denied.[3]

[3] To the extent the defendants ask the Government to review the entire SEC investigative file – which would include searching databases located out of state, reviewing large quantities of documents, and parsing through attorney work product – simply because the Government and the SEC sought to maximize the efficiencies of investigation would "inappropriately require [the Court] to adopt 'a monolithic view of government' that would 'condemn the prosecution of criminal cases to a state of paralysis.'" *United States v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998). Reviewing the entire investigative file of another independent agency would be inordinately time consuming and burdensome for attorneys for the Government, which does not have custody of the files, is not familiar with the files, and knows of no effective way to search them.

Moreover, it bears noting that, following the filing of the defendants' motion, the SEC informed the Government that the SEC has not withheld any materials from discovery in the civil action pursuant to the Civil Discovery Carve-Out. The Government also understands that all documents that the SEC obtained through subpoenas to third parties have been produced to the defendants, either as discovery in the criminal case or as part of the SEC's production in the parallel civil case. The balance of the SEC file, as the Government understands it, consists primarily of attorney work product and statistical and trading data collected in large databases as part of the SEC's market monitoring efforts. The SEC has informed the Government that these materials are derivative of information already provided to the defendants in discovery.

Next, the defendants request that the Government be made to review for possible *Brady* and Rule 16 materials, or in the alternative produce to the defendants, ESI belonging to the individuals referred to in the Indictment as CC-1, CC-2, CC-3, CC-5, and CC-6 that the Government obtained pursuant to search warrants and, after review, determined not to be responsive to those warrants. As a threshold matter, this request is moot, because when the Government obtained the ESI and reviewed it for responsiveness to the respective warrants, the Government also reviewed the ESI for *Brady* and *Giglio* material. *Cf. Galanis*, No. 16 Cr. 371 (RA), Aug. 3, 2017 Tr. at 14 (noting that "if the Government were to discover *Brady* material during the course of its responsiveness review, such material must be disclosed in time for its effective use").[4] Thus to the extent that the Government came across *Brady* or *Giglio* material when it reviewed the search warrant returns, such material would have been included in the subset of the ESI that the Government seized as responsive and would have been produced to the

[4] The defendants' bald allegation that the Government's initial responsiveness review involved "turning a blind eye to *Brady* and Rule 16 disclosures" (Disclosure Mot. at 27) is simply wrong.

defendants at the appropriate time. The Government has complied with its *Brady* obligations, and there is no basis for the defendants to demand that the Government essentially check the same materials again. *See, e.g.*, *McDow*, 206 F. Supp. 3d at 858; *Davis*, 2018 WL 4373998, at *10; *Gallo*, 1999 WL 9848, at *8; *United States v. Perez*, 940 F. Supp. at 553.

In any event, the defendants' request should be denied because the Government does not view itself as having the authority to re-examine, or produce, ESI that it obtained pursuant to a search warrant and already determined not to be responsive to that warrant. *See Galanis*, No. 16 Cr. 371 (RA), Aug. 3, 2017 Conf. Tr. at 14; *Middendorf*, No. 18 Cr. 36 (JPO), Feb. 1, 2019 Conf Tr. at 73; *see also United States v. Grant*, No. 16 Cr. 469 (GHW), Dec. 26, 2018 Trial Tr. at 7133-35 (expressing concern regarding Government's overproduction of non-responsive ESI to third parties in discovery; noting with approval the new policy of the U.S. Attorney's Office not to produce (without consent) non-responsive materials obtained via search warrants in discovery; and stating that it was "fairly clear that Rule 16 does not require such a dramatic overproduction"); *United States v. Metter*, 860 F. Supp. 2d 205 (E.D.N.Y. 2012) (district court granting a motion to suppress based in part on the Government's stated intention to cross-produce in discovery, over Metter's objection, the entirety of his ESI (both responsive and non-responsive) to other defendants). The defendants are incorrect when they imply that the Government's position on this issue is somehow self-serving or conveniently formalistic. (*See* Disclosure Mot. at 27). To the contrary, the Government's position is driven by recent case law, articulated by several courts in this District, rejecting the type of open-ended review the defendants request. *See Grant*, No. 16 Cr. 469 (GHW), Dec. 26, 2018 Trial Tr. at 7133-35; *United States v. Wey*, 256 F. Supp. 3d 355, 405 (S.D.N.Y. 2017) (suppressing search warrant as overbroad and expressing disapproval of the Government's having "subject[ed] the electronic Search fruit to continuing and, at least to some

extent, expanding searches as its investigation and charging theories developed over the months and years following the initial Searches."); *United States v. Lumiere*, No. 16 Cr. 483 (JSR), 2016 WL 7188149, at *3 (S.D.N.Y. Nov. 29, 2016) (recognizing that Government's failure to complete a search of an iPad 30 months after its seizure presented an arguably close question on suppression). The defendants fail to cite any authority for the proposition that the Government's *Brady* obligations free the Government from the strictures of the Fourth Amendment.

