UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| | : | |
| vs. | : | |
| | : | 1:18-CR-00567 (VSB) |
| | : | |
| CHRISTOPHER COLLINS, CAMERON | : | |
| COLLINS, and STEPHEN ZARSKY | : | |
| | : | |
| Defendants. | : | |
| | : | |

## SENTENCING MEMORANDUM ON BEHALF OF STEPHEN ZARSKY

Mauro M. Wolfe, Esq.
Sarah Fehm Stewart, Esq.
Jovalin Dedaj, Esq.
Arletta K. Bussiere, Esq.
**Duane Morris LLP**
*A Delaware Limited Liability Partnership*
1540 Broadway
New York, New York 10036
Tel: 212.692.1017
mmwolfe@duanemorris.com

*Attorneys for Defendant Stephen Zarsky*

### TABLE OF CONTENTS

I.  **Introduction** ................................................................................................. 1

II.  **Background** .................................................................................................. 5

III.  **The Second Circuit Sentencing Model** ................................................ 8

IV.  **The Guidelines Calculation** .................................................................. 9

V.  **The 3553(a) Factors Compel a Below Guidelines Sentence** ................ 10

    A.  History and Characteristics of the Defendant ................................... 10

        i.  Personal History ................................................................ 10

        ii.  ▇▇▇▇▇▇ Health Issues and ▇▇▇▇▇ ........................... 16

    B.  The Nature and Circumstances of the Offense ................................. 19

        i.  The Guidelines Place a Disproportionate Emphasis on the Loss Amount ...................................................................... 19

        ii.  Mr. Zarsky Has Already Suffered Significant Collateral Consequences .................................................................... 21

    C.  The Need for the Sentence Imposed and Types of Sentences Available ............................................................................................ 22

        i.  Incarceration Serves No Reasonable Purpose in This Case ........ 22

        ii.  A Sentence Without Incarceration Will Afford Adequate Deterrence, Protect the Public, Supply Just Punishment, and Encourage Respect for the Law ........................................ 23

        iii.  Should the Court Conclude Probation is Insufficient Punishment, A Period of Home Confinement Could Be Considered to Augment Mr. Zarsky's Sentence ..................... 25

        iv.  Mr. Zarsky Will Not Receive Adequate Care If Incarcerated ........................................................................................... 27

        v.  Probation with Community Service is the Appropriate Sentence ............................................................................ 20

    D.  Community Service Proposal ............................................................ 34

VI.  **Conclusion** ................................................................................................. 36

## TABLE OF AUTHORITIES

**Cases**

*Nelson v. United States*, 555 U.S. 350 (2008) ................................................................8

*Peugh v. United States*, 569 U.S. 530 (2013) ................................................................8

*Rita v. United States*, 551 U.S. 338 (2005) ...................................................................8

*United States v. Adelson*, 441 F. Supp. 2d 506 (S.D.N.Y. 2017) ......................................20,23-24

*United States v. Algahaim*, 842 F.3d 796 (2d Cir. 2016) ..................................................20

*United States v. Bonthu*, 18-CR-237 (AT) (N.D. Ga. 2018) .............................................25

*United States v. Booker*, 553 U.S. 220 (2005) ..............................................................8

*United States v. Braun*, 382 F. Supp. 214 (S.D.N.Y. 1974) ..............................................23

*United States v. Chatwal*, No. 14-CR-00143 (E.D.N.Y. Dec. 18, 2014) .................................33

*United States v. Dorvee*, 616 F.3d 174 (2d Cir. 2010) .....................................................8

*United States v. Ebbers*, 458 F.3d 110 (2d Cir. 2006) ....................................................19

*United States v. Faibish*, No. 12-CR-265 (ENV) (E.D.N.Y. Aug. 3, 2015) ..........................19-20

*United States v. Gardellini*, 545 F.3d 1089 (D.C. Cir. 2008) .............................................24

*United States v. Gupta*, 904 F. Supp. 2d 349 (S.D.N.Y. 2006) ..........................................20

*United States v. Peterson*, 11-CR-665 (RPP) (S.D.N.Y. Oct. 11, 2011) ................................25

*United States v. Perez*, 17-CR-538 (MS) (D.N.J. 2017) ...................................................25

*United States v. Okada*, 07-CR-144 (DC) (S.D.N.Y. May 6, 2008) .....................................25

*United States v. Samson*, No. 2:16-CR-00334-1 (JLL) (D.N.J. Mar. 7, 2017) .........................32

*United States v. Shamilzadeh*, No. 04-CR-1094 (E.D.N.Y. Apr. 1, 2008) ..............................32

*United States v. Singh*, 877 F.3d 107 (2d Cir. 2017) ........................................................9

*United States v. Stewart*, 15-CR-287 (LTS) (S.D.N.Y. May 4, 2017) ...................................25

*United States v. Yu*, 17-CR-349 (MS) (D.N.J. 2017) ......................................................25

*United States v. Zeringue*, 14-CR-67 (BAJ) (RLB) (M.D. La. 2014) ...................................25

**Statutes**

15 U.S.C. § 78 ..................................................................................................................1

18 U.S.C. § 3553 ................................................................................... 1,5,8-10,36

17 C.F.R. § 2440 ..............................................................................................................1

**Other Authorities**

"A Report on Behalf of the American Bar Association Criminal Justice Section
    Task Force on The Reform of Federal Sentencing for Economic Crimes," The
    A.B.A. Crim. Just. Section (Nov. 10, 2014). ..........................................................20

Christie Thompson and Taylor Elizabeth Elridge, "Treatment Denied: The Mental
    Health Crisis in Federal Prisons," The Marshall Project, Nov. 21, 2018,
    https://www.themarshallproject.org/2018/11/21/treatment-denied-the-mental-
    health-crisis-in-federal-prisons# ............................................................................28

"Court & Community: An Information Series about U.S. Probation and Pretiral
    Services: Community Service," Office of Probation and Pretrial Services,
    Administration Office of the U.S. Courts (2007) ...................................................30

Darren Gowen, "Overview of the Federal Home Confinement Program," *Federal
    Probation*, 11 (Dec. 2000) .....................................................................................26

Josiah D. Rich, Scott A. Allen, and Brie A. Williams, "The Need for Higher
    Standards in Correctional Healthcare to Improve Public Health," 30 J. Gen.
    Intern. Med. 503 (2014) ..........................................................................................28

Mark W. Bennett, Justin D. Levinson & Koichi Hioki, *Judging Federal White-
    Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further
    Reform*, 102 Iowa L. Rev. 939 (2017) ............................................................. 20-21

Memorandum, U.S. Dep't of Justice, Federal Bureau of Prisons, "Home
    Confinement under the First Step Act," (Apr. 4, 2019) .................................... 26-27

"Mental Health Treatment Among Prison/Jail Inmates," Nat'l Ins. of Mental
    Health, https://www.nimh.nih.gov/health/statistics/prevalence/file_148261.pdf....................29

Office of the Inspector General, "Review of the Federal Bureau of Prisons' Use of
    Restrictive Housing for Inmates with Mental Illness," U.S. Dep't of Justice,
    July 2017 .................................................................................................................29

Office of the Inspector General, "The Impact of an Aging Inmate Population on the
    Federal Bureau of Prisons," U.S. Dep't of Justice, Feb. 2016................................27

*United States Dep't of Justice Manual* (Wouters Kluwer 3d ed. 2017) .......................................32

*U.S. Sentencing Guidelines Manual* (U.S. Sentencing Comm'n 2018)......1,3,8-10,19-21,25-26,33

**TABLE OF EXHIBITS**

**A.  Support Letters**

1.  Stella Ciborowski (mother-in-law)

2.  Gary Guthreau (friend)

3.  John Owren (friend)

4.  Beverly Tinnell (sister)

5.  Ted Tolles (friend)

6.  Francesca Vignola (friend)

7.  Sandra Zablocki (friend)

8.  Brandon Zarsky (son)

9.  Dorothy Zarsky (wife)

10. Gene Zarsky (brother)

11. Lauren Zarsky (daughter)

12. Richard J. Uniacke (Executive Director of Bridges Outreach, Inc.)

13. Stephen Zarsky

**B.  Other Exhibits**

1.  "A Report on Behalf of the American Bar Association Criminal Justice Section Task Force on The Reform of Federal Sentencing for Economic Crimes," The A.B.A. Crim. Just. Section (Nov. 10, 2014).

