# Exhibit B2

# Judging Federal White-Collar Fraud Sentencing: An Empirical Study Revealing the Need for Further Reform

*Mark W. Bennett, Justin D. Levinson, & Koichi Hioki\**

*ABSTRACT: White-collar federal fraud sentencing has long been fraught with controversy and criticism. As a result, the U.S. Sentencing Commission's intensive multi-year examination of sentencing for fraud crimes generated tremendous interest among the Department of Justice, criminal defense organizations, the academy, and a wide range of advocacy groups. In November 2015, the Commission's publicly announced proposed amendments became law without Congressional change. These amendments, while commendable in process and purpose, fall short of sorely needed reforms that would serve to realign white-collar fraud punishments with legitimate, empirically based penal justifications. This Article portrays the historical tension between the Federal Sentencing Commission and federal judges, presents the results of an original empirical study that demonstrates clearly the continuing need for significant reforms, and includes specific recommendations to reform the current sentencing scheme for these crimes.*

I.      INTRODUCTION............................................................................941

II.     A BRIEF HISTORY OF FEDERAL SENTENCING, JUDICIAL
        DISCRETION, AND WHITE-COLLAR FRAUD CRIME.....................945
        A.  SENTENCING BEFORE THE SENTENCING REFORM ACT OF 1984
            AND THE SENTENCING GUIDELINES..........................................946
        B.  THE SENTENCING REFORM ACT OF 1984 AND THE SENTENCING
            GUIDELINES ........................................................................949
            1.  Introduction ...........................................................949

---

\*      Mark W. Bennett is in his 23rd year as a U.S. District Court Judge in the Northern District of Iowa. Justin D. Levinson is a Professor of Law and Director, Culture and Jury Project at the University of Hawaii William S. Richardson School of Law. Koichi Hioki is an Assistant Professor at Kobe University Graduate School of Business Administration. The authors would like to thank Krysti Uranaka for outstanding research assistance.

2.   Pre-*Koon* and the Creation of the SRA and the
     Guidelines ................................................................ 949
3.   *Koon*, the PROTECT Act, and the Standard of
     Review.................................................................... 953
4.   *Booker* Guideline Sentencing—the Current Federal
     Sentencing Regime .................................................. 954
5.   The Overlay of *Gall* and the *Booker* Advisory
     Guidelines ............................................................... 956
6.   Summary ................................................................. 957

III.  A LOOK AT CURRENT FEDERAL FRAUD OFFENDER SENTENCING
      DATA ................................................................................ 958
      A.   OVERVIEW OF OFFENDERS' SENTENCES UNDER THE U.S.
           SENTENCING FRAUD GUIDELINES—2014 ................................. 958
      B.   OVERVIEW OF TRENDS FOR OFFENDERS SENTENCED UNDER
           THE U.S. SENTENCING FRAUD GUIDELINE ............................... 959
           1.   Number of Fraud Offenders Increased ...................... 959
           2.   Average Guideline Increase Outpaces Minimum
                Sentence Increase......................................... 960
           3.   Amount of Loss Increased ................................. 961
           4.   Average Guideline Minimum Exceeds Sentence
                Length, Especially for Huge Offenders .................... 961
           5.   Summary ................................................... 964

IV.   THE EMPIRICAL STUDY ......................................................... 964
      A.   INTRODUCTION .......................................................... 964
      B.   PARTICIPANTS .......................................................... 965
      C.   MATERIALS ............................................................. 965
      D.   STUDY LIMITATIONS..................................................... 967
      E.   RESULTS ............................................................... 968
           1.   Judges Regularly Sentenced at the Exact Bottom of
                the Range................................................. 968
           2.   Older Federal Judges Gave Shorter Sentences ........... 969
           3.   Federal District Court Judges (Marginal Significance)
                Gave Longer Sentences to Jewish (vs. Christian)
                Defendants; State Court Judges Gave Longer
                Sentences to White (vs. Asian) Defendants................. 969
           4.   State Judges Self-Reported More Retributive
                Sentencing Philosophies.................................. 970
           5.   Republican Judicial Appointees Were More
                Supportive of Retribution, but Did Not Sentence
                Differently................................................ 970
           6.   Democratic Judicial Appointees Were More
                Supportive of Mercy...................................... 970

7. Protestant State Court Judges Report More Retributive Sentencing Philosophy but Did Not Sentence Differently.................................................................971
8. Judges' Mercy Philosophies, but Not Retribution Philosophies, Predicted Sentence Length...................971

*F.   DISCUSSION*.............................................................................972

V.   THE 2015 AMENDMENTS TO THE FRAUD GUIDELINE SECTION 2B1.1 AND THE CRITICAL RESPONSE ...........................................973

*A.   INTRODUCTION* ....................................................................973
*B.   THE 2015 PROPOSED CHANGES TO THE FRAUD GUIDELINE* .......975
*C.   THE PUBLIC COMMENT PERIOD AND PUBLIC HEARING*.............977
*D.   THE FRAUD GUIDELINE AMENDMENT SENT TO CONGRESS ON APRIL 30, 2015* ........................................................978
*E.   ABA AND COMMENTATOR RESPONSES TO THE NEW FRAUD GUIDELINE*..........................................................978

VI.   OUR SUGGESTIONS FOR ADDITIONAL NEEDED REFORMS OF THE NEW FRAUD GUIDELINE .....................................................980

*A.   INTRODUCTION* ....................................................................980
*B.   TRIM THE FRAUD LOSS TABLE*................................................982
*C.   BUZZ-CUT THE FRAUD GUIDELINES SOCS* ...............................985
*D.   SIMPLIFY AND MODIFY THE VICTIM TABLE* ..............................986
*E.   ELIMINATE THE SOC FOR SOPHISTICATED MEANS*.....................988
*F.   ADOPT A DEPARTURE FOR THE LACK OF PECUNIARY GAIN*..........988

VII.   CONCLUSION ........................................................................989

APPENDIX A ................................................................................990

APPENDIX B..................................................................................995

## I.   INTRODUCTION

Let's play an easy word-association game: "Bernie Madoff"—what comes to mind? We think for most it is likely some form of "massive fraud scheme."[1]

---

1.   Mr. Madoff's massive fraud scheme was described in the Government's Sentencing Memorandum as follows:

Defendant conceived and orchestrated a multi-billion dollar Ponzi scheme by which he defrauded thousands of investors, including individuals, non-profit organizations and for-profit institutions, who placed money directly or indirectly with his registered broker–dealer and, later, registered investment advisory firm, Bernard L. Madoff Investment Securities ("BLMIS"). For more than two decades, Madoff solicited billions of

The Assistant U.S. Attorney for the Southern District of New York prosecuting Madoff, Lisa A. Baroni, began her argument at the 2009 sentencing of Mr. Madoff this way:

> This defendant carried out a fraud of unprecedented proportion over the course of more than a generation. For more than 20 years he stole ruthlessly and without remorse. . . . [H]e destroyed a lifetime of hard work of thousands of victims. And he used that victims' [sic] money to enrich himself and his family, with an opulent lifestyle, homes around the world, yachts, private jets, and tens of millions of dollars of loans to his family, loans of investors' money that has [sic] never been repaid.[2]

Considering Bernie Madoff was 71 years old at the time of his sentencing,[3] not even Rip Van Winkle would live long enough to serve Madoff's 150-year federal prison sentence. It was, in every real sense, a slow death sentence. Was Madoff's fraud scheme a death-worthy crime? Do other white-collar fraud offenders deserve prison sentences that can literally triple those of intentional (second-degree) murderers?[4]

The Federal Sentencing Guidelines[5] for economic crimes, as well as U.S. Supreme Court jurisprudence on the role of judicial discretion in sentencing, have shifted consistently and rapidly since the 1980s, and the sentences of white-collar criminals have hung in the balance. In some eras, a simple fraud crime with a medium-to-high loss dollar value (either actual or intended loss) might have been expected to culminate in a short sentence or probation; yet, in current times, it could be expected to result in much harsher sentences.

---

dollars from investors under false pretenses, failed to invest such funds as promised, and misappropriated and converted investors' funds for his own benefit and the benefit of others. These criminal acts caused billions of dollars of losses to investors, drove many individuals and charitable organizations to economic collapse or near collapse, and visited especially significant non-economic, emotional damage on many of Madoff's victims.

Government's Sentencing Memorandum at 2, United States v. Madoff, 586 F. Supp. 2d 240 (S.D.N.Y. 2009) (No. 09 Cr. 213 (DC)), ECF No. 92. There is no single definition of a Ponzi scheme, named for Charles Ponzi, who, in the late 1920s, was convicted for multiple fraud schemes in Boston. *See generally* Gold v. First Tenn. Bank, Nat'l Ass'n (*In re* Taneja), Ch. 11 Case No. 08–13293–RGM, Adv. No. 10–1225, 2012 WL 3073175 (Bankr. E.D. Va. July 30, 2012) (collecting definitions). For a short definition of a Ponzi scheme see Alexander v. Compton (*In re* Bonham), 229 F.3d 750, 759 n.1 (9th Cir. 2000) ("Generically, a Ponzi scheme is a phony investment plan in which monies paid by later investors are used to pay artificially high returns to the initial investors, with the goal of attracting more investors.").

2.    Transcript of Sentencing Hearing at 39, United States v. Madoff, 586 F. Supp. 2d 240 (S.D.N.Y. 2009) (No. 09 CR 213 (DC)), ECF No. 100.

3.    *Id.* at 32, 49.

4.    Jeffrey S. Parker & Michael K. Block, *The Limits of Federal Criminal Sentencing Policy; Or, Confessions of Two Reformed Reformers*, 9 GEO. MASON L. REV. 1001, 1053 (2001).

5.    The term "guidelines" is a reference to the U.S. Sentencing Guidelines Manual as a whole. The term "guideline" is a reference to a specific guideline in the Manual.

In this Article, we explore the evolution of white-collar criminal sentencing since the 1980s, including the November 2015 updated Fraud Guideline, examine the newly important role of the federal judge in sentencing, and present the results of a unique empirical study that tests how sitting federal and state judges sentence a fraud offender in the context of what one leading judge has called a "draconian approach to white collar crime, unsupported by any empirical data."[6] The results of our study show that judges resist the harsh sentencing guidelines for today's economic crimes, and do so in interesting ways.

While major white-collar[7] fraud schemes like Madoff, Enron (Jeff Skilling), Cendant (Walter Forbes), MF Global (Jon Corzine), WorldCom (Bernard Ebbers), HealthSouth (five CFOs), Tyco International (Dennis Kozlowski), and Qwest Communications (Joseph Nacchio)[8] dominate the headlines, they do not reflect the daily gist of federal fraud prosecutions or offenders. Indeed, high-loss-value fraud cases are rare, and have likely garnered a lot more media and scholarly attention on a per-crime basis than perhaps any other type of individual offense, save terrorism. What is so special about these high-value economic crime cases that have made them the subject of societal focus and curiosity? Does this special attention extend to the way these crimes are handled by the Federal Sentencing Commission and federal judges?

To place high-value fraud cases in the proper perspective, we first review a brief history of federal sentencing and white-collar fraud in Part II. This review illustrates the ebb and flow of not only judicial discretion, as Congress and the U.S. Supreme Court have weighed in, but also a frequent and fervent march of revised Federal Sentencing Guidelines, which have sought to increasingly penalize white-collar offenders, particularly for high-value crimes. Part III builds on this history by examining the statistical reality of the sentencing of modern federal fraud prosecution data. This investigation into the data reveals that, as the guidelines have become harsher and crimes both more

---

6.      United States v. Gupta, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012).

7.      Defining "white-collar" crime is no easy task. The now ubiquitous phrase was first coined in *writing* by path-breaking criminologist Edwin H. Sutherland in his book *White Collar Crime* in 1949. EDWIN H. SUTHERLAND, WHITE COLLAR CRIME 9 (1949). Sutherland defined "white collar crime" as "a crime committed by a person of respectability and high social status in the course of his occupation." *Id.*; *see also* Samuel W. Buell, *Is the White Collar Offender Privileged?*, 63 DUKE L.J. 823, 827 (2014). Buell's article also has a section on White Collar Offense Definition. *Id.* at 841–46.  Sutherland first used the phrase *orally* in a speech to the American Economic Society in 1939, reprinted in Edwin H. Sutherland, *White-Collar Criminality*, 5 AM. SOC. REV. 1 (1940). *See also* Lucian E. Dervan & Ellen S. Podgor, *"White Collar Crime": Still Hazy After All These Years*, 50 GA. L. REV. 709, 712 (2016) (noting that "[s]everal commentators have discussed the struggle of providing a definition to what is encompassed within the term 'white collar crime'" and then providing an overview of various definitions).

8.      *See The 10 Biggest Frauds in Recent U.S. History*, FORBES, http://www.forbes.com/pictures/ghmf45hedh/1-enron (last visited Jan. 6, 2017).

complex and involving larger loss amounts, judges regularly sentence economic criminals well below the minimum guideline in all but the smallest of loss cases. Part IV describes the original empirical study we conducted of 240 sitting federal and state judges, representing all federal circuits and eight states. We found that three in four federal district court judges sentenced our study's defendant to the exact minimum sentence possible (151 months) of a seven-year range. Furthermore, we found a variety of statistically significant results when comparing the cohorts of judges, ranging in topics from the type of judge (district court judge vs. magistrate judge vs. state court judge), to the political affiliation of the appointing President of the United States, to philosophy on retribution, to the age of the judge, and to the reported religious affiliation of the judge. Part V frames these results in the context of the 2015 amendment process of the U.S. Sentencing Commission concerning the section 2B1.1 fraud guideline, which had been passed along to Congress at the time our study commenced. Part V also details the criticism of the Task Force of the American Bar Association ("ABA"), as well as a leading sentencing guidelines scholar. Part VI builds on both our study, as well as the 2015 amendments and its critiques, by making specific recommendations for additional reforms of the section 2B1.1 fraud guideline. We urge five particular and realistic reforms the Commission should adopt to improve the fundamental fairness of the fraud guideline, beginning with significant cuts to the so-called "loss table" as well as the specific offense characteristics that frequently lead to nearly nonsensical sentencing guidelines.

   Before turning to the history of white-collar fraud sentencing, defining some key federal sentencing terminology will assist the reader. "Loss" for guidelines purposes means either "actual loss" or "intended loss."[9] The starting point for computing any guideline sentence is computing the "base offense level" ("BOL")—fraud crimes start with either a BOL of 7 or 6.[10] After a "base offense level" is computed for any federal crime (the loss table is only for fraud and theft related crimes) one has to determine if any "specific offense characteristics" ("SOCs") included in any specific guideline for any crime apply.[11] The "loss table" is one of many SOCs that apply in fraud cases—

---

   9.    Application Note 3(A)(i) of section 2B1.1 defines "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S. SENTENCING GUIDELINES MANUAL § 2B1.1 cmt. n.3(A)(i) (U.S. SENTENCING COMM'N 2016). Application Note 3(A)(ii) of section 2B1.1 defines "intended loss" as: (I) "the pecuniary harm that the defendant purposely sought to inflict; and (II) includes intended pecuniary harm that would have been impossible or unlikely to occur (*e.g.*, as in a government sting operation, or an insurance fraud in which the claim exceeded the insured value)." *Id.* § 2B1.1 cmt. n.3(A)(ii).

   10.   "Base Offense Level: (1) 7, if (A) the defendant was convicted of an offense referenced to this guideline; and (B) that offense of conviction has a statutory maximum term of imprisonment of 20 years or more; or (2) 6, otherwise." *Id.* § 2B1.1(a)(1)–(2).

   11.   The base offense levels and SOCs are referred to as Chapter Two Offense Conduct calculations because they are all contained in Chapter Two of the Federal Sentencing Guideline

it contains 16 ranges of monetary loss, the first (A) is $6,500 or less, the last (P) is more than $550,000,000.[12] Other SOCs include, e.g., enhancements for numbers of victims; substantial financial harm to victims; misrepresentations by a defendant on behalf of charitable, educational, religious, political or governmental organizations; and misappropriation of trade secrets. Once other allowable adjustments are made under the guidelines and the criminal history score of the defendant is computed, the judge determines a guideline range for each defendant. Following this, the judge must then consider specific guideline departures and nonguideline 18 U.S.C. § 3553(a) sentencing factors (called variances) to arrive at a final sentence.[13] Both departures and variances can either increase or decrease a guideline sentence. See Appendix A for a flow chart of a federal white-collar sentencing.

## II.   A BRIEF HISTORY OF FEDERAL SENTENCING, JUDICIAL DISCRETION, AND WHITE-COLLAR FRAUD CRIME

A historical look at federal white-collar sentencing from the 1980s to the present details a busy era characterized by multiple themes, specifically

---

Manual.

12.   U.S. SENTENCING GUIDELINES MANUAL § 2B1.1:

(b) Specific Offense Characteristics
(1) If the loss exceeded $6,500, increase the offense level as follows:
Loss (Apply the Greatest) Increase in Level
   (A) $6,500 or less no increase
   (B) More than $6,500 add 2
   (C) More than $15,000 add 4
   (D) More than $40,000 add 6
   (E) More than $95,000 add 8
   (F) More than $150,000 add 10
   (G) More than $250,000 add 12
   (H) More than $550,000 add 14
   (I) More than $1,500,000 add 16
   (J) More than $3,500,000 add 18
   (K) More than $9,500,000 add 20
   (L) More than $25,000,000 add 22
   (M) More than $65,000,000 add 24
   (N) More than $150,000,000 add 26
   (O) More than $250,000,000 add 28
   (P) More than $550,000,000 add 30.

U.S. SENTENCING GUIDELINES MANUAL § 2B1.1(b)(1).

