# Exhibit B3

# Overview of the Federal Home Confinement Program 1988–1996

*By Darren Gowen, Probation Administrator, Federal Corrections and Supervision Division, Administrative Office of the United States Courts*

## Introduction

Over the past two decades, home confinement has gained acceptance in the criminal justice community as a credible noncustodial sanction and alternative to incarceration. Judicial officers have used home confinement more frequently as they have learned more about what it offers (Boone, 1996). In the federal courts, the home confinement program is used as an additional sentencing option more cost effective than imprisonment or halfway house placement. According to 1997 estimates from the Federal Bureau of Prisons (BOP) and the Administrative Office of the United States Courts (AO), the average daily cost of federal custody was $64.32 while the average daily cost of home confinement supervision with electronic monitoring was $17.98.[1]

The home confinement program in the federal courts is conceptually designed as a noncustodial sanction more punitive than probation supervision but less restrictive than imprisonment. It ranges from a simple nighttime curfew to 24-hour-a-day "lock-down" home incarceration. The extent to which those in the federal home confinement program are permitted to leave their residence is determined case by case, depending on the goals of supervision and the orders of the court or releasing authority.

In the federal courts, the home confinement program is used with both post-sentence offenders (to punish) and with pretrial defendants (to ensure their appearance in court and to protect the community). It is ordered by the court as a special condition of pretrial release, probation, or supervised release. Home confinement is also used as an intermediate sanction for supervision violators and by the BOP for inmates in pre-release status serving the last 10 percent of their imprisonment term under the direction of probation officers as a courtesy to the BOP.

This article reviews the home confinement program in the federal courts and presents an overview of the program based on data collected on over 17,000 program participants from 1988 through 1996. I will include a description of the program goals and officers' responsibilities, and a profile of program participants and reasons for termination for pretrial defendants and post-sentence offenders.

## Background

In March 1986, the United States Parole Commission responded to deficit reduction legislation by initiating an experimental "Curfew Parole Program" to target the early release of inmates who would normally have been placed in a BOP Community Treatment Center prior to their scheduled release to parole supervision. Participants selected for the program had their release dates advanced for up to 60 days and were monitored by probation officers through random telephone calls and weekly in-person contacts. To be eligible, each offender who volunteered for the program had to have an acceptable release plan and also had to remain at home between 9 p.m. and 6 a.m., unless granted permission to leave by the supervising probation officer.

Because of limited resources and increasing responsibilities, chief probation officers raised concerns as to whether officers would be able to enforce curfews adequately with only random telephone calls. As a result, a pilot study (a joint venture with the BOP and the Administrative Office of the U.S. Courts (AO) initiated by the United States Parole Commission) was launched in the probation offices in the Central District of California and the Southern District of Florida to evaluate the use of electronic equipment to monitor persons in the curfew program. Federal probation officers provided intensive supervision, with increased personal contacts, to ensure parolees' compliance with curfew times. Also, the BOP advanced release dates up to 180 days to allow more offenders to participate in the program. On January 19, 1988, the first federal offender was released to curfew parole using electronic monitoring.[2]

In 1989, the Judicial Conference Committee on Criminal Law approved the expansion of the pilot program to 12 districts[3] and included not only pre-release inmates and parolees, but also offenders on probation and supervised release, and federal defendants on pretrial release supervision. In 1991, the pilot program expanded nationally, with 63 dis-

---

[1] Components used in the calculations are based on information received from the AO's Budget Division (i.e., unit cost estimates) and the BOP (i.e., costs of incarceration).

[2] The United States Parole Commission Research Unit issued an evaluation report (Community Control Project, Report Forty Four, September 1989), which showed that only 31 out of 169 parolees failed the program in the first year.

[3] Ten districts were added to the original two districts (California Central and Florida Southern): Colorado, District of Columbia, Georgia Northern, Maryland, Michigan Eastern, New York Eastern, Ohio Northern, South Carolina, Texas Northern, and Texas Southern.

tricts participating. In 1993, the AO awarded its first national contract to BI Incorporated to provide electronic monitoring services for its offender/defendant population. Home confinement is now available in all federal jurisdictions, including Puerto Rico, Guam, and the Virgin Islands.