*United States v. Ganias*, on which the defendants rely, is not to the contrary. (Disclosure Mot. at 26). In *Ganias*, the Second Circuit noted that preservation of the original storage medium or a complete mirror of electronically stored information may be necessary in order to safeguard the integrity of the evidence that has been lawfully obtained or to authenticate it at trial. *See* 824 F.3d 199, 215 (2d Cir. 2016). Nothing in *Ganias* provides support for the defendants' apparent position that the Government should conduct additional searches of warrant returns after a responsiveness review has been conducted.

In conjunction with their request that the Government re-review or produce non-responsive search warrant returns, the defendants also ask that the Government be ordered to produce "everything" that it obtained "consensually or from cooperating witnesses." (Disclosure Mot. at 28-29). In support of this extraordinarily expansive view of the Government's discovery obligations, the defendants cite a lone District of Wisconsin case dating back to 1981 in which that court "s[aw] no objection to an order requiring the Government . . . to use its 'best efforts' to obtain from Standard Oil," which was the company where the defendant used to work and which he allegedly defrauded, "all of the documents in its possession which came out of the defendant's former office." *United States v. Kilroy*, 523 F. Supp. 206, 215 (E.D. Wis. 1981). The holding in *Kilroy*, which is not binding on this Court, has absolutely no application here, where the defendants

are requesting not only materials relating to them that the Government obtained from a third party, but for "everything" that the Government has obtained from cooperating witnesses or other third parties without compulsory process. The defendants' position constitutes a radical break from Rule 16, which requires in relevant part only that the Government produce documents "material to preparing the defense" or that the Government "intends to use . . . in its case-in-chief at trial," and which specifically excludes from production "statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500." Fed. R. Crim. P. 16(a)(1)(E)(i) & (ii), (a)(2). With respect to materials that the Government received on consent from third parties, the Government is in compliance with, and will continue to comply with, its obligations under Rule 16, *Brady*, *Giglio*, and 18 U.S.C. § 3500. Nothing more is required. *See, e.g.*, *McDow*, 206 F. Supp. 3d at 858; *Davis*, 2018 WL 4373998, at *10; *Gallo*, 1999 WL 9848, at *8; *United States v. Perez*, 940 F. Supp. at 553.

Finally, the defendants seek an order compelling the Government to produce, approximately one year before trial, the full notes of interviews with two witnesses ("Witness-1" and "Witness-2"). With respect to each of these witnesses, the Government has already produced summaries of portions of interview notes that could arguably be construed as exculpatory, taking a broad view of possible defense theories.[5] But the defendants claim that they are entitled to more – namely, the entirety of the interview notes, at this exceptionally early stage. This thinly veiled bid to force the production of what is clearly Jencks Act material a year in advance of trial is without legal basis and should be rejected. By providing the summaries in Exhibit F, the Government has met its disclosure obligations with respect to Witness-1 and Witness-2 – namely, producing "the essential facts which would enable [the defendants] to call the witness[es] and thus

[5] These summaries are filed under seal as Exhibit F to the Defendant's Disclosure Motion.

take advantage of any exculpatory testimony that [they] might furnish." *United States v. Stewart*, 513 F.2d 957, 960 (2d Cir. 1975); *see also, e.g.*, *United States v. Middendorf*, 2018 WL 3956494, at *4 (S.D.N.Y. Aug. 17, 2018) (rejecting defense argument that letter from Government providing the names of nine individuals who could provide potentially exculpatory information, together with the "essential facts" of that potentially exculpatory information, was not sufficiently complete or specific, and denying defense request for "further disclosure of the substance of the nine individuals' statements").

The summaries that the Government has already produced easily satisfy the Government's obligation to provide the defendants with the essential facts about the identity of witnesses who could provide potentially exculpatory information and the nature of such information so that the defendants can make effective use of that information. Consistent with the practice in this District, the Government plans to produce the remainder of the Jencks Act material in advance of the witnesses' testimony in this case, *see* 18 U.S.C. § 3500; *In re United States*, 834 F.2d 283, 287 (2d Cir. 1987) (courts cannot mandate early production of Jencks Act material); *United States v. Ruiz*, 702 F. Supp. 1066, 1069-70 (S.D.N.Y. 1989) (approving Government's agreement to provide impeachment material along with Jencks Act material one day prior to witness's testimony), *aff'd*, 894 F.2d 501 (2d Cir. 1990), and the Government expects to work with defense counsel to craft an agreed-upon schedule for the production of such material prior to trial. But there is no basis at all to require the Government to produce the entirety of the Jencks Act material for two witnesses a year before trial, simply because a small portion of such material contained statements that warranted early production. *See, e.g.*, *United States v. Bagley*, 473 U.S. 667, 676 (2d Cir. 1985) ("[T]he prosecutor is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial.").