2.  Mark W. Bennett, Justin D. Levinson & Koichi Hioki, *Judging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform*, 102 Iowa L. Rev. 939 (2017).

3.  Darren Gowen, "Overview of the Federal Home Confinement Program," *Federal Probation*, 11 (Dec. 2000).

4.  Memorandum, U.S. Dep't of Justice, Federal Bureau of Prisons, "Home Confinement under the First Step Act," (Apr. 4, 2019).

5.  Office of the Inspector General, "The Impact of an Aging Inmate Population on the Federal Bureau of Prisons," U.S. Dep't of Justice, Feb. 2016.

6.  Josiah D. Rich, Scott A. Allen, and Brie A. Williams, "The Need for Higher Standards in Correctional Healthcare to Improve Public Health," 30 J. Gen. Intern. Med. 503 (2014).

7.  Christie Thompson and Taylor Elizabeth Elridge, "Treatment Denied: The Mental Health Crisis in Federal Prisons," The Marshall Project, Nov. 21, 2018, https://www.themarshallproject.org/2018/11/21/treatment-denied-the-mental-health-crisis-in-federal-prisons#.

8.  "Mental Health Treatment Among Prison/Jail Inmates," Nat'l Ins. of Mental Health, https://www.nimh.nih.gov/health/statistics/prevalence/file_148261.pdf.

9.  Office of the Inspector General, "Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness," U.S. Dep't of Justice, July 2017.

10. "Court & Community: An Information Series about U.S. Probation and Pretiral Services: Community Service," Office of Probation and Pretrial Services, Administration Office of the U.S. Courts (2007).

## I.   **Introduction**

Stephen Zarsky respectfully submits this sentencing memorandum and supporting documentation in advance of his sentencing hearing, currently scheduled for January 24, 2020.

As the Court is aware, on October 3, 2019, Mr. Zarsky pleaded guilty to one count of conspiracy to commit securities fraud pursuant to 15 U.S.C. §§ 78j(n) and 78(ff) and 17 § C.F.R. 2440.10b-5. He also agreed to a two-level enhancement for obstruction of justice pursuant to U.S. Sentencing Guidelines Manual § 3C1.1 due to the statements he made to the FBI during an April 2018 surprise, dawn interview. Through his plea, Mr. Zarsky accepted full and complete responsibility for all of his improper conduct in this case, which was an aberration in an otherwise unblemished and commendable life of 67 years. After careful consideration of Mr. Zarsky's life history, good character, serious ▇▇▇▇ concerns, the effects of the offense on Mr. Zarsky and his family, and Mr. Zarsky's sincere remorse and contrition, the United States Probation Office ("Probation") submitted a Presentence Investigation Report ("PSR") concluding, "[a] variance may be warranted in this case based on the defendant's personal characteristics, such as his lack of a criminal history, and his ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ needs." PSR at 24. Probation recommends a substantial downward variance pursuant to 18 U.S.C. § 3553(a) with a custodial sentence of six months, a year of supervised release, and a $20,000 fine.

Probation has acknowledged Mr. Zarsky's remorse and contrition. Specifically, Probation correctly concluded that Mr. Zarsky "understand[s] the magnitude of his actions and the seriousness of the offense and is extremely remorseful and regretful." PSR at 31. Further, Probation confirmed that, "[Mr.] Zarsky has led a law-abiding life." *Id.* And Probation observed Mr. Zarsky's effort to make amends stating, "[Mr. Zarsky] has also cooperated in settling with the SEC in an effort to rectify the situation." *Id.* Simply put, this case was an anomaly in the life of an otherwise principled and law-abiding man.

1

At the age of 67, Mr. Zarsky has led an exemplary life, committed to his family, his friends, his profession, and his service to others. Other than the isolated and impulsive conduct that brings him before the Court, his history is beyond reproach, and in many ways is admirable for overcoming terrible hardships. Despite a very difficult ███████████████████████, ███████████████████████, Mr. Zarsky worked hard to build a career in project management to support his family. As the numerous letters to the Court provided with this submission attest, Mr. Zarsky is a devoted father, a loving husband, and a lifelong friend to many. Now, ████████ ██ and retired, Mr. Zarsky stands before this Court a humbled, ashamed, and deeply remorseful person. As Ted Tolles, Steve's friend and neighbor of 30 years wrote, "[E]very day he must carry the weight of that felony, publicly, on his shoulders…Steve's legal troubles have caused him to withdraw from our community, understandably, out of shame, born of regret."[1]  Similarly, his daughter Lauren wrote, "As I've noted, my father is an emotional human-being, and although his emotions may have caused him to make a regretful decision, he has undergone massive amounts of angst and sorrow as a result of these events."

Mr. Zarsky suffers from ██████████████████████████████████████████, all of which require ███████████████████ Among other things, Mr. Zarsky has ██████ ████████████████████████████████████████████████████████████ ████████████████ As a result ██████████████ Mr. Zarsky has ███████████ ████████████████████. Mr. Zarsky also suffers ███████████████████ ██████████████████████████████████████████████████████████ ████████ Mr. Zarsky's ████████████████████████████████████, as he suffers ████████

---

[1] This quotation and those that follow are taken from character letters written on Mr. Zarsky's behalf. These letters are attached to this memorandum as Exhibits A1-A12. Mr. Zarsky's letter to Judge Broderick is attached as Exhibit A13. Each of the letters is listed in a table of exhibits included at the beginning of this Sentencing Memorandum, immediately following the table of authorities.

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████

Through this sentencing memorandum, we ask the Court to place Mr. Zarsky's offense in the context of the entirety of his otherwise exemplary life. His guilty plea reflects his recognition that his actions in the instant case were absolutely wrong and that he fully accepts responsibility for all of his conduct. That said, Mr. Zarsky attempted to avoid a personal financial loss, and did not harm the general public. The offense in this case occurred impulsively, over the course of 24 hours; his conduct does not reflect a long-term, criminal enterprise motivated by greed and financial gain. On June 22, 2017, Mr. Zarsky received material, non-public information about negative test results for a drug made by Innate Immunotherapeutics Limited ("Innate"). Beside himself with fear and anxiety over potentially losing the majority of his retirement savings, Mr. Zarsky, in agreement with his future family member, sold his shares in Innate the following day. He also shared the news with other friends and family members to protect them from major financial loss as well. Mr. Zarsky unquestionably made a bad, impulsive decision in this isolated incident, but the 24 hours do not define his entire character or his life of 67 years.

Courts and scholars recognize that the Guidelines range for insider trading offenses is greatly disproportionate to the seriousness of the crime. This is primarily due to enhancements for loss amount in the U.S.S.G. § 2B1.1 table. The Guidelines range is particularly incommensurate in this case, where the conduct differs greatly in duration and scope compared to many other more serious insider trading prosecutions involving financial industry professionals, unlike Mr. Zarsky. This was not a multi-year, premeditated scheme. Here, Mr. Zarsky acted impulsively and made

uncharacteristic lapses in judgment over a period of 24 hours.  However, Mr. Zarsky recognizes the seriousness of the offense and takes full responsibility for his actions.

We also ask the Court to consider the collateral consequences of Mr. Zarsky's guilty plea. He has been publicly humiliated due to the prominence of another defendant.  At the winter of his days, he has been branded a felon.  This case consumed his entire family, and he has seen the suffering of his wife, daughter, siblings, and future in-laws.  Due to the pressure and anxiety caused by the case, Mr. Zarsky was confronted by ████████████████████████████████ ███████████████████████████████████  It has been a dramatic and tragic fall from grace for a beloved family man and upstanding community member.

There is no benefit to society in incarcerating an ailing 67-year-old husband and father.  In recent years, there has been increased advocacy for non-custodial sentences, especially cases involving elderly, white-collar offenders, like Mr. Zarsky.  A non-custodial sentence will provide adequate deterrence, supply just punishment, and encourage respect for the law.  Further, through no fault of its own making, the Bureau of Prisons ("BOP") is not sufficiently equipped to provide adequate healthcare to Mr. Zarsky given its documented lack of resources, and Mr. Zarsky's ██ ██████████████████████████████████████████████

There is no doubt that Mr. Zarsky will never appear before a criminal court again in his life.  While true that Mr. Zarsky made a bad, impulsive decision and violated the law on this one occasion, he has already paid, and continues to pay, for his exercise of terrible judgment.  Under all the circumstances present in this case, we respectfully submit that a non-custodial sentence with a substantial community service component suited to Mr. Zarsky's qualifications will accomplish the goals of sentencing.