13.   The section 3553(a) sentencing factors include, *inter alia*, the "nature and circumstances of the offense"; the "history and characteristics of the defendant"; and the need to: "reflect the seriousness of the offense"; "promote respect for the law"; "provide just punishment"; "afford adequate deterrence"; "protect the public from further crimes of the defendant"; and "avoid unwarranted sentencing disparities." 18 U.S.C. § 3553(a)(1), (2) (A)–(C), (6) (2012).

regarding the major players in federal white-collar law: Congress, the U.S. Supreme Court, individual sentencing judges, and the Federal Sentencing Commission. First, Congressional action has largely been defined by two major pieces of legislation, the Sentencing Reform Act of 1984 ("SRA")[14] and the PROTECT Act.[15] Together, these acts have sought to harshen criminal penalties and restrict judicial discretion. Second, the United States Supreme Court has also played a remarkably active role, primarily due to the restoration of the discretion of federal judges in sentencing, most recently in *Booker*[16] and *Gall.*[17] Next, individual judges have largely been perceived to be on the lenient side of white-collar federal sentencing, perhaps due to the likelihood that they empathize with white-collar defendants, and perhaps because many have frequently departed from or criticized the sentencing guidelines.[18] Finally, the Federal Sentencing Commission, which has continually resisted criticism for its unannounced methods and overreliance on possibly illogical sentencing enhancement, has substantially increased penalties for economic criminals to often-extreme levels. But as demonstrated later in this Article, federal sentencing has now come almost full circle: from total discretion, to mandatory guidelines with virtually no discretion, to advisory guidelines with considerable discretion.

## A. *Sentencing Before the Sentencing Reform Act of 1984 and the Sentencing Guidelines*

Historically, the United States Constitution did not explicitly assign exclusive jurisdiction over federal sentencing to any one of the three branches of government.[19] Of course, Congress "has the power to fix the sentence for a federal crime."[20] Yet, before the SRA, "Congress delegated almost unfettered discretion to the sentencing judge to determine what the sentence should be within the customarily wide range so selected."[21] This grant of "broad discretion was further enhanced by the power later granted [to] the judge to suspend the sentence and by the resulting growth of an elaborate probation system."[22] "[W]ith the [creation] of parole, Congress moved toward a 'three-way sharing' of sentencing responsibility [between the three branches of government] by

---

14.    *See* Sentencing Reform Act of 1984, Pub. L. No. 98-473, 98 Stat. 1987 (codified as amended in scattered sections of 18 U.S.C.).

15.    *See* Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today (PROTECT) Act of 2003, Pub. L. No. 108-21, 117 Stat. 650 (codified as amended in scattered sections of 18, 21, 28, 42 and 47 U.S.C.).

16.    United States v. Booker, 543 U.S. 220 (2005).

17.    Gall v. United States, 552 U.S. 38 (2007).

18.    *See infra* Part IV.F.

19.    *See* Mistretta v. United States, 488 U.S. 361, 364 (1989).

20.    *Id.*

21.    *Id.*

22.    *Id.*

granting corrections personnel in the Executive Branch the discretion to release a prisoner before the expiration of the sentence imposed by the judge."[23] Pursuant to this indeterminate, pre-SRA sentencing scheme, Congress defined the maximum statutory sentence, the judge sentenced within the statutory range (which usually included probation as an option), and the Executive Branch's parole system ultimately determined the precise length of imprisonment.[24]

While this three-part scheme was followed into the 1980s, critics began to emerge when, in 1980, Kenneth Mann, Stanton Wheeler, and Austin Sarat published their study of "lengthy interviews with fifty-one federal district judges in seven federal districts, including those with the heaviest 'white-collar crime' caseloads."[25] They were "struck by the fundamental tension many judges feel between the aims of general deterrence on the one hand, and the particular attributes of white-collar offenders on the other."[26] White-collar defendants received "special empathy" because their position in society was more like the judge's own position.[27] The judges further believed that the collateral consequences of conviction—loss of prestigious jobs, professional licenses, and status in their communities—satisfied the needs of punishment and sentencing.[28] Just four years before professors Mann, Wheeler, and Sarat published their study, noted sentencing reformer and harsh critic of judicial discretion, Judge Marvin Frankel,[29] ironically wrote

---

23.    *Id.* at 364–65.

24.    *See id.* at 365.

25.    Kenneth Mann et al., *Sentencing the White-Collar Offender*, 17 AM. CRIM. L. REV. 479, 481 (1980) (footnote omitted).

26.    *Id.* at 499.

27.    Daniel Richman, *Federal White Collar Sentencing in the United States: A Work in Progress*, 76 L. & CONTEMP. PROBS. 53, 55 (2013).

28.    *See id.* (citing Mann et al., *supra* note 25, at 482–86).

29.    Judge Marvin Frankel's writings are considered to have "played a particularly influential role in the sentencing reform movement of the 1970s and 1980s." Michael M. O'Hear, *Is Restorative Justice Compatible with Sentencing Uniformity?*, 89 MARQ. L. REV. 305, 322 n.77 (2005); Rose Duffy, Comment, *The Return of Judicial Discretion*, 45 IDAHO L. REV. 223, 227 (2008) ("Equitable concerns, like those of Judge Marvin Frankel, were the driving force behind the adoption of a more uniform sentencing system."). Judge Frankel's impact was further illuminated by D. Michael Fisher:

   As Judge Marvin Frankel indicated in his influential book, *Criminal Sentences: Law Without Order*, allowing judges unfettered discretion results in disparity. Speaking of the sentencing practices of the 1970s, which left determining a sentence up to a judge, Judge Frankel described the difficulties of discretion with no guidance:

      Our practice in this country, of which I have complained at length, is to leave that ultimate question [of how long or severe a sentence should be] to the wide, largely unguided, unstandardized, usually unreviewable judgment of a single official, the trial judge. This means, naturally, that intermediate questions as to factors tending to mitigate or to aggravate are also for that individual's exclusive judgment. We allow him not merely to "weigh" the various elements that go into a sentence. Prior to that, we leave to his

*IOWA LAW REVIEW* [Vol. 102:939]

in a federal sentencing opinion that imposing just a four-month prison sentence on an ordained rabbi who owned nursing homes and engaged in Medicare fraud "should be sufficiently frightening to serve the major end of general deterrence. For all but the profoundly vengeful, it should not depreciate the seriousness of his offenses."[30]

Therefore, prior to the passage of the SRA, judicial discretion was paramount and "[w]hite collar offenders . . . receive[d] notoriously lighter sentences than street offenders in federal court."[31] Alternatives to incarceration, like "[p]robation, community service, fines, and short terms of imprisonment followed by early parole were commonplace" for white-collar offenders.[32] These readily available "lenient" alternatives for federal judges "w[ere] one of the major motivations for Congress" to pass the SRA and "to create the U.S. Sentencing Commission, which in turn promulgated the Federal Sentencing Guidelines."[33] At bottom, there were many in the sentencing reform movement "who believed that . . . sentences for financial crimes had just been too lenient for too long."[34] The SRA attempted to respond to these concerns. The leniency expressed by the federal sentencing judges in white-collar crimes proved to be an impetus not only for the passage of the SRA, but for harsh punishment in the initial setting of the fraud guideline.[35] The Senate Report on the SRA indicated that too many white-collar offenders were given probation "without due consideration being given

---

unfettered (and usually unspoken) preferences the determination as to what factors ought to be considered at all, and in what direction.

D. Michael Fisher, *Striking a Balance: The Need to Temper Judicial Discretion Against a Background of Legislative Interest in Federal Sentencing*, 46 DUQ. L. REV. 65, 85–86 (2007) (alteration in original) (quoting MARVIN E. FRANKEL, CRIMINAL SENTENCES: LAW WITHOUT ORDER 122 (1973)). For further discussion of the federal sentencing reform movement that gave rise to the Federal Sentencing Guidelines, see also Frank O. Bowman, III, *The Quality of Mercy Must Be Restrained, and Other Lessons in Learning to Love the Federal Sentencing Guidelines*, 1996 WIS. L. REV. 679, 680–92. *See generally* Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises upon Which They Rest*, 17 HOFSTRA L. REV. 1 (1988); Kate Stith & Steve Y. Koh, *The Politics of Sentencing Reform: The Legislative History of the Federal Sentencing Guidelines*, 28 WAKE FOREST L. REV. 223 (1993).

30.     United States v. Bergman, 416 F. Supp. 496, 502 (S.D.N.Y. 1976).

31.     Buell, *supra* note 9, at 833.

32.     *Id.*

33.     *Id.*

34.     *Id.* at 834.

35.     *See* Mark H. Allenbaugh, *"Drawn from Nowhere": A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, 26 FED. SENT'G REP. 19, 19 (2013) ("Just over twenty-five years ago, when assigned the task of developing the initial set of sentencing guidelines, the new U.S. Sentencing Commission began by compiling data on 10,000 federal sentences, from which it sought to build a comprehensive picture of past sentencing practices. After reviewing these data, the Commission decided that sentences for white-collar offenses had historically been too low compared to so-called 'street crimes' involving similar economic losses. Accordingly, the Commission intentionally crafted the initial set of guidelines to require more severe punishment, and more frequent use of imprisonment, than had historically been the case for typical white-collar offenses." (footnotes omitted)); Richman, *supra* note 27, at 55.

to the fact that the heightened deterrent effect of incarceration and the readily perceivable receipt of just punishment accorded by incarceration were of critical importance."[36]

B.   THE SENTENCING REFORM ACT OF 1984 AND THE SENTENCING GUIDELINES

1.   Introduction

Since the guidelines went into effect in the fall of 1987, the U.S. Sentencing Commission has divided the post-SRA and guideline regime into four eras for statistical purposes.[37] They are the *Koon* era,[38] the PROTECT Act era,[39] the *Booker* era,[40] and the *Gall* era.[41] Figure 1 below depicts a timeline of these four sentencing eras and this Part will discuss each era in turn. It is important to remember that prior to the implementation of the SRA, federal judges had virtually unlimited sentencing discretion, and after *Booker* and *Gall* much of that discretion was returned.

**Figure 1: Timeline of Federal Sentencing Periods**



2.   Pre-*Koon* and the Creation of the SRA and the Guidelines

The Senate Report on the proposed SRA legislation is illuminating:[42]

---

36.   S. REP. NO. 98-225, at 91–92 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3274–75.

37.   U.S. SENTENCING COMM'N, REPORT ON THE CONTINUING IMPACT OF *UNITED STATES V. BOOKER* ON FEDERAL SENTENCING: PART A 2–3 (2012), http://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/booker-reports/2012-booker/Part_A.pdf.

38.   *See generally* Koon v. United States, 518 U.S. 81 (1996).

39.   *See* Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today (PROTECT) Act of 2003, Pub. L. No. 108-21, 117 Stat. 650 (codified as amended in scattered sections of 18, 21, 28, 42 and 47 U.S.C.).

40.   *See generally* United States v. Booker, 543 U.S. 220 (2005).

41.   *See generally* Gall v. United States, 552 U.S. 38 (2007).

42.   *See* S. REP. NO. 98-225, at 38 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3221.

*IOWA LAW REVIEW*                    [Vol. 102:939

The Report referred to the "outmoded rehabilitation model" for federal criminal sentencing, and recognized that the efforts of the criminal justice system to achieve rehabilitation of offenders had failed. It observed that the indeterminate-sentencing system had two "unjustifi[ed]" and "shameful" consequences. The first was the great variation among sentences imposed by different judges upon similarly situated offenders. The second [allegedly unjustified consequence] was the uncertainty as to the time the offender would spend in prison. Each was a serious impediment to an evenhanded and effective operation of the criminal justice system. The Report went on to note that parole was an inadequate device for overcoming these undesirable consequences.[43]

However, before settling on and passing the mandatory-guideline system of federal sentencing, Congress considered and rejected "other competing proposals for sentencing reform."[44] Specifically, Congress rejected both strict determinate sentencing and an advisory guideline system.[45] Instead, Congress settled on the mandatory guideline system because it felt that this "system would be successful in reducing sentence disparities while retaining the flexibility needed to adjust for unanticipated factors arising in a particular case."[46]

In recognition of this concern, the fraud guideline that emerged was "driven by the economic 'loss' that judges were charged with calculating, a task that turned out to be enormously complex, challenging courts to devise methodologies for calculating 'intended' or 'actual' loss and, sometimes, gain."[47] Moreover, unlike the guideline penalties for most other offenses that *allegedly* used pre-guideline empirical data developed by the initial Sentencing Commission, economic crime guidelines were ratcheted up in excess of this prior judicial sentencing data.[48] In effect, the Commission and the guideline

---

43.   Mistretta v. United States, 488 U.S. 361, 366 (1989) (first alteration in original) (citing S. REP. NO. 98-225, at 38, 65, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3221).

44.   *Id.* at 367.

45.   *Id.* Congress determined that the SRA was superior to fixed or determinative sentencing because it provided more discretion in terms of guideline ranges rather than a fixed sentence. Yet by making the guidelines mandatory, it avoided the problems that states were having with judges ignoring voluntary guidelines and creating unwarranted sentencing disparity. S. REP. NO. 98-225, at 78–79.

46.   *Mistretta*, 488 U.S. at 367.

47.   Richman, *supra* note 27, at 56.

48.   *See* James E. Felman, *The Need to Reform the Federal Sentencing Guidelines for High-Loss Economic Crimes*, 23 FED. SENT'G REP. 138, 138 (2010). We use the term *allegedly* because, while the Sentencing Commission did examine presentence reports from 10,000 prior cases to help determine the initial guideline ranges, it inexplicably deleted from its calculations the 50% of offenders who received probation—thus, in our view, rendering its claim that the guidelines are empirically based fraudulent. *See* Mark Osler & Mark W. Bennett, *A "Holocaust in Slow Motion?": America's Mass Incarceration and the Role of Discretion*, 7 DEPAUL J. FOR SOC. JUST. 117, 140–41

equalized the white-collar fraud offenses with blue-collar theft offenses.[49] However, even with these changes, as noted expert and scholar on the guidelines, Professor Frank O. Bowman, III, explained, "to many observers, economic crime sentences still appeared quite low, both by comparison with sentences imposed for other offenses (particularly narcotics), and as measured by their moral seriousness and the damage they inflict on society."[50]

Thus, "[t]he upward ratchet of the Guidelines for economic crimes began at the beginning—with the initial set of Guidelines."[51] The original fraud guideline, section 2F1.1 of the United States Sentencing Guidelines of 1987, was designed by the Sentencing Commission to alter the pre-guideline status quo of frequent probation to ensure that a much higher percentage of white-collar offenders received terms of incarceration.[52] At least some of this initial adjustment may well have been a necessary step, if the goals for the increase were to counteract the extra empathic connection that federal judges felt with these specific defendants.[53]

(2014) ("The Sentencing Commission claimed that it reviewed 10,000 pre-sentence reports from fiscal year 1984 and 100,000 cases from the computerized files of the U.S. Administrative Office from 1983 to 1985 (not just drug cases, but all types of criminal cases). Even though the Sentencing Commission farmed this data, it immediately, and arbitrarily, without explanation then or now, jettisoned the nearly 50% of federal sentences where a defendant was given probation—thus hijacking realistic data from prior federal sentencing practices. To make matters worse, the Sentencing Commission abandoned the empirical approach of prior sentences, even with the skewed data of eliminating cases with probation, for a new, significantly harsher approach." (footnotes omitted)).

49.  *See* Alan Ellis et al., *At a "Loss" for Justice: Federal Sentencing for Economic Offenses*, 25 CRIM. JUST., no. 4, Winter 2011, at 34, 36.

50.  Frank O. Bowman, III, *The 2001 Federal Economic Crime Sentencing Reforms: An Analysis and Legislative History*, 35 IND. L. REV. 5, 29 (2001).

51.  Felman, *supra* note 48, at 138.

52.  *See* Frank O. Bowman, III, *Damp Squib: The Disappointing Denouement of the Sentencing Commission's Economic Crime Project (and What They Should Do Now)*, 27 FED. SENT'G REP. 270, 271 (2015).

53.  Indeed, there are reasons to believe that empathy is not felt equally for all types of defendants. Various neuropsychological and social psychological studies have demonstrated that people display much different empathic responses when harm is imposed upon in-group members as opposed to out-group members. For example, in a study of affective empathy, researchers using functional magnetic resonance imaging found that Chinese and White participants exhibited different brain activity levels when watching in-group and out-group members in pain. *See* Xiaojing Xu et al., *Do You Feel My Pain? Racial Group Membership Modulates Empathic Neural Responses*, 29 J. NEUROSCIENCE 8525, 8528 (2009). Participants who watched in-group members experience pain produced empathetic brain responses, but did not have the same empathetic response when watching out-group members experience pain. *Id.* Another study found that White participants experienced greater skin conductance responses when they watched White people in pain than when they watched African people in pain. *See generally* Matteo Forgiarini et al., *Racism and the Empathy for Pain on Our Skin*, FRONTIERS PSYCHOL., May 23, 2011, at 1. The researchers also connected these results to implicit racial bias, finding that the more implicit racial bias a participant showed—measured using an implicit association test—the more likely they were to display a race-based empathetic response bias in favor of White people. *Id.* at 1–2. If federal judges indeed feel as though they have traits in common with white-collar defendants, the above research would predict that the unequal empathic response could have sentencing consequences. *See* Robert

*IOWA LAW REVIEW* [Vol. 102:939]

The SRA, as adopted, changed the prior indeterminate sentencing scheme in five important ways described by the Court in *Mistretta*:

> 1. It reject[ed] imprisonment as a means of promoting rehabilitation, and it state[d] that punishment should serve retributive, educational, deterrent, and incapacitative goals.

> 2. It consolidate[d] the power that had been exercised by the sentencing judge and the Parole Commission to decide what punishment an offender should suffer. This [was] done by creating the United States Sentencing Commission, directing that Commission to devise guidelines to be used for sentencing, and prospectively abolishing the Parole Commission.