Today, the federal home confinement program has three components. The first is *curfew,* which restricts program participants to their residence during limited, specified hours, generally at night. The second is *home detention,* which requires participants to remain at home unless the court permits them to leave for employment, education, treatment, or other specified reasons, such as to purchase food or for medical emergencies. If strictly enforced, home detention is more punitive than curfew and provides for increased monitoring over the participants' movements. *Home incarceration* is the most restrictive component of home confinement, since the participant must remain at home at all times with few, if any, exceptions (e.g., religious services or medical treatment).

## Legal Authority

In the United States courts, home confinement is authorized only as a condition of pretrial release, probation, parole, or supervised release, and it may be used by the BOP for inmates in the last phase of custody. It is not an authorized sentence in and of itself. The following is a list of authorities for the imposition of home confinement:

- **Pretrial Release.** 18 U.S.C. § 3142(c)(1)(B)(iv) (authorizing restrictions on places of abode and travel) and (vii)(authorizing curfew restrictions), support the use of home confinement condition as a condition of pretrial release.

- **Probation.** Until 1988, home confinement, with or without electronic monitoring, was imposed as a condition of probation under the court's general authority to impose conditions of release that furthered the twin goals of probation: rehabilitation of the offender and protection of the community. The Anti-Drug Abuse Act of 1988 (Pub. L. No. 100-690, sec. 7304, 102 Stat. 4181,4465 (Nov. 18, 1988)), for the first time, provided explicit authority for the court to order home confinement as a condition of probation or supervised release. Pursuant to that legislation, 18 U.S.C. § 3563(b)(19) authorizes the court to impose a condition requiring that the probationer "remain at his place of residence during non-working hours and, if the court finds it appropriate, that compliance with this condition be monitored by telephonic or electronic signaling devices, except that a condition under this paragraph may be imposed only as an alternative to incarceration; . . ."

- **Supervised Release.** 18 U.S.C. § 3583(d)(2), by cross reference, authorizes the court to impose, *inter alia,* the discretionary condition set out in 18 U.S.C. § 3563(b)(19).

- **Sentencing Guidelines.** Sections 5B1.3(e)(2) and 5F1.2 provide that home detention may be imposed as a condition of probation or supervised release, but only as a substitute for imprisonment. See also sections 5C1.1(c) and (d), which permit the court, in certain situations, to substitute home confinement as a condition supervision for a term of imprisonment otherwise applicable under the guidelines.

- **Parole.** For persons incarcerated for offenses committed prior to November 1, 1987, the Parole Commission may impose a special condition of home confinement pursuant to the provisions of 18 U.S.C. § 4209.

- **Pre-Release Inmates.** 18 U.S.C. § 3624(c) authorizes the BOP, to the extent practicable, to assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last 10 percent of the term to be served under conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for his reentry into the community. The authority provided by this subsection may be used to place a prisoner in home confinement. The United States probation system, to the extent practicable, offers assistance to a prisoner during such pre-release custody. Crime Control Act of 1990 (Pub. L. No. 101-647, sec. 2902, 104 Stat. 4789, 4913 (Nov. 29, 1990)).

## Program Goals

The laws and rules that govern each phase of the criminal justice process determine the appropriate purposes to be served by a home confinement condition at any given stage. For example, in the pretrial context, home confinement may be imposed only as an alternative to detention and only when it is the least restrictive condition necessary to protect the public from further crimes by the defendant and to assure the defendant's appearance at all subsequent court proceedings. Under the sentencing guidelines, home confinement is primarily to be used to accomplish punishment goals for less serious offenders.

These differing purposes target individuals at different levels of risk and will result in very different populations depending on the legal status. But the potential advantages of the sanction are the same: A cost-effective, community-based alternative that controls an individual's risk through intensive monitoring.

### Use of Non-Electronic Monitoring

While surveillance techniques other than electronic monitoring may be provided so long as they are effective, home confinement without electronic monitoring requires frequent home contacts and telephone calls to verify that the person is at home when required. Consequently, these techniques are more time consuming, less reliable, and therefore discouraged. However, alternatives to electronic monitoring may be warranted for persons with special medical conditions or living arrangements (see *United States Sentencing Guidelines Manual,* 1997).