The defendants' theory of what they are entitled to would yield an absurd result: a handful of arguably exculpatory statements by a witness would trigger the immediate production of *inculpatory* and other statements made by that witness. This position is contrary to statutory and case law. The Government has produced summaries of the two witnesses' arguably exculpatory statements, and nothing more is required.[6]

The Government respectfully submits that, upon reading the summaries attached as Exhibit F to the Defendants' Disclosure Motion, the Court should find that no additional production of statements by Witness-1 or Witness-2 is required to satisfy the Government's disclosure obligations at this time. In the event that upon reading the summaries, the Court believes it would be helpful to the Court to review the entirety of the notes which the summaries describe, the Government would propose to provide submit those notes for *in camera* review.

## POINT THREE

## CONGRESSMAN COLLINS'S MERITLESS ALLEGATIONS OF A SPEECH OR DEBATE VIOLATION DO NOT ENTITLE HIM TO A PREVIEW OF THE GOVERNMENT'S TRIAL PROOF

Congressman Collins separately seeks an order directing the government to produce: (1) the complete contents of electronically stored information obtained pursuant to search warrants for *personal* accounts and devices belonging to current and former congressional staffers; (2) reports of statements made by current and former staffers who were interviewed by the Government during its investigation in this case; (3) grand jury testimony and materials that reference an Office of

[6] The defendants argue that because with respect to certain other witnesses the Government produced complete sets of notes, it should do the same with respect to Witness-1 and Witness-2. This argument takes literally the adage that no good deed goes unpunished. There is no legal basis for the proposition that because the Government chose to produce Jencks Act material early for one witnesses, it should have to do the same for completely unrelated witnesses who may be differently-situated. The form and scope of the Government's disclosures with respect to Witness-1 and Witness-2 easily conform to what is required by law.

Congressional Ethics inquiry related to Congressman Collins. (S/D Mot. at 2). The Congressman claims that production of these materials is necessary in order for him to "probe the nature and scope of any contamination" related to claimed violations of the Speech or Debate Clause of the Constitution. (S/D Mot. at 6). As discussed below, this argument rests on a novel view of the Speech or Debate Clause that finds no support in the law of this Circuit or any other. The Congressman's claim that his status as a legislator entitles him to inspect materials that would not be available to an ordinary citizen is a transparent attempt to harness an important guarantee of our constitutional order as a tool for his personal, private benefit. The law does not countenance such an outcome. *See United States v. Brewster*, 408 U.S. 501, 507 (1972) ("The immunities of the Speech or Debate Clause were not written into the Constitution simply for personal or private benefit of Members of Congress."). Because "legislators ought not to stand above the law they create but ought generally to the bound by it as are ordinary persons," *Gravel v. United States*, 408 U.S. 606, 615 (1972), Collins's motions should be denied.

**A. Legal Principles Applicable to the Speech or Debate Clause**

The Speech or Debate Clause provides that "for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place." U.S. Const., art. I, § 6, cl. 1. As the Supreme Court has explained, the Clause "was designed to assure a co-equal branch of the government wide freedom of speech, debate, and deliberation without intimidation or threats from the Executive Branch." *Gravel*, 408 U.S. at 616. The Speech or Debate Clause thus confers on Members of Congress absolute immunity from being compelled to testify regarding matters that "directly impinge upon or threaten the legislative process." *Id.* Moreover, because "it is literally impossible . . . for Members of Congress to perform their legislative tasks without the help of aides and assistants," *Id.* at 616, congressional aides "are protected for conduct which would

enjoy immunity if performed by Members of Congress themselves," *McSurely v. McClellan*, 553 F.2d 1277, 1285 (D.C. Cir. 1976) (en banc); *Gravel*, 408 U.S. at 613.