Mr. Zarsky already secured a volunteer position with a charitable enterprise that can appropriately satisfy a community service obligation. On January 13, 2020, Mr. Zarsky will begin volunteering for Bridges Outreach, Inc. ("Bridges"), an organization providing services to the homeless in the greater New York City metropolitan area. Bridges volunteer workers deliver food and other necessities to those suffering homelessness in the community. In addition to assisting with deliveries, Mr. Zarsky will use his professional experience as a project manager to aid Bridges in creating a strategic plan for the agency's future growth. Through this effort, Mr. Zarsky has the opportunity to change hundreds of lives in his community for the better. Certainly, this would benefit society more than his incarceration.

For all of the reasons described herein, we respectfully request that the Court grant Mr. Zarsky a variance pursuant to 18 U.S.C. § 3553(a). Furthermore, we respectfully request a non-custodial sentence for Mr. Zarsky that includes a period of community service, which fulfills the requirements of 18 U.S.C. § 3553(a) by imposing a sentence that is "sufficient, but not greater than necessary" to meet the goals of sentencing.

## II.    Background

This case arises from Mr. Zarsky's family connection with former Congressman Christopher Collins and his son Cameron Collins, the other co-defendants in this case. Mr. Zarsky's daughter, Lauren, is now engaged to Cameron Collins. Christopher Collins sat on the board of directors of Innate, a biotechnology company headquartered in Sydney, Australia. Innate was developing and researching a drug called MIS416, intended to treat Secondary Progressive Multiple Sclerosis ("SPMS"). There is currently no cure for SPMS, so MIS416 had the potential to immensely benefit the sufferers of a horribly debilitating disease. Due to his board position and belief in the company, Christopher Collins was one of Innate's largest stockholders. Cameron

Collins was also a significant shareholder due, in part, to an initial investment Christopher Collins made on his behalf.  Through the influence of his future family and his interest to financially benefit his family, Mr. Zarsky invested in Innate.  Mr. Zarsky enthusiastically encouraged others to invest, including his siblings Gene Zarsky and Beverly Tinnell, and his longtime friend Jarvis Hoffer.

In October 2014, Innate initiated a clinical trial of MIS416, and successful completion of the drug trial was a necessary step on the road to public distribution.  In June 2017, Innate completed the drug trial of MIS416 and, unfortunately, the trial failed.  On the night of June 22, 2017, Christopher Collins received an email from Innate's CEO, Simon Wilkinson, informing him that MIS416's clinical trial had been a failure and lacked therapeutic value in the treatment of SPMS.  The information regarding the trial's failure was confidential and was not made public by the company until the evening of June 26, 2017.

After receiving the email on June 22, Christopher Collins informed his son Cameron that the drug trial had failed.  That same night Cameron gave the information to Mr. Zarsky.  Mr. Zarsky was terrified by this information, and fearful that if he did not sell his shares, he would lose his entire investment.  Mr. Zarsky invested $143,900.00 in Innate, which made up the majority of his retirement savings.  With his significant ███████ issues, Mr. Zarsky felt that he could not afford to lose his entire retirement account.  His mind was further plagued over deep concerns about the welfare of his family and friends who invested in the company.

Motivated by gripping fear, the next morning Mr. Zarsky sold all of his Innate stock as a result of his mounting stress and anxiety.  Always the family man and friend, Mr. Zarsky could not bear the idea of his siblings and close friend, Mr. Hoffer, also losing their investments, so with a sense of misguided obligation, he informed them of the drug trial's failure.  Both selling his stock

using material non-public information and spreading that information to others were poor lapses in judgment. It was also a poor decision for Mr. Zarsky to invest his entire retirement account in such a speculative enterprise, however, Mr. Zarsky's actions were primarily motivated by his desire to aid his family. He is not a sophisticated investor or a registered representative in the financial services industry. He is not an insider who misappropriated client information for his own financial gain or professional advancement. He invested in Innate because he hoped to support the endeavors of his daughter's future husband and father-in-law, and benefit his immediate family. He sold his stocks because he did not want to overburden his wife and children by losing his retirement savings. He informed his siblings and Mr. Hoffer about the drug trial failure because he could not sit by and let them suffer losses when he could help prevent it. Mr. Zarsky avoided a loss of $143,900, while the total loss avoided among all the family and friends totaled $768,520 ($571,000 of which was the shares sold by Cameron Collins). When confronted by the FBI in a surprise, dawn interview on April 25, 2018, Mr. Zarsky, confused and terrified, compounded his failings and denied receiving any non-public information, stating that an unnamed friend had told him to invest in Innate. PSR at 43. As his son Brandon wrote, "[h]is misguided desire to protect his friends and family at all costs, led him to act the way he did. While I appreciate that this in no way absolves him, I think the context of his actions is important."

To be clear, Mr. Zarsky's motivations in this case are not offered to minimize his acceptance of responsibility, or the gravity of the offense in any way. Mr. Zarsky committed a crime, and he has accepted full responsibility for the offense and its consequences. Instead, the details are provided to emphasize that the circumstances in this case are unique and do not resemble a large, long-term, premeditated criminal enterprise designed to line his pockets. In this case, Mr. Zarsky acted impulsively, out of fear, to avoid losing his investment and to help those close to

him.  His uncharacteristic lapses in judgment over the course of, ostensibly, 24 hours were an anomaly that will not occur again.  His false statements to the FBI during a surprise, dawn interview, were equally instinctive, wrong, and misguided.  The sentence to be imposed by this Court should take into account that Mr. Zarsky's conduct was truly an extraordinarily unusual event in his otherwise commendable life of 67 years.

### III.    The Second Circuit Sentencing Model

After *United States v. Booker*, 543 U.S. 220, 264 (2005), the Sentencing Guidelines are not determinative, they are the starting point in a judge's determination.  *See Peugh v. United States*, 569 U.S. 530, 536 (2013).  The Guidelines are not necessarily reasonable in every case, and may, in some instances, be affirmatively unreasonable.  *See Nelson v. United States*, 555 U.S. 350, 352 (2008) (holding "[t]he Guidelines are not only not mandatory on sentencing courts, they are also not to be presumed reasonable.");  *United States v. Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010) (noting that "[e]ven where a district court has properly calculated the Guidelines, it may not presume that a Guidelines sentence is reasonable for any particular defendant.").  Sentencing cannot, therefore, be a mechanical application of the Guidelines.  Rather, a sentencing court should take into account all the factors of a case, including the history of the case, along with factors set forth in § 3553(a).  *See Rita v. United States*, 551 U.S. 338, 364 (2007) (holding "it has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." (Stevens, J. and Ginsburg, J., concurring) (quotation omitted)).

Inherent in the guidance from the Supreme Court and the Second Circuit is also the concept that punishment must be tempered with compassion, understanding, and mercy:

8

Sentencing, that is to say punishment, is perhaps the most difficult task of a trial court judge." Jack B. Weinstein, *Does Religion Have a Role in Criminal Sentencing?*, 23 Touro L. Rev. 539, 539 (2007). While there are many competing considerations in every sentencing decision, a sentencing judge must have some understanding of "the diverse frailties of humankind." *See Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (plurality opinion). In deciding what sentence will be "sufficient, but not greater than necessary" to further the goals of punishment, 18 U.S.C. § 3553(a), a sentencing judge must have a "generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." Guido Calabresi, *What Makes a Judge Great: To A. Leon Higginbotham, Jr.*, 142 U. Pa. L. Rev. 513, 513 (1993); *see also* Edward J. Devitt, *Ten Commandments for the New Judge*, 65 A.B.A. J. 574 (1979), *reprinted in* 82 F.R.D. 209, 209 (1979) ("Be kind. If we judges could possess but one attribute, it should be a kind and understanding heart. The bench is no place for cruel or callous people regardless of their other qualities and abilities. There is no burden more onerous than imposing sentence in criminal cases.").

*United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017).