> 3. It ma[de] all sentences basically determinate. A prisoner [was] to be released at the completion of his sentence reduced only by any credit earned by good behavior while in custody.

> 4. It ma[de] the Sentencing Commission's guidelines binding on the courts, although it preserve[d] for the judge the discretion to depart from the guideline applicable to a particular case if the judge f[ound] an aggravating or mitigating factor present that the Commission did not adequately consider when formulating guidelines. The Act also require[d] the court to state its reasons for the sentence imposed and to give 'the specific reason' for imposing a sentence different from that described in the guideline.

> 5. It authorize[d] limited appellate review of the sentence. It permit[ted] a defendant to appeal a sentence that [wa]s above the defined range, and it permit[ted] the Government to appeal a sentence that [was] below that range. It also permit[ted] either side to appeal an incorrect application of the guideline.[54]

Finally, "[t]he maximum of the range ordinarily may not exceed the minimum by more than the greater of 25% or six months, and each sentence is to be within the limit provided by existing law."[55]

It took the Commission only two years, however, before it raised "the penalties for economic crimes through a new loss table."[56] Nonetheless, these initial sentences for white-collar fraud cases, while more severe than they had been prior to the passage of the SRA and the guidelines, were a mere harbinger of the far more intensive guideline ranges for white-collar

---

J. Smith et al., *Implicit White Favoritism in the Criminal Justice System*, 66 ALA. L. REV. 871, 918–23 (2015) (discussing the automatic associations of positive stereotypes and attitudes with White Americans, and how this leads to implicit White favoritism in criminal law).

54.    Mistretta v. United States, 488 U.S. 361, 367–68 (1989) (citations omitted).

55.    *Id.* at 368.

56.    Felman, *supra* note 48, at 138.

crimes to come.[57] For instance, with the initial guideline, the amount of the fraudulent loss could only increase the sentencing range fivefold—under the current fraud guideline, that increase is nearly fortyfold.[58] Similarly, the highest loss in the original loss table was only $5 million and contained only one SOC enhancement of two levels if the fraud crime involved "more than minimal planning" (and a few other factors).[59] Thus, the maximum guideline range for a first-time offender under this original fraud guideline resulted in a guideline "sentencing range of 30–37 months."[60] Just two years later, the Sentencing Commission increased the loss table by several levels so that the highest loss in the loss table went from $5 million to $80 million—increasing the sentencing range from 30 to 37 months to 51 to 63 months—without adding any other SOCs.[61] By 2000, the Commission added 16 SOCs to the fraud guideline in addition to loss amount, an increase of 15 over the original fraud guideline.[62] Increases also followed the Commission's Economic Crime Package of 2001 and the 2002 passage of the Sarbanes-Oxley Act.[63]

As discussed below, following the passage of the SRA and the effective date of the guidelines in the fall of 1987, there have been two notable sentencing shifts: (1) the *Koon* decision, coupled with the PROTECT Act; and (2) the more recent and immensely more significant *Booker* and *Gall* decisions that have returned substantial discretion back to sentencing judges.

### 3.   *Koon,* the PROTECT Act, and the Standard of Review

The *Koon* period, from 1996 to 2003, reflected the decision in *United States v. Koon*[64] that a district court's decision to depart from "the Guidelines were entitled to deference on appeal by adopting an abuse of discretion standard of review" rather than the *de novo* standard.[65] However, in 2003, seeking to

---

57.     *See* Ellis et al., *supra* note 49, at 36.

58.     Felman, *supra* note 48, at 140.

59.     *See* Bowman, *supra* note 52, at 271.

60.     *See id.* This range is without any Chapter 3 adjustments or acceptance of responsibility. *Id.* at 281 n.9.

61.     *Id.* at 271.

62.     *See id.*

63.     *See* U.S. SENTENCING COMM'N, FINAL REPORT ON THE IMPACT OF *UNITED STATES V. BOOKER* ON FEDERAL SENTENCING 74 (2006); *see also* Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745. Among other matters, section 903 of Sarbanes-Oxley increased the maximum sentences for mail and wire fraud from 5 years to 20 years. The Economic Crime Package was "a group of amendments to guidelines governing the sentencing of economic crimes" that the Commission approved in April of 2001. Bowman, *supra* note 50, at 7 (detailing the history of the economic crime package and its effect on the Federal Sentencing Guidelines).

64.     Koon v. United States, 518 U.S. 81 (1996).

65.     Mark W. Bennett, *Confronting Cognitive "Anchoring Effect" and "Blind Spot" Biases in Federal Sentencing: A Modest Solution for Reforming a Fundamental Flaw,* 104 J. CRIM. L. & CRIMINOLOGY 489, 512 (2014); *see also Koon,* 518 U.S. at 96–100.

restrict judges' departures under the guidelines in the post-*Koon* era, Congress passed the Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today Act ("PROTECT Act").[66] Specifically, the purpose of the PROTECT Act was to "restrict[] the use of departures by sentencing courts and change[] the standard of review for departures [back] to *de novo*."[67] Thus, the perennial tug-of-war surrounding the boundaries of judicial discretion continued.

    4.  *Booker* Guideline Sentencing—the Current Federal Sentencing Regime

    The limitations of judicial discretion inherent in the PROTECT Act did not last long. In 2005, *United States v. Booker* ushered in a federal sentencing revolution by (1) declaring the U.S. Sentencing Guidelines unconstitutional, and (2) establishing a constitutionally saving remedy by making the guidelines advisory rather than mandatory.[68] Consequently, the so-called *Booker* revolution marked the Maginot line[69] between the mandatory sentencing guideline regime and the new advisory guideline-sentencing scheme.[70]

---

    66.    *See* Prosecutorial Remedies and Other Tools to End the Exploitation of Children Today (PROTECT) Act of 2003, Pub. L. No. 108-21, 117 Stat. 650 (codified as amended in scattered sections of 18, 21, 28, 42 and 47 U.S.C.).

    67.    Bennett, *supra* note 65, at 512.

    68.    *See* United States v. Booker, 543 U.S. 220 (2005). *See also* Bennett, *supra* note 65, at 513–14.

    69.    "The Maginot Line, sometimes known as the Great Wall of France, was the last of the great gun-bearing fortifications and was both praised and criticized for its role in history. It was conceived in the 1920s to shield the French frontier against an anticipated threat from a resurgent Germany in the 1930s." J. E. KAUFMANN & H.W. KAUFMANN, FORTRESS FRANCE: THE MAGINOT LINE AND FRENCH DEFENSES IN WORLD WAR II xv (2006).

    70.    Actually, the seeds of the post-*Booker* sentencing revolution were sown in the somewhat obscure case of *Jones v. United States*, 526 U.S. 227 (1999). In *Jones*, the Supreme Court interpreted a federal carjacking statute, 18 U.S.C. § 2119 (Supp. V 1988), to define three separate offenses rather than a single offense with potentially three different maximum sentences triggered by aggravating factors that were not found by a jury. *Jones*, 526 U.S. at 251–52. This interpretation avoided the potential due process and Sixth Amendment constitutional issues identified by the Court. *Jones*, 526 U.S. at 239–52. The following year, in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court answered the question raised, but not decided, in *Jones* and held:

        In sum, our reexamination of our cases in this area, and of the history upon which they rely, confirms the opinion that we expressed in *Jones*. Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.

*Apprendi*, 530 U.S. at 490. Then, in *Blakely v. Washington*, 542 U.S. 296, 313–14 (2004), the Court extended the *Apprendi* rationale to invalidate a state mandatory sentencing regime because the Sixth Amendment right to a jury trial prohibited a state sentencing judge from enhancing a criminal sentence three years above the 53-month maximum sentence based on facts not decided by a jury or admitted by a defendant, in this case, that Ralph Howard Blakely, Jr. acted with deliberate cruelty. *Blakely*, 542 U.S. at 298, 313–14. *Blakely*, thus, refined the *Apprendi* rule by

As way of background, "*Booker*, in short, held the [U.S.] Sentencing Guidelines [to be] unconstitutional under the [Court's previous] *Apprendi-Blakely* rationale."[71] Specifically, the Court found that the guidelines were unconstitutional as they had allowed the sentencing judge to enhance "Freddie Booker's sentence beyond the 262-month sentence he could have imposed . . . to 360 months based [solely] on facts the judge found by a preponderance of the evidence," rather than the facts the jury had found beyond a reasonable doubt.[72]

However, as explained above, the Court also provided a constitutional remedy when it made the guidelines *advisory* rather than mandatory.[73] This remedy did two specific things.

> First, it severed and excised the provision of the SRA that made the [U.S. Sentencing] Guidelines mandatory and binding on federal judges, 18 U.S.C. § 3553(b)(1). The Court noted that had Congress made the [U.S.] Sentencing Guidelines advisory rather than mandatory, the SRA would fall 'outside the scope of *Apprendi*'s requirement.'[74]

That is: "Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be admitted by the defendant or proved to a jury beyond a reasonable doubt."[75] "Second, the Court severed and excised 18 U.S.C. § 3742(e), which 'sets forth standards of review on appeal, including *de novo* review of departures from the applicable Guidelines range.'"[76] It substituted reasonableness review of the sentence pursuant to 18 U.S.C. § 3553(a).[77] "Thus, *Booker* made clear that mandatory guidelines violated the Sixth Amendment right to trial by jury by extending the Court's prior holdings in *Apprendi* and *Blakely* to the United States

---

holding:

> In other words, the relevant "statutory maximum" is not the maximum sentence a judge may impose after finding additional facts, but the maximum he may impose *without* any additional findings. When a judge inflicts punishment that the jury's verdict alone does not allow, the jury has not found all the facts "which the law makes essential to the punishment," and the judge exceeds his proper authority.

*Id.*, 542 U.S. at 303–04 (citation omitted). "*Blakely* made *Booker*'s constitutional holding all but inevitable . . . ." Scott Michelman & Jay Rorty, *Doing* Kimbrough *Justice: Implementing Policy Disagreements with the Federal Sentencing Guidelines*, 45 SUFFOLK U. L. REV. 1083, 1093 (2012).

71.    *See* Bennett, *supra* note 65, at 513–14.

72.    *Id.* at 514 (citing *Booker*, 543 U.S. at 227, 243–44).

73.    *Booker*, 543 U.S. at 245.

74.    Bennett, *supra* note 65, at 514 (quoting *Booker*, 543 U.S. at 259) (footnote omitted).

75.    *Booker*, 543 U.S. at 244.

76.    Bennett, *supra* note 65, at 514 (quoting *Booker*, 543 U.S. at 259).

77.    *Booker*, 543 U.S. at 261–62.

Sentencing Guidelines."[78] In rendering the guidelines advisory *Booker* restored significant discretion to federal district judges.

5.   The Overlay of *Gall* and the *Booker* Advisory Guidelines

Two years later, the U.S. Supreme Court expanded its decision in *Booker* when it decided *Gall v. United States*.[79] In *Gall*, the Court "explained that trial court judges are 'in a superior position to find facts,' determine the credibility of the witnesses, apply the § 3553(a) factors, and 'gain[] insights not conveyed by the record.'"[80] The section 3553(a) factors include, *inter alia*, "the nature and circumstances of the offense[;] . . . the history and characteristics of the defendant"; and the need "to reflect the seriousness of the offense[;] to promote respect for the law[;] to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and . . . to avoid unwarranted sentence disparities."[81] "Quoting from its earlier opinion in *Koon*, the Court emphasized the historic role of a federal sentencing judge"[82] and reaffirmed the importance of judicial discretion: "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."[83] "The Court further observed, '[I]t is not for the Court of Appeals to decide *de novo* whether the justification for a variance is sufficient or the sentence reasonable.'"[84] "Rather, under the more deferential 'abuse-of-discretion review, the Court of Appeals should have given due deference to the District Court's reasoned and reasonable decision that the §[ ]3553(a) factors, on the whole, justified the sentence.'"[85]

Thus, the combination of *Booker* and *Gall* swung the pendulum back toward judicial discretion, and gave federal sentencing judges wider discretion to both apply the section 3553(a) factors and to also achieve the overarching principle of federal sentencing, namely that every federal district court judge "shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing.[86]

---

78.    Bennett, *supra* note 65, at 514.

79.    *See* Gall v. United States, 552 U.S. 38 (2007).  The remainder of this paragraph builds upon a previous description of *Gall* written by the lead author of this Article, Mark W. Bennett. *See* Bennett, *supra* note 65, at 516–17.

80.    Bennett, *supra* note 65, at 517 (alteration in original) (quoting *Gall*, 552 U.S. at 51).

81.    18 U.S.C. § 3553(a) (2012).

82.    Bennett, *supra* note 65, at 517.

83.    *Gall*, 552 U.S. at 52 (quoting Koon v. United States, 518 U.S. 81, 113 (1996)).

84.    Bennett, *supra* note 65, at 517 (alteration in original) (quoting *Gall*, 552 U.S. at 59).

85.    *Id.* (alteration in original) (quoting *Gall*, 522 U.S. at 59–60).

86.    18 U.S.C. § 3553(a).

### 6. Summary

In their seminal book on the Federal Sentencing Guidelines, Judge José Cabranes and Professor Kate Stith criticized the guidelines' approach of relying so heavily on tying the length of a sentence to quantifiable differences in harm.[87] They wrote: "Unfortunately, the Sentencing Commission has nowhere stated, much less explained, why these quantifiable differences in harm caused are *appropriate* measurements of the extent of individual culpability, or why they are more significant than other sentencing factors that receive less weight in Guidelines sentencing calculations."[88] The authors give a prime example of their criticism: "Why, for instance, should the bank robber who is handed a bag containing $5,000 be punished differently from the bank robber who happens to be handed a bag containing $15,000?"[89] Cutting even more sharply to the quick, they write: "Indeed, the Commission has never explained the rationale underlying *any* of its identified specific offense characteristics, why it has elected to identify certain characteristics and not others, or the weights it has chosen to assign to each identified characteristic."[90] Thus, because of the Commission's preoccupation and reliance with "quantifiable offense characteristics," the guidelines short shrift both mitigating and aggravating factors relative to culpability and harm.[91]

In the arc of just two decades, federal sentencing in general, and white-collar sentencing in particular, has come nearly full circle. It has evolved from virtually unlimited pre-SRA and guideline sentencing discretion, to extremely limited sentencing discretion under the SRA and guidelines, to post-*Booker* and *Gall* sentencing that emphasizes the objective nature of the guidelines tempered and infused by the discretionary nature of the section 3553(a) sentencing factors. This results in the current sentencing regime, where the overarching sentencing principle is reasonableness.[92]

The evolution of action by Congress, the Sentencing Commission, and the courts has, thus, resulted in the restoration of judicial discretion in federal white-collar sentencing. However, the starting point for such sentencing has shifted drastically during this same period, with massive sentence range recommendations sometimes awaiting many economic criminals. Individual trial judges and commentators have put up scholarly resistance, but without

---

87.   *See* KATE STITH & JOSÉ A. CABRANES, FEAR OF JUDGING: SENTENCING GUIDELINES IN THE FEDERAL COURTS 69–70 (1998).

88.   *Id.* at 69.

89.   *Id.*

90.   *Id.*

91.   *Id.* at 70.

92.   *See* Kimbrough v. United States, 552 U.S. 85, 111 (2007) ("The ultimate question in Kimbrough's case is 'whether the sentence was reasonable—*i.e.*, whether the District Judge abused his discretion in determining that the § 3553(a) factors supported a sentence of [15 years] and justified a substantial deviation from the Guidelines range.'" (alteration in original)).

analyzing aggregate data on actual fraud sentencing or empirically examining how judges respond to the same type of case, it is difficult to make conclusions about how and whether judges actually deviate from the harsh sentencing guidelines. In the following Part, we therefore report and consider such sentencing data through 2014, paying special attention to sentencing discretion in white-collar crimes with multimillion-dollar damages. In Part IV, we then turn to the empirical study we conducted, which examined 240 sitting federal and state judges' sentences in a white-collar fraud case with multimillion-dollar harm and a long recommended sentence.

### III.   A LOOK AT CURRENT FEDERAL FRAUD OFFENDER SENTENCING DATA

The post-*Booker* and *Gall* restoration of judicial discretion reignited the need to analyze and understand judicial decision-making in white-collar sentencing. Here, we begin to do that by reviewing U.S. Sentencing Commission data, which paints a detailed picture of fraud frequency, federal sentencing, and judicial discretion in modern white-collar fraud jurisprudence. Our review indicates that, over time, the number of federal fraud convictions has increased, the average dollar amount for these crimes has increased, and, perhaps most importantly, the gap between the average minimum sentence and the actual sentence rendered has increased.

#### A.   OVERVIEW OF OFFENDERS' SENTENCES UNDER THE U.S. SENTENCING FRAUD GUIDELINES—2014

In fiscal year 2014, 8,216 offenders were sentenced under the basic economic offenses U.S. Sentencing Guideline section 2B1.1 ("fraud guideline").[93] This accounted for 12.1% of all offenders sentenced under the guidelines in federal court that year.[94] Most offenders sentenced under this guideline were male (66.5%); 44.7% were White, 32.3% black, 16.1% Hispanic and 6.9% were other races.[95]

The average age of an offender sentenced under section 2B1.1 in 2014 was 43 years old.[96] These offenses were overwhelmingly committed by U.S. citizens (88.8%).[97] Furthermore, because 71.4% were assigned a guideline Criminal History Category I, the lowest criminal history score under the guidelines, the vast majority of offenders were clearly first-time offenders or had little criminal history.[98]

---

93.   *See* U.S. SENTENCING COMM'N, QUICK FACTS: THEFT, PROPERTY DESTRUCTION, AND FRAUD OFFENSES 1 (2014), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Quick_Facts_Theft_Property_Destruction_Fraud_FY14.pdf.