### Use of Electronic Monitoring

Electronic monitoring alerts the officer when a participant leaves a specific location (usually the residence) or tampers with the electronic monitoring equipment. The participants wear a waterproof, shock-resistant transmitting device around the ankle 24 hours a day. The transmitter emits a continuous electronic signal, which is detected by a receiving unit connected to the home telephone. When the transmitter comes within the signal range of the receiver unit, the receiver unit calls a monitoring center to indicate the participant is in range or at home. The transmitter and the receiving unit work in combination to detect and report the times participants enter and exit their homes. The electronic monitoring equipment only indicates when participants enter or leave the equipment's range—not where they have gone or how far they have traveled. The range of the receiving unit in the federal program is adjustable up to 150 feet. In other words, at the maximum range setting, the participant must stay within 150 feet of the receiving unit in the residence to be considered in range or at home.

To ensure compliance with home confinement restrictions, the national electronic

monitoring contractor is required to test for the participant's presence at specific locations during prescribed hours. The contractor tracks and reports "key events" to the probation or pretrial services officer. Examples of key events include:

- Unauthorized absences from the residence.
- Failure to return to residence from a scheduled absence.
- Late arrivals and early departures from residence.
- Equipment malfunctions (e.g., transmitter or receiver/dialer).
- Equipment tampering.
- Loss of electrical power or telephone service.
- Location verification failure.
- Missed calls from receiver/dialer.

When alerted by the contractor (either by telephone or pager) of a key event, the officer investigates to determine whether the participant has failed to comply with home confinement conditions. Officers can use discretion in imposing informal sanctions in response to minor violations, such as a participant arriving home 10 minutes late. Officers may suspend or reduce the amount of time the participant is allowed away from home. More serious violations require a formal response, either by petitioning the court or notifying the BOP.

*Officer Responsibilities*

Home confinement supervision is a labor-intensive and time-consuming form of community supervision and can be dangerous. Officers provide round-the-clock coverage and respond to electronic monitoring alerts 24 hours a day, 7 days a week. Home confinement supervision also requires officers to make more frequent home and community visits, often in response to alerts signaling that participants may have violated program rules. Sometimes late night home visits are necessary. When officers receive an alert, they evaluate the need for a home visit based on several criteria: the offender's or defendant's history; the severity of the offense or charge; the nature of the alert, and, in the case of after-hour alerts, the increased potential danger to officers.

*The Federal Home Confinement Program for Defendants and Offenders*, Monograph 113, provides the general steps that federal probation and pretrial services officers consider when alerted of a participant's possible violation of the home confinement program. While some electronic monitoring key events may only indicate equipment or system problems, certain events (e.g., Unauthorized Leave, Did Not Return, Equipment Tamper, Location Verification Failure, and Missed Calls from the receiver/dialer unit) require further investigation. When officers receive such alerts, Monograph 113 provides the following general steps for officers to follow:

- Check office messages.
- Call the participant's residence.
- Make collateral calls (e.g., to relatives, employer).
- Notify the supervisor of the incident and the steps taken.
- Seek law enforcement assistance, if appropriate.
- Evaluate community and officer risk.
- Conduct a home visit to verify the participant's compliance/noncompliance at the earliest safe and feasible opportunity.
- Document all responses in the chronological record.

## Data Collection and Methodology

Data were collected on 17,659 home confinement participants from 1988 to 1995 and for the first two quarters of 1996, using the Home Confinement Program Participant Tracking System (Probation Form 60). Data were recorded on the Probation Form 60 by probation and pretrial services officers in individual districts and mailed to the Federal Corrections and Supervision Division. While forms were not submitted in every case and not all data elements were included on each form, there were no discernable patterns to the data submission or their accuracy to suggest that these omissions skewed the data in any systematic way.

*Variables*

Eight variables were used for the review of home confinement participant data: legal status, offense category, start and end dates to calculate the length of home confinement, and type of program outcome. For participants who were sentenced under the sentencing guidelines, data were also collected on the offense level and criminal history categories as calculated by the officer in accordance with the United States Sentencing Commission guidelines. Lower offense levels represent minor federal offenses and lower criminal history categories represent minor prior criminal records.

*Program Participants*

Past studies have reported a rapid increase in the use of home confinement as a noncustodial sanction (Beck, et. al., 1990; Boone, 1996; Clarkson & Weakland, 1991; Vaughn, 1991). As correctional agencies become more experienced with using this sanction, the apprehension of officials towards the technology dissipates (Gowen, 1995).