In addition to providing testimonial immunity, the Speech or Debate Clause provides a Member of Congress and her staff with immunity from prosecution or civil liability for "legislative acts or the motivation for actual performance of legislative acts." *Brewster*, 408 U.S. at 509. *See Gravel*, 408 U.S. at 615 (The Speech or Debate Clause "at the very least protects [a member of Congress] from criminal or civil liability and from questioning elsewhere than in [Congress]."). The freedom from liability is derived from the freedom from questioning, the rationale being that "[r]evealing information as to a legislative act . . . to a jury would subject a Member to being 'questioned' in a place other than the House or Senate." *United States v. Helstoski*, 442 U.S. 477, 490 (1979).

Finally, there is broad agreement that the Speech or Debate Clause places limitations on the Executive Branch's ability to rely on documents or third-party statements implicating a Member's legislative acts in any prosecution. *See United States v. Myers*, 635 F.2d 932, 937 (2d Cir. 1980) (Under the Speech or Debate Clause, "[c]onduct that falls within the broad category of legislative action may not be charged as an offense [], nor may evidence of a Member's legislative action be offered in evidence against him."). Courts disagree, however, on the nature and scope of this limitation. The majority of circuits hold that while the Speech or Debate Clause prohibits the Executive from making evidentiary use of documentary materials covered by the Speech or Debate Clause, it places no limitation on the Executive's ability to compel disclosure of records that may include such materials. *See United States v. Renzi*, 651 F.3d 1012, 1035-36 (9th Cir. 2011) (holding that the privilege is one of use, not disclosure, when the disclosure is sought in the context of an investigation into otherwise unprotected activity); *In re Fattah*, 802 F.3d 516, 528-

29 (3d Cir. 2015) (same).  The D.C. Circuit alone takes a broader view, holding that the Clause precludes the use of compelled process even to obtain legislative documents or other materials from legislators, their staff, or Congress.  *See Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 421 (D.C. Cir. 1995).

Because the purpose of the Speech or Debate Clause is to free "the legislator from the executive and judicial oversight that *realistically* threatens to control his conduct as a legislator," *Helstoski*¸ 442 U.S. at 492 (emphasis added), the Clause does not shield "everything [] 'related' to the office of a Member [of Congress]" from Executive Branch or prosecutorial scrutiny.  *Brewster*, 408 U.S. at 513–14.  Rather, it limits Executive Branch inquiry only with respect to "legislative acts or the motivation for actual performance of legislative acts."  *Id*. at 509.  Activities frequently undertaken by Members of Congress that are not immune from Executive branch scrutiny include lobbying federal agencies, *Gravel*, 408 U.S. at 625, *United States v. Johnson*, 383 U.S. 169, 172 (1966), communicating with the press and the public, *Hutchinson v. Proxmire*, 443 U.S. 111, 133 (1979), and constituent services, *Brewster*, 408 U.S. at 512.  Nor does the Speech or Debate Clause immunize Members of Congress from investigation or prosecution for misconduct in their private lives.  *United States v. Rose*, 28 F.3d 181, 188 (D.C. Cir. 1994).

Even in the legislative context, the Supreme Court has been "careful not to extend the scope of [the Speech or Debate Clause] further than its purposes require."  *Forrester v. White*, 484 U.S. 219, 224 (1988).  Indeed, because "[t]he immunities of the Speech or Debate Clause were not written into the Constitution simply for personal or private benefit of Members of Congress, but to protect the legislative process," the "shield" that the Speech or Debate Clause provides "does not extend beyond what is necessary to preserve the integrity" of that process.  *Brewster*, 408 U.S. at 507, 517.  Ultimately, as the Supreme Court has repeatedly emphasized, the Speech or Debate

Clause does not "make Members of Congress super-citizens, immune from criminal responsibility." *Brewster*, 408 U.S. at 516.

**B.  Demand for Electronically Stored Information and Reports of Interviews**

At the outset, there is no merit to Congressman Collins's sensational claim that the Government has "disregard[ed] the constitutional protections of the Speech or Debate Clause." (S/D Mot. at 15).  It is common ground that the privilege enshrined in the Speech or Debate Clause serves as "an important protection of the independence and integrity of the legislature," *Johnson*, 383 U.S. 178 (1966).  As discussed, however, the law is clear that the "shield" that the Speech or Debate Clause provides "does not extend beyond what is necessary to preserve the integrity of the legislative process." *Brewster*, 408 U.S. at 517.

As the Court knows, and as Congressman Collins appears not to dispute, the allegations in this case have nothing whatsoever to do with the Congressman's legislative acts.  Rather, the Government alleges that Congressman Collins, in his personal capacity, violated federal law by breaching the duties he owed to Innate (in his personal capacity) and sharing inside information with his family, so that they and their associates could make beneficial trades in the company's stock.