We submit that the circumstances in this case, when tempered with compassion, understanding, and mercy, and taking into account the toll it has taken on Mr. Zarsky and his family, and all the factors of § 3553(a), merit a non-custodial sentence of probation, community service, and a minor penalty.

## IV.   **The Guidelines Calculation**

The Guidelines assign Mr. Zarsky an offense level of 21 as follows:

| | |
|---|---|
| Base Offense Level USSG §§ 2B1.4(a), | +8 |
| Specific Offense Characteristics: Loss avoided of $768,520.00 USSG § 2B1.1(b)(1)(H) | +14 |
| Obstructing or Impeding the Administration of Justice USSG § 3C1.1 | +2 |
| Acceptance of Responsibility | |

9

| USSG § 3E1.1(a) and (b) | -3 |
|---|---|
| **Total Adjusted Offense Level** | **21** |

Mr. Zarsky has no criminal record, placing him in Criminal History Category I. His Guidelines sentencing range is 37-46 months' imprisonment. Probation recommends a sentence of six months imprisonment with one year of supervised release, and a penalty of $20,000. We generally agree with Probation's basis for a variance and recommendation, however, we submit that a non-custodial sentence is the most just outcome given the facts and circumstances of this case and taking into account all of the § 3553(a) factors, as described in more detail below.

### V.   The 3553(a) Factors Compel a Below Guidelines Sentence

As the Court will see, the manner in which Mr. Zarsky has lived his life, his numerous ██████████████████████████████ the nature of the offense, and the purposes and types of punishment available warrant a non-custodial sentence. *See* 18 U.S.C. § 3553(a).

#### A. History and Characteristics of the Defendant

i.   Personal History

Mr. Zarsky's life is a compelling story of someone who was raised under extremely difficult and unsupportive family circumstances, who then became the heart and backbone of his own family despite these early difficulties. Throughout his life, Mr. Zarsky has always placed his family and friends first, and he is considered a fundamentally kind and decent person by all who know him.

Stephen Zarsky was born on ████ 1952 in Summit, New Jersey to Elizabeth (née Imrishek) and Eugene D. Zarsky. He has two siblings, his brother Gene, two years his senior, and his sister Beverly, who is six years younger. Mr. Zarsky's father owned and operated a tree company in the Summit, New Jersey area. His father's business was a successful one and the

10

family enjoyed a middle-class lifestyle.  Mr. Zarsky presently resides in his childhood home in Summit.

Despite the family's relative economic comfort, Mr. Zarsky experienced a ███████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████

██████████████████████████████████████████████████

████████████ Mr. Zarsky rose up as a source of love and support for his family and friends.

As his brother Gene Zarsky wrote, "[t]ogether, we faced many difficult challenges during our formative years. I believe those shared experiences gave us strength and courage to move forward in our lives in a positive manner. To this day, I value Stephen's friendship and admire his courage to remain positive during a very difficult time in his life." Similarly, his sister Beverly Tinnell shared that their mutual love of song writing helped both of them recover from their ██████

██████: "We are both song writers and share a profound passion for telling stories about our lives. This aptitude has ██████████████████████████████████████████

████████████████████████████████████████████████████

██████████ This theme of Mr. Zarsky providing great support and comfort to his family and friends remains a constant throughout his life.

After graduating from high school in 1970, Mr. Zarsky attended Edison Junior College in Fort Meyers, Florida for two years and then obtained his Bachelor's degree in philosophy from the

University of Florida in Gainesville in 1976. He also obtained a computer programing degree from the Chubb Institute in Parsippany, New Jersey in 1989, and became a certified program project manager in 2003. Mr. Zarsky had a successful lifelong career as an IT project manager for numerous companies, primarily in the healthcare sector. He worked as both a direct employee and a consultant and has over twenty years of experience. Gary Guthreau met Mr. Zarsky in 2005 when they were working as consultants for the same client. He describes Steve as "very outgoing, funny, talented, and loyal to his family and friends. He always brings a smile and a joke to start the day and brings joy to everyone. He has a glass half full personality." Mr. Guthreau also recounts a time when both he and Mr. Zarsky were looking for a job at the same time:

> Steve is not a selfish person by any means. After we first met in 2005, Steve was looking for another job and went on an interview for a job with a different company. The job would be a shorter commute, more money, a chance for advancement, and job security. During the interview Steve decided that the job was really not a match for him, but he recommended that the interviewer meet with me as a better match. I was eventually offered the job, advancing my career forward since that point. This was a selfless act! We only knew each other for less than a year, yet he thought of my best interests at a time when jobs were hard to come by. Steve passed up a good opportunity for himself to the benefit of a friend. I will forever be grateful for Steve's action.

Even in his work life, Mr. Zarsky puts others' needs ahead of his own and is highly regarded as a kind and thoughtful person.

Mr. Zarsky met his wife Dorothy (née Ciborowski) on the Jersey Shore in 1985, and according to Mrs. Zarsky, they "have had a very special and loving relationship ever since our first date. Our relationship grew very quickly and we were soon inseparable. We enjoyed doing everything together." They became engaged a year later and married on September 12, 1987. Mrs. Zarsky describes Mr. Zarsky's interests and passions as her favorite thing about him. He taught her to golf, cook, and enjoy "one of Steve's strongest passions … his music." Mr. Zarsky

composes, performs, and records his own music, and it is his favorite activity. The first thing the Zarskys bought together as a couple was a piano, which Mr. Zarsky uses to this day. Mr. and Mrs. Zarsky share a strong and loving marriage that has lasted over 32 years. They substantially rely on one another and provide each other with constant love and support.

Mr. and Mrs. Zarsky also have two children, Brandon and Lauren. Brandon is 29 and an attorney residing in Jersey City, New Jersey. Lauren is 25 and splits her time between Asbury Park, New Jersey and Marco Island, Florida. Mr. Zarsky has a wonderful relationship with both of his children, and he has devoted his life to providing them with a loving and nurturing environment to compensate for what he was denied as a child. Mrs. Zarsky recounts how Mr. Zarsky postponed his dreams of playing music professionally to get a corporate job when they decided to have children, starting his career in 1989 as a programmer at MetLife. After the children were born, Mrs. Zarsky states, "Steve's whole life soon became all about taking care of his family. Steve wanted to expose his children to everything in life. He shared his interests with our kids, especially music." Lauren also wrote, "Over the years, I know that he [Mr. Zarsky] formed many lifelong friendships, however, I've since learned that finance and IT weren't the fields that he was truly passionate about. My dad worked very hard to support our family and sacrificed his pursuit of music in exchange for our family's comfort and security. He has exemplified giving and loving above all else."

Along with working hard to support his family, Mr. Zarsky made sure to be involved in his children's lives. Mr. Zarsky participated in sports, music, and Boy Scouts with his son, and he supported Brandon in attending Northeastern University and Seton Hall Law School. Mr. Zarsky also joined a father-daughter group called "Little Princesses" to spend more time with Lauren, and later coached Lauren in soccer and basketball, never missing a game. Lauren wrote, "[m]y dad

14

consistently prioritized spending quality time with me, even when I knew he had many other things he could be doing instead." Mr. Zarsky is overjoyed that both of his children are currently engaged to such wonderful, loving people. He looks forward to their upcoming weddings and watching their lives unfold.

Mr. Zarsky's caring nature extends well beyond his immediate family to other family members and friends.  His brother Gene wrote that Mr. Zarsky "has always been a kind, considerate and respectful brother."  Gene also remembers Mr. Zarsky's close relationship with his father-in-law Ed Ciborowski, who has since passed away, "Stephen and Ed had a very special relationship that I delighted in every time I saw them together."  Mr. Zarsky's mother-in-law, Stella Ciborowski, considers Steve "a very hard worker and a great man."  Mr. and Mrs. Ciborowski lived for ten years with the Zarskys to provide childcare for their grandchildren while Mr. and Mrs. Zarsky were at work.  Mrs. Ciborowski wrote that "Stephen was always there when it counted, and never got home late.  Even after a hard day's work, he would always cook dinner for all of us. It was touching to see what he would do for his family."