94.   *See id.*

95.   *Id.*

96.   *Id.*

97.   *Id.*

98.   *Id.*

While large fraud schemes like Bernie Madoff's infamous Ponzi scheme immediately come to mind, in fact, in 2014, 81.6% of the 8,216 section 2B1.1 offenses involved less than $1 million dollars and slightly over half (50.4%) involved $120,000 or less.[99] However, that leaves 1,512 offenders who were sentenced under the fraud guideline with more than $1 million in loss—more than 18% of all offenders sentenced pursuant to the fraud guideline in 2014. The average length of sentence for the 8,216 offenders sentenced in 2014 was 24 months.[100] Nearly a third were given probation (29.9%).[101]

### B. OVERVIEW OF TRENDS FOR OFFENDERS SENTENCED UNDER THE U.S. SENTENCING FRAUD GUIDELINE

#### 1.    Number of Fraud Offenders Increased

The number of offenders sentenced under section 2B1.1 has, from 2003 to 2012, increased by 34.3%.[102] However, the percentage of fraud

---

99.    *See id.* This is exemplified by the data represented in the following table and graph. Note that with the exception of the Virgin Islands, the other nine federal judicial districts represented reported an average median loss value of a mere $131,659 in 2012. *See* U.S. SENTENCING COMM'N, NUMBER OF §2B1.1 CASES IN EACH FEDERAL JUDICIAL DISTRICT WITH MEAN AND MEDIAN LOSS AMOUNTS FY2012 (2012), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/economic-crimes/20130918-19-symposium/Number_of_Cases_FY2012.pdf

**Number of §2B1.1 Cases in Each Federal Judicial District with Mean and Median Loss Amounts in 2012**

| Rank | | Number | Percent | Mean Loss | Median Loss |
|---|---|---|---|---|---|
| 1 | Florida South | 490 | 5.8% | $2,820,082 | $499,107 |
| 2 | New York South | 309 | 3.6% | $2,011,198 | $170,000 |
| 3 | California Central | 274 | 3.2% | $1,936,383 | $193,945 |
| 4 | Florida Middle | 274 | 3.2% | $2,823,931 | $169,541 |
| 5 | Texas West | 255 | 3.0% | $656,958 | $32,125 |
| 90 | *** Oklahoma East | 18 | 0.2% | $74,722 | $37,418 |
| 91 | Delaware | 17 | 0.2% | $120,420 | $62,582 |
| 92 | Alaska | 9 | 0.1% | $673,789 | $18,937 |
| 93 | Northern Mariana Islands | 6 | 0.1% | $1,950 | $1,275 |
| 94 | Virgin Islands | 3 | 0.0% | $732,378 | $1,098,567 |

100.    *See* U.S. SENTENCING COMM'N, *supra* note 93, at 1.

101.    *See id.*

102.    *See* U.S. SENTENCING COMM'N, SENTENCING AND GUIDELINE APPLICATION INFORMATION FOR § 2B1.1 OFFENDERS 1 (2013), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/economic-crimes/20130918-19-symposium/Sentencing_Guideline_Application_Info.pdf. In 2003, the number of offenders sentenced under § 2B1.1 was 6,332, compared to 8,507 offenders sentenced under § 2B1.1 in 2012. *Id.* fig.1. ("Of the 769,466 cases, 101,622 were excluded due to incomplete guideline application information. Of the 667,844 remaining cases, 591,882 were excluded that were not sentenced under

offenders compared to all offenders in each year remained consistent at approximately 11% of the federal offenders sentenced during this decade.[103]

2.   Average Guideline Increase Outpaces Minimum Sentence Increase

Over the same decade, the average guideline minimum for an offender increased from 10 months to 29 months.[104] The average sentence increased from ten months to 22 months—increases of 190% and 120%, respectively.[105] Thus, as Figure 2 shows, the actual length of a sentence increased at a slower rate than the increasing minimum guideline. Furthermore, the statistics more broadly demonstrate that the *average* sentence has not even reached that of the *minimum* guideline since 2004. In fact, from 2009 to 2012, the average guideline minimum increased six months, yet the average sentence length increased by only two months, indicating that, while sentences became stiffer, judges have chosen not to keep up.[106]

**Figure 2: Average Sentence Length and Average Guideline Minimum for Section 2B1.1 Offenders (2003–2012)[107]**



§ 2B1.1. Of the remaining 75,962 cases sentenced under §2B1.1, 1,112 were excluded that were sentenced using a *Guidelines Manual* in effect prior to November 1, 2001.").

103.    *See id.* fig.1.

104.    *See id.* at 3 fig.3.

105.    *See id.* fig.3.

106.    *See id.* fig.3.

107.    *Id.* fig.3 ("Calculation of the mean includes sentences of probation as zero months and any term of confinement as described in USSC § 5C1.1.  Sentences of 470 months or longer (including life) are included in the calculation as 470 months. An additional 75 cases were excluded due to missing information on sentence length.").

### 3.   Amount of Loss Increased

As the minimum guideline range and ultimate length of sentence increased, so too did the amount of loss. Indeed, this is not surprising as the dollar amount of the loss is a major determinant of the guideline range. "The median loss amount increased steadily" over the decade from $18,414 in 2003 to $95,408 in 2012, a 418.12% increase (not adjusted for inflation).[108]

### 4.   Average Guideline Minimum Exceeds Sentence Length, Especially for Huge Offenders

In the 2012 Guidelines Manual, section 2B1.1(b)(1), the fraud guidelines monetary table contains 16 SOCs based on the amount of the loss expressed in ranges.[109] For example, the lowest range is $5,000 or less, the next is more than $5,000, and the one after that is more than $10,000, all the way up to the highest: more than $400,000,000.[110] Each increase in the SOC beyond the lowest one adds a two point incremental upward increase in the offense level before other adjustments are made, thus increasing the length of the guideline sentence based on the loss amount.[111] This guideline, and other monetary tables within the guidelines, was amended effective November 1, 2015, "to account for inflation."[112]

Figures 3 and 3A below represent the average guideline and sentence imposed for fraud offenders in 2012 for each of the loss table categories that existed before the 2015 Guidelines Manual adjusted the loss levels for inflation. These figures also show the number of offenders in each loss category. For example, at the lowest loss category for 2012, $5,000 or less, there were 1,247 offenders sentenced. This was the highest number of offenders sentenced in any loss category. At the highest end of the loss categories, $400,000,000, there were just nine offenders sentenced. Somewhere close to the middle of the loss categories (more than one million but less than 2.5 million), there were 727 offenders. The vast majority of fraud offenders, 83.0%, in 2012, were from the lower half of the loss tables, involving $1,000,000 or less.

---

108.    *Id.* at 2 fig.2 ("An additional 11,356 cases were excluded due to missing information on exact loss amount. The median is the midpoint so that half of the loss amounts are greater than the median and the remaining half of are less than the median.").

109.    U.S. SENTENCING GUIDELINES MANUAL § 2B1.1(b)(1)(A)–(P) (U.S. SENTENCING COMM'N 2012).

110.    *Id.*

111.    *Id.*

112.    PATTI B. SARIS, U.S. SENTENCING COMM'N, 2015 U.S. SENTENCING GUIDELINES MANUAL COVER LETTER 1 (2015); *see also supra* note 12 and accompanying text (providing the current dollar range for section 2B1.1(b)(1)).

*IOWA LAW REVIEW* [Vol. 102:939

**Figure 3: Average Sentence Length and Average Guideline Minimum
for Each Section 2B1.1 Loss Table Category (2012)[113]**



113.    *See* U.S. SENTENCING COMM'N, *supra* note 102, at 7 fig.7 ("Of the 84,173 cases in the fiscal year 2012 datafile, 9,678 were excluded due to incomplete guideline application information. Of the 74,495 remaining cases, 65,985 were excluded that were not sentenced under § 2B1.1. Of the remaining 8,510 cases sentenced under § 2B1.1, three were excluded that were sentenced using a *Guidelines Manual* in effect prior to November 1, 2001 or for other logical criteria. An additional two cases were excluded due to missing information on sentence imposed.").

**Figure 3A: Average Sentence Length and Average Guideline Minimum for Each Section 2B1.1 Loss Table Category (2012)**



From this data, it is clear that, as the loss increases, so does the gap between the average guideline minimum (which increases rapidly) and the average sentence (which increases less rapidly).[114] The percent of sentences within the guideline range for offenders in the lowest loss category ($5,000 or less) was 84.1%.[115] Between $7 and 20 million, it dropped to 26.8%, while

---

114.   *Id.*

115.   *Id.* at 8.

*IOWA LAW REVIEW* [Vol. 102:939

for the nine offenders in the more than $400,000,000 loss category, the drop was 0.0%.[116]

### 5.   Summary

While massive white-collar fraud schemes grab the news headlines, the data establish that most white-collar fraud offenders in federal court remain nameless and faceless, and their cases involve loss amounts far tinier than the front-page news grabbers. The median loss in all federal cases under guideline section 2B1.1 in 2014 was only $118,081.[117] The data also show, however, that these "run-of-the-mill" economic criminals, like their high-value criminal counterparts, regularly receive sentences below the recommended sentencing guidelines. The statistical evidence on sentencing discretion, then, raises the question of whether, after three decades of sentencing reform, judges still empathize with economic criminals (as they were reported to do in the 1980s),[118] or if the sentencing guidelines simply failed to approximate judges' proper estimates of the harm done. Our study aimed to further investigate these trends.

## IV.   THE EMPIRICAL STUDY

### A.   INTRODUCTION

In an effort to explore how federal judges make white-collar sentencing decisions in a modern context, we designed a study to measure judges' sentences and sentencing philosophies in the context of a medium-to-high value (approximately $7 million) economic crime. We deployed the study among a group of 240 federal district court judges, federal magistrate judges, and state trial judges. Federal judges from all 12 circuits (including the D.C. Circuit) participated in the study, as did state court judges from eight different states. We conducted the study using three cohorts of judges, not only to get a broad judicial sample, but also to be able to compare the responses of the different types of judges. For example, if federal district court judges' sentences are more lenient than magistrate or state court judges for the exact same crime, it could potentially be due to these judges' familiarity with, and wariness of, the Federal Sentencing Guidelines. In addition to measuring sentencing discretion and the effect of retribution theories versus mercy theories of punishment across all three types of judges, we were also interested in measuring whether judges harbored stereotypes related to a defendant that would affect their judgment.[119] Furthermore, we wanted to

---

116.   *Id.*

117.   U.S. SENTENCING COMM'N, *supra* note 93, at 1.

118.   *See supra* Part II.A.

119.   The group-membership and stereotype-related bias portion of this empirical study is presented and considered in depth in Justin D. Levinson, Mark W. Bennett & Koichi Hioki, *Judging*

investigate the relationship, if any, between the judges' sentences and their sentencing philosophies, age, judicial experience, gender, religion, or the political affiliation of the relevant appointing United States President.

### B.   PARTICIPANTS

Two hundred and forty judges participated in the study, all of whom participated voluntarily on their own time and on their own computers. One hundred and eighty federal judges participated in the study, 100 of whom were district court judges, and 80 of whom were magistrate judges. Fifty-nine state judges from eight states participated in the study. Seventy-one percent of the judges were male and 29% were female.  The vast majority of judges (91.6%) identified themselves as White.  Three percent identified themselves as African American.  Two percent identified themselves as Asian, and 2% identified themselves as "more than one race."[120] The age of judge participants was collected in decades (in order to preserve anonymity) and ranged from 21–30 to 80-plus, with the majority of judges (71%) between the ages of 51 and 70.[121] In terms of religion, 31% identified themselves as Protestant, 30% identified as Catholic, 21% identified as "none," and 11% identified as Jewish.  The remaining judges identified religious affiliations including Baptist and Latter Day Saints, as well as others.

### C.   MATERIALS

After giving informed consent and completing demographic information, participants began the online study by completing the sentencing task first.

The sentencing task asked judges to read a realistic federal-style pre-sentence report for a garden-variety securities fraud case. The pre-sentence report, which is attached as Appendix B, described a fraud crime in which the alleged perpetrator had agreed to plead guilty for federal securities fraud in violation of 18 U.S.C. § 1348. Judges read that, "the defendant abused his position of trust within the company by persuading [a company for which he was the director] to give him money and stock under the guise that he was going to take the company private through a stock buyback."  The amount involved in the fraud was estimated to be between $6,800,000 and $7,200,000, an amount that was inexact because certain records had been lost.  This range created an overlapping loss amount under the guidelines then in existence. The defendant, like most white-collar offenders, had no prior criminal record. Under the Federal Sentencing Guidelines, a conviction for such a

---

*Implicit Bias: A National Empirical Study of Judicial Stereotypes,* 69 FLA. L. REV. (forthcoming 2017).

120.    We separately asked if judges identified as Hispanic or Latino.  Five percent of judges indicated that they identified as Hispanic or Latino.

121.    Thirty-seven percent reported being between the ages of 51 and 60 and 34% between the ages of 61 and 70.

*IOWA LAW REVIEW* [Vol. 102:939

crime results in a guideline sentencing range between 151 to 240 months in prison. However, the pre-sentence report was simplified to make it understandable to federal magistrate judges (who do not sentence federal felony offenders), and state trial court judges (who do, but who would lack sufficient familiarity with the Federal Sentencing Guidelines).[122] Specifically, we eliminated the guideline calculations and went with a stipulated guideline range of 151 to 235 months and an 11(c)(1)(C) plea agreement that required the judges to sentence the defendant within this range.[123]

Because we were interested in whether the defendant's group affiliation would affect judicial response as reflected in sentencing, judges were given a case that described either a White defendant, an Asian defendant, a Christian defendant, or a Jewish defendant.[124] The religion of the defendant was identified by stating that the defendant and his wife were active in either the Christian or Jewish community, and that the defendant's brother served as a member of the clergy of either a Christian church or Jewish synagogue. All other information about the defendant was identical, including age (47), marital status (married), citizenship (U.S.), birthplace (Chicago, IL), and education (Master's degree). Judges then completed an Implicit Association

---

122.   To be clear, all of the judges read the same simplified materials.

123.   *See infra* app.A.

124.   The defendant's group membership was varied by using different defendant names. The white and Christian defendants were named Nathaniel Kinnear. The Asian defendant was named Michael Zhang, a Chinese-American surname. The Jewish defendant was identified as Nathanial Goldberg.

Test[125] and reported levels of agreement or disagreement with group-related attitudes and stereotypes.[126]

### D.   STUDY LIMITATIONS

All experimental study designs have some identifiable limitations. Here, we briefly highlight some of the limitations of the current study. First, although we sought a balanced sample by inviting all federal district judges and federal magistrate judges to participate, it is possible that there are some identifiable differences among the judges who chose to respond to our invitation by participating in the study. One possible difference is that, because we indicated in the invitation that the study centered on sentencing, judges who were more interested in sentencing topics may have been more likely to respond. If those judges were not representative of the broader group of American judges (specifically with their economic crime sentencing beliefs and practices), then the data would reflect that limitation. A related sample-based limitation would have occurred if judges chose to respond (or even not to respond) based upon knowledge of the particular judge soliciting their participation. Our judicial demographics suggest a very broad sample of judges responded, but we do not know if there were judges who responded or did not respond based upon their knowledge of the soliciting judge, and if so, whether this fact would reflect any particular response bias. [127] Another limitation of the study is that it was

---

125.   Anthony G. Greenwald et al., *Measuring Individual Differences in Implicit Cognition: The Implicit Association Test*, 74 J. PERSONALITY & SOC. PSYCHOL. 1464, 1478 (1998). Two other articles explain this in a very similar way. Levinson et al., *supra* note 119; Justin D. Levinson et al., *Guilty by Implicit Racial Bias: The Guilty/Not Guilty Implicit Association Test*, 8 OHIO ST. J. CRIM. L. 187, 191 (2010) ("The IAT measures implicit cognitions in a simple and compelling way. It asks participants to categorize information as quickly as possible, and then calculates a participant's reaction time (in milliseconds) and accuracy in completing the categorization task. The wisdom behind the IAT holds that statistically significant speed and accuracy-based differences in a person's ability to categorize different types of information reflect something meaningful in that person's automatic cognitive processes." (footnote omitted)). In the study:

> Participants complete multiple trials of the pairing tasks, such that researchers can measure how participants perform in matching each of the concepts with each other. For example, in one trial of the most well known IATs, participants pair the concepts Good-White together by pressing a designated response key and the concepts Bad-Black together, with a different response key. After completion of the trial, participants then pair the opposite concepts with each other, here Good-Black and Bad-White. The computer software that gathers the data measures the number of milliseconds it takes for participants to respond to each task [to determine] whether participants hold implicit association between the attitude object and dimension tested.

*Id.* at 192 (footnotes omitted). In our empirical study, we used the software Inquisit, produced by Millisecond Software.

126.   Specifically, the judges were asked to report their attitudes and stereotypes toward Asians and Jews.  For a detailed look at these questions and the different responses of judges, see Levinson et al., *supra* note 119.

127.   Another related sample-based limitation could have occurred for our state judges, in

*IOWA LAW REVIEW* [Vol. 102:939

intentionally confined to just one economic crime-sentencing task. We chose this format because of the realistic time constraints in asking busy judges to participate in a study balanced with our desire to replicate a meaningful pre-sentence report as part of the decision-making task. It would have been possible to solicit responses to a more diverse list of sentencing tasks, but doing so would have required sacrificing the detailed reality of sentencing and relying instead on short vignettes. In the end, we chose to retain only one realistic sentencing task, with the recognition that our results are necessarily limited to the type of economic crime we tested.

### E. RESULTS

The following subsections highlight our major findings, including the fact that 75% of federal district judges sentenced at the precise bottom of the designated guideline range, that judges' ages were correlated with the length of their sentences, and that sentence lengths were predicted by judges' mercy, but not retribution, philosophies.