As shown in Figure 1, the first 3 years (1988–90) of the federal program in the pilot



**FIGURE 1**
Home Confinement Cases



**FIGURE 2**
Total Number of Cases by Length of Confinement (1988–1996)

phases shows little use of the program. Then, as more districts implemented home confinement programs (1991–93), the number of cases increased to approximately 1,300 participants. During that period districts individually contracted for electronic monitoring services with several different providers. The use of different contractors meant variations in price, equipment used, and quality of services. This may explain the fluctuations among districts in the implementation of the home confinement program during this time period.

Program growth resumed in 1994 with the acquisition of a national electronic monitoring contractor, a step that standardized the services and monitored prices for all districts. Consequently, the use of the home confinement program with electronic monitoring increased sharply and, by June 1996, there were over 2,400 participants.

Future growth will depend on technical advances in program tools that monitor participant compliance and on whether home confinement is expanded for use as an intermediate sanction for persons already under community supervision who have demonstrated noncompliance. Changes in sentencing guideline policies could also have an impact on future program growth. At this time, the federal sentencing guidelines restrict the use of the home confinement program and inhibit the size of the eligibility pool among originally sentenced offenders.

*Length of Participation*

When the federal home confinement program began, no national standard had been established for the length of the monitoring period. Hofer and Meierhoefer (1987) believed that this issue concerned the judiciary and suggested that a period, not to exceed 180 days, would be an appropriate starting point. Even without empirical evidence to support or refute this length limitation, two factors—conventional wisdom and federal sentencing guidelines—have, in effect, restricted individual terms of home confinement to 180 days. The conventional wisdom is that persons confined to their homes for long periods of time will get "cabin fever" and be tempted to leave or violate. Most home confinement participants, however, are allowed out of their homes for work or school. Recidivism studies that examine the relationship between the time on supervision and failure have found that those who recidivate do so early on in the term of supervision (Schmidt & Witte, 1990). It follows that because risk prediction is largely based on a person's past record, a record of good conduct under the restrictions of the home confinement program would suggest continued good conduct under the same restrictions.

Though the time limitation may be unnecessary from a risk perspective, the monitoring duration for most participants in the home confinement program in the data collection did not exceed 180 days (see Figure 2). The mean monitoring length across legal status categories was 124.65 days or approximately 4 months. Probation cases had the highest mean of 133.61 days, with pretrial and supervised release cases averaging 129.22 and 124.96 days, respectively (See Figure 3). Most of the probationers received a period of home confinement ranging from 56 to 211 days. Supervised release cases had similar ranges for home confinement terms. Pretrial defendants had monitoring times ranging from 17 to 242 days.

There appears to be a qualitative difference in the length of monitoring between post-sentence offenders and pretrial defendants. Most post-sentence offenders in the home confinement program have a specified monitoring term set by the court, and, consequently, a specific end date is known when monitoring is initiated. Conversely, pretrial defendants do not have a specified monitoring length; monitoring duration is affected by the operations



**FIGURE 3**
Average Home Confinement Monitoring Length



**FIGURE 4**
Charges for Pretrial Services Participants

of the local jurisdiction and the speed with which a case is adjudicated.

Pre-release inmates, on the other hand, are restricted by statute, BOP rules, and specific criteria, such as institutional adjustment, and the number of participants and the length of participation is therefore limited. As such, pre-release inmates have a monitoring duration that is considerably shorter—80.5 days on average—than participants on probation, supervised release, or pretrial release.

## Program Participants

The data collection contained a total of 2,775 pretrial defendants and 14,459 post conviction offenders. The characteristics of pretrial defendants in the data sample contrasted with those of post-sentence offenders in several respects as described below.

### Pretrial Defendants

Sixty-two percent of the pretrial defendants had drug/drug-related charges, followed by 11.9 percent with theft- or fraud-related charges (see Figure 4). Defendants with drug charges are assumed to be at higher risk of flight and pose more of a danger to the community than defendants with property-type charges. As expected, pretrial defendants had a higher failure rate than most categories of post-conviction offenders. Pretrial defendants who are placed in the home confinement program would otherwise remain detained if this program were not an alternative. The home confinement program may be used for pretrial defendants only when less restrictive alternatives to detention are not feasible.

### Post-sentence Offenders

Overall, in post-sentence cases, the home confinement program was used more frequently for theft and fraud offenses than for any other single offense classification, followed by drug/drug-related offenses, conspiracies, threats, and robberies. These findings are consistent with the popular belief that participation in the home confinement program should be limited to persons charged or convicted of nonviolent crimes.