In the course of investigating Congressman Collins's personal criminal conduct, the Government obtained search warrants for *personal* devices and online accounts belonging to a number of individuals close to Congressman Collins, some of whom themselves engaged in suspicious trading in Innate during the period charged in the Indictment.  Among those individuals were Congressman Collins's current chief of staff and a former chief of staff, who, during the relevant period, was employed as an outside consultant and paid, at least in part, from Congressman Collins's campaign funds.  Additionally, the Government interviewed several of

Congressman Collins's current and former staff members, all of whom were represented by counsel, regarding Innate-related discussions that they had with Congressman Collins during the relevant time period.

In executing these search warrants and conducting these interviews, the Government was mindful and respectful of the privilege that attaches to legislative communications under the Speech or Debate Clause. Given this consideration, and despite the fact that the electronic accounts and devices for which the Government obtained warrants were the personal property of their users (not the Congressman or the House of Representatives), when searching materials belonging to current or former congressional staffers, the Government took care to assign members of the U.S. Attorney's Office other than the prosecutors working on the investigation to conduct an initial review and filter out materials that could arguably concern legislative activity. Similarly, despite the fact that the Government's interviews of current and former staffers concerned topics entirely divorced from legislative activity, the Government took the prophylactic measure of explicitly advising interviewees not to disclose information regarding the legislative activities of the Congressman or his office.[7]

Although fully aware of these precautions, Congressman Collins breathlessly claims that the Government has shown "disregard for the constitutional protections of the Speech or Debate Clause." (S/D Mot. at 15). As the discussion above demonstrates, however, nothing could be further from the truth.

[7] The Government also understands that, in at least some instances, prior to their clients' being interviewed by the Government, counsel for current or former staffers communicated with counsel for Congressman Collins regarding, among other things, his rights under the Speech or Debate Clause.

Equally meritless is the Congressman's insistence that he is entitled to what amounts to early production of Jencks Act material – and to probe the private messages, photographs and browsing histories of his staffers – in order to substantiate an imagined violation of the Speech or Debate Clause that does not exist. At bottom, the Congressman's claim is that his status as a legislator entitles him to act as a gateway between the Government and potentially incriminating information generated by him or his staff, no matter the context in which that information was generated. That contention is wrong for at least three reasons.

First, the Second Circuit has never considered the question whether the Speech or Debate Clause gives legislators a right to object to the compelled disclosure of documents, even when those documents reference plainly protected activity. As discussed above, although there is broad agreement that the Speech or Debate Clause provides an evidentiary privilege prohibiting the Government from offering documents covered by the privilege at a trial or other legal proceeding, courts disagree about whether there is a non-disclosure component to the Speech or Debate privilege. The D.C. Circuit has held in a series of civil cases that there is such a privilege. Accordingly, it has invalidated subpoenas duces tecum served on congressional committees or representatives that called for documents containing information that "falls within the legislative sphere." *MINPECO, S.A. v. Conticommodity Svcs., Inc.*, 844 F.2d 856, 860 (D.C. Cir. 1988); *Brown & Williamson*, 62 F. 3d at 421. More recently, the D.C. Circuit extended this analysis to hold that a search warrant issued to collect non-legislative documents from a congressional office was "unconstitutional in its design and implementation," where the location to be searched was one "where legislative materials were inevitably to be found." *United States v. Rayburn House Office Bldg.*, 497 F.3d 654, 661 (D.C. Cir. 2007). As the D.C. Circuit has explained, the rationale of these cases is that compelled disclosures that necessarily require legislative branch personnel to

reveal the details of legislative activity create "distractions that divert their time, energy, and attention from their legislative tasks," and therefore interfere with the legislative process. *Brown & Williamson*, 62 F.3d at 421 (internal quotation marks and citations omitted).

The other circuits that have considered the question have disagreed with the D.C. Circuit.[8] Both the Ninth Circuit and the Third Circuit have concluded that, as it relates to documentary or third-party evidence, the privilege conferred by the Speech or Debate Clause is an evidentiary one that attaches when the Government attempts to rely on protected material at trial or another proceeding. *See Renzi*, 651 F.3d at 1035-36 (holding that the privilege is one of use, not disclosure, when the disclosure is sought in the context of an investigation into otherwise unprotected activity); *In re Fattah*, 802 F.3d 516, 528-29 (3d Cir. 2015) ("Accordingly, while the Speech or Debate Clause prohibits hostile questioning regarding legislative acts in the form of testimony to a jury, it does not prohibit disclosure of Speech or Debate Clause privileged documents to the Government. Instead, as we have held before, it merely prohibits the evidentiary submission and use of those documents."). Buttressing these decisions are two important observations regarding the Supreme Court's Speech or Debate jurisprudence. First, as the Ninth Circuit observed in *Renzi*, the Supreme Court has several times confronted circumstances in which the Government obtained records containing protected material through compelled disclosure without ever suggesting that the procurement of that material was improper. Indeed, in at least one instance, the Court stated explicitly that the Government would be entitled to use that material at trial, provided it applied appropriate redactions to remove references to legislative acts. *See Renzi*, 651 F.3d at 1037 (quoting *Helstoski*, 422 U.S. at 488 n.7). Second, although the Speech or Debate Clause applies