Mrs. Zarsky's childhood best friend Sandra Zablocki wrote that "Stephen has come to my aid and offered me his assistance on multiple occasions."  Ms. Zablocki called Mr. Zarsky when she heard a noise inside her clothes dryer.  Mr. Zarsky went to her house to catch and release the bird that was trapped inside.  Another time, he rescued Ms. Zablocki from the train station when her car died due to sub-zero winter weather, then drove her back to her car the next morning to meet AAA.  Lauren Zarsky's childhood friend, Francesca Vignola, has been close with the Zarsky family for over 20 years and wrote that Mr. Zarsky's "true character cannot be determined by this one involvement and decision alone, but by a lifetime of being someone people can count on, joke with and love dearly."  Mr. Zarsky comforted Ms. Vignola when she was ███████████

15

██████████████████████████████████████████████████████████████ They talked

"for over an hour" and she wrote that "it is a distinct memory I have of a conversation I never

would've been able to have with anyone else that helped me get through an unfavorable situation."

██████████████████████████████████████████

As discussed above, Stephen Zarsky is 67 years old and ████████████████████████

████████████████████████████████████████████ Medical reports detailing Mr.

Zarsky's current medical condition have been submitted to the Probation Department and

incorporated into the Presentence Report. ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████ Mrs. Zarsky provides constant care

and support to Mr. Zarsky ████████████ She wrote:

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

16







**B. The Nature and Circumstances of the Offense**

Mr. Zarsky pled guilty to one count of conspiracy to commit securities fraud and has agreed to accept a sentencing enhancement because of his false statements to the FBI. This is no doubt a serious crime and related conduct, however, it was Mr. Zarsky's first and only offense, he has taken full responsibility for his actions, and he is committed to making amends.

    i.    The Guidelines Place a Disproportionate Emphasis On the Loss Amount

Mr. Zarsky's high offense level of 21 is principally due to the loss avoidance figures associated with a co-defendant. The loss table set forth in section 2B1.1(b)(1) increases Mr. Zarsky's offense level by 14 points. For good reason, there has been much discussion recently about the disproportionate sentences occasioned by financial crimes as a result of the Guidelines' loss table. "Under the Guidelines, it may well be that all but the most trivial frauds in publicly traded companies may trigger sentences amounting to life imprisonment." *United States v. Ebbers*, 458 F.3d 110, 129 (2d Cir. 2006); *see also United States v. Faibish*, No. 12-CR 265 (ENV)

(E.D.N.Y. Aug. 3, 2015) ("The loss table is but one example of the seemingly mindless acceleration of penalties for economic crimes incorporated into the current Sentencing Guidelines regime.").

As Judge Rakoff observed, the Sentencing Guidelines "reflect an even more draconian approach to white-collar crime, unsupported by any empirical data." *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012); *see also United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y. 2006) (Rakoff, J.) (noting that the government's calculation of the Guidelines was driven by, "more than any other single factor…the inordinate emphasis that the Sentencing Guidelines place in fraud cases on the amount of actual or intended loss"). Recognizing this fact, the Second Circuit has explained that sentencing adjustments based on loss amounts should trigger a thorough consideration by the sentencing court as to the reasonableness of the offense level. *See United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) (noting that the enhancements for loss amount in § 2B1.1 of the Guidelines is unique, and that "its unusualness is a circumstance that a sentencing court is entitled to consider"); *see also Adelson*, 441 F. Supp. 2d at 509; *Gupta*, 904 F. Supp. 2d at 350-51.

In addition to this Circuit's disdain for white-collar sentencing under the Guidelines, there has been widespread criticism across the legal profession. In 2014, the American Bar Association (ABA) commissioned a task force to review and propose reforms to the Guidelines sentencing for economic crimes.[4] The task force recommended that there should be an offense level cap of 10 for first time offenders and "a sentence other than imprisonment is generally appropriate."[5] In an article for the Iowa Law Review, U.S. District Judge Mark W. Bennett, along with law professors

---

[4] *See* "A Report on Behalf of the American Bar Association Criminal Justice Section Task Force on The Reform of Federal Sentencing for Economic Crimes," The A.B.A. Crim. Just. Section (Nov. 10, 2014). Attached hereto as Exhibit B1.
[5] *Id.* at 2.

Justin D. Levinson and Koichi Hioki, emphasized the need for an overhaul of sentencing for white-collar fraud cases.[6]  Though discussing fraud, the article's implications are the same for white-collar insider trading offenses.  The authors "urge five particular and realistic reforms the Commission should adopt to improve the fundamental fairness of the [sentencing] guideline, beginning with significant cuts to the so-called 'loss table' as well as the specific offense characteristics that frequently lead to nearly nonsensical sentencing guidelines."[7]  The authors make numerous suggestions for increasing the fairness of white-collar sentencing, concluding: "[f]ailing these recommendations, we respectfully request that the Commission consider scrapping section 2B1.1 completely."[8]

The advisory Guidelines range of 37-46 months in this case places an undue emphasis on loss and does not take into account the unique circumstances of the case.  We whole heartedly agree with Probation that sentence far below the Guidelines range is warranted in this case.  As discussed previously, Mr. Zarsky avoided a loss of $143,900, while the total loss avoided among all involved with the case totaled $768,520 ($571,000 of which was the shares sold by Cameron Collins).  Given the widespread disdain for sentencing based on loss amount across the legal profession, Mr. Zarsky's Guidelines range is not an appropriate indicator of the sentence he should receive.  Instead, the balance of factors weigh in favor of a non-custodial sentence.

ii.      Mr. Zarsky Has Already Suffered Significant Collateral Consequences

Mr. Zarsky has suffered physically and mentally as result of the case, ▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮.  After pleading guilty, he has been labeled a felon for the rest of his life.  As

---

[6] *See* Mark W. Bennett, Justin D. Levinson & Koichi Hioki, *Judging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform*, 102 Iowa L. Rev. 939 (2017). Attached hereto as Exhibit B2.
[7] *Id.* at 944.
[8] *Id.* at 989

a result of the concurrent civil proceedings with the Securities and Exchange Commission ("SEC"), Mr. Zarsky has agreed to pay disgorgement in the amount of $143,900, plus interest of $15,980, in order to start making amends for his wrongful actions. This case was also prominently featured in the media as a result of Christopher Collins' position in Congress.[9] Mr. Zarsky did not choose a life in the public eye, but the worst mistake of his life has been broadcast locally, nationally, and internationally. Mr. Zarsky's 30-year friend and neighbor Ted Tolles wrote, "[f]olks are aware of Steve's illegal behavior and every day he must carry the weight of that felony, publicly, on his shoulders. And that ain't over by a long shot." As this case directly involved his family (and future in-laws), Mr. Zarsky has also had to endure the suffering of his wife, daughter, siblings, and his daughter's future family. Lauren Zarsky emphasized that "[a]n additional note must also be made about the suffering and torment my father has already endured." Mr. Zarsky's crime did not harm thousands of victims directly, or devastate financial institutions or nonprofit organizations. He takes full responsibility for all of his wrongful conduct and has taken steps, and is committed, to making amends for his actions. Mr. Zarsky is a man who made a crucial error in judgement, but not one who deserves six months in prison, given the potential negative health consequences that Mr. Zarsky may suffer, even for a short period of incarceration.

### C. The Need for the Sentence Imposed and Types of Sentences Available

      i.     <u>Incarceration Serves No Reasonable Purpose in This Case</u>

---

[9] *See e.g.* Benjamin Weiser and Vivian Wang, "Rep. Chris Collins Resigns Before Expected Guilty Plea in Insider Trading Case," *New York Times*, Sept. 30, 2019, https://www.nytimes.com/2019/09/30/nyregion/rep-chris-collins-ny-insider-trading.html ("Cameron Collins and the third defendant, Stephen Zarsky, whose daughter is engaged to Cameron Collins..."); Dan Mangan, "GOP Rep. Chris Collins' son and son's fiancé bought drug company stock days before Collins warned about failed trial, the SEC alleges," *CNBC*, Aug. 9, 2018, https://www.cnbc.com/2018/08/09/rep-collins-son-and-sons-fiancee-bought-more-drug-company-stock.html ("The complaint was filed at the same time as a federal criminal indictment Wednesday accusing Chris Collins, Cameron Collins and Zarsky's father Stephen Zarsky of insider trading.").