#### 1. Judges Regularly Sentenced at the Exact Bottom of the Range

The majority of judges sentenced the defendant at the precise bottom of the stipulated guideline range of 151 months. Specifically, 135 of 239 judges sentenced the defendant at the exact 151-month bottom of the guideline range. (The study did not allow below-range sentencing.) This comprises 56.5% of the judges surveyed.

When broken down by judicial cohorts, the data revealed significant differences between them on the length of sentencing. Federal district court judges gave the shortest sentences. Seventy-five of 100, or 75.0% of the federal district judges, sentenced at the 151-month bottom of the guideline range. Forty-four of 80, or 55.0% of the magistrate judges, sentenced at the 151-month bottom of the guideline range. Finally, 16 of 59, or 27.1% of state trial judges, sentenced at the 151-month bottom of the guideline range. The mean sentences for the judicial cohorts also reflected this finding. For all federal district judges, the mean sentence was 158.08 (SD = 13.85) months. The mean sentence for all magistrate judges was 164.51 (SD = 19.17) months. The mean sentence for all state trial judges was 174.81 (SD = 22.51) months. This difference in mean sentencing for each judicial cohort was statistically significant,[128] such that state judges sentenced longer

---

that our solicitation methods were necessarily different for that cohort. Unlike for federal district and magistrate judges, who were directly emailed solicitations, we sought and received permissions from state supreme court chief justices (and sometimes other state stakeholders) to solicit judges in their states. Although we did not disclose the specific purposes of our study as we sought permissions, it is nonetheless possible that the state judges we surveyed were not more representative of a broader state judge sample.

128.    $F_{(2, 236)} = 15.84$, p ≤.01.

than magistrate judges, who in turn sentenced longer than district court judges.

### 2.   Older Federal Judges Gave Shorter Sentences

While there was no correlation between years of judicial experience and the length of the sentence, there was a correlation between the age of the federal judge and the length of the sentence. For each of the two federal judicial cohorts, we found that the older the judge, the shorter the sentence.[129] However, there was no such correlation for state trial judges.[130] Relatedly, the age of the judges was also related to support for mercy. Across the sample of judges, the older the judges were at the time of the study, the more likely they were to self-report more agreement with mercy-related sentencing philosophies.[131]

### 3.   Federal District Court Judges (Marginal Significance) Gave Longer Sentences to Jewish (vs. Christian) Defendants; State Court Judges Gave Longer Sentences to White (vs. Asian) Defendants

Although there is reason to believe that judges would perhaps be influenced by the defendant's group membership in sentencing,[132] the results indicated that, for the combined group of 239 federal and state judges, the judges' desire to sentence the defendant at or near the minimum sentence occurred regardless of the defendant's group membership. An ANOVA[133] revealed that there were no significant group-membership effects on sentencing. However, when looking at the three cohorts of judges separately, some interesting results emerged.

Federal district judges appeared to give marginally longer sentences to Jewish defendants than Christian defendants, a finding that reached marginal, but not full, statistical significance.[134] There were no significant differences in how these judges sentenced White as compared to Asian defendants. Magistrate judges did not give significantly longer sentences to any of the

---

129.   $r_{federal\ trial} = -0.22$, p <.05; $r_{federal\ magistrate} = -0.25$, p <.05.

130.   $r = -0.07$, ns.

131.   $r = 0.14$, p < .05.

132.   For a detailed discussion of the role of Asian and Jewish defendants, and finding moderate to strong negative morality-related implicit biases against Asians and Jews among the judges we surveyed here, see Levinson et al., *supra* note 119.

133.   "ANOVA, or Analysis of Variance, is a series of statistical techniques that segment the observed variance in a dataset into the sources of variance, allowing for the comparison of the means between two or more groups." Justin D. Levinson et al., *Devaluing Death: An Empirical Study of Implicit Racial Bias on Jury-Eligible Citizens in Six Death Penalty States*, 89 N.Y.U. L. Rev. 513, 557 n.216 (2014) (citing BARBARA G. TABACHNICK & LINDA S. FIDELL, USING MULTIVARIATE STATISTICS 322–23 (4th ed. 2001)).

134.   $F(1, 52) = 2.89$, p = .095, $\eta p^2 = .05$; $M_{Jewish} = 160.12$, SD = 15.51; $M_{Christian} = 153.90$, SD = 6.51.

groups.  Interestingly, however, state judges sentenced White defendants to significantly longer sentences than Asian defendants.[135]

### 4.   State Judges Self-Reported More Retributive Sentencing Philosophies

When asked to state how much they agree with the retributive concepts, "the harshest crime deserves the harshest punishment," and "those who hurt others deserve to be hurt in return," state judges appeared to report a more retributive sentencing philosophy (on a combined retribution measure) as compared to federal district judges, a finding that reached marginal statistical significance.[136]

### 5.   Republican Judicial Appointees Were More Supportive of Retribution, but Did Not Sentence Differently

Based upon the year of appointment information provided by federal district judges, we were able to determine the party of the appointing President of the United States. We then compared Republican-appointed judges with Democrat-appointed judges with regard to punishment philosophy. Data showed that Republican appointees were significantly more likely to agree with the retribution theory question, "A person who commits the harshest crime deserves the harshest punishment,"[137] but not the question focused on a defendant's need to be "hurt in return."[138]

### 6.   Democratic Judicial Appointees Were More Supportive of Mercy

With regard to mercy philosophy, Democratic appointees were significantly more likely than Republican appointees to agree with the mercy theory questions, "People who commit serious crimes sometimes deserve leniency," and "People who commit serious crimes often should receive treatment instead of punishment."[139] Interestingly, however, judges appointed by Democratic Presidents and Republican Presidents sentenced the defendant almost identically.[140]

---

135.    $F_{(1, 26)} = 6.77$, p = .05, $\eta p^2 = .21$; $M_{Caucasian} = 184.00$, SD = 24.06; $M_{Asian} = 163.50$, SD = 14.73. We discuss and explore these findings in our companion article focused on intergroup bias and judicial decision-making. *See* Levinson et al., *supra* note 119.

136.    $F_{(2, 236)} = 2.42$, p = .09, $\eta p^2 = .02$; $M_{State} = 4.46$ (SD = 1.02); $M_{Federal District} = 4.01$ (SD = 1.42); $M_{Federal Magistrate} = 4.10$ (SD = 1.23).

137.    $F_{(1, 98)} =$, p<.10(=.07), $\eta p^2 = .03$; $M_{Republican} = 5.23$ (SD = 1.87); $M_{Democratic} = 4.61$ (SD = 1.52).

138.    $F_{(1, 98)} = 0.29$, ns.; $M_{Republican} = 3.28$ (SD = 1.65), $M_{Democratic} = 3.10$ (SD = 1.68).

139.    $F_{(1, 98)} = 4.14$, p < .05, $\eta p^2 = .04$; $M_{Republican} = 4.00$ (SD = 1.43); $M_{Democrat} = 4.57$ (SD = 1.31).

140.    $F_{(1, 98)} = 0.05$, ns.; $M_{Republican} = 158.46$ (SD = 14.85); $M_{Democratic} = 157.84$ (SD = 13.30).

7.   Protestant State Court Judges Report More Retributive Sentencing
Philosophy but Did Not Sentence Differently

Because the judges were invited to respond to demographic questions, including which religion they self-identified with, we were able to compare responses of judges who affiliated with some religions or with no religions. The largest groups of affiliation were "no religion" (n = 50), Protestant (n = 77), and Catholic (n = 71).[141] Comparisons of these three groups showed that judges who identified as Protestant were significantly more likely to agree with the retribution-focused punishment theory questions than judges who self-identified as Catholic or "no religion."[142] Despite the differences in retribution sentencing philosophy, the judges from these three groups did not sentence the defendant differently.[143]

8.   Judges' Mercy Philosophies, but Not Retribution Philosophies,
Predicted Sentence Length

The more the judges agreed with mercy punishment philosophies ("People who commit serious crimes often should receive treatment instead of punishment," and "People who commit serious crimes sometimes deserve leniency"), the shorter they sentenced the defendant. Unlike these mercy questions, retribution sentencing theory questions were not significantly correlated with judges' sentences. A regression analysis[144] confirmed that support for mercy theories, but not retribution theories, predicted the judges' punishment by marginal significance[145] for the combined groups of judges.

Further analysis showed the relationship between mercy and sentence length was stronger for federal judges than state judges. For federal judges, the regression model was significant,[146] indicating that federal judges' mercy philosophies predicted their sentences.  This finding was not significant for state judges.[147]

---

141.   Other religions represented included Jewish (n = 26), American Methodist Episcopal (n<5), Latter-Day Saints (n<5), and Baptist (n<5).

142.   $F_{(2, 195)} = 11.06$, $p < .01$, $\eta_p^2 = .10$; $M_{Protestant} = 4.63$ (SD = 1.08); $M_{Catholic} = 4.06$ (SD = 1.32); $M_{No\ Religion} = 3.59$ (SD = 1.34).

143.   For federal district judges, $M_{Protestant} = 158.92$, $M_{Catholic} = 158.93$, and $M_{No\ Religion} = 157.95$.

144.   *Sentenced Month(s) = Beta1 x Mercy + Beta2 x Retribution + Constant.*

145.   Adjusted $R^2 = .02$, $F_{(2, 236)} = 3.04$, $p = .05$; Beta1 = −.16, t = 2.45, $p < .05$; Beta2 = −.02, t = 0 .27, ns.

146.   Adjusted $R^2 = .03$, $F_{(2, 177)} = 3.50$, $p = .05$; Beta1 = −.16, t = 2.14, $p < .05$; Beta2 = −.11, t = 1.4, ns.

147.   Adjusted $R^2 = −.02$, $F_{(2, 56)} = .52$, ns.

*IOWA LAW REVIEW* [Vol. 102:939

### F. DISCUSSION

Although we believe many of these individual findings to be worthy of further examination and discussion in the context of economic crime sentencing overall, the most compelling finding in the context of judicial discretion and the evolution of white-collar criminal sentencing was that nearly three out of four federal district judges imposed the precise minimum sentence, despite a wide possible sentencing range of seven years. Furthermore, we found that this finding was predicted by judges' self-reported agreement with mercy-related punishment rationales (but not retributive punishment rationales), and was correlated with the age of the judge. In contrast, other judges—magistrates as well as state court—did not show this same level of leniency.[148] As we have discussed, researchers have argued that judges have identified with white-collar criminals more than other criminals, and that this possible empathic connection has led to sentencing leniency.[149] Such an argument would be consistent with our finding that mercy philosophy, but not retribution philosophy, predicts punishment.

As judicial discretion has been restored by *Booker* and *Gall*, judges once again have the ability to adjust sentences outside of the guideline range. Our study shows that, in the context of a harsh sentencing regime for mid-to-high value economic crimes, judges across America's federal court system may still be holding back in sentencing economic criminals.  Yet, we found that this reticence was significantly more pronounced for federal district judges as compared to magistrate and state court judges, suggesting that the results of the study are likely not entirely empathy-based.

Although federal district judges' resistance to a recommended sentence might have been a legitimate cause for concern in the era of light economic crime sentencing (at least to the extent that one regards empathy as an undesirable trait in sentencing), the cause of the judges' resistance in the study may be understood when considered in historical context.  As we have described, there is much to be desired in the federal economic crime-sentencing scheme, and the continued shortcomings of the Sentencing Commission cannot possibly go unnoticed by federal district judges. Thus, it is plausible that federal district judges' "short" sentences were not entirely due to empathy, but rather experience with (or rejection of) overly harsh sentencing guidelines.

Perhaps adding to the timeliness of the study's results is that, at the very time judges were participating in this study, the Commission's most recent

---

148.    There are multiple reasons for the possible gap between state court judges, magistrate judges, and federal district court judges. One possibility is simply that elected judges (as most or all of our state judge participants were) may feel a greater need to be punitive, or at least a lesser need to make a downward departure from a sentencing guideline range.  It is notable in this context that state court judges' mercy philosophies did not predict their sentences.

149.    Mann et al., *supra* note 25, at 500.

series of proposed amendments were well on their way to becoming law, although not without significant criticism. In the next Part, we summarize the 2015 amendments to the fraud guideline, which were heavily criticized by a range of commentators, yet remained untouched by Congress and officially became part of the guidelines on November 1, 2015. We also consider the continuing failures of the new guidelines to address long-known shortcomings of the scheme, especially as they relate to the exceedingly harsh punishments of high-value economic criminals.

V.   THE 2015 AMENDMENTS TO THE FRAUD GUIDELINE SECTION 2B1.1 AND THE CRITICAL RESPONSE

*A.   INTRODUCTION*

Since the fraud and theft guidelines were consolidated in 2001, these guidelines "ha[ve] been [the] subject of sustained comment and critique."[150] The primary criticism has been that white-collar fraud defendants, especially those who were first-time offenders, and those with higher dollar loss amounts, were eligible for extremely draconian-length guideline sentences.[151] One noted commentator on federal sentencing observed that, "[b]eginning in 1988, the Sentencing Commission tweaked the theft and fraud guidelines nearly annually."[152] Moreover, due to the many enhancements adopted by

---

150.    Bowman, *supra* note 52, at 270; *see also* Douglas A. Berman, *Fiddling with the Fraud Guidelines as* Booker *Burns*, 27 FED. SENT'G REP. 267, 267 (2015) ("The federal fraud guidelines have long had many critics among judges and commentators.").

151.    *See, e.g.*, United States v. Watt, 707 F. Supp. 2d 149, 151 (D. Mass. 2010) (noting that the guidelines called for a life sentence with a total offense level of 43 and a criminal history of *I*, but were trumped by a statutory maximum of a five-year sentence); United States v. Parris, 573 F. Supp. 2d 744, 754 (E.D.N.Y. 2008) ("[W]e now have an advisory guideline regime where . . . any officer or director of virtually any public corporation who has committed securities fraud will be confronted with a guidelines calculation either calling for or approaching lifetime imprisonment."); United States v. Adelson, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (commenting that this financial fraud crime, where the guideline range called for a life sentence, "exposed . . . the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense"); Bowman, *supra* note 52, at 270 ("[T]he ABA and some defense advocacy groups[] feel that the guideline is fundamentally flawed, produces unduly high sentences for defendants across the loss spectrum, and needs to be completely rewritten."); Ellis et al., *supra* note 49, at 35–37; Felman, *supra* note 48, at 138–39.

152.    Frank O. Bowman, III, Pour Encourager les Autres? *The Curious History and Distressing Implications of the Criminal Provisions of the Sarbanes–Oxley Act and the Sentencing Guidelines Amendments That Followed*, 1 OHIO ST. J. CRIM. L. 373, 387 (2004) ("In 1989, the Commission amended the loss table to increase sentences for defendants causing loss greater than $40,000. In ensuing years, it added an array of specific offense characteristics and passed numerous amendments in an attempt to clarify the reach of the troublesome term 'loss.' The lush thicket of amendments had two basic effects. First, the table modification, as well as virtually all of the new specific offense characteristics and definitional alterations to the loss concept, tended to increase guideline sentence levels for economic offenders. Second, the proliferating amendments made these guidelines increasingly complex and ever more difficult to apply."

the Commission, in "fairly typical" high-loss fraud cases, the guideline range can often produce a guideline range equal to first-degree murder and three times longer than "second-degree murder."[153]

Furthermore, as one of the leading experts on federal sentencing, Professor Douglas Berman, has pointed out, "[t]he federal fraud guidelines have long had many critics among judges and commentators."[154] Indeed, the nearly continuous harshening of white-collar sentencing guidelines has generated significant pushback, evident in numerous judicial opinions. Federal judges have referred to the fraud guidelines as "a black stain on common sense";[155] "patently unreasonable" and "so run amok that they are patently absurd on their face";[156] "of no help";[157] and both "fundamentally flawed" and "valueless."[158]

Judge Jed S. Rakoff, who sits in the epicenter of security fraud cases (the Southern District of New York), and is a leading expert on the fraud guidelines, commented in a recently high profile securities fraud sentencing opinion that "the numbers assigned by the Sentencing Commission to various sentencing factors appear to be more the product of speculation, whim, or abstract number-crunching than of any rigorous methodology—thus maximizing the risk of injustice."[159] Judge Rakoff went on to observe that the current guideline calculations in white-collar fraud cases "are no longer tied to the mean of what federal judges had previously imposed for such crimes, but instead reflect an ever more draconian approach to white-collar crime, unsupported by any empirical data."[160] We submit that Judge Rakoff was too kind in this observation. As we discussed earlier, the guidelines in their inception decapitated the 50% of pre-guidelines cases that gave probation from the setting of the original guideline ranges.[161] Thus, they were never tied to the mean—and the Commission has never publicly explained this.[162] By way of example, Judge Rakoff explains that while a typical fraud case in 1987 would produce a guideline range of 30 to 37 months, by 2003, that identical fraud case was ratcheted up to 151 to 188 months, a staggering increase of more than 500%.[163] Judge Rakoff asks an insightful question when he states,

---

(footnote omitted)).

153.   Parker & Block, *supra* note 4, at 1053.

154.   Berman, *supra* note 150, at 267 (footnote omitted).

155.   *Parris*, 573 F. Supp. 2d at 754.

156.   *Adelson*, 441 F. Supp. 2d at 506, 515.

157.   United States v. Watt, 707 F. Supp. 2d 149, 151 (D. Mass. 2010).

158.   United States v. Corsey, 723 F.3d 366, 377, 380 (2d Cir. 2013) (Underhill, J., concurring).

159.   United States v. Gupta, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012).

160.   *Id.*

161.   *See* Osler & Bennett, *supra* note 48, at 140–41.

162.   *See id.* at 141.

163.   *See Gupta*, 904 F. Supp. 2d at 351.

"Was such a crime really 500% worse in 2003 than it was in 1987?"[164] Of course not.