In probation cases, 49 percent of the offenders in the sample had convictions for theft/fraud, followed by 19 percent for drug/drug-related offenses (see Table 1). In supervised release cases, 43 percent of the offenders in the sample had convictions for theft/fraud, followed by 26 percent for drug/drug-related offenses.

However, in parole cases, 52 percent of the offenders in the sample had convictions for drug/drug-related offenses, followed by 20 percent of the offenders who had convictions for theft/fraud offenses. Likewise, in pre-release cases, 61 percent of the offenders had drug/drug-related convictions and 18 percent had fraud/theft-related convictions.

Among supervision violation cases, or those placed into the program as an intermediate sanction in lieu of revocation of supervision, 52 percent had underlying drug/drug-related convictions, followed by 26 percent who had theft/fraud-related convictions.

Overall offenders had limited prior criminal histories. The majority of the post-sentence offenders—54.8 percent—had an average criminal history category of "I," which typically represents no more than one prior conviction that resulted in a sentence of less than 60 days. Approximately 8.6 percent of the post-sentence offenders had an average criminal history category of "II," which typically represents no more than one prior conviction that resulted in a sentence of at least 60 days but not more than one year (see Table 2).

Sentencing guideline offense level scores were recorded for most offenders where guidelines were applicable.[4] Of the 13,997 cases that had offense level recorded, over 50 percent had an offense level of 15 or less on an offense level scale of 1-43 (see Figure 5).

## Program Participant Outcomes

The participant success rate of a home confinement program hinges upon the selection of participants and the enforcement of the program rules once a person is placed into

---

[4] Offenses levels were not recorded for most parolees unless they had another conviction that fell under the federal sentencing guidelines. There were also a small number of petty and misdemeanor cases where guidelines did not apply and did not have offense levels recorded. Out of 14,459 post-sentence cases, 462 did not have this information.



**FIGURE 5**
Home Confinement Participants with Recorded Offense Levels

**TABLE 1**

*Post-Sentence Case—Type Conviction*

| Offense | Probation No. | Pct. | Supervised Release No. | Pct. | Parole No. | Pct. | BOP Inmate No. | Pct. | Supervision Violator No. | Pct. |
|---|---|---|---|---|---|---|---|---|---|---|
| Drug/Drug-related | 1,272 | 18.7 | 649 | 25.7 | 204 | 53.5 | 751 | 60.3 | 192 | 50.8 |
| Theft/Fraud | 3,300 | 48.4 | 1,102 | 43.7 | 77 | 20.2 | 218 | 17.5 | 100 | 26.5 |
| Firearms/Explosives | 271 | 4.0 | 168 | 6.7 | 6 | 6.6 | 72 | 5.8 | 16 | 4.2 |
| Threats/Robbery | 290 | 4.3 | 81 | 3.2 | 42 | 11.0 | 28 | 2.2 | 20 | 5.3 |
| Conspiracy | 816 | 12.0 | 253 | 10.0 | 25 | 6.6 | 80 | 6.4 | 19 | 5.0 |
| Racketeering/Bribery | 289 | 4.2 | 96 | 3.8 | 17 | 4.5 | 64 | 5.1 | 9 | 2.4 |
| Perjury/Obstruction | 27 | 0.4 | 21 | 0.8 | 1 | 0.3 | 3 | 0.2 | 1 | 0.3 |
| Not Classified | 547 | 8.0 | 152 | 6.0 | 9 | 2.4 | 30 | 2.4 | 21 | 5.6 |

**TABLE 2**

*Criminal History Category (Post-Sentence)*

| Category | Probation No. | Pct. | Supervised Release No. | Pct. | Parole No. | Pct. | BOP Inmate No. | Pct. | Supervision Violator No. | Pct. |
|---|---|---|---|---|---|---|---|---|---|---|
| I | 5,183 | 65.7 | 1,966 | 65.6 | 27 | 6.7 | 724 | 54.8 | 200 | 45.2 |
| II | 507 | 6.4 | 249 | 8.3 | 3 | 0.7 | 113 | 8.6 | 46 | 10.4 |
| III | 321 | 4.1 | 207 | 6.9 | 1 | 0.2 | 87 | 6.6 | 42 | 9.5 |
| IV | 85 | 1.1 | 61 | 2.0 | — | — | 36 | 2.7 | 16 | 3.6 |
| V | 24 | 0.3 | 27 | 1.0 | 3 | 0.8 | 15 | 1.1 | 8 | 1.9 |
| VI | — | — | — | — | — | — | — | — | — | — |
| VII | — | — | — | — | — | — | — | — | — | — |
| VIII | — | — | — | — | — | — | — | — | — | — |
| Unknown | 1,764 | 22.4 | 487 | 16.2 | 372 | 91.6 | 347 | 26.2 | 130 | 29.4 |
| **Total** | **7,884** | **100.0** | **2,997** | **100.0** | **406** | **100.0** | **1,322** | **100.0** | **442** | **100.0** |