[8] Although the Second Circuit has not addressed the issue, one district court in this Circuit has sided with the D.C. Circuit in concluding that the privilege is one of non-disclosure. *See SEC v. Comm. On Ways and Means*, 161 F. Supp. 3d 199, 238-46 (S.D.N.Y. 2015).

equally to the Executive and the Judiciary, courts, including the Supreme Court, regularly review evidence to determine whether that evidence is protected or not. *See Renzi*, 651 F.3d at 1038-39 (citing *Helstoski*, 442 U.S. at 487–90; *Johnson*, 383 U.S. at 185–86). As the *Renzi* Court noted, "[w]ere the Clause truly to incorporate a non-disclosure privilege, each of these disclosures would serve as an independent violation of the Clause." *Renzi*, 651 F.3d at 1039.

Because the privilege conferred by the Speech or Debate Clause is properly understood as an evidentiary one, Congressman Collins's discovery demands should be rejected. However, even if the Speech or Debate Clause conferred a privilege of non-disclosure, Congressman Collins's discovery demands would still be entirely without merit. That is because any arguably legislative material that may have been incidentally collected in this case was not obtained from locations "where legislative materials were inevitably to be found," *Rayburn House Office Bldg.*, 497 F.3d at 661, and therefore could not have meaningfully interfered with the legislative function, *see Brown & Williamson*, 62 F.3d at 421. As discussed above, the Government sought warrants only for the personal devices and accounts and, when conducting interviews, explicitly warned staffers that they should not discuss topics that could impinge on the privilege.

This case is thus a far cry from *Rayburn House Office Bldg.*, which concerned a search procedure that contemplated the forcible seizure of documents, including legislative materials, from a House office building and the necessary disruption of legislative activity. As discussed, the non-disclosure principle recognized in *Rayburn House Office Building* is rooted in a concern that compelled disclosure of legislative material by Members or their staff will distract from the legislative function. *Brown & Williamson*, 62 F.3d at 421. However real that threat may be in the case of a search like the one that the D.C. Circuit considered in *Rayburn House Office Bldg.*, the search procedures employed here – which involved the Government's obtaining staffers' private

data, in some cases from third parties, without depriving them of the use of that data – posed no such risk. As to the interviews, because the Government instructed staffers not to discuss legislative activities, the risk of chilling those functions was non-existent. *See Rayburn House Office Bldg.*, 497 F.3d at 661 (defining the constitutional problem posed by the search to be that "compelled review by the Executive occurred . . . in a location where legislative materials were inevitably to be found, [and] that some impairment of legislative deliberations occurred").

Finally, Congressman Collins's motion should be denied on the additional ground that there is no danger that the procedures employed here have or would compromise the "integrity of the legislative process," which is the touchstone for assessing the scope of the Speech or Debate privilege. *Brewster*, 408 U.S. at 517. The Government does not intend to offer at trial any privileged material. The prosecutors assigned to this case have not seen that data, and, unless the owners of the data consent to its release, it will not be further disclosed.[9] As to the witness statements, in light of the admonitions given during the interviews, the Government does not believe that they contain any protected material.[10] To the extent the Government calls any of the staffers as witnesses at trial, it will provide Congressman Collins will all documents memorializing their statements as part of its production of Jencks Act material. This production will occur before trial and with ample time for Congressman Collins to move to exclude any testimony that he finds potentially problematic under the Clause.

Although the Congressman suggests that the discovery he seeks is necessary for him to determine whether the prosecution has been tainted through the disclosure of materials protected

[9] Although one of the staffers has consented to the release of his privileged and non-responsive data to Congressman Collins's attorneys for the limited purpose of reviewing the date for Speech or Debate Clause materials, the other has refused.