Incarceration serves no purpose here, other than a punitive one, and it would be greatly detrimental to Mr. Zarsky's health and well-being. The purposes of punishment are not to destroy a person's body and soul. In the words of the late Judge Frankel of the Southern District of New York, in imposing a sentence of probation:

> The court is told—and knows in any event—that the defendant has suffered terribly in the intervening years of investigation, uncertainty, legitimate efforts to avoid indictment, the awful decision to plead guilty, and the tortured wait for the day of sentence..."The defendant has suffered enough already" is a familiar refrain to sentencing judges. But the familiar is not necessarily contemptible. The refrain tells a true and moving story.

*United States v. Braun*, 382 F. Supp. 214, 214-15 (S.D.N.Y. 1974) (Frankel, J.). This is especially true for Mr. Zarsky for the aforementioned reasons. He is not in need of rehabilitation, and there is nothing in his past that suggests he will reoffend. To the contrary, the damage he has caused to his life makes it next to impossible that he will risk so much for so little again.

        ii.    A Sentence Without Incarceration Will Afford Adequate Deterrence, Protect the Public, Supply Just Punishment, and Encourage Respect for the Law

Incarceration serves no specific deterrence goal here. There is no risk that Mr. Zarsky will commit an offense in the future after the acute hardship he has already suffered as a result of this case. As discussed above, Mr. Zarsky has already experienced serious collateral consequences as a result of his actions. He lost the majority of his retirement savings, ████████████████, ████████, was shamed publicly by the media, and most painfully has had to endure the distress and hardship of his loved ones. Mr. Zarsky also will live the rest of his life as a felon, losing various civil rights and carrying the stain of conviction with him. As the court stated in *Adelson*, "[with the defendant's] reputation ruined by his conviction, it was extremely unlikely that he would ever involve himself in future misconduct." *See Adelson*, 441 F. Supp. 2d at 514. As Probation

recognizes, Mr. Zarsky "acted in an aberrant manner" very different from his otherwise "law-abiding life." PSR at 31. Specific deterrence will be more than achieved through a non-custodial sentence, there is no danger that Mr. Zarsky will commit any illegal actions ever again.

Nor is the goal of general deterrence furthered by incarceration, for no one could look at the example of Mr. Zarsky's conduct and wish to risk so much for so little. The many collateral consequences, combined with a non-custodial sentence of probation with community service will serve as a strong example to anyone considering insider-trading. Mr. Zarsky lost so much as a result of the offense and his case will demonstrate that impulsively breaking the law, even with misguided good intentions, will lead to dire consequences.

Additionally, Society will derive no benefit from incarcerating Mr. Zarsky. Mr. Zarsky has never been arrested prior to this case, and he poses no danger to the public. To the contrary, Society will benefit immediately should Mr. Zarsky receive a non-custodial sentence through his community service at Bridges, where Mr. Zarsky will make a positive societal impact by helping the homeless in New Jersey and New York City. Also, though discussed more thoroughly below, Mr. Zarsky will burden the BOP with his numerous ▇▇▇▇▇▇ health needs. With a non-custodial sentence, Mr. Zarsky can continue to receive the excellent care from his medical team that he relies on presently to remain healthy, and remove the burden and cost from the BOP.

The Court has alternatives to incarceration. In recent years, there has been increased advocacy for the use of alternatives to custodial sentences, recognizing, at least in white-collar cases, that incarceration provides little added deterrent value. *See, e.g.*, *United States v. Gardellini*, 545 F.3d 1089, 1091 (D.C. Cir. 2008) (noting that, in white-collar cases, a government investigation alone can serve as a deterrent); *Adelson*, 441 F. Supp. 2d at 514 (finding that "there

is [] considerable evidence that even relatively short sentences can have a strong deterrent effect on prospective 'white collar' offenders").

Our nationwide analysis of white-collar cases revealed that significant departures below the Guidelines ranges are the norm and that probation is common. Judges in the Southern District and elsewhere have recognized that non-custodial sentences are appropriate and provide just punishment for insider trading cases. Judge Swain recently sentenced Robert Stewart, a 61-year-old father to four years' probation including a year of home confinement. *See United States v. Stewart*, 15-CR-287 (LTS) (S.D.N.Y. May 4, 2016). Stewart pleaded guilty to participating in a trading scheme producing $1.6 million in profits. *See id.* Similarly, Judge Chin sentenced Ken Okada to three years' probation for his participation in an insider trading ring. *See United States v. Okada*, 07-CR-144 (DC) (S.D.N.Y. May 6, 2008). Okada made $300,000 in profits and made false statements to the FBI prior to his plea. *See id.*[10]

As demonstrated by these cases, non-custodial sentences are common for white-collar insider trading cases, and a sentence of probation with community service will serve the interests of justice in Mr. Zarsky's case.

> iii.   Should the Court Conclude Probation is Insufficient Punishment, A Period of Home Confinement Could Be Considered to Augment Mr. Zarsky's Sentence

We strongly suggest that a sentence of probation with community service is sufficient and just in this case. However, should the Court have strong reservations about probation, the Court could consider a period of home confinement as a condition of probation as an adequate alternative

---

[10] *See also United States v. Bonthu*, 18-CR-237 (AT) (N.D. Ga. 2018) (Defendant sentenced to eight months home confinement after sale of stocks due to inside information); *United States v. Yu*, 17-CR-349 (MS) (D.N.J. 2017) (Defendant sentenced to one year of home confinement following guilty plea for insider trading); *United States v. Perez*, 17-CR-538 (MS) (D.N.J. 2017) (Defendant who traded using inside tips sentenced to one year home confinement); *United States v. Zeringue*, 14-CR-67 (BAJ) (RLB) (M.D. La. 2014) (defendant tipper sentenced to three years' probation); *United States v. Peterson*, 11-CR-665 (RPP) (S.D.N.Y. Oct. 11, 2011) (tipper sentenced to two years' probation).

to incarceration as a component of a just sentence.  Home detention is defined by the United States

Sentencing Guidelines as:

> ...a program of confinement and supervision that restricts the
> defendant to his place of residence continuously, except for
> authorized absences, enforced by appropriate means of surveillance
> by the probation office. When an order of home detention is
> imposed, the defendant is required to be in his place of residence at
> all times except for approved absences for gainful employment,
> community service, religious services, medical care, educational or
> training programs, and such other times as may be specifically
> authorized.[11]

Home detention in the Federal system "ranges from a simple nighttime curfew to a 24-

hour-a-day 'lock-down' home incarceration."[12]  The extent to which individuals are permitted to

leave their residence is determined on a case-by-case basis, depending on the goals of supervision

and the orders of the court.[13]  If the Court determines that the "amenities available in the residence

of a defendant would cause home detention not to be sufficiently punitive," it is permitted to "limit

the amenities available."[14]

Home detention has gained acceptance in the federal criminal justice community as a

credible sanction and alternative to incarceration.[15]  Judges have imposed home confinement more

frequently as they have "learned more about what it offers" and discovered its cost effectiveness.[16]

Recently, Congress enacted the First Step Act, Pub. L. 115-391, which supports the BOP placing

elderly inmates in home confinement and "authorizes the Bureau to maximize the amount of time

spent on home confinement when possible" for low risk offenders.[17]  The First Step Act also

---

[11]U.S. Sentencing Guidelines Manual § 5F1.2, Application Note 1.
[12]Darren Gowen, "Overview of the Federal Home Confinement Program," *Federal Probation*, 11 (Dec. 2000). Attached hereto as Ex. B3.
[13]*Id.*
[14]U.S. Sentencing Guidelines Manual §5F1.2, Application Note 2.
[15]Gowen at 12.
[16]Gowen at 11.
[17] *See* Memorandum, U.S. Dep't of Justice, Federal Bureau of Prisons, "Home Confinement under the First Step Act" (Apr. 4, 2019). Attached hereto as Ex. B4.

expanded upon an earlier pilot program to place elderly and terminally ill inmates in home confinement.[18]

While we believe probation with community service is the appropriate sentence in this case, in the event that the Court believes more is needed, a period of home confinement may be an alternative consideration in lieu of a period of incarceration.

        iv.     <u>Mr. Zarsky Will Not Receive Adequate Care If Incarcerated</u>

Mr. Zarsky is concerned that he will not receive adequate care ▇▇▇▇▇▇▇▇▇



▇▇▇▇▇▇▇ In stark contrast, independent reports conclude that the BOP is struggling to cope with the needs of an increasingly elderly prison population, and it is also failing to provide adequate ▇▇▇ health services to many inmates.