Thus, on January 9, 2015 the Commission proposed a preliminary series of amendments to the economic crime guideline that, upon publication in the Federal Register, triggered the 60-day notice and public comment period.[165] The Commission had spent several years studying and reexamining the economic crime guideline.[166] In her remarks accompanying the release of the proposed preliminary revisions to the fraud guideline, Commission Chair, Chief Judge Patti B. Saris noted that the Commission had held a symposium on the subject in 2013 at the John Jay College of Criminal Justice, the Commission staff had "spent countless hours analyzing data on fraud sentences," and had met with judges and the ABA.[167] Chief Judge Saris concluded that, "[t]his extensive process has led [them] to believe that the fraud guideline may not be fundamentally broken for most forms of fraud."[168] As Professor Bowman commented, "[t]his carefully modulated conclusion did not go down well among those who, like the ABA and some defense advocacy groups, feel that the guideline is fundamentally flawed, produces unduly high sentences for defendants across the loss spectrum, and needs to be completely rewritten."[169]

Indeed, as discussed below, the Commission's proposed amendments to the fraud guideline were met with disappointment and alternative proposals by several of the stakeholders, who sought to remedy the longstanding problems of the fraud guideline not addressed by the Commission's proposed amendments.

### B.   THE 2015 PROPOSED CHANGES TO THE FRAUD GUIDELINE

In brief,[170] the Commission's January 16, 2015 proposed amendments to the fraud guideline (section 2B.1.1) contained components that were presumably designed to address some of the shared criticisms of the fraud guideline.  As we will describe, these amendments invited comment, but were ultimately passed on to Congress with only a few minor changes.  The

---

164.    *Id.*

165.    Proposed Amendments to Sentencing Guidelines, 80 Fed. Reg. 2570 (proposed Jan. 16, 2015).

166.    *See* Bowman, *supra* note 52, at 270; Chief Judge Patti B. Saris, Chair, U.S. Sentencing Comm'n, Remarks for Public Meeting (Jan. 9, 2015).

167.    Saris, *supra* note 166, at 2.

168.    *Id.*

169.    Bowman, *supra* note 52, at 270.

170.    For a comprehensive discussion of the Commission's proposed January 16, 2015 amendments to the fraud guideline, see generally FRANK O. BOWMAN, III, COMMENT ON PROPOSED AMENDMENTS TO ECONOMIC CRIME GUIDELINE § 2B.1.1 (2015), http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20150312/Bowman.pdf.

*IOWA LAW REVIEW* [Vol. 102:939]

document proposed, and eventually incorporated, the following into the guidelines:

> A revision of "the victims table in § 2B1.1(b)(2) to specifically incorporate substantial financial hardship to victims as a factor in sentencing economic crime offenders."[171]

> A Commission-proposed amendment to the definition of "intended loss" in Application Note 3(A)(ii) of section 2B1.1 to reflect the position of the Tenth Circuit that it is a subjective inquiry due to a circuit split over whether the definition of "intended loss" comprised a subjective or objective inquiry.[172]

> An altered definition of the "sophisticated means" special offense characteristic at section 2B1.1(b)(10)(C) to "narrow[] the focus" to "cases in which the defendant intentionally engaged in or caused conduct constituting sophisticated means" from the broader approach of applying "sophisticated means" if "the offense otherwise involved sophisticated means."[173]

> A revision of "the special rule at Application Note 3(F)(ix) relating to the calculation of loss in cases involving the fraudulent inflation or deflation in the value of a publicly traded security or commodity." (Fraud on the market).[174]

---

171. U.S. SENTENCING COMM'N, AMENDMENTS TO THE SENTENCING GUIDELINES 24 (2015), http://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/20150430_RF_Amendments.pdf. For the original proposed amendments, see generally Proposed Amendments to Sentencing Guidelines, 80 Fed. Reg. 2570 (proposed Jan. 16, 2015). In amending the victims table, the Commission's commentary accompanying the proposed amendment noted that they believed "the number of victims is a meaningful measure of the harm and scope of an offense and can be indicative of its seriousness" and that "[c]onsistent with the Commission's overall goal of focusing more on victim harm, the revised victims table ensures that an offense that results in even one victim suffering substantial financial harm receives increased punishment while also lessening the cumulative impact of loss and the number of victims, particularly in high-loss cases." U.S. SENTENCING COMM'N, *supra*, at 23. The proposed amendment also adds a list of nonexhaustive factors for courts to assist in deciding "whether the offense caused substantial financial hardship." *Id.*

172. U.S. SENTENCING COMM'N, *supra* note 171, at 24–25. The modification to the definition of "intended loss" balances the Commission's assertion that "intended loss is an important factor in economic crime offenses" but that increased sentences based on intended rather than actual loss "should focus more specifically on the defendant's culpability." *Id.* at 25.

173. *Id.* at 25. Narrowing the focus of "sophisticated means" from applying it if "the offense otherwise involved sophisticated means" to examine "the defendant's own intentional conduct better reflects the defendant's [own] culpability" and "minimize[s] application of this enhancement to less culpable offenders." *Id.*

174. *Id.* The amended special rule for "fraud on the market" cases "reflects the Commission's view that the most appropriate method to determine a reasonable estimate of loss will often vary in these highly complex and fact-intensive cases." *Id.*

An amendment to add an inflationary adjustment to the monetary tables contained in the guidelines, including the fraud loss tables in section 2B1.1(b)(1).[175]

## C. THE PUBLIC COMMENT PERIOD AND PUBLIC HEARING

During the 60-day public comment period for the 2015 fraud amendments and other amendments to the guidelines, the Commission received written comments from numerous groups and individuals including, *inter alia*, the United States Department of Justice; Federal Public and Community Offenders; Advisory groups for Practitioners, Probation Officers and Victims; the ABA; Families Against Mandatory Minimums; the National Association of Criminal Defense Lawyers; Washington Legal Foundation; Professor Frank O. Bowman, III; various citizens; and even a third-year law student, Alexandrea L. Nelson.[176]

Many of the comments sent to the Commission reflect views similar to the Federal Defender community. While the Federal Defender community was pleased to work with the Commission on the fraud guideline over the past several years, it was disappointed that, at the end of the process, the Commission believed "the fraud guideline may not be fundamentally broken for most forms of fraud. Our experience and interpretation of the data are to the contrary."[177] After detailing their concerns, the Federal Defender community concluded that the Commission's proposed amendments to the fraud guideline failed to address the core problems that cause the fraud guideline sentencing ranges to be higher than necessary in so many cases.[178] The Federal Defender community asserted that any amendments to the fraud guideline:

---

175.   *Id.* at 12–14. The inflationary adjustment amendment to the monetary tables contained in the guidelines, including the fraud loss tables in section 2B1.1(b)(1), adjusts the amounts in each seven monetary tables in the guidelines to reflect inflation. *Id.*; *see also supra* note 12 and accompanying text (providing the current dollar range for section 2B1.1(b)(1)).

176.   *Public Comments Received on Proposed Amendments (80 FR 2569)*, U.S. SENTENCING COMM'N (Mar. 18, 2015), http://www.ussc.gov/amendment-process/public-comment/public-comment-march-18-2015 (commenting on proposed amendments for 2016). Ms. Nelson, at the time a third-year law student at the University of Utah, S.J. Quinney College of Law, submitted thoughtful written comments asking the Commission to expand its definition of victim harm to include non-economic harm, noting that the victims of Bernie Madoff's scheme suffered "'emotional, spiritual, and psychological devastation' that was 'indescribable.'" Letter from Alexandrea L. Nelson to U.S. Sentencing Comm'n 3 (Mar. 17, 2015), http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-comment/20150318/Nelson.pdf.

177.   Michael Caruso, Fed. Pub. Def., S. Dist. Fla., Statement Before the United States Sentencing Commission Public Hearing on Economic Crime and Inflationary Adjustments 1 (Mar. 12, 2015), http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20150312/Caruso.pdf.

178.   *Id.* at 6.

[N]eed to reduce the current overemphasis on loss as [the primary driver] of culpability, eliminate intended loss, allow loss amounts to be mitigated by [various] factors [related] to culpability, encourage alternatives to incarceration, eliminate [entirely] the victim table, eliminate [entirely] the enhancement for sophisticated means, . . . cap the cumulative effect of the [SOCs], . . . and also possibly include a safety-valve for fraud cases.[179]

### D.  *The Fraud Guideline Amendment Sent to Congress on April 30, 2015*

While the Amendment was untouched by Congress and became part of the fraud guideline on November 1, 2015,[180] there were some differences between the proposed fraud amendments announced by the Commission on January 16, 2015, and the April 30, 2015 amendments forwarded to Congress.[181] The major proposed fraud amendment worth noting is the Commission's proposal to reduce the size of the victim number enhancement in section 2B1.1(b)(2) from 2, 4, and 6 levels to 1, 2, and 3 levels.[182] In the final April 30, 2015 amendments, the Commission combined its attempt to reduce the effect of mere victim numbers with its proposed "substantial hardship amendment" to create a "curious hybrid" that Professor Bowman predicts will, at best, "have a very modest net ameliorative effect" but only "in the universe of high-loss cases."[183]

### E.  *ABA and Commentator Responses to the New Fraud Guideline*

James E. Felman, a prominent federal criminal defense lawyer from Tampa, Florida, testified on behalf of the ABA at the public hearing before the Commission on March 12, 2015.[184]

Felman testified that the fraud "guideline[] appear[s] to be broken" and that the Commission's proposed amendments "simply do not go far enough

---

179.   *Id.* at 5.

180.   For a comprehensive discussion of the Commission's amendments to the fraud guideline forwarded to Congress, see generally Bowman, *supra* note 52.

181.   *See id.* at 276–77.

182.   Proposed Amendments to Sentencing Guidelines, 80 Fed. Reg. 2570, 2588 (proposed Jan. 16, 2015).

183.   Bowman, *supra* note 52, at 276–77.

184.   James E. Felman, Chairman, Am. Bar Ass'n Criminal Justice Section, Testimony on Behalf of the American Bar Association Before the United States Sentencing Commission for the Hearing on Proposed Amendments to the Federal Sentencing Guidelines Regarding Economic Crimes 1 (Mar. 12, 2015), http://www.americanbar.org/content/dam/aba/uncategorized/GAO/2015mar12_ ussceconcrimetestimony.authcheckdam.pdf. Mr. Felman is a former Co-Chair of the Commission's Practitioners' Advisory Group and Chair of the Criminal Justice Section of the ABA and their liaison to the Commission. *Id.* Felman indicated that the ABA's position on the fraud guideline reflected "the collaborative efforts of representatives of every aspect of the profession, including prosecutors, defense attorneys, judges, professors, and victim advocates, as well as a special task force of expert academics, judges, and practitioners assembled specifically to address this topic." *Id.*

to reduce the unwarranted emphasis on both loss and multiple specific offense characteristics that, alone and especially in combination, tend to overstate the seriousness of many offenses."[185] Felman testified that the Commission needed to go further than the proposed amendments by amending the fraud guideline to: (1) "place greater emphasis on mens rea and motive in relation to an offense"; (2) focus on "whether and to what extent the defendant received a monetary gain from the offense"; (3) consider "other circumstances that better reflect the culpability of the offender and the severity of the offense"; and (4) "reflect the general appropriateness of imposing a sentence other than imprisonment in cases where the defendant is a first offender who has not been convicted of a crime of violence or an otherwise serious offense."[186]

In urging the Commission to reduce its overwhelming emphasis on loss as the primary driver of lengthy fraud sentences, Mr. Felman, in his testimony, emphasized this point by citing to a more than decade-old opinion:[187]

> The Guidelines place undue weight on the amount of loss involved in the fraud. This is certainly a relevant sentencing factor: All else being equal, large thefts damage society more than small ones, create a greater temptation for potential offenders, and thus generally require greater deterrence and more serious punishment. But the guidelines provisions for theft and fraud place excessive weight on this single factor, attempting - no doubt in an effort to fit the infinite variations on the theme of greed into a limited set of narrow sentencing boxes - to assign precise weights to the theft of different dollar amounts. In many cases . . . the amount stolen is a relatively weak indicator of the moral seriousness of the offense or the need for deterrence.[188]

Because of the plethora of flaws the ABA perceived in the existing fraud guideline and the lack of meaningful solutions in the Commission's proposed amendments, the ABA offered its own fraud guideline to the Commission.[189]

---

185.    *Id.* at 2.

186.    *Id.* at 2; *see also* 28 U.S.C. § 994(j) (2012).

187.    Felman, *supra* note 184, at 9 (citing United States v. Emmenegger, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004)).

188.    *Id.* at 9 (alteration in original) (quoting United States v. Emmenegger, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004)). Mr. Felman further testified that the Commission's proposed amendments fail to address the following shortcomings in the fraud guideline: (1) "undue emphasis on loss"; (2) reliance on intended rather than actual loss; (3) the "piling on" of numerous offense characteristics that often overstate culpability; (4) "the failure to include" other factors "that bear on culpability . . . or render" the offense less serious; (5) the "factor creep" from the three-fold increase in SOCs; (6) the overly complex and overlapping nature of the guideline; (7) the failure to limit the application of the victim table with a more nuanced approach; and (8) the failure to reflect mitigating culpability factors. *Id.* at 13.

189.    The proposed ABA guideline is attached as Appendix A. *See infra* app.A. It resulted

After the Commission sent the 2015 amendments to Congress on April 30, 2015, Professor Bowman also addressed the need to fix the fraud guideline.[190] He viewed "the Commission's ballyhooed multiyear study of the economic crime guideline [as] fizzled" in light of their 2015 amendments.[191] Bowman suggests "[s]et[ting] a maximum limit on punishment for economic crime[s]," "[g]iv[ing] the loss table a haircut," and "[r]educ[ing] the number, size, and cumulative impact of [SOCs]" by (1) "[c]ap[ping] the cumulative effect of SOCs," (2) "[r]educ[ing] the number of levels assigned to many SOCs," and (3) "[e]liminat[ing] the sophisticated means enhancement."[192]

## VI.   Our Suggestions for Additional Needed Reforms of the New Fraud Guideline

### A.   Introduction

Like the ABA, Professor Bowman, and others, we agree that the Commission's efforts, while moving the ball in the right direction, do not go

---

from a lengthy process when the ABA Criminal Justice section formed a special Task Force to draft a specific model economic crime guideline to submit to the Commission. *See infra* app.A. The Task Force included "five professors, three judges, six practitioners, two organizational representatives, and observers from the Department of Justice and the Federal Defenders." *See infra* app.A.  Mr. Felman summarized the proposed ABA economic crime guideline in his March 12, 2015, testimony at the Commission's public hearing as follows:

> Our Task Force Final Report reflects a proposed guideline that would accomplish the goals stated in our resolution. In particular, the Task Force proposal reduces the weight placed on loss, eliminates the use of loss that is purely "intended" rather than actual, and introduces the concept of "culpability" as a measure of offense severity working in conjunction with loss. Through the culpability factor, the Task Force proposal would permit consideration of numerous matters ignored by the current guideline, including the defendant's motive (including the general nature of the offense), the correlation between the amount of the loss and the amount of the defendant's gain, the degree to which the offense and the defendant's contribution to it was sophisticated or organized, the duration of the offense and the defendant's participation in it, extenuating circumstances in connection with the offense, whether the defendant initiated the offense or merely joined in criminal conduct initiated by others, and whether the defendant took steps (such as voluntary reporting or cessation, or payment of restitution) to mitigate the harm from the offense. The Task Force proposal also sets forth a more nuanced approach to victim impact, recognizing that in many instances the harm to victims is fully captured by consideration of the amount of the loss caused by the offense, and that in some circumstances the nature of the harm suffered by the victims will be more significant than their number.  Finally, the Task Force proposal would implement the statutory directive of 28 U.S.C. § 994(j) by providing an offense level cap where the offense is not "otherwise serious."

Felman, *supra* note 184, at 12.

190.    *See generally* Bowman, *supra* note 52.

191.    *Id.* at 270.

192.    *Id.* at 277–80.

nearly far enough.[193] As our independent review of sentencing statistics and the results of our empirical study show, federal district judges usually choose not to follow the advisory fraud guideline, particularly in the context of mid-high monetary damage cases.[194] Perhaps more than anything, it is this data that sends the clearest signal that the Commission's work, while laudable, falls short of the significant changes that are needed to restore the faith of judges, scholars, and commentators alike.

Our view that the amendments are a positive, but insufficient, step is well summarized by the submission to the Commission's public hearing by the conservative Washington Legal Foundation ("WLF"): "While the proposed amendments are a modest first step in the right direction, the gravity and breadth of the problem demand a much more comprehensive solution."[195] The WLF frequently litigates federal sentencing issues as *amicus curie*, "especially to oppose the knee-jerk application of the Guidelines in cases that would result in the imposition of excessively harsh prison sentences."[196] We share WLF's view that it and many federal judges, scholars, and practitioners "have long argued that § 2B1.1's narrow focus on monetary loss, when

---

193.  *See, e.g., id.*; N.Y. COUNCIL OF DEF. LAWYERS, COMMENTS OF THE NEW YORK COUNCIL OF DEFENSE LAWYERS REGARDING 2015 PROPOSED AMENDMENTS TO THE SENTENCING GUIDELINES, POLICY STATEMENTS, AND OFFICIAL COMMENTARY 2 (2015), http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-comment/20150318/NYCDL.pdf ("The NYCDL believes that although the amendments currently being considered are a step in the right direction, further work is required to more appropriately reflect the culpability of individual defendants and to reduce the number of exorbitantly high advisory Guidelines ranges that arise in a substantial number of these cases."); Caruso, *supra* note 177, at 1, 5; FAMILIES AGAINST MANDATORY MINIMUMS, COMMENT ON PROPOSED AMENDMENTS TO THE SENTENCING GUIDELINES 3–4 (2015), http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-comment/20150318/FAMM.pdf ("We were encouraged when the Commission commenced the multi-year review of economic crime sentencing. . . . The few modest proposals to emerge from the multi-year study are, for the most part, fine as far as they go. But they do little to address the underlying problems we and others identified with the guideline."); Eric A. Tirschell, Vice-Chair, Practitioners Advisory Grp., Testimony Before the United States Sentencing Commission 1 (March 12, 2015), http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20150312/Tirschwell.pdf ("Notwithstanding our continuing hope that . . . in the near future the Commission will consider larger-scale revisions, we applaud the Commission for the proposals we are here to discuss today, which begin the hard work of moving [forward].").