**TABLE 3**

*Participant Outcomes by Legal Status*

| Legal Type | Successful Percentage | Unsuccessful Percentage |
|---|---|---|
| Probationers | 94.0 | 6.0 |
| Supervised Releasees | 90.0 | 10.3 |
| Parolees | 88.3 | 11.7 |
| Pre-release Inmates | 95.0 | 5.3 |
| Supervision Violators | 75.0 | 24.7 |
| Pretrial Releasees | 77.0 | 23.0 |

Case 1:18-cr-00567-VSB   Document 154-3   Filed 01/10/20   Page 8 of 9
December 2000                                                                                       FEDERAL HOME CONFINEMENT    17

the program. In the past, objective risk assessment of participants in any type of criminal justice program (e.g., probation or home confinement) has been met with pessimism among practitioners about the ability of statistical models to improve the ability to predict recidivism (Schmidt & Witte, 1990) for two possible reasons: First, it is correctly assessed that empirical models rarely have been able to predict more than 50 percent of supervision outcomes. Second, supervision and community program failures are incorrectly blamed on the use of a statistical device even though the responsibility lies with the releasing authority and the supervising officer. As a result, selection of participants for the home confinement program frequently has been based on the assessment of judges and probation officers (Hofer & Meierhoefer, 1987).

Although no predictive scales have been specifically developed for the federal home confinement program, a number of factors often are considered by the releasing authority before imposing home confinement as a condition of release. Candidates are evaluated on their personal histories, substance abuse history, criminal history, and stability in the community. However, the severity of the offense of conviction has historically taken precedence in the selection process (Hofer & Meierhoefer, 1987).

Corbett and Fersch (1985) suggested that violent offenders and habitual property offenders be excluded from the program as they represent a greater risk to public safety. Boone (1996) reported that policy makers and judges do not believe that offenders who commit violent offenses should be considered for home confinement. Most researchers, as well as practitioners, believe that dangerous individuals should not be allowed to participate in the home confinement program. They assume that when these persons reoffend, there is an increased likelihood that they again will commit a violent act.

Out of the 17,000 program participants in the data collection, 89 percent successfully completed a term of home confinement without incident.

Defendants with drug charges appear to have a higher risk of flight and pose more of a danger to the community than defendants charged with crimes against property. As a result, pretrial defendants in the study had a failure rate double that of the entire sample of post-sentence offenders in the program.

Of the 3,011 pretrial defendants in the home confinement program, 694 (23 percent) failed. A majority of these defendants either tested positive for illegal substances (7 percent) or incurred unauthorized leave violations (7.9 percent). This is not surprising given the high incidence of substance abuse in the criminal community. Review of correlations (omitted from this analysis) indicated *positive urinalysis* often coincided with *leave* violations.

Of the 14,459 post-sentence offenders, 12,856 (or 89 percent) successfully completed the program. Success rates among this group of participants were consistent each year and comparable to the general federal supervision population.

As a subtype of post-sentenced offenders, supervision violators, or those offenders placed on home confinement as an intermediate sanction for violating supervision conditions, showed a higher failure rate than pretrial defendants. Among post-sentence cases, supervision violators had the highest percentage of program failures (24.7 percent), followed by supervised release cases (10.3 percent) (see Table 3).

Supervision violators and pretrial defendants have comparable failure rates and share some common characteristics. Both groups consist of individuals who represent a greater risk of program failure. Supervision violators are individuals who already have demonstrated noncompliance with existing supervision conditions. Pretrial defendants are placed into the home confinement program as an alternative to detention and only when less restrictive alternatives are not feasible. Both supervision violators and pretrial defendants represent high risks for the home confinement program, but, unless a history of violence is present, the risk is controllable with a well-structured program and close supervision by officers.