[10] Should the Court wish to verify this fact itself, the Government would propose to provide the memoranda for *in camera* review.

by the Speech or Debate Clause (S/D Mot. at 1), he cites no authority for the proposition that a taint analysis would apply in this context. That is unsurprising given that, as discussed in further detail below, Second Circuit precedent holds that even when material covered by the Speech or Debate Clause is presented to the grand jury, that does not taint the prosecution or necessitate dismissal of the indictment, unless it is clear that the charge in the indictment cannot be sustained without the privileged evidence. *See United States v. Murphy*, 642 F.2d 699 (2d Cir. 1980) (per curiam). *Rayburn House Office Bldg.*, the case upon which the Congressman relies most heavily to support his motion, does not dictate a different outcome. Indeed, in that case, despite finding that the search procedures employed by the Government violated the Speech or Debate Clause, the D.C. Circuit concluded that the Government was entitled to retain material seized pursuant to the warrant that was not subject to the privilege and never suggested that the violation of the Speech or Debate Clause could taint the prosecution going forward. 497 F.3d at 665; *see also United States v. Rostenkowski*, 59 F.3d 1291, 1300 (D.C. Cir. 1995) (rejecting the suggestion that *Kastigar*-like hearings are appropriate in the Speech or Debate context). Thus, even if it were the case that the materials sought by the Congressman's motion contained information protected by the Speech or Debate clause, that would not support an argument that the prosecution, which centers on conduct entirely divorced from the Congressman's legislative acts, has been tainted.

**C. Motion to Inspect the Grand Jury Minutes**

As noted, Congressman Collins also seeks "transcripts of any grand jury testimony, and any materials provided or shown to the grand jury, that references or relates to any investigation by the U.S. House of Representatives Office of Congressional Ethics or Committee on Ethics relating to Congressman Collins." (S/D Mot. at 24). Congressman Collins argues that production of these materials is warranted because the Indictment alleges that, at the time of the charged

conduct, he "was already under investigation by the Office of Congressional Ethics ("OCE") in connection with his holdings in, and promotion of, Innate. Indeed, he had been interviewed by OCE personnel on or about June 5, 2017, just 17 days earlier." (Indictment ¶ 24). Congressman Collins does not appear to argue that the Indictment's reference to the OCE interview on its face implicates the Speech or Debate Clause, nor could he. Rather, he asserts that Indictment's reference to the OCE interview "raises serious concerns about whether constitutionally privileged information," presumably the contents of the interview, "was presented to the grand jury." (S/D Mot. at 6).[11] Collins's request to inspect the grand jury minutes is without legal basis and should be denied.

**1. Applicable Law**

"There is a tradition in the United States, a tradition that is 'older than our Nation itself,' that proceedings before a grand jury shall generally remain secret." *In re Petition of Craig*, 131 F.3d 99, 101 (2d Cir. 1997) (quoting *Pittsburgh Plate Glass Co. v. United States*, 360 U.S. 395, 399 (1959)). A defendant may seek disclosure of grand jury materials, but "the burden is on the party seeking disclosure to show a 'particularized need' that outweighs the need for secrecy." *United States v. Moten*, 582 F.2d 654, 662 (2d Cir. 1978) (internal quotation marks and citations omitted). A defendant may obtain inspection of grand jury minutes "upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury." Fed. R. Crim. P. 6(e)(3)(C)(ii). Normally, an indictment is not subject to dismissal on the

[11] This inference itself is dubious. The Indictment does not state or imply that the grand jury heard evidence regarding the *content* of the Congressman's statements to the OCE, merely that the grand jury was made aware of the fact that he was interviewed.

ground that there was "inadequate or incompetent" evidence before the grand jury.  *Costello v. United States*, 350 U.S. 359 at 363 (1956).

These principles are no less applicable where the claimed basis for inspection is an actual or suspected violation of the Speech or Debate Clause.  Indeed, in *United States v. Murphy*, 642 F.2d 699 (1980) (per curiam), the Second Circuit affirmed the denial of a similar motion to inspect the grand jury minutes for evidence of Speech or Debate violations.  The indictment in that case charged two United States congressmen with soliciting and accepting bribes and specifically identified official actions that the defendants were alleged to have performed in return for those bribes.  *Id.* at 699.  Arguing that certain of the official actions identified in the indictment were conduct protected by the Speech or Debate Clause, the defendants moved to dismiss the indictment or, in the alternative, for inspection of the grand jury minutes to determine whether the grand jury had been exposed to protected material.  The Court ruled that, in the absence of a claim "that the grand jury did not hear significant and sufficient evidence unprotected by the Speech or Debate Clause" to return the indictment, neither dismissal nor inspection of the grand jury minutes was warranted, because any potential Speech or Debate issues could be addressed by precluding the evidence at trial.  *Id.* at 700; *see also Myers*, 635 F.2d at 941 (trial on an indictment redacted to remove information protected by the Speech or Debate Clause permitted, even where the grand jury that returned the indictment "obviously had heard evidence of the protected conduct"); *United States v. Williams*, 644 F.2d 950, 952 (2d Cir. 1981) (introduction before the grand jury of an "insignificant amount" of testimony tainted by the Speech or Debate Clause "did not create the 'particularized need' for complete disclosure that is required under the Supreme Court's holdings" before grand jury minutes may be inspected).