For example, in 2016, the Office of the Inspector General at the Department of Justice (the OIG) published a report criticizing the BOP's treatment of elderly prisoners, ("OIG Report") titled "The Impact of an Aging Inmate Population on the Federal Bureau of Prisons."[19]  The report notes the fast growing population of federal inmates age 50 and older.  OIG Report at 2.  The report's findings state that the BOP lacks the appropriate staffing levels, physical infrastructure, and programming to address the needs of aging inmates.[20]  As a result, elderly inmates are not receiving adequate medical care. From the report:

---

[18] *Id.* ("The Bureau may release some or all eligible elderly offenders and eligible terminally ill offenders from Bureau facilities to home detention, upon written request from either the Bureau staff, or an eligible elderly offender or eligible terminally ill offender.").

[19] Office of the Inspector General, "The Impact of an Aging Inmate Population on the Federal Bureau of Prisons," U.S. Dep't of Justice, Feb. 2016.  Attached hereto as Ex. B5.

[20] *Id.* at 2-3.

> We further found that the increasing population of aging inmates has
> resulted in a need for increased trips outside of institutions to
> address their medical needs but that institutions lack correctional
> officers to staff these trips and have limited medical staff within
> institutions. As a result, aging inmates experience delays in
> receiving medical care. For example, using BOP data from one
> institution, we found that the average wait time for inmates,
> including aging inmates, to be seen by an outside medical specialist
> for cardiology, neurosurgery, pulmonology, and urology to be 114
> days. In addition, we found that while Social Workers are uniquely
> qualified to address the release preparation needs of aging inmates,
> such as aftercare planning and ensuring continuity of medical care,
> the BOP, which employs over 39,000 people, has only 36 Social
> workers nationwide for all of its institutions.[21]

Similarly, three doctors writing for the Journal of General Internal Medicine published an

article raising concerns about the inadequate care of elderly patients, entitled "The Need for Higher

Standards in Correctional healthcare to Improve Public Health."[22]   In the article, the doctors

describe the inadequate care received by elderly prison inmates: "Conditions commonly associated

with advancing age—multimorbidity, sensory impairment, disability, dementia, and end-of-life

care—present unique challenges in the correctional environment, and can lead to worsening health,

increased vulnerability to injury or victimization, and increased healthcare utilization and cost."[23]

The BOP also is not providing adequate mental healthcare to inmates.  In November 2018,

the nonprofit news organization The Marshall Project published an article revealing findings from

a Freedom of Information Act request they sent to the BOP.[24]  The "request shows that instead of

expanding treatment, the bureau has lowered the number of inmates designated for higher care

levels by more than 35 percent.  Increasingly, prison staff are determining that prisoners—some

---

[21] *Id.* at 3.
[22] Josiah D. Rich, Scott A. Allen, and Brie A. Williams, "The Need for Higher Standards in Correctional Healthcare to Improve Public Health," 30 J. Gen. Intern. Med. 503 (2014). Attached hereto as Ex. B6.
[23] *Id.*
[24] Christie Thompson and Taylor Elizabeth Elridge, "Treatment Denied: The Mental Health Crisis in Federal Prisons," The Marshall Project, Nov. 21, 2018, https://www.themarshallproject.org/2018/11/21/treatment-denied-the-mental-health-crisis-in-federal-prisons#. Attached hereto as Ex. B7.

with long histories of psychiatric problems—don't require any routine care at all."[25]  A chart created by the National Institute of Mental Health shows that while 35.3% of federal inmates have ever received mental health treatment, only 24% of them receive it after being admitted to prison.[26] Further, while 25.6% of Federal inmates have attended therapy, only 15.1% of them receive any therapy after they are incarcerated.  The OIG also published a report ("OIG Mental Health Report") reviewing the BOP's use of restrictive housing for inmates with mental illness.[27] The OIG reported that:

> BOP data showed that, as of 2015, only 3 percent of the BOP's sentenced inmate population was being treated regularly for mental illness. Yet, the BOP's *FY 2016 Performance Budget Congressional Submission* cited an internal BOP study, which suggested that approximately 19 percent of federal inmates had a history of mental illness. Moreover, a 2006 Bureau of Justice Statistics report concluded that 45 percent of federal inmates had symptoms or a recent history of mental illness. We found that the BOP cannot accurately determine the number of inmates who have mental illness because institution staff do not always document mental disorders.[28]



---

[25] *Id.* at 2.
[26] "Mental  Health  Treatment  Among  Prison/Jail  Inmates,"  Nat'l  Ins.  of  Mental  Health, https://www.nimh.nih.gov/health/statistics/prevalence/file_148261.pdf. Attached hereto as Ex. B8.
[27] Office of the Inspector General, "Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness," U.S. Dep't of Justice, July 2017. Attached hereto as Ex. B9.
[28] *Id.* at 3.



v.     <u>Probation with Community Service is the Appropriate Sentence</u>

A sentence of community service is strongly encouraged in appropriate cases. The Administrative Office of the United States Courts has observed that community service is "a flexible, personalized, and humane sanction, a way for the offender to repay or restore the community.   It is practical, cost-effective, and fair—a 'win-win' proposition for everyone involved."[29]

"Community service addresses the traditional sentencing goals of punishment, reparation, restitution, and rehabilitation . . . It restricts offenders' personal liberty[,] allows offenders to atone, [and] may be regarded as . . . a form of symbolic restitution when the community is the victim."[30] In selecting an appropriate candidate to perform community service, the Office of Probation and Pretrial Services recommends:

> [C]ourts can use community service successfully with a wide spectrum of offenders: corporations and individuals, first offenders and recidivists, the indigent and the affluent, juveniles and senior citizens. Not every offender is a good candidate for community service...Courts look for offenders with personal and social stability, who are willing, motivated, and who have no history of violence.[31]

Stephen Zarsky has personal and social stability, is extremely willing and motivated, and has

---

[29] "Court & Community: An Information Series about U.S. Probation and Pretrial Services: Community Service," Office of Probation and Pretrial Services, Administrative Office of the U.S. Courts (2007). Attached hereto as Ex. B10.
[30] *Id.*
[31] *Id.*

absolutely no history of violence.

Sentencing judges have recognized that community service can serve as a significant sanction. In a case in the Eastern District of New York, where the defendant pleaded guilty to conspiracy to defraud financial institutions and others to the tune of over $100 million, former Judge John Gleeson spoke eloquently of the value of community service:

> The prospect of a sentence that does not include incarceration, which is explicit in the papers submitted by your lawyers, is a daunting one for no other reason than it might fail to promote respect for the law which is one of the things a sentence must do for someone who participated so integrally in a fraud from, as far as your piece of it is concerned, cost financial institutions, what, $110 million.
>
> ***
>
> In fact, you know, one might say how could, no matter how essential you were to the prosecution of the more culpable participants in this crime, how do you justify an intelligent, accomplished businessman such as yourself committing this type of crime and not being sent to jail, not being, having the punishment include that type of condemnation, the most significant form of condemnation a sentencing judge in a financial crime can mete out?
>
> But nothing should ever be out of bounds and I've struggled with your lawyer's request, struggled with it throughout the presentations I've heard here, and I conclude that a sentence that doesn't include incarceration is appropriate here. *Alternatives to incarceration exist that can carry both the community and this Court's condemnation of your conduct but channel it in a way that's more constructive, given your significant charitable works and contributions before this case, given the extraordinary timing of your cooperation and its nature....I don't think the goals of sentencing here require you to be incarcerated.*
>
> I am placing you on probation for a period of five years. One special condition of probation would be that you be in home detention for a period of six months.
>
> Another is that you perform 500 hours of community service. *It strikes me that you can do some good in your community. You already have. It seems to me you deserve it. The combination of*

> *circumstances in your case makes you worthy of serving your*
> *punishment in a manner that's a little more constructive than going*
> *to jail.*[32]

More recently, the United States Department of Justice Manual discussed "expanding the use of diversion programs."[33] It further states that, as one of its strategies to achieve this objective, "[t]he Department is taking steps to identify and share best practices for enhancing the use of diversion programs, such as . . . community service initiatives that can serve as effective alternatives to incarceration."[34]

Courts have also recently been more inclined to impose sentences of probation with community service as an alternative to incarceration in appropriate cases. In *United States v. Samson*, the Chairman of the Port Authority of New York/New Jersey pleaded guilty to knowingly and corruptly accepting bribes from United Airlines in exchange for favorable treatment. *See* Judgment, *United States v. Samson*, No. 2:16-CR-00334-1 (JLL) (D.N.J. Mar. 7, 2017) (ECF No. 24). The government in *Samson* argued for a sentence of two years' imprisonment. *See* Gov't Sentencing Letter at p. 2, *Samson*, No. 2:16-CR-00334-1 (JLL) (D.N.J. Mar. 2, 2017) (ECF No. 16). The defendant in *Samson* was 77 years old at the time of sentencing, and also had numerous health issues like Mr. Zarsky. *See* Defendant Sentencing Letter at p. 35, *Samson*, No. 2:16-CR-00334-1 (JLL) (D.N.J. Mar. 2, 2017) (ECF No. 13-1). On March 6, 2017, Judge Jose Linares sentenced the defendant to five years of probation, with 12 months home confinement, and 3,500 hours of community service over the term of probation. *See* Judgment, *United States v. Samson*, No. 2:16-CR-00334-1 (JLL) D.N.J. (ECF No. 24).