194.  In fact, our study was conducted after the new guideline proposals had been widely publicized. *See infra* app.B.

195.  WASHINGTON LEGAL FOUND., COMMENTS OF THE WASHINGTON LEGAL FOUNDATION TO THE UNITED STATES SENTENCING COMMISSION CONCERNING PROPOSED AMENDMENTS TO § 2B1.1 OF THE U.S. SENTENCING GUIDELINES (ECONOMIC CRIMES) 6 (2015), http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-comment/20150318/WLF.pdf. The WLF, no stranger to the Commission, bills itself as a "public-interest law firm" that defends and promotes "free enterprise, individual rights, a limited and accountable government, and the rule of law." *Id.* at 2.

196.  *Id.* at 2. The WLF also publishes articles related to federal sentencing and has regularly submitted comments and testified before the Commission since the Commission's creation. *Id.* The WLF also takes the Commission to task, and to court, for failing to formulate policy in a transparent manner. *Id.*

*IOWA LAW REVIEW* [Vol. 102:939

combined with the use of numerous overlapping enhancements (which are often an inappropriate measure of culpability), has resulted in unusually long sentences for first-time" fraud offenders.[197] However, our proposed reforms outlined in this Part go beyond the comments of the WLF and seek to address some of the clear sentencing problems that were revealed by our empirical study: too many SOCs, a badly flawed loss table, an overly rigid and formulaic focus on victims' harm, and an overused SOC for "sophisticated means" that has essentially lost its purpose.

Specifically, we offer five reform proposals. Our first proposal is to diminish the fraud loss table and ask the Commission to determine the appropriate loss ranges and level increases based on empirical data that it collects. Our second reform proposal is to conduct a comprehensive review of all SOCs in the fraud guidelines with the presumption that most should be removed unless there is solid empirical data to support it or a very compelling policy reason not to leave it to the more flexible section 3553(a) calculus. Third, we suggest eliminating the current victim table and replacing it with a two-level SOC when a defendant's fraudulent conduct proximately causes "severe emotional distress" to the victims. Our fourth suggestion is to eliminate the "sophisticated means" SOC while our fifth and final proposal is for the Commission to adopt a downward departure to reflect instances where an offender's gain is substantially lower than the loss the offender caused.

## B.   *TRIM THE FRAUD LOSS TABLE*

We, like most of the groups and individuals that provided comments or testimony to the Commission, are also troubled by the guidelines' overreliance on the amount of the loss. This strikes us as very similar to the drug guidelines' overreliance on drug quantity, and may be the primary reason why the federal district judges in our study so commonly chose the exact minimum sentence.[198] This overreliance, indeed, caused one of the authors to publish an opinion on why drug quantity is not a good proxy for culpability.[199] It also caused the Commission to pass the so- called "All Drugs Minus Two" amendment, which reduced the length of drug sentences

---

197.    *Id.* at 1.

198.    *See supra* Part IV.E.1; *see also generally* Mark W. Bennett, *A Slow Motion Lynching? The War on Drugs, Mass Incarceration, Doing* Kimbrough *Justice, and a Response to Two Third Circuit Judges*, 66 RUTGERS L. REV. 873 (2014). Our study parameters did not allow the judges to sentence below the minimum 151 months. *See supra* Part IV.D.

199.    United States v. Hayes, 948 F. Supp. 2d 1009, 1022–31 (N.D. Iowa 2013) (expressing a policy disagreement with the methamphetamine guideline because it lacks empirical support and drug quantity is a poor proxy for criminal culpability, establishing an across-the-board one-third reduction in the sentence); *see also generally* United States v. Diaz, No. 11–CR–00821–2 (JG), 2013 WL 322243 (E.D.N.Y. Jan. 28, 2013) (expressing a policy disagreement with the guidelines for heroin, cocaine, and crack offenses because the drug guidelines are not empirically based and are too quantity driven).

virtually across the board.[200] The vast majority of the comments to the Commission in the 2015 public hearing share our view that loss has the potential to seriously overstate criminal culpability because in practice it is not the panacea for culpability the guidelines hoped it would be.[201] These comments were nothing new, as judges, lawyers, and academics have long argued for a reassessment of the inordinate reliance on loss as a sentence driver in section 2B1.1.[202] In our empirical study, the inexact dollar amount of harm highlighted the table's arbitrariness of a loss cut-off of $7,000,000, representing the line between increases of 18 or 20 levels.[203] In the case we presented, there is little reason to assume that one of the two enhancements is more commensurate with the crime than the other, or even as compared to a third option, for that matter.

In response to this, Professor Bowman recommends only deleting the top four levels of the loss table—which correspond to 50, 100, 200, and 400 million dollars of loss and only affected 56 offenders in 2012.[204] We think this is insufficient. The federal judges who participated in our study (with an approximately $7,000,000 loss estimate) appear to agree, at least in terms of their recommended minimum sentence.

In comparison, the ABA proposal trims the loss table from 16 loss ranges to 6, and cuts the potential additions of up to 30 levels down to a maximum of 14 levels.[205] One major advantage of this proposal is that it not only gives the current loss table a "haircut" in Professor Bowman's terminology, but a much needed "buzz-cut." We note that the ABA was more concerned with the structure of the proposal rather than assigning offense levels, which was done simply to help in understanding its proposed structure.[206] Thus, its suggested offense levels were indicated as "tentative."[207] The ABA Task Force conceded

---

200.    U.S. SENTENCING GUIDELINES MANUAL app. C supp., amend. 782 (U.S. SENTENCING COMM'N 2015).

201.    *See, e.g.*, WASHINGTON LEGAL FOUND., *supra* note 195, at 1 (criticizing "§ 2B1.1's narrow focus on monetary loss"); NAT'L ASS'N OF CRIMINAL DEF. LAWYERS, NACDL COMMENTS ON PROPOSED AMENDMENTS FOR 2015 Cycle 8–9 (2015), https://www.nacdl.org/WorkArea/DownloadAsset.aspx?id =36638&libID=36608 ("Reliance on the loss table as a key driver of sentences in fraud cases has drawn widespread criticism from bench and bar alike.").

202.    *See generally* David Debold & Matthew Benjamin, *"Losing Ground"—In Search of a Remedy for the Overemphasis on Loss and Other Culpability Factors in the Sentencing Guidelines for Fraud and Theft*, 160 U. PA. L. REV. PENNUMBRA 141 (2011).

203.    *See infra* app.B.

204.    Bowman, *supra* note 52, at 278.

205.    AM. BAR ASS'N CRIMINAL JUSTICE SECTION, A REPORT ON BEHALF OF THE AMERICAN BAR ASSOCIATION CRIMINAL JUSTICE SECTION TASK FORCE ON THE REFORM OF FEDERAL SENTENCING FOR ECONOMIC CRIMES i (2014), http://www.americanbar.org/content/dam/aba/uncategorized/ criminal_justice/economic_crimes.authcheckdam.pdf.

206.    *Id.* at 9.

207.    *Id.*

*IOWA LAW REVIEW* [Vol. 102:939

it had no empirical research to support its tentative offense levels.[208] Thus, while we endorse the ABA's effort to "buzz-cut" the loss table, without additional research and empirical data, we decline to endorse its "tentative" offense levels. We do believe, however, that it is on the right track as our empirical study indicates that federal district judges overwhelmingly sentenced individuals to the lowest level they could in the 11(c)(1)(C) range.

Furthermore, many commentators and federal judges have commented on the harshness of the fraud guideline.[209] While we wholeheartedly recommend the ABA proposed structure of giving the loss table a "buzz-cut," we leave it to the substantial expertise of the Commission to gather the empirical evidence to support a new loss table. Indeed, the Commission's current data already establishes that in the bottom half of the loss table (loss amounts of $500,000 up to $1 million), the percentage of within-guideline sentences was less than 50%.[210] Thus, contrary to Professor Bowman's concern and suggestions,[211] the dissatisfaction with the harshness of guideline sentences is not driven just by the high-loss cases in the upper half of the loss table.[212] Rather, as the WLF told the Commission, "the fundamental problem in white-collar sentencing lies with the oversized role that loss *amount* plays in the loss calculation, a problem that remains wholly unaddressed by the Commission's proposed amendment."[213]

In recognition of both the importance of loss amount and the lack of empirical data concerning the loss table, our first reform proposal is to reduce the number of levels in the loss table and ask the Commission to determine the appropriate loss ranges and level increases based on empirical data it collects. The ABA's proposal of six loss levels in the loss table may be a tad bit too few given the breadth of loss ranges in fraud cases, but is much improved over the current 16 levels.

---

208.    *Id.*

209.    *See* Sandra D. Jordan, *Fraud and Money Laundering—A Renewed Look at the Sentencing Guidelines: Part II*, 17 WHITE-COLLAR CRIME REP. 1, 3 (2003) ("Prompted by the corporate scandals that gave rise to Sarbanes-Oxley, the Sentencing Commission was concerned that extensive and serious fraud be dealt with aggressively. The commission dealt harshly with those convicted of preciously unforeseen catastrophic losses."); *see also* Jamie L. Gustafson, Note, *Cracking Down on White-Collar Crime: An Analysis of the Recent Trend of Severe Sentences for Corporate Officers*, 40 SUFFOLK U. L. REV. 685, 698 (2007) (noting that corporate officers can "face extremely harsh sentences, sometimes harsher than sentences for manslaughter").

210.    *See supra* figs.3, 3A; *see also* U.S. SENTENCING COMM'N, *supra* note 102, at 7–8.

211.    Bowman, *supra* note 52, at 278–79.

212.    Caruso, *supra* note 177, at 3.

213.    WASHINGTON LEGAL FOUND., *supra* note 195, at 3.

### C.  Buzz-Cut the Fraud Guidelines SOCs

We also remain troubled by the sheer length and complexity of the amended section 2B1.1 fraud guideline.[214] This "super-sized guideline,"[215] as amended in 2015, runs 23 pages, including commentary; contains 16 sub-parts in the loss table—potentially adding from 2 to 30 levels from the base offense level of six or seven; contains, in total, 19 SOCs, many with multiple sub-parts (for a total of 34 sub-parts) and many of which read like a last minute special-interest rider to the U.S. tax code; and four complex cross-references.[216] It is clearly one of the most complicated and time-consuming federal guidelines to apply, and often results in lengthy sentencing hearings.[217] For example, a defendant's sentencing range increases from a range of zero to six months to a range of 151 to 188 months when: the defendant was a director of a publicly traded company, the offense involved more than 50 victims, and loss exceeded $7,000,000.[218] In the empirical study we employed, we attempted to avoid some of the more complex issues in the SOCs but, nonetheless, the SOCs almost entirely drove the sentencing range calculation.

In recognition of this difficulty, one of the major structural flaws in the guidelines, in general, and the fraud guideline, in particular, is the rapid proliferation of SOCs. Increasing SOCs after the initial promulgation of the guidelines made some sense when they were mandatory, but with the return of discretion, most make little sense now. Now, either side can argue any SOC-like characteristic in the case as part of the section 3553(e) variance portion of sentencing. For example, SOC section 2B1.1(b)(14) involves a two-level enhancement for an organized scheme to steal or to receive stolen vehicle parts like an auto "chop shop" mentioned in the application notes. This would be much better handled in the variance section, so that the scope of the "chop shop," its criminal methods, and the entire range of its activities can be considered and factored into the appropriate sentence rather than limited to a two level increase.  Moreover, why are stolen vehicle parts specially selected for an SOC? What about stolen anti-aircraft missile launching parts, parts for water processing plants, electric switches for nuclear power plants, or thousands of other products that create more of a national security problem? Moreover, why is this limited to "stealing" and "receiving"—wouldn't a fraudulent scheme to manufacture defective anti-aircraft missile launching parts potentially cause greater harm?

---

214.   Ellis et al., *supra* note 49, at 35 ("In short, the increasingly complex fraud guideline is rapidly becoming a mess.").

215.   Caruso, *supra* note 177, at 1.

216.   U.S. Sentencing Guidelines Manual § 2B1.1 (U.S. Sentencing Comm'n 2016).

217.   *See, e.g.*, Caruso, *supra* note 177, at 1; *see also infra* app.A (depicting our schematic diagram of a typical white-collar fraud federal sentencing).

218.   U.S. Sentencing Guidelines Manual § 2B1.1(b) (U.S. Sentencing Comm'n 2016).

This brings us back to the critically profound point that Professor Stith and Judge Cabranes made in 1998: "the Commission has never explained the rationale underlying *any* of its identified specific offense characteristics, why it has elected to identify certain characteristics and not others, or the weights it has chosen to assign to each identified characteristic."[219] Most SOCs unnecessarily complicate guideline computation with little corresponding benefit and have little or no empirical basis either for the SOC or the value assigned to it. We also find deeply troubling the extensive proliferation and potential "piling on" of SOCs, which can quickly drive a first-time fraud offender's guidelines sentence range higher than the sentence for a second degree murderer.[220] Indeed, the Commission acknowledged this "factor creep"—noting that as more and more adjustments creep into sentencing it is increasingly problematic to ensure interactions between factors and their cumulative effect to "properly track offense seriousness."[221]

Our second reform proposal, therefore, would be for the Commission to perform a comprehensive review of all SOCs in the fraud guideline with the presumption that most should be removed unless there is solid empirical data to support a very compelling policy reason not to leave it to the more flexible section 3553(a) calculus.

### D. SIMPLIFY AND MODIFY THE VICTIM TABLE

Along with concerns regarding SOCs and the loss level, we also believe both the prior victim table and the one adopted by the Commission in 2015 overemphasizes the victim aspect of fraud offenses and unduly drives fraud guideline sentencing ranges higher than the acceptable range. The WLF advocates completely eliminating the 2015 amended victim table.[222] This is no real surprise, as the WLF wanted to abolish the prior victim table because they feel that loss adequately reflected victim concerns.[223] The ABA, on the other hand, suggested to the Commission at the 2015 public hearing a simplified victim table set forth below:

(3) Victim Impact

    (A) Minimal or none [no increase]

    (B) Low add [2]

---

219.   STITH & CABRANES, *supra* note 87, at 69.

220.   Bowman, *supra* note 52, at 278 ("First, virtually no one believes that financial fraud is worse than murder or treason or blood-soaked bank robbery . . . .").

221.   U.S. SENTENCING COMM'N, FIFTEEN YEARS OF GUIDELINES SENTENCING: AN ASSESSMENT OF HOW WELL THE FEDERAL CRIMINAL JUSTICE SYSTEM IS ACHIEVING THE GOALS OF SENTENCING REFORM 137 (2004), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year-study/15_year_study_full.pdf.

222.   WASHINGTON LEGAL FOUND., *supra* note 195, at 4.

223.   *See id.*

(C) Moderate add [4]

(D) High add [6][224]

We find the ABA's proposal too subjective for judges to decide between the categories from Minimal to High.  If there is no victim impact, perhaps two levels should be subtracted from the total offense level rather than, as the ABA proposal suggests, have no impact at all. We also find that the proposal by the WLF to eliminate the victim impact does not adequately reflect the nonoverlapping aspects of loss and victim harm.[225] Although we are sympathetic to their position that the "victims table makes arbitrary distinctions without any empirical basis" and that the loss table captures and punishes for losses suffered by the victim, we respectfully disagree that loss "adequately"[226] captures victim losses without the need for a victim table. However, we do agree with Professor Bowman that the number of victims has assumed too much importance under the guidelines and that loss often correlates with the number of victims.[227] Thus, we see the nonoverlapping area between loss and victims as the severe emotional distress that victims may suffer in a fraud case. Current application note 20(A)(ii) suggests there may be cases where an upward departure for "severe emotional trauma" may be appropriate.[228]  Despite our view that there are too many SOCs, we do urge a SOC increase of two levels to the fraud guideline where one or more victims suffer "severe emotional distress" proximately caused by an offender's fraudulent conduct.[229] Greater "severe emotional distress" than typical or in many victims could also be considered a variance under section 3553(a). Our third reform proposal, therefore, would be to eliminate the current victim table and replace it with a two-level SOC where "severe emotional distress" in one or more victims is proximately caused by an offender's fraud conduct.

---

224.    *See* AM. BAR ASS'N CRIMINAL JUSTICE SECTION, *supra* note 205, at i.

225.    WASHINGTON LEGAL FOUND., *supra* note 195, at 4 (stating their position that "financial losses suffered by victims are already adequately captured" in the current loss table).

226.    *Id.*

227.    Bowman, *supra* note 52, at 276.

228.    U.S. SENTENCING GUIDELINES MANUAL § 2B1.1 cmt. n.20(A)(ii) (U.S. SENTENCING COMM'N 2016).

229.    The Department of Justice in their comments to the Commission recognized that "[m]any non-monetary harms can be equally devastating for victims" of fraud offenses. U.S. DEP'T OF JUSTICE, U.S. DEPARTMENT OF JUSTICE VIEWS ON THE PROPOSED AMENDMENTS TO THE FEDERAL SENTENCING GUIDELINES AND ISSUES FOR COMMENT PUBLISHED BY THE U.S. SENTENCING COMMISSION IN THE FEDERAL REGISTER ON JANUARY 16, 2015 30 (2015), http://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20150312/DOJ.pdf (giving the Department of Justice's views on the proposed amendments to the sentencing guidelines as they relate to the monetary harms suffered by victims of fraud offenses).