Overall, among the post-sentenced offenders with unsuccessful terminations, the main reasons for termination included testing positive for illegal substances (23.3 percent) or incurring unauthorized leave violations (22.6 percent). Below are the descriptions of some of the types of reasons for program terminations, along with contrasting outcomes in these categories for particular types of cases:

*Tamper:* Sometimes participants or others tampered with the electronic monitoring equipment. They can do this by disconnecting the equipment, or by disconnecting the receiver unit, transmitter, or telephone line/service from the service unit in the participant's home. In each case, the supervising officer is alerted and investigates the situation. Of the supervision violators who were unsuccessfully terminated, 5.2 percent were terminated for tampering. Among the pre-release inmates who failed the program, only 0.6 percent had been terminated for tampering.

*Unauthorized Leave:* Sometimes participants left home (or stayed away) without authorization. Participants are required to comply with a daily activity schedule that specifies when they may leave and return home. Unauthorized leave violations were reported in 13.1 percent of the unsuccessfully terminated supervision violator cases and in .9 percent of the unsuccessful pre-release cases.

*Abscond:* Participants sometimes left the residence and remained away from home for such a length of time that the participants' whereabouts were determined as unknown. Supervision violators who failed the program absconded from supervision most often (8.1 percent) compared to only 0.4 percent of the pre-release case failures.

*New arrest:* Some participants were arrested or charged with a new offense, including misdemeanor offenses, such as driving under the influence or shoplifting, or more serious offenses such as theft, fraud, or drug possession, while in the home confinement program. While only 0.7 percent of pre-release inmates were terminated from the program because of a new arrest, 4.8 percent of the supervision violator failures were rearrested.

## Conclusion

The use of the home confinement program is growing around the country. As the merits of this safe and cost-effective community corrections program become more widely understood, its use is likely to increase. The results of the descriptive analysis indicate that the federal home confinement program is operating within the expectations of its role with all types of federal criminal supervision cases.

The low percentage of new criminal conduct among program participants in the data reflects well on the program's implementation by pretrial services and probation offices. It is also a good indicator that officers are making appropriate recommendations for the home confinement program as a special condition of release.

While it is apparent that the federal home confinement program has received increased acceptance on the part of probation and pretrial services officers and judicial officers, there

are still unanswered questions that, if answered, might yield a broader application of this sanction. Plans are underway to fully implement electronic data collection for the home confinement program at the national level. This will make it possible to analyze a larger number of variables, conduct comparison and follow-up studies, and monitor performance of national home confinement policies and procedures. In combination, these efforts will help develop objective participant selection criteria, establish appropriate standards for officer contact with participants, and ensure consistent response time for officers responding to electronic monitoring alerts.

## References

Beck, J., Klein-Saffron, J., & Wooten, H. (1990, December). Home confinement and the use of electronic monitoring with federal parolees. *Federal Probation, 54*(4), 22-23.

Boone, H. N. (1996). Electronic home confinement judicial and legislative perspectives. *American Probation and Parole Association Perspectives*, 18-25.

Clarkson, J. S., & Weakland, J. J. (1991). Transitional aftercare model for juveniles: Adapting electronic monitoring and home confinement. *Journal of Offender Monitoring, 4*(2), 1-15.

Corbett, R., & Fersch, E. (1985). Home as prison: Use of house arrest. *Federal Probation, 49*(1).

Gowen, D. (1995). Electronic monitoring in the Southern District of Mississippi. *Federal Probation, 59*(1).

Hofer, P. J., & Meierhoefer, B. J. (1987). Home confinement: An evolving sanction in the federal criminal justice system. Washington, DC: Federal Judicial Center.

Schmidt, P., & Witte, A. D. (1990). Some thoughts on how and when to predict in criminal justice settings. In *New directions in the study of justice, law and social control. Plenum Press* (p. 265). Phoenix, AZ: School of Justice Studies, Arizona State University.

The Federal Home Confinement Program for Defendants and Offenders, *Monograph 113* (March 1999), Federal Corrections and Supervision Division, Administrative Office of the United States Courts.

United States Sentencing Commission (Guidelines Manual, November 1997), Washington, DC.

Vaughn, J. B. (1991). Use of electronic monitoring with juvenile intensive supervision programs. In T. Armstrong (Ed.), *Intensive supervision with high-risk youths*. Monsey, NY: Criminal Justice Press.