The Second Circuit is not alone in holding that unless the face of the indictment suggests that conduct protected by the Speech or Debate Clause is essential proof of the charge, neither dismissal nor inspection of the grand jury minutes is warranted. In *United States v. Rostenkowki*, 59 F.3d 1291 (D.C. Cir. 1995), the D.C. Circuit affirmed a district court's denial of a similar motion to inspect the grand jury minutes and to dismiss the indictment on Speech or Debate grounds. In so doing, the court concluded that unless there is evidence on the face of the indictment that "any charge in the indictment was based on conduct that is protected by the Speech or Debate Clause," inspection of the grand jury minutes is not warranted, because, even assuming a Speech or Debate violation before the grand jury, the proper remedy would not be dismissal of the indictment, but rather the preclusion of the privileged evidence at trial. *Id.* at 1300-01; *see also United States v. McDade*, 28 F.3d 283, 298 (3rd Cir. 1994) (Alito, J.) (evidentiary exploration of potential Speech or Debate violations before the grand jury not required where the face of the indictment provides sufficient factual information to determine that no count of the indictment was "based on conduct that is protected by the Speech or Debate Clause"); *United States v. Johnson*, 419 F.2d 56 (4th Cir. 1969); *United States v. Johnson*, 383 U.S. 169, 185 (1966) (finding a Speech or Debate violation, but concluding that dismissal was not warranted and the Government should be allowed to proceed to trial "with all references to [the protected conduct] eliminated").

**2. Discussion**

As a preliminary matter, although the defendant argues strenuously that the Speech or Debate privilege protects his statements to the Office of Congressional Ethics, the law is decidedly against him. Statements to a congressional ethics body come within the ambit of the Speech or Debate Clause only if the investigation concerns the "legislative acts" of the member being

interviewed. *Rose*, 28 F.3d at 188.[12] Here, the OCE inquiry concerned matters entirely unrelated to the Congressman's legislative function. Indeed, the only allegation even remotely tied to the Congressman's official status was OCE's inquiry into whether he improperly sought to influence the Food and Drug Administration on Innate's behalf. Notably, such efforts to "cajole" and "exhort" Executive Branch officials "with respect to the administration of a federal statute" are not protected by the Speech or Debate Clause. *Gravel*, 408 U.S. at 625.

More significantly for present purposes, Congressman Collins cannot seriously contend that the Indictment's isolated reference to the OCE investigation and his having been interviewed in connection with that investigation gives rise to a basis to conclude that "grounds may exist for a motion to dismiss the indictment," Fed. R. Crim. P. 6(e)(3)(C)(ii), a prerequisite to obtaining inspection of the grand jury minutes. As discussed, the law is clear that dismissal would only be warranted if it were determined that "the grand jury did not hear significant and sufficient evidence unprotected by the Speech or Debate Clause" to return the indictment. *Murphy*, 642 F.2d at 700. Here, given the detailed allegations of insider trading set out in the 29-page indictment, there is no reason to believe that the introduction of evidence related to the OCE investigation had any effect on the grand jury's decision to indict. Conspicuously, Congressman Collins's motion makes no effort to argue otherwise. Given that it is the defendant who bears the burden of demonstrating a "particularized need" to inspect the grand jury minutes that outweighs the presumption of secrecy, *Moten*, 582 F.2d at 662, that omission alone compels denial of his motion. However, should the

[12] The defendant's reliance on then-Judge Kavanaugh's concurring opinion in *In re Grand Jury Subpoena*, 571 F.3d 1200, 1205 (D.C. Cir. 2009), and a subsequent district court decision that cites that opinion to distinguish *Rose* is particularly unavailing. Judge Kavanaugh himself acknowledged that *Rose* was the controlling law of the circuit and would need to be overruled by the *en banc* court in order for his views to carry the day.

court want comfort that the grand jury's decision to indict was not influenced by the introduction of privileged material, the Government would consent to *in camera* inspection of the minutes.

**CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the Court should deny the defendants' motions in their entirety.

Dated: New York, New York
March 8, 2019

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney
Southern District of New York

By: /s/
Damian Williams
Scott Hartman
Max Nicholas
Assistant United States Attorneys