---

[32] Sentencing Transcript, *United States v. Shamilzadeh*, No. 04-CR-1094 (E.D.N.Y. Apr. 1, 2008) at pp. 10-12.
[33] 1 U.S. *Department of Justice Manual* (Wouters Kluwer 3d ed. 2017), Comment 1-2.000A, *U.S. Department of Justice Strategic Plan, Fiscal Years 2014-2018* (2017-3 Supplement), Objective 3.4.
[34] *Id.*

In *United States v. Chatwal*, the defendant pleaded guilty to providing straw donors with illegal campaign contributions, resulting in an advisory Guidelines range of 46-57 months. *See* Gov't Sentencing Memorandum at pp. 3, 8, *United States v. Chatwal*, No. 1:14-cr-00143(ILG) (E.D.N.Y. Dec. 10, 2014) (ECF No. 28). Judge Glasser in the Eastern District of New York sentenced the defendant to 1,000 hours of community service with an agency that helped youth obtain employment after imprisonment on Riker's Island. *See* Judgment, *Chatwal*, No. 1:14-cr-00143(ILG) (E.D.N.Y. Dec. 19, 2014) (ECF Nos. 32, 33).

Finally, community service as an alternative has also been used in the Western District of New York for first-time offenders. In February 2014, the Honorable Frank P. Geraci, Jr. sentenced a defendant to probation and home confinement with the expectation that he would continue his community service with a camp for disabled and autistic children in Rochester, New York. This defendant pleaded guilty to a $2.5 million tax evasion charge and had an advisory Sentencing Guidelines range of 30-37 months (United States vs. John Gizzi: 6:13 CR 06046-0001). Prior to sentencing, Mr. Gizzi had performed over 100 hours of community service with the Sunshine Camp, a program of the Rochester Rotary Club. Post-sentencing, he performed over 2,000 hours of additional community service. These authorities all indicate that probation with community service can be an appropriate sentence, and all of these cases highlight the value to the community that first-time offenders like Mr. Zarsky can provide.

Community service is an appropriate sentence in this case. Mr. Zarsky fully understands the consequences of his criminal conduct and has demonstrated to those who know him well that his remorse is deeply felt and genuine; he will never re-offend. For all the reasons set forth in this memorandum, we submit that a sentence of incarceration is not necessary to satisfy the goals and purposes of sentencing. Instead, we recommend a sentence of probation with community service

33

for Stephen Zarsky with Bridges Outreach, Inc., (Bridges), a nonprofit organization focused on services for the homeless in New York City and Newark, Irvington, and Summit, New Jersey.

**D. Community Service Proposal**

Bridges initially began in September 1988 when Geoff and Ginger Worden made their first of many Friday night trips carrying brown bag lunches, hot soup and coffee to the homeless people living under the Brooklyn Bridge (hence the organization's name) and on the streets of lower Manhattan. Today, over 2,000 volunteers help deliver more than 65,000 brown bag meals, 10,000 pairs of socks and underwear, 7,500 toiletry kits, 49,000 cups of soup, and literally tons of donated clothing annually to over 21,000 homeless individuals in New York City, and Newark and Irvington, New Jersey.

In March 2014, Bridges established Project Connect in Newark. Through this effort, professional case managers work with homeless clients individually to create an attainable set of goals that will lead to better health and, ultimately, permanent housing, steady employment, and an independent, self-sufficient life. In addition, through a partnership with St. James Health, Bridges' Project Connect provides onsite medical services to clients in need of medical attention.

By connecting volunteers whose housing is established and secure with homeless individuals, Bridges also seeks to increase understanding, awareness, and acceptance of the issues and challenges facing those who are currently homeless. Bridges' vision is the elimination of the social and economic divides between the housed and the homeless. Through Bridges' Street Outreach, volunteers compassionately and respectfully deliver ready-made meals, clothing and personal care necessities to the most vulnerable homeless and food insecure.

Every Friday, Bridges opens its doors in Summit, New Jersey to indigent residents and offers showers, clothing, and other necessities. The organization also provides new backpacks and

school supplies for more than 1,000 children in Summit who are eligible for the federal government's free and reduced lunch program.  Annually, the agency offers a health fair for community members.[35]

Stephen Zarsky starts volunteering with Bridges on January 13, 2020. Bridges' Executive Director Richard Uniacke provided a letter to the Court describing the work Mr. Zarsky will perform at Bridges. Mr. Zarsky's first assignment will be to clear out and help re-organize Bridges' storage facility in Springfield, New Jersey.  He will also join staff and volunteers when teams go into the community on "Runs" to distribute packaged, prepared meals, warm soup, and personal care hygiene kits to homeless individuals. Bridges is eager to have Mr. Zarsky volunteer and Mr. Uniacke is willing to "support the request of a sentence with probation with community service with Bridges." He elaborates that "Stephen Zarsky seems to have a genuine concern for others in need in his community, and that spirit of caring is what we seek in our volunteers."

In addition, if given a sentence of probation with community service with Bridges, Mr. Zarsky could create a strategic plan for the agency.  He has years of successful professional experience as a project manager and is highly skilled in helping organizations develop essential and effective "road maps" for their futures.  He could certainly apply those same invaluable skills to aid Bridges in designing and implementing a most needed strategic vision and plan.  Few nonprofit agencies have the time or resources to generate strategic plans.  Many operate on extremely limited budgets and rely on volunteers to do much of the agency's work.  As Mr. Uniacke wrote, "[g]iven Steve's extensive professional background in project management. I know, over time, we will be able to tap into his invaluable skills to help Bridges develop and implement effective program and project plans." Access to someone with as experienced a skill

---

[35] *See* Bridges Outreach, https://www.bridgesoutreach.org/ (last visited January 9, 2020).

set as Mr. Zarsky's is something few nonprofit agencies can afford. Bridges' staff, volunteers, and the vulnerable clients the organization diligently serves will all benefit greatly from having Mr. Zarsky's assistance.

Mr. Zarsky has many talents to share, a reliable work ethic, and a true sense of commitment to give back to those in need. We therefore respectfully ask the Court to consider a sentence of probation with community service for Mr. Zarsky with Bridges Outreach, Inc.

## VI.    Conclusion

Mr. Zarsky has made poor decisions, and he is deeply remorseful for all of his actions in this matter. However, Mr. Zarsky respectfully requests that the Court not let his misguided conduct, which has already taken his retirement and the reputation of his family, continue to destroy his life through a prison sentence and take time away from his family. Mr. Zarsky is dedicated to atoning for his mistakes through meaningful community service. As a 67 year old, non-violent, first-time offender, with significant health issues, we respectfully suggest that a non-custodial sentence is warranted here, based on the § 3553(a) factors, and request that the Court consider imposing probation, community service with Bridges, and a penalty.


Dated: New York, New York
        January 10, 2020

_____ /s/ Mauro M. Wolfe _____
Mauro M. Wolfe, Esq.
Sarah Fehm Stewart, Esq.
Jovalin Dedaj, Esq.
Arletta K. Bussiere, Esq.
**Duane Morris LLP**
*A Delaware Limited Liability Partnership*
1540 Broadway
New York, New York 10036
Tel: 212.692.1017
mmwolfe@duanemorris.com