### E. ELIMINATE THE SOC FOR SOPHISTICATED MEANS

Even if our suggestion of presumptively eliminating most SOCs is not adopted, the Commission should eliminate the "sophisticated means" SOC in section 2B1.1(b)(10). Many have commented to the Commission that this SOC should be eliminated,[230] and Professor Bowman, who originally advocated for it in 1998, has come to believe it "no longer . . . serves any useful purpose."[231] As Professor Bowman points out, it applies in virtually every case where the loss is moderate or high and is also often applied even in the simplest of fraud schemes.[232] Consequently, because the "sophisticated means" SOC applies in virtually every case and is unnecessary, we also propose eliminating it.

### F. ADOPT A DEPARTURE FOR THE LACK OF PECUNIARY GAIN

Our fifth reform proposal is for the Commission to adopt a downward departure to adequately respond to situations where an offender's gain is substantially lower than the loss the offender caused, with the largest decrease for offenders who derive little or no gain. Currently, "gain" is used in the fraud guideline "as an alternative measure of loss only if there is a loss but it reasonably cannot be determined."[233] We argue that an offender's "gain" is a much greater indicator of an offender's culpability than the guidelines reflect. The ABA agrees, but suggests the fix is to add a five-level culpability SOC with multiple factors including "gain."[234] The problem inherent in this suggestion is that it adds undue subjective complexity to an already overly complex guideline. While we prefer the ABA's suggestion to the current exceptionally limited role of "gain," we offer a simpler solution. We urge the Commission to instead adopt a downward departure for "gain" where an offender's gain is substantially lower than the loss caused by the offender. The departure, no greater than minus four levels, should be greater when the gain is smaller and greatest of all when an offender derives little or no pecuniary gain from the offense.[235]

---

230.    *See* NAT'L ASS'N OF CRIMINAL DEF. LAWYERS, *supra* note 201, at 12 (noting that this enhancement leads to "unprincipled double-counting," and "is a paradigmatic example of the redundancy and ambiguity that plagues § 2B1.1, and that it should be eliminated in its entirety").

231.    Bowman, *supra* note 52, at 280.

232.    *Id.* Professor Bowman has also pointed out that in high loss cases the SOC not only always applies but boosts an already too high sentence by 25%. *Id.* at 282 n.34.

233.    U.S. SENTENCING GUIDELINES MANUAL § 2B1.1 cmt. n.3(B) (U.S. SENTENCING COMM'N 2016).

234.    *See infra* app.A.

235.    Even the Department of Justice has observed that when loss greatly exceeds gain, fraud offenders are likely to receive a below guideline sentence. Preet Bharara, U.S. Attorney, S. Dist. N.Y., Statement Before the United States Sentencing Commission Hearing on Proposed Amendments to the Federal Sentencing Guidelines 8–9 (Feb. 16, 2011).

VII.   Conclusion

Contextualized against the near universal lack of faith in the Sentencing Commission's approach to economic crime sentencing, and in light of the Supreme Court's restoration of judicial discretion in sentencing in *Booker* and *Gall*, our examination has revealed that federal trial judges frequently sentence well below the fraud guideline. This resistance to the guidelines has manifested likely because, as with a wide range of critics, federal judges lack sufficient confidence in the policies underlying it and the sentencing ranges it produces.[236] Federal trial judges now follow the advisory fraud guideline range in less than half of all cases.[237] Indeed, "[t]he rate of non-government sponsored below range sentences [in fraud cases has] steadily increased during the past five years" from 23.9% in 2011 to 31.0% in 2015.[238] Adding volume to the already existing chorus of dissent are the results of our original empirical study of 100 federal district court judges, and 240 judges overall, which showed remarkable minimum sentencing agreement among an extremely diverse group of judges. The study also showed that the desire for these minimum sentences largely overpowered judges' differences in sentencing philosophies such as retribution. Instead, it was the age of the judge and their support for mercy philosophies that drove agreement among judges and pushed these sentences down to the lowest levels possible. Indeed, three out of four district court judges sentenced the absolute minimum allowed under the guidelines. Our proposed solutions, building on years of commentators' critique and criticism, are necessary steps not only in beginning to reconstruct an economic crime sentencing guideline that is consistent with the proper principles of punishment, but also can begin to re-plant the seeds of judicial trust. Failing these recommendations, we respectfully request that the Commission consider scrapping section 2B1.1 completely and constructing a new fraud guideline that is actually empirically based. This could serve not only as a starting point for a new fraud guideline but also as a model for the much needed wholesale reconstruction of the Federal Sentencing Guidelines Manual.

---

236.   Caruso, *supra* note 177, at 1 n.2 (citing the Commission's own data).

237.   U.S. Sentencing Comm'n, *supra* note 93, at 2.

238.   U.S. Sentencing Comm'n, Quick Facts: Theft, Property Destruction and Fraud Offenses 2 (2015), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Theft_Property_Destruction_Fraud_FY15.pdf.

*IOWA LAW REVIEW* [Vol. 102:939

APPENDIX A

---

**Diagram of a Federal Fraud Sentencing Guideline:**
***United States v. Nathaniel Kinnear***

---

**Example: Defendant Nathaniel Kinnear is a 47-year-old White male who has pled guilty to securities fraud "straight up" (without a plea agreement or proffer).**



**Step 1: Determine the crime or crimes to which Kinnear pled guilty, or was convicted of.**
***E.g.*, 18 U.S.C. § 1348(2) (obtaining securities fraud)**



**Step 2: Determine the Guideline applicable to the offense conduct pursuant to section 1B1.2 and Appendix A. § 2B1.1.**



**Step 3: Determine the base offense level. Use section 2B1.1(a)(1) because the offense is referenced to the guideline and has a statutory maximum of 20 years or more.**

**Diagram of a Federal Fraud Sentencing Guideline cont'd . . .**

**Step 4: Determine the applicability of any specific offense characteristics. Section 2B.1(b) has 19 numbered subsections, with 34 subdivisions.**
*The loss is more than $3,500.00, but is less than $9,500.00. § 2B1.1(b)(1)(J): + 18*
*The offense resulted in substantial financial hardship to five or more victims. §*



*The offense otherwise involved sophisticated means.*
*§ 2B1.1(b)(10)(C): +2*
*The offense involved a violation of securities law by an officer or director of a publicly traded company.*
*§ 2B1.1(b)(19)(A)(io): +4*



**Step 5: Determine any cross-references. § 2.B1.1(c).**
*None applicable.*



**Step 6: Determine all Guidelines adjustments. Victim-related adjustments: Ch. 3, Pt. A:**
*None applicable.*

**Role in the offense, Ch. 3, Pt. B:**
**Abuse of trust, § 3B1.3: +2**

**Obstruction and related adjustments: Ch. 3, Pt. C:** *Acceptance of responsibility. § 3E1.1(a): –2*
*Further acceptance of responsibility decrease requested. § 3E1.1(b): –1*

**Adjusted Offense Level: 34**

*IOWA LAW REVIEW* [Vol. 102:939

---

**Diagram of a Federal Fraud Sentencing Guideline cont'd . . .**



**Step 7: Determine Kinnear's criminal history category. Chapter 4.**

*Kinnear has a criminal history score of zero, Criminal History Category I. § 4A1.1: Sentencing Table, Ch. 5, Pt. A.*



**Step 8: Determine Kinnear's Guideline range. Sentencing Table, Ch. 5, Pt. A.**

*Kinnear's Offense Level of 34 and Criminal History Category I yield an advisory Guidelines range of 151–188 months.*



| NO | Step 9: Determine whether any Guideline "departures" are appropriate: Are there features of Kinnear's case that potentially take it outside of the Guidelines "heartland" and make it a special or unusual case warranting a departure, as provided in Ch.5, Pt. K, or section 4A1.3? | YES |
|---|---|---|
| Downward. E.g., for the defendant's extreme age or ill health. § 5K2.0.  *Not applicable to Kinnear.* | | Upward. E.g., for "substantial under-representation of criminal history." *See* § 4A1.3(a).  *Not applicable to* |

**Diagram of a Federal Fraud Sentencing Guideline cont'd . . .**

**Step 10:** Determine whether any "variance" from the advisory guideline range is warranted.

**(a) "Policy disagreements":** Determine whether any "policy disagreements" with the applicable Guidelines warrant a "variance" from the advisory Guidelines range. See, e.g., *Spears v. United States*, 129 S. Ct. 840 (2009); *Kimbrough v. United States*, 128 S. Ct. 558 (2007).

Examples include "policy disagreements" with the "amount of loss" guideline in section 2B1.1(b)(1), the "number of victims/substantial financial hardship" guideline from section 2B1.1(b)(2), and the "sophisticated means" guideline from section 2B1.1(b)(10).

**(b) Section 3553(a) factors:** Determine whether the seven factors in section 3553(a), including any "policy disagreements," warrant a "variance" from the Guidelines range.

| Diagram of a Federal Fraud Sentencing Guideline cont'd . . . |
| --- |

**Step 11: Impose the sentence, either below, within, or above the advisory Guideline range, that is "sufficient," but not greater than necessary to comply with the purpose [of sentencing]." §3553(a).**

**Impose a "below Guidelines" sentence, if a downward variance is appropriate.**

**Impose a "within Guidelines" sentence, if no variance is appropriate.**

**Impose an "above Guidelines" sentence, if an upward variance is appropriate.**

APPENDIX B

## UNITED STATES DISTRICT COURT

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **vs.** | ) | **PRESENTENCE INVESTIGATION REPORT** |
| | ) | **Docket No.0862 5:14CR04476-1** |
| **Nathaniel Kinnear** | ) | |
| | ) | **Rule 11(c)(1)(C) Binding Plea Agreement** |

**Prepared for:** U.S. District Judge

**Sentence Date:** <u>April 1, 2015 1:30 PM</u>
**Offense:**
<u>Count 1:</u>  Securities Fraud; 18 U.S.C. § 1348
0 years to 25 years imprisonment/$250,000.00 fine
**Release Status:**  Personal Recognizance Bond with Pretrial Supervision
**Detainers:** None
**Codefendants:**  None
**Related Cases:**  None

<u>**Identifying Data:**</u>
**Date of Birth:** August 20, 1967
**Age:** 47
**Race:** White
**Hispanic Origin:**  Non-Hispanic origin
**Sex:** Male
**SSN#:** 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
**FBI#:** 19765TD7
**USM#:** 13546-029
**PACTS#:** 112566
**Education:**  Master's Degree
**Dependents:** None
**Citizenship:** U.S. Citizen
**Country of Birth:** United States
**Place of Birth:** Chicago.Ill.
**Legal Address:** 1206 Danburg Road, Chicago, Ill. 36076
**Alias(es):** None

**Alternate IDs:**     None

**Height / Weight:** 5" 10'' / 170 lbs.

**Hair / Eye Color:** Brown / Brown
**Identifying Marks:** None

### PART A. THE OFFENSE <u>Charge(s) and Conviction(s)</u>

1.  On January 24, 2015, you formally accepted the defendant's plea to count one of an Information charging Securities Fraud, in violation of 18 U.S.C. § 1348.

2.  Pretrial Custody/Release: On May 7, 2014, the Court ordered the defendant released on a personal recognizance bond with pretrial supervision. There have been no violations of pretrial release.

3.  Summary of the Plea Agreement: After reviewing the preliminary PSR you have accepted the parties Rule 11(c)(1)(C) plea agreement and are bound by their stipulated sentencing range. There are no contested guideline issues. The plea agreement provides that neither party will move for a departure or variance. The defendant has no prior arrests or criminal history record. The government believes the amount of the loss is slightly over $7,000,000. The defendant believes the amount of the loss slightly under $7,000,000. In lieu of contesting the amount of the loss, the parties' stipulated sentencing range is 151 to 235 months. This reflects the fact that it was impossible for either party to establish the exact amount of the loss. If the loss was $7,000,000 to $20,000,000 the guideline range would be 188-235; if the amount of the loss was $2,500,000 to $7,000,000 the guideline range would be 151-188. Thus, the parties stipulated to a sentencing range of 151 to 235 months. You must sentence within this range.

4. The plea agreement provides for restitution of $7,000,000 to Heartland.

### <u>The Offense Conduct</u>

5.  The defendant founded Ultra Yield Venture Group, Inc. (Ultra Yield), a corporation based out of Chicago, Illinois, in 2000. He was the sole owner and served as the Chief Executive Officer until it ceased operation in February 2013. The company was a private equity and business consulting firm, often investing in start-up ventures.

6. The defendant served on the board of directors for several companies, including Heartland Supply Corporation (Heartland) of Joliet, Illinois. The company designed and manufactured accessories for tractors and other farm implements. Heartland's stock was registered with the United States Securities and Exchange Commission (SEC) and traded on the New York Stock Exchange.

7. The defendant became a member of Heartland's Board of Directors in 2001. From September 2009 until his resignation on December 6, 2012, the defendant acted as the Chairman of Heartland's Board of Directors. During his tenure as a board member, the defendant exercised considerable influence over Heartland's management, recruited its president and chief executive officer (CEO), and directed and assisted the staff in preparing the company's public filings with the SEC.

8. Between September 2008 and January 2012, the defendant executed a scheme to fraudulently obtain money from Heartland. The defendant abused his position of trust within the company by persuading Heartland to give him money and stock under the guise that he was going to take the company private through a stock buyback. The defendant told management and board members that he and Ultra Yield would facilitate the entire stock buyback. On October 29, 2008, at the defendant's direction, Heartland began a complex series of money and stock transfers to the defendant through Ultra Yield for the stock buyback. Due to a significant computer failure at Heartland and a flood that destroyed backup records, both unrelated to the defendant or Ultra Yield, the exact amounts transferred are incapable of precise computation. Forensic accountants for Heartland, the defendant, and the United States each agree that the loss is between

$6,800,000 and $7,200,000.

9. Neither the defendant nor Ultra Yield used any of the funds received to buy shares of Heartland's stock. Instead, the funds were expended on living expenses and various investments, including those in start-up companies.

10. **Loss amount:** between $6,800,000 and $7,200,000.

### Victim Impact

11. As a result of the defendant's conduct with respect to Heartland, the parties have agreed to a restitution amount of $7,000,000 to Heartland.

### Adjustment for Obstruction of Justice

12. The probation officer has no information indicating the defendant impeded or obstructed justice.

### Adjustment for Acceptance of Responsibility

13. It appears the defendant accepts responsibility for the offense and, therefore, is eligible for a reduction for acceptance of responsibility.

### Offense Level Computation

### PART B. THE DEFENDANT'S CRIMINAL HISTORY

### Juvenile Adjudication(s)

14.  None

### Adult Criminal Conviction(s)

15.  None

### Other Criminal Conduct

16.  None

### Pending Charges

17.  None

### Other Arrests

18.  None

### PART C. OFFENDER CHARACTERISTICS

19.  The following information was obtained through an interview with the defendant. The defendant's personal and family data was corroborated by the defendant's wife, Ellen Kinnear.

### Personal and Family Data

20.  The defendant is one of two children born to Thomas Kinnear, deceased, and Ann (née Richards) Kinnear, deceased. The defendant's father passed away due to natural causes and his mother passed away due to cancer.  The defendant's parents divorced when he was a young teenager in high school. The defendant reported he had a good childhood and was raised primarily by his mother.

21.  The defendant has one sibling, David Kinnear, age 51, a protestant pastor, who lives in Southern Florida.

22.  The defendant was raised in Chicago Illinois. Presently, the defendant lives with his wife in Chicago, Illinois. The defendant and his wife are active in their Protestant church, Chicago Christian Church.

23.  The defendant married Ellen (née Matthews) Kinnear on November 13, 1992, in Carmel, Indiana. The defendant's wife, age 44, is a physician.  The couple has two children, ages 21 and 19. Both children are currently enrolled in college. The defendant reported and his wife confirmed that the couple had a good marriage up until the instant offense was discovered, but it has since been strained.

## Physical Condition

24. The defendant reported he is in good health. He reported no history of serious illness or surgery.

## Mental and Emotional Health

25. The defendant reported no history of mental or emotional health concerns.

## Substance Abuse

26. Alcohol: The defendant began using alcohol at age 21. The defendant consumes alcohol one to two nights per week, but never to the point of intoxication.

27. Other Controlled Substances: The defendant denied the use of any other controlled substances.

28. Substance Abuse Treatment: The defendant has never been evaluated or treated for a substance abuse problem.

## Educational, Vocational and Special Skills

29. The defendant graduated from public high school in Chicago in 1985. He was ranked 15th out of 639 students and achieved a grade point average (GPA) of 3.917.

30. The defendant obtained a Bachelor of Business Administration Degree from the University of Iowa in Iowa City, Iowa, on May 18, 1989. His GPA was 3.85.

31. The defendant obtained a Masters of Business Administration Degree from the University of Illinois in Champaign, Illinois, in 1994. His GPA was 3.79.

## Employment Record

32. Since 2013, the defendant has been employed by Gold Coast LLC in Chicago, Illinois, where he has held the position of Vice President of Sales and earns $10,000 per month.

33. From 2000 to 2013, the defendant was sole owner of Ultra Yield based out of Chicago, Illinois. He reported earning $160,000 per year in gross income. This company is related to the instant offense and is no longer in existence.

## Restitution

**Statutory Provisions:** Restitution is mandatory in this case pursuant to 18 U.S.C. § 3663A. The parties have agreed to a restitution total of $7,000,000.

*IOWA LAW REVIEW*

## PART E. FACTORS THAT MAY WARRANT DEPARTURES OR VARIANCES.

34.  The probation officer has not identified any factors that would warrant a departure or variance from the applicable sentencing guideline range.

Respectfully Submitted,

Crystal D. Moore
U.S. Probation Officer

Approved:

Stacy J. Sturdevant
Supervisory U.S. Probation Officer