# Exhibit B9



Office of the Inspector General
U.S. Department of Justice

# Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness

Evaluation and Inspections Division 17-05 July 2017

# EXECUTIVE SUMMARY

## Introduction

The Federal Bureau of Prisons (BOP) is responsible for confining offenders in environments that are safe, humane, cost-efficient, and appropriately secure. To do so, the BOP utilizes various forms of Restrictive Housing Unit (RHU) to confine certain inmates, including those with mental illness. However, according to recent research and reports, as well as the BOP's own policy, confinement in RHUs, even for relatively short periods of time, can adversely affect inmates' mental health and can be particularly harmful for inmates with mental illness.

As of June 2016, of the 148,227 sentenced inmates in the BOP's 122 institutions, 9,749 inmates (7 percent) were housed in its three largest forms of RHU: Special Housing Units (SHU) in 111 institutions; 2 Special Management Units (SMU) at the U.S. Penitentiaries (USP) in Lewisburg and Allenwood, Pennsylvania; and the USP Administrative Maximum Security Facility (ADX) in Florence, Colorado.[1]

The Office of the Inspector General conducted this review to examine the BOP's use of RHUs for inmates with mental illness, including trends in the use of restrictive housing and the screening, treatment, and monitoring of inmates with mental illness who are housed in RHUs. We found significant issues with the adequacy of the BOP's policies and its implementation efforts in this critical area.

## Results in Brief

*BOP Policies Do Not Adequately Address the Confinement of Inmates with Mental Illness in RHUs, and the BOP Does Not Sufficiently Track or Monitor Such Inmates*

BOP guidance and policies do not clearly define "restrictive housing" or "extended placement." Although the BOP states that it does not practice solitary confinement, or even recognize the term, we found inmates, including those with mental illness, who were housed in single-cell confinement for long periods of time, isolated from other inmates and with limited human contact. For example, at the ADX, we observed an RHU that held two inmates, each in their own cell, isolated from other inmates. The inmates did not engage in recreation with each other or with other inmates and were confined to their cells for over 22 hours a day. Also, in five SHUs, we observed single-celled inmates, many with serious mental illness. One inmate, who we were told was denied ADX placement for mental health reasons, had been single-celled for about 4 years.

Although the BOP generally imposes a minimum amount of time that inmates must spend in RHUs, it does not limit the maximum amount of time and does not

[1] The USP Allenwood SMU closed in October 2016, during the course of our review. USP Lewisburg is the only remaining BOP institution that maintains the SMU program.

monitor inmates' cumulative time in RHUs.[2] The BOP also does not track its housing of inmates in single-cell RHU confinement, nor does it account for their confinement in all RHUs throughout BOP institutions. As a result, inmates, including those with mental illness, may spend years and even decades in RHUs. For example, we learned of an inmate with serious mental illness who spent about 19 years at the ADX before being transferred to a secure residential mental health treatment program. In addition, our sample of inmates with mental illness showed that they had been placed in the ADX for an average of about 69 months. Similarly, we found that between fiscal years (FY) 2008 and 2015, inmates with mental illness averaged about 896 consecutive days, or about 29 months, in the SMU. We further found that inmates with mental illness spend disproportionately longer periods of time in RHUs than their peers. Equally concerning, our review showed that 13 percent of the inmates with mental illness in our sample were released by the BOP directly into the community after spending nearly 29 months in the SMU prior to their release.

By contrast, officials in six of the eight state departments of corrections told us that they limit the length of time inmates with mental illness can be placed in restrictive housing. In 2015, three states (Massachusetts, Mississippi, and New York) had at least a 30-day limit, while three other states (Colorado, Maine, and Pennsylvania) no longer placed inmates with serious mental illness in RHUs at all.

*Mental Health Staff Do Not Always Document Inmates' Mental Disorders, Leaving the BOP Unable to Accurately Determine the Number of Inmates with Mental Illness and Ensure that It Is Providing Appropriate Care to Them*

BOP data showed that, as of 2015, only 3 percent of the BOP's sentenced inmate population was being treated regularly for mental illness. Yet, the BOP's *FY 2016 Performance Budget Congressional Submission* cited an internal BOP study, which suggested that approximately 19 percent of federal inmates had a history of mental illness. Moreover, a 2006 Bureau of Justice Statistics report concluded that 45 percent of federal inmates had symptoms or a recent history of mental illness.

We found that the BOP cannot accurately determine the number of inmates who have mental illness because institution staff do not always document mental disorders. The BOP's FY 2014 data estimates that approximately 12 percent of inmates have a history of mental illness; however, in 2015, the BOP's Chief Psychiatrist estimated, based on discussions with institutions' Psychology Services staffs, that approximately 40 percent of inmates have mental illness, excluding inmates with only personality disorder diagnoses. Similarly, one institution's Deputy Chief Psychologist estimated that 50 percent of that institution's inmates may have Antisocial Personality Disorder; nevertheless, we found that this disorder was documented for only about 3.3 percent of the BOP's total inmate population. Because mental health staffs do not always document inmates' mental disorders, the BOP is unable to ensure that it is providing appropriate care to them.

[2] In August 2016, the BOP issued a revised SMU policy that now limits the duration of time an inmate can spend in the SMU. We discuss the revised SMU policy throughout the report.

*Since the BOP Adopted Its New Mental Health Policy, BOP Data Shows a 30 Percent Reduction in Inmates Who Receive Regular Mental Health Treatment*

The BOP adopted a new mental health policy in 2014, increasing the standards of care for inmates with mental illness.  However, since the policy was issued, the total number of inmates who receive regular mental health treatment decreased by approximately 30 percent, including 56 percent for inmates in SMUs, and about 20 percent overall for inmates in RHUs during the scope of our review.  Based on our review, it appears that mental health staff may have reduced the number of inmates, including those in RHUs, who must receive regular mental health treatment because they did not have the necessary staffing resources to meet the policy's increased treatment standards.  Indeed, we found that, as of October 2015, the BOP had filled only 57 percent of its authorized full-time Psychiatrist positions nationwide and that it had significant staffing issues with regard to Psychologist positions as well.

This treatment trend was particularly pronounced among SMU inmates at USP Lewisburg, which confined over 1,100 SMU inmates as of June 2016.  Based on our sample of SMU inmates, we found that, prior to the new policy, the number of inmates (16) whose mental health care level was increased equaled the number of inmates (16) whose care level was decreased.  In contrast, after the new policy was adopted, all 27 inmates whose care level changed had a decrease and therefore ostensibly required less treatment.  By May 2015, only about 2.5 percent of SMU inmates at USP Lewisburg were categorized as requiring regular treatment, compared to about 11 percent of ADX inmates and 7 percent of SHU inmates nationwide, which we believe raises treatment concerns for inmates in USP Lewisburg's SMU.

*While the BOP Has Taken Recent Steps to Mitigate Mental Health Concerns for Inmates in RHUs, Additional Actions Can Be Taken*

The BOP has taken a number of steps to mitigate the mental health concerns for inmates in RHUs.  These efforts include diverting inmates with serious mental illness from placement in traditional RHUs (i.e., SHUs, the SMUs, and the ADX) and into alternative programs such as secure residential mental health treatment programs.  While these are positive BOP initiatives, limited inmate capacities, slow inmate progression through the programs, high staffing needs, and a lack of formal performance metrics with which to measure the effectiveness of these programs limit their utility and the BOP's ability to expand their use to other institutions.

**Recommendations**

We make 15 recommendations to the BOP to improve its screening, treatment, and monitoring of inmates with mental illness housed in RHUs.

## TABLE OF CONTENTS

INTRODUCTION ........ 1

Background ........ 1

Types of Restrictive Housing Units ........ 2

Mental Illness among BOP Inmates ........ 4

BOP Mental Health Care Levels ........ 5

BOP Policies Impacting Inmates in RHUs, including those with Mental Illness ..... 7

Prior Reports on the BOP's Use of Restrictive Housing and Inmates with Mental Illness ........ 11

Scope and Methodology of the OIG Review ........ 14

RESULTS OF THE REVIEW ........ 15

BOP Policies Do Not Adequately Address the Confinement of Inmates with Mental Illness in RHUs, and the BOP Does Not Sufficiently Track or Monitor Such Inmates ........ 15

Mental Health Staff Do Not Always Document Inmates' Mental Disorders, Leaving the BOP Unable to Accurately Determine the Number of Inmates with Mental Illness and Ensure that It Is Providing Appropriate Care to Them ......... 34

Since the BOP Adopted Its New Mental Health Policy, BOP Data Shows a 30 Percent Reduction in the Number of Inmates Who Receive Regular Mental Health Treatment ........ 37

While the BOP Has Taken Recent Steps to Mitigate Mental Health Concerns for Inmates in RHUs, Additional Actions Can Be Taken ........ 51

CONCLUSION AND RECOMMENDATIONS ........ 63

Conclusion ........ 63

Recommendations ........ 65

APPENDIX 1: METHODOLOGY OF THE OIG REVIEW ........ 67

Standards ........ 67

Data Analysis ........ 67

Site Visits ........ 70

Interviews ........ 70

Inmate Case File Review ........ 71

APPENDIX 2: BOP POLICIES GOVERNING RESTRICTIVE HOUSING AND MENTAL HEALTH SCREENING, TREATMENT, AND MONITORING ........ 73

Restrictive Housing Units ........ 73

Mental Health Screening, Treatment, and Monitoring ........ 78

APPENDIX 3: BOP RESIDENTIAL MENTAL HEALTH TREATMENT PROGRAMS ........ 84

APPENDIX 4: THE BOP’S RESPONSE TO THE DRAFT REPORT ........ 86

APPENDIX 5: OIG ANALYSIS OF THE BOP’S RESPONSE ........ 91

# INTRODUCTION

## Background

The Federal Bureau of Prisons (BOP) is responsible for confining offenders in environments that are safe, humane, cost-efficient, and appropriately secure. To ensure safe and orderly environments for inmates and staff, the BOP utilizes various forms of Restrictive Housing Unit (RHU) for the confinement of some inmates, including inmates with mental illness. The U.S. Department of Justice (Department, DOJ) defines restrictive housing as "any type of detention that includes removal from the general inmate population, whether voluntary or involuntary; placement in a locked room or cell, whether alone or with another inmate; and inability to leave the room or cell for the vast majority of the day, typically 22 hours or more."[3] In recent years, studies have suggested that the frequency, duration, and conditions of confinement of restrictive housing, even for short periods of time, can cause psychological harm and significant adverse effects on these inmates' mental health. For example, research suggests that "isolation can be psychologically harmful to any prisoner — psychological effects can include anxiety, depression, anger, cognitive disturbances, perceptual disorders, obsessive thoughts, paranoia, and psychosis" — some of which may be long lasting.[4] According to some experts, inmates who have spent long periods in isolation are more likely to recidivate and have a more difficult time creating the lasting social bonds that are necessary for reintegration into society.[5] The BOP's own policy also recognizes that "an inmate's mental health may deteriorate during restrictive housing placement."[6]

As of June 2016, of the 148,227 sentenced inmates in the BOP's 122 institutions, 9,749 inmates (7 percent) were housed in its 3 largest forms of RHU: Special Housing Units (SHU) in 111 institutions; 2 Special Management Units (SMU) at the U.S. Penitentiaries (USP) in Lewisburg and Allenwood, Pennsylvania; and the USP Administrative Maximum Security Facility (ADX) in Florence, Colorado.

---

[3] DOJ, *Report and Recommendations concerning the Use of Restrictive Housing* (January 2016), 3. While the BOP has taken several corrective actions in response to the recommendations in this report, we found that several issues remain unresolved and require the BOP's immediate attention.

[4] Jeffrey L. Metzner, MD, and Jamie Fellner, Esq., "Solitary Confinement and Mental Illness in U.S. Prisons: A Challenge for Medical Ethics," *Journal of the American Academy of Psychiatry and the Law,* 38 (March 2010): 104–08.

[5] Craig Haney, Professor of Psychology at the University of California, Santa Cruz, before the Judiciary Subcommittee on the Constitution, Civil Rights, and Human Rights, U.S. Senate, concerning "Reassessing Solitary Confinement: The Human Rights, Fiscal, and Public Safety Consequences" (June 19, 2012), 10–11. The Office of the Inspector General (OIG) separately reviewed the BOP's Release Preparation Program. See DOJ OIG, *Review of the Federal Bureau of Prisons' Release Preparation Program,* Evaluation and Inspections Report 16-07 (August 2016).

[6] BOP Program Statement 5310.16, Treatment and Care of Inmates with Mental Illness (May 1, 2014), 16.

In this review, the Office of the Inspector General (OIG) examined the BOP's use of restrictive housing for inmates with mental illness in these RHUs and analyzed trends in the BOP's placement of inmates with mental illness in restrictive housing. We also evaluated the BOP's policies and procedures related to its screening, treatment, and monitoring of inmates with mental illness in RHUs. In the following sections and Appendix 2, we discuss the three primary types of RHU that the BOP uses, as well as the prevalence of mental illness among BOP inmates; we explain how the BOP determines an inmate's mental health needs, as well as trends in the placement of inmates with mental illness in RHUs; we describe previous reports related to the use of RHUs and inmates with mental illness; and we summarize the BOP's RHU and mental health policies.

**Types of Restrictive Housing Units**

There are three primary types of RHU within BOP institutions. As of January 2016, 111 institutions have a SHU to house inmates for both disciplinary reasons and non-disciplinary reasons, such as for their own protection.[7] In two BOP institutions, a SMU houses inmates who present unique security and management concerns.[8] The ADX houses inmates who have demonstrated violent, disruptive, and/or escape-prone behavior at other BOP institutions or those who cannot be safely housed in the general population of other BOP institutions. We further discuss the three primary types of RHU below, and we then discuss the prevalence of mental illness among BOP inmates generally, followed by the availability of mental health services for inmates housed in the different types of RHU. See Appendix 2 for more information on SHUs, the SMUs, and the ADX.

*Special Housing Units*

Institution SHUs are securely separated from general inmate population housing. In August 2015, the BOP's former Director stated that, on average, inmates spend about 65 days (about 2 months) in the SHU BOP-wide.[9] In June

---

[7] In November 2016, the BOP issued a revised SHU policy in response to the recommendations detailed in the Department's January 2016 report on the use of restrictive housing. See DOJ, *Use of Restrictive Housing*, which we discuss below. See also BOP Program Statement 5270.11, Special Housing Units (November 23, 2016). We did not evaluate this new policy, as it was issued after completion of our fieldwork. However, we note throughout this report examples of changes to the SHU policy as they relate to our findings during the course of our review. See Appendix 2 for more information on the revised SHU policy.

[8] BOP Program Statement 5217.01, Special Management Units (November 19, 2008), provides guidance and procedures for operation of the SMU.

In August 2016, the BOP issued a revised SMU policy. See BOP Program Statement 5217.02, Special Management Units (August 9, 2016). We did not evaluate this new policy, as it was issued after the completion of our fieldwork. However, we note throughout this report examples of changes to the SMU policy as they relate to our findings on the SMU program during the course of our review. See Appendix 2 for more information on the revised SMU policy.

[9] Former BOP Director Charles E. Samuels, Jr., before the Homeland Security and Governmental Affairs Committee, U.S. Senate, concerning "Oversight of the Bureau of Prisons: First Hand Accounts of Challenges Facing the Federal Prison System" (August 4, 2015).

2016, the BOP housed about 5 percent (8,065 inmates) of its total population of sentenced inmates in SHUs. Eighty-three percent of all BOP inmates in RHUs are housed in SHUs; though some inmates are placed in a SHU for disciplinary reasons, most are held there for non-disciplinary reasons, including for their own protection.

*Special Management Units*

The BOP established SMUs in 2008 as a program to house inmates who require greater management of their interactions with others to ensure the safety, security, or orderly operation of BOP institutions and to protect the public.[10] Most SMU inmates are transferred from USPs. Inmates assigned to the SMUs are expected to complete a four-phase program, which means they have demonstrated a sustained ability to coexist and interact appropriately with other inmates and staff, within 18 to 24 months, after which they may be designated to another appropriate facility.[11]

*U.S. Penitentiary Administrative Maximum Security Facility*

Activated in November 1994 in Florence, Colorado, the ADX has a rated capacity of 490 inmates and confines inmates under close control. As of November 2013, the BOP determined that the average length of stay for inmates at the ADX was 1,376 days (about 45 months, or 3.8 years).[12] At the time of our review, the ADX housed the majority (about 70 percent) of its inmates in general population, while the remaining 142 inmates, who require closer control and increased levels of security, are housed in the ADX's Control Unit or its Special Security Unit.[13] All inmates in the ADX are in single-occupant cells and can receive programming through a closed-circuit television system.

[10] By 2012, the SMU program had expanded to 5 institutions with a population of over 1,700 inmates. However, as of June 2016, the BOP maintained its SMU program within two institutions, USP Lewisburg (1,166) and USP Allenwood (124), both in Pennsylvania, which together house 1,290 inmates. According to the former Deputy Assistant Director for the Correctional Programs Division, the BOP condensed the SMU program to two institutions because the need for the program had diminished. He cited fewer inmate assaults, staff assaults, and protective custody cases throughout the BOP. In October 2016, Psychology Services Branch officials told us that USP Allenwood's SMU has since closed and, currently, USP Lewisburg is the only remaining institution that maintains the SMU program.

[11] In August 2016, as a result of recommendations made in the Department's January 2016 restrictive housing report, the BOP issued a revised SMU policy that, among other things, reduced the intended time frame for inmates' completion of the program to 9–13 months. See DOJ, *Use of Restrictive Housing*. See Appendix 2 of this report for more information on the revised SMU policy.

[12] This was the most recent data the BOP had at the time that a Center of Naval Analysis and Solutions (CNA) analysis was done, which we discuss further below. CNA, *Federal Bureau of Prisons: Special Housing Review and Assessment* (December 2014), 58.

[13] The ADX's Control Unit provides housing for inmates who are unable to function in a less restrictive environment without posing a threat to others. This unit typically houses inmates who have assaulted or killed staff or other inmates or who have escaped or attempted escape from other institutions. The ADX's Special Security Unit houses inmates who are subject to Special Administrative Measures, which are restrictions on communications that the U.S. Attorney General imposes, typically for reasons related to national security.

**Mental Illness among BOP Inmates**

Reports citing statistics on the prevalence of mental illness, both within the BOP's inmate population and nationally, vary based on sources of data and mental health information, the definition of mental illness used, and the research methodology employed.  For example, the BOP's fiscal year (FY) *2016 Performance Budget Congressional Submission* cited an internal BOP study that suggested that approximately 19 percent of federal inmates had a history of mental illness.[14]  In comparison, a 2006 Bureau of Justice Statistics report concluded that 45 percent of federal inmates had symptoms or a recent history of mental illness.[15]

According to the BOP, inmates with diagnosed mental illness, including inmates with serious mental illness, may be housed in each of the RHUs described above "due to safety and/or security needs for any length of time."[16]  BOP policy defines a mental disorder (illness) as:

> A syndrome characterized by clinical significant disturbance in an individual's cognition, emotional regulation, or behavior that reflects a dysfunction in the psychological, biological, or developmental processes underlying mental functioning.  Mental disorders are usually associated with significant distress or disability in social, occupational, or other important activities.[17]

In determining whether an inmate should be classified as having serious mental illness, BOP policy states that mental health staff will consider the inmate's diagnosed mental illness or illnesses, the severity and duration of the symptoms, the degree of functional impairment associated with the illness or illnesses, and the

---

[14]  This study was limited to 2,855 inmates who were new court commitments to the BOP's custody, spoke either English or Spanish fluently, could read at a fourth grade level, and were physically and mentally able to complete self-reporting instruments.  Philip R. Magaletta et al., "Estimating the Mental Illness Component of Service Need in Corrections, Results from the *Mental Health Prevalence Project,*" *Criminal Justice and Behavior* 36, no. 3 (March 2009).

[15]  DOJ Office of Justice Programs, Bureau of Justice Statistics, *Mental Health Problems of Prison and Jail Inmates,* Special Report (revised December 14, 2006), https://www.bjs.gov/content/pub/pdf/mhppji.pdf (accessed June 27, 2017).  This report was based on data collected from structured clinical interviews of federal inmates during 2004.  It was limited to inmates' self-reported symptoms or recent history of mental illness that must have occurred during the 12 months prior to the interview.  It did not exclude symptoms due to medical illness, bereavement, or substance abuse.

By contrast, this report also stated that about 11 percent of persons age 18 or older in the U.S. general population displayed symptoms of mental disorder, while in 2015 the National Institute of Mental Health estimated that 17.9 percent of all adults in the United States had experienced mental illness within the previous year.  See National Institute of Mental Health, "Any Mental Illness (AMI) among U.S. Adults," https://www.nimh.nih.gov/health/statistics/prevalence/any-mental-illness-ami-among-us-adults.shtml (accessed June 27, 2017).

[16]  BOP Program Statement 5310.16, 15.  The BOP's definition of mental illness is derived from the American Psychiatric Association's *Diagnostic and Statistical Manual for Mental Disorders,* 5th ed. (Arlington, Va.:  American Psychiatric Association, 2013) (DSM-5), which is a classification and diagnostic tool used throughout the field of psychology.

[17]  BOP Program Statement 5310.16, 1.

inmate's treatment history and current treatment needs.  BOP policy lists specific diagnoses that are generally classified as serious mental illnesses, as well as specific diagnoses that may be classified as serious mental illnesses.[18]

According to BOP policy, when inmates with serious mental illness are placed in restrictive housing, they should continue to receive mental health care commensurate with their treatment needs.[19]  The BOP limits the placement of inmates with serious mental illness in the SMUs and the ADX to those inmates who present extraordinary security needs that cannot be managed elsewhere.  Below, we discuss how the BOP categorizes inmates' mental health, as well as its policies to address inmates with mental illness in RHUs.

**BOP Mental Health Care Levels**

The BOP classifies inmates into four Mental Health Care Levels (MHCL), which are determined by the resources and services an inmate needs as opposed to the inmate's diagnosed mental illness.  The BOP policy classifies inmate MHCLs as follows:

- **MHCL 1:**  The inmate shows no significant level of functional impairment associated with a mental illness and demonstrates no need for regular mental health intervention.  Or, if a history of mental illness is present, the inmate has consistently demonstrated appropriate help-seeking behavior in response to any reemergence of symptoms.

- **MHCL 2:**  The inmate requires routine outpatient mental health care on an ongoing basis and/or brief, crisis-oriented mental health care of significant intensity, e.g., placement on suicide watch or behavioral observation status.

- **MHCL 3:**  The inmate requires enhanced outpatient care (i.e., weekly mental health intervention) or residential mental health care (i.e., placement in a residential Psychology Treatment Program).

- **MHCL 4:**  The inmate may require inpatient psychiatric care and acute care in a psychiatric hospital if the inmate is gravely disabled and cannot function within the general population at an institution having the mission and resources to house MHCL 3 inmates.

According to BOP Psychology Services Branch officials, MHCLs are based on resource utilization and, as such, the BOP tries to assess what type of resources an

---

[18]  BOP policy lists Schizophrenia Spectrum and other Psychotic Disorders, Bipolar and related disorders, and Major Depressive Disorders as diagnoses that are generally classified as serious mental illnesses.  The policy lists Anxiety Disorders, Obsessive-Compulsive and related disorders, Trauma and Stressor-Related Disorders, Intellectual Disabilities and Autism Spectrum Disorders, Major Neurocognitive Disorders, and Personality Disorders as diagnoses that are often classified as serious mental illnesses, especially if the condition is sufficiently severe, persistent, and disabling.  See BOP Program Statement 5310.16, 1–2.

[19]  BOP policy specifies that if an inmate with a serious mental illness must be placed in restrictive housing, he/she will continue to receive mental health care commensurate with his/her treatment needs.  See BOP Program Statement 5310.16, 15, 19.

inmate needs to function effectively.[20]   Inmates at both MHCL 3 and MHCL 4 are considered to have serious mental illness.  However, inmates at all MHCLs may have a serious mental illness.  For example, an inmate with a history of psychosis could be designated at MHCL 1 or 2 despite having a serious mental illness, as long as he or she faithfully takes medication and does not need further staff intervention to function effectively.  MHCLs do not necessarily correspond to specific diagnoses, although this is a factor that the BOP takes into consideration.  Rather, MHCLs correspond to treatment requirements and how often inmates need intervention.  The BOP directs its clinicians to assess inmates who are asking for services and inmates who could benefit from services.  For example, the BOP would typically classify an inmate with Schizophrenia at MHCL 2, 3, or 4, even if the inmate does not require reoccurring mental health interventions for a prolonged period of time, because such services may be required in the future.

*Recent MHCL Trends*

BOP data indicates that a smaller percentage of inmates are being treated for mental illness than the percentage that the BOP's *Mental Health Prevalence Project* reported as having mental health needs.  Specifically, BOP data showed that as of 2015 only 3 percent of the BOP's total sentenced inmate population was designated at MHCL 2, 3, or 4, thus requiring recurring treatment, as opposed to nearly 4.3 percent in 2010.[21]  From the end of FY 2010 through May 2015, the number of inmates designated at MHCL 2, 3, or 4 decreased by over 30 percent, from 6,853 inmates to 4,768 inmates, while the number of inmates designated at MHCL 1 increased slightly (2 percent).  Most notably, the number of inmates designated at MHCL 4 decreased by almost 60 percent.  Table 1 below shows the total number of inmates across all institutions, by MHCL, from FY 2010 through May 2015.[22]

---

[20]  Similar to how MHCLs delineate the mental health needs of inmates, the BOP also designates institutional care levels to delineate the varying levels of medical and mental health care that can be provided to inmates at its institutions.  For example, an MHCL 4 inmate should be housed only at a Care Level 4 institution because only Care Level 4 institutions have the resources needed to address that inmate's intensive mental health needs.

[21]  Later in this report, we discuss what BOP officials estimated as the percentage of the BOP's inmate population with mental illness.

[22]  In response to a working draft of this report, the BOP cited disparities following an MHCL analysis of its inmate population at the end of FY 2010.  While the BOP found the same ratio of its inmate population who required recurring treatment in FY 2010 (4.3 percent) and May 2015 (3.0 percent), the BOP did not include 17,269 inmates in its FY 2010 numbers that we included in Table 1 (below).  According to the BOP, it did not include these inmates in its analysis because the MHCL system was formally adopted in December 2009 and many inmates at the end of FY 2010 did not have a MHCL yet assigned to them.  However, the raw data the BOP provided to us for the end of FY 2010 showed that, with few exceptions, all inmates had MHCLs assigned to them.  We based our analysis on this data.

**Table 1**

**Inmate MHCLs, FY 2010 – May 2015**

| Inmates Designated at All MHCLs | FY 2010 | May 2015 | Percent Change (+/-) |
|---|---|---|---|
| **MHCL 1** | 147,907 | 150,884 | **2.01%** |
| **MHCL 2** | 5,701 | 3,971 | **-30.35%** |
| **MHCL 3** | 578 | 551 | **-4.67%** |
| **MHCL 4** | 574 | 246 | **-57.14%** |
| **Total** | **154,760** | **155,652** | **0.57%** |

Note: This table does not include inmates who had undergone an initial mental health records review, were given a tentative MHCL designation by the BOP's Designation and Sentence Computation Center, but had yet to be examined, in person, by a mental health clinician.

Source: OIG analysis of BOP data

Over this same period, the BOP decreased its use of restrictive housing for inmates in general by nearly 20 percent and for inmates designated at MHCL 2, 3, or 4 by slightly more. Specifically:

- The number of inmates housed in SHUs decreased 22.3 percent, with a corresponding decrease of 26.3 percent in the number of MHCL 2, 3, or 4 inmates housed in SHUs.
- The number of inmates placed in the SMU program increased 11.3 percent, from 1,157 to 1,288. However, the number of MHCL 2, 3, or 4 inmates placed in the SMU program decreased 13.9 percent overall (from 36 to 31).[23]
- The number of inmates at the ADX decreased 7.6 percent (from 447 to 413) and the number of MHCL 2, 3, or 4 inmates at the ADX increased by nearly 40 percent (from 33 to 46).

BOP policy currently prohibits the placement of MHCL 4 inmates in the SMUs or the ADX. Similarly, under the BOP's 2014 policy, most MHCL 3 inmates are diverted from SMU or ADX placement, except when extraordinary security needs prevent them from being housed anywhere else. Later in this report, we discuss further the 30 percent reduction in the number of inmates who receive regular mental health treatment, including those in RHUs.

## BOP Policies Impacting Inmates in RHUs, including those with Mental Illness

In 2014, the BOP adopted a new national mental health care policy that detailed enhanced standards of care for all inmates with mental illness. The BOP supplements this policy with its longstanding Psychology Services Manual, which, among other things, specifies national mental health screening requirements for all

---

[23] We note that the number of MHCL 2, 3, or 4 inmates in the SMU increased by 294 percent (from 36 to 142) from 2010 to 2012 and has since decreased by 78 percent (from 142 to 31).

inmates.[24] To govern the operation of RHUs, the BOP maintains national policies for institutions' use of both SHUs and SMUs. Meanwhile, the ADX has local policies and guidelines establishing an institution's daily operating procedures, including supplementing BOP policy regarding the care and treatment of ADX inmates with mental illness. We discuss the policies below and provide additional detail in Appendix 2.

*National Mental Health Care Program*

The BOP's Psychology Services Branch, located within the Reentry Services Division, and its Health Services Division develop policy and oversee the overall psychology, psychiatry, and medical services provided at institutions. Within institutions, psychology, psychiatry, and medical staff provide mental health services to inmates with mental illness. Psychologists have the primary responsibility for diagnosing inmates' mental illness, treating inmates with diagnosed mental illness, and monitoring the mental health of inmates, including all inmates housed in RHUs.[25] Psychologists share these responsibilities with Psychiatrists, particularly for inmates diagnosed with serious mental illness, for whom Psychiatrists may prescribe psychotropic medications.[26] General practitioners may also diagnose inmates' mental illness and prescribe psychotropic medications.[27]

Mental Health Care Policy

In May 2014, the BOP issued a national policy requiring that all inmates receive mental health care commensurate with their needs, even while they are in restrictive housing. The policy seeks to ensure that inmates with mental illness are identified and receive treatment to assist their progress toward recovery and to reduce or eliminate the frequency and severity of symptoms and associated negative outcomes of mental illness, such as placement in restrictive housing. According to the policy, any BOP staff member who observes unusual behavior that may indicate mental illness must report such observations to the institution's Chief Psychologist or Mental Health Treatment Coordinator. The policy also redefines MHCLs, as we described above, and incorporates additional diagnostic, impairment,

---

[24] For more information about the Psychology Services Manual, see Appendix 2.

[25] Psychologists are not medical doctors, but they attend graduate school and earn a doctorate degree in psychology. They are trained to apply psychological assessments, testing for mental health diagnoses, and various types of treatment; but they generally are not licensed to prescribe medications without additional, specialized training.

[26] Research refers to psychotropic medication as "any drug capable of affecting the mind, emotions, and behavior" of an individual. See MedicineNet.com, "Medical Definition of Psychotropic drug," http://www.medicinenet.com/script/main/art.asp?articlekey=30807 (accessed June 27, 2017).

[27] Both General Practitioners and Psychiatrists attend medical school and become medical doctors who are licensed to diagnose mental illness and prescribe medications, including psychotropic medications. Psychiatrists generally receive more extensive and specialized mental health training than do General Practitioners.

and intervention-based criteria for inmates designated at MHCL 2, 3, or 4.[28] Additionally, the policy increases the frequency of psychosocial interventions that institution Psychologists are required to provide to inmates with mental illness, mandating that such interventions occur at least monthly for MHCL 2 inmates and at least weekly for MHCL 3 and 4 inmates.  The policy requires that these interventions be consistent with the goals of the inmate's treatment and be conducted out of cell, face to face, and in a private setting to the extent possible based on security and safety considerations.[29]  Further, the policy establishes a Care Coordination and Reentry (CCARE) team, which is a multidisciplinary team that meets no less than once a month to share information on the treatment needs of inmates with mental illness.[30]

Finally, the policy requires that all MHCL 2, 3, or 4 inmates have an individualized mental health treatment plan, which Psychology Services staffs are supposed to develop in collaboration with the inmate.  Each plan identifies the inmate's individual and/or group programming needs and describes the inmate's mental health conditions and goals and the interventions planned to help the inmate reach them.  The policy requires plans to be reviewed and updated every 12 months for MHCL 2 inmates, every 6 months for MHCL 3 inmates, and every 90 days for MHCL 4 inmates.

The policy requires Psychology Services staff to conduct an Extended Restrictive Housing Placement Review for each inmate housed in an RHU for an extended period of time to determine whether he or she has mental issues that preclude placement in this setting.  The policy requires that Psychology Services staff conduct these reviews when an inmate is housed in the SHU continuously for 6 months, in the ADX for 12 months, or in the SMU for 18 months.[31]

---

[28]  Prior to May 2014, MHCL 1 inmates "required clinical intervention no more frequently than every 3 to 6 months."  Under the 2014 policy, MHCL 1 inmates are not required to be evaluated other than during their initial mental health screening but inmates have the option to pursue mental health services on an as-needed basis.

[29]  According to the BOP, psychosocial interventions are treatment interventions between mental health staff and inmates and can include different types of psychotherapy, psycho education, self-help and support groups, as well as skills training aimed at providing treatment, education, and support to inmates with mental illness.  According to BOP policy, the mental health staff's psychosocial interventions and individualized treatment plans must rely on evidence-based clinical practices that have been demonstrated to reduce the symptoms of mental illness.  See BOP Program Statement 5310.16.

[30]  According to BOP policy, a CCARE team meets to identify potential issues for inmates with mental illness, such as an inmate who presents mental health symptoms that are unreported or have gone unidentified or who demonstrates escalating patterns of destructive or dangerous behavior.  Per policy, the CCARE team must include, at a minimum, the Mental Health Treatment Coordinator (CCARE team co-leader), psychiatric services provider (CCARE team co-leader), treating Psychologist, institution Social Worker (if applicable), and Pharmacist.  See BOP Program Statement 5310.16.

[31]  BOP Program Statement 5310.16, 16.

*Restrictive Housing Units*

As discussed earlier, to ensure safe and orderly environments for inmates and staff, the BOP utilizes various forms of RHUs to confine some inmates, including inmates with mental illness. The BOP has established policies to govern how inmates are confined in each of the three primary types of RHU.

Special Housing Units

According to the BOP's SHU policy, inmates may be placed in the SHU for disciplinary segregation or administrative detention, but the SHU policy does not specifically address conditions of confinement for inmates with mental illness.[32] All inmates placed in the SHU on administrative detention status receive a segregation review within 3 workdays of placement. All inmates placed in the SHU, regardless of the reason for their placement, receive a formal review within 7 calendar days of placement, with subsequent reviews every 7 continuous days thereafter. In addition, the SHU policy states that after every 30 calendar days of continuous placement, each SHU inmate receives a mental health examination, including a personal interview, and emergency mental health care must always be available.[33]

Special Management Units

The BOP's mental health policy excludes the placement of inmates with serious mental illness in the SMU unless there are extraordinary security concerns that prevent their placement elsewhere.[34] According to the BOP's SMU policy, the BOP designates an inmate to a SMU when greater management of the inmate's interaction is necessary to ensure the safety, security, or orderly operation of BOP institutions, or for the protection of the public.[35] Conditions of confinement are more restrictive for SMU inmates than for general population inmates, though the conditions become less restrictive as the inmate progresses through the phases of the SMU program. Each inmate is evaluated by mental health staff every 30 days, and emergency mental health care must always be available at the institution or from the community.

---

[32] Administrative detention status removes the inmate from the general population when necessary to ensure the safety, security, and orderly operation of correctional facilities or to protect the public. Administrative detention status applies only to SHU inmates, is non-punitive, and can occur for a variety of reasons. See BOP Program Statement 5270.10, Special Housing Units (August 1, 2011), 2.

[33] See BOP Program Statement 5270.10, 5–6.

[34] See BOP Program Statement 5310.16, 19.

[35] National policy for the operation of the SMU is found in BOP Program Statement 5217.01. As stated earlier, in August 2016 the BOP issued a revised SMU policy. See Appendix 2 for more information.

Administrative Maximum Security Facility

The BOP's mental health policy also excludes inmates with serious mental illness from ADX placement unless there are extraordinary security concerns that cannot be met elsewhere.[36]  Seriously mentally ill inmates who are to remain at the ADX must have an individualized mental health treatment plan and be provided with at least 10, and as many as 20, hours of out-of-cell time per week, consistent with their treatment plan.[37]  In July 2015, the ADX issued local policy for the care and treatment of its inmates with mental illness.  The policy establishes that all ADX inmates will receive psychotropic medications as clinically indicated and requires that inmates receiving psychotropic medications be seen by a Psychiatrist, Physician, or Psychiatric Nurse every 90 days, or more often if clinically indicated, for at least the first year of ADX placement.  When in-person psychiatry services are not available, private tele-psychiatry is to be provided.  In addition to private group counseling and treatment, ADX inmates ordinarily have access to in-cell therapeutic and recreation activities, including access to Psychology Services programming through closed-circuit television.

For all types of restrictive housing, staff members are required to make themselves available to RHU inmates for brief conversations and to demonstrate their concern and availability to help.  Qualified health practitioners and one or more responsible officers the Warden designates (ordinarily the Institution Duty Officer) are required to visit each inmate daily, including on weekends and holidays.  After every 30 calendar days of continuous placement in an RHU, each inmate, including those with mental illness, is required to be examined by mental health staff.  The examination must include a personal interview to evaluate the inmate's adjustment to his or her surroundings and to determine whether the inmate poses any threat to himself or herself, staff, or other inmates.[38]

**Prior Reports on the BOP's Use of Restrictive Housing and Inmates with Mental Illness**

As part of our review, we examined the following reports published by other agencies related to restrictive housing and mental illness:

*The Government Accountability Office's Review of BOP Segregated Housing*

In May 2013, the U.S. Government Accountability Office (GAO) issued a report on the BOP's segregated housing unit practices.  The GAO found that from FY 2008 through February 2013, the population of SHUs, SMUs, and the ADX had increased 17 percent compared to just 6 percent growth in the BOP's total inmate

---

[36]  See BOP Program Statement 5310.16, 19.

[37]  U.S. Penitentiary, Administrative Maximum, Institution Supplement FLM 5310.16A, Treatment and Care of Inmates with Mental Illness (July 22, 2015).

[38]  BOP Program Statement 5270.10, 11–12.

population during the same period.[39]  The GAO also found that the BOP's monitoring of its segregated housing units varied greatly by type of unit, with some institutions' documentation related to conditions of confinement and inmate placement being incomplete and with oversight of ADX-specific conditions of confinement notably lacking.  Further, the GAO determined that the BOP had not evaluated the effects of long-term segregation on inmates' mental health, despite BOP policy acknowledging the risks.  The GAO recommended that the BOP develop ADX-specific monitoring requirements and that any BOP study to assess segregated housing units also assess the extent that segregated housing contributes to institutional safety and the impact of long-term segregation on inmates in SHUs, SMUs, and the ADX.

*The Center of Naval Analysis and Solutions' Review of BOP SHUs*

In 2013, the BOP funded an independent assessment of its operation of restrictive housing following a June 2012 Senate Judiciary Committee hearing on solitary confinement.[40]  During the hearing, the former BOP Director stated that SHUs and the SMU are forms of solitary confinement but that the BOP had no internal studies or policies to evaluate the effects of solitary confinement.  Following the hearing (and the release of the GAO's May 2013 report discussed above), the BOP contracted with the Center of Naval Analysis and Solutions (CNA), which issued a report with 9 findings and 11 recommendations specifically related to the diagnosis, care, and treatment of inmates with mental illness in the BOP's RHUs.[41]  Most notably, the CNA disagreed with the BOP's mental health diagnoses of inmates in nearly two-thirds of the cases it reviewed and concluded that the treatment the BOP provided was insufficient or inappropriate in over half of the cases it reviewed.

The CNA also found inmates in RHUs whose mental conditions should have precluded them from assignment to these units; that most RHUs had no mental health programming, including out-of-cell programming for inmates; that almost all institutions reported a shortage of staff to provide mental health treatment; and that a number of inmates in RHUs had symptoms of serious mental illness that BOP

---

[39] GAO, *Bureau of Prisons:  Improvements Needed in Bureau of Prisons' Monitoring and Evaluation of Impact of Segregated Housing,* GAO-13-429 (May 2013).  The GAO also issued *Bureau of Prisons:  Timelier Reviews, Plan for Evaluations and Updated Policies Could Improve Inmate Mental Health Services Oversight,* GAO-13-1 (July 2013).  Although not specifically related to restrictive housing, the GAO found that the BOP had not evaluated the effectiveness of most mental health treatment programs, that the most common deficiencies cited in Psychology Services program reviews were related to care provided in residential treatment programs, and that delays in completing BOP internal program reviews were most often due to institution staffing issues.  The GAO recommended that the BOP update Program Statements 5310.13, Institutional Management of Mentally Ill Inmates (March 31, 1995), and 5310.12, Psychology Services Manual (March 7, 1995).

[40] U.S. Senate, Hearing before the Subcommittee on Constitution, Civil Rights and Human Rights of the Committee on the Judiciary, "Reassessing Solitary Confinement:  The Human Rights, Fiscal, and Public Safety Consequences," June 19, 2012.

[41] CNA, *Federal Bureau of Prisons:  Special Housing Unit Review and Assessment* (December 2014).  The CNA report was issued just prior to the start of the OIG's review.  Our review did not seek to support or refute the CNA's findings.

psychology staff had failed to detect.  The BOP concurred with some of the CNA's key findings, but also expressed concern with some recommendations and key points the BOP believed the CNA report had omitted.

*The Department of Justice's* Report and Recommendations concerning the Use of Restrictive Housing

In January 2016, the Department issued a report on the use of restrictive housing within the U.S. criminal justice system.[42]  The Department's report included "Guiding Principles" to serve "as best practices for correctional facilities within the American criminal justice system" to implement if resources allow.  The report defined the term restrictive housing as "any type of detention that includes removal from the general inmate population, whether voluntary or involuntary; placement in a locked room or cell, whether alone or with another inmate; and inability to leave the room or cell for the vast majority of the day, typically 22 hours or more."  The Department recommended that the BOP expand its ability to divert inmates with serious mental illness to mental health treatment programs, by increasing the capacity of existing secure mental health units, and provided the BOP with an estimated cost of this expansion.  The Department also recommended that the BOP expand its ability to divert "protective custody" inmates to less restrictive forms of housing by building "Reintegration Housing Units" at multiple BOP institutions.  The Department further recommended that the BOP cut the duration of the SMU program by half, direct Wardens to develop plans for expanding out-of-cell time for inmates in restrictive housing, and finalize upgrades in data collection software to improve tracking of inmates in restrictive housing.

A Department official provided the OIG with the Department's "180-day Status Report" on steps the BOP had taken in response to the Department's recommendations.[43]  According to the Department, the BOP implemented new training for staff; ended the placement of juveniles and pregnant women in restrictive housing; and limited the length of investigations and maximum penalties for disciplinary violations, as well as the length of stay in SMUs.  The BOP also created new "protective custody" units, increased transparency by releasing monthly data on restrictive housing, expanded a mental health pilot program, and enhanced officer-to-inmate communication.  Finally, the BOP revised its SHU and SMU policies to address a number of the Department's recommendations.  We did not assess the steps that the BOP took in response to the Department's recommendations as part of this review.  However, throughout this report we provide additional information on steps the BOP has taken as they relate to findings resulting from our review.

---

[42]  DOJ, *Use of Restrictive Housing.*

[43]  DOJ, "Report and Recommendations concerning the Use of Restrictive Housing:  180-day Status Report" (September 2016).  The status report also discusses steps taken in response to recommendations directed to the U.S. Marshals Service and the Office of Justice Programs, as well as reforms at the state and local law enforcement levels.

## Scope and Methodology of the OIG Review

We examined BOP program statements, policies, and other guidance related to the screening, treatment, and monitoring of inmates with mental illness and those related to the SHUs, the SMUs, and the ADX. Our fieldwork occurred from April 2015 through October 2016 and consisted of document review, case file reviews, data analysis, interviews, site visits, and observations. We analyzed BOP population data, mental health data, and restrictive housing data from FY 2010 through May 30, 2015. We also analyzed how the BOP collects and analyzes mental health and RHU data at BOP-managed institutions. We interviewed officials with the Office of the Deputy Attorney General, the Civil Rights Division, BOP officials in the Central Office, institution staff, and representatives from eight state departments of corrections about reforms and policies related to the treatment of inmates with mental illness. We also interviewed inmates with a history of mental illness. See Appendix 1 for more information about the OIG's methodology.

In this report, we discuss our concerns related to the confinement of inmates with mental illness in RHUs, including single-cell confinement or conditions that could be considered "solitary confinement," as well as the screening, treatment, and monitoring of inmates with mental illness, including but not limited to those in restrictive housing.[44] We also discuss steps that the BOP has taken to address concerns with inmates in RHUs, including inmates with mental illness, and additional steps the BOP might take to build on them.

---

[44] For the purposes of our analysis, we considered solitary confinement to be an inmate alone in a cell for 22 hours or more per day with limited human contact.

# RESULTS OF THE REVIEW

## BOP Policies Do Not Adequately Address the Confinement of Inmates with Mental Illness in RHUs, and the BOP Does Not Sufficiently Track or Monitor Such Inmates

During the OIG team's visits to BOP institutions, we found inmates who had been housed in traditional Restrictive Housing Units (RHU), including Special Housing Units (SHU), Special Management Units (SMU), and the U.S. Penitentiary Administrative Maximum Security Facility (ADX), as well as in other conditions of confinement that could be considered solitary confinement. However, the BOP does not have explicit guidance and policy to define or address solitary confinement, extended placement, or restrictive housing. While our review focused on traditional RHUs, including the SHU, the SMU, and the ADX, we found that existing policies do not account for the broad variation of RHUs throughout BOP institutions. In addition, while the BOP recognizes that inmates' mental health can deteriorate if they are held in restrictive housing for long periods of time, BOP policy does not limit the length of time inmates spend in restrictive housing. In contrast, we found that state departments of corrections do limit the length of time inmates spend in restrictive housing. We also found that the BOP does not track inmates' single-cell confinement or assess cumulative time in RHUs. The lack of specificity in BOP policy for RHUs can potentially affect the mental health services provided to all inmates, to include those in RHUs, which is particularly concerning for inmates with mental illness.[45]

*Though Policies Do Not Specifically Define "Solitary Confinement," the BOP Houses Inmates in Restrictive Conditions of Confinement that Could Be Considered Solitary Confinement*

Neither the BOP nor the Department has a definition for the term solitary confinement. When the OIG asked the BOP for its definition of solitary confinement, the BOP responded: "The Bureau does not recognize the term solitary confinement. Therefore, the Bureau does not have a definition or a reference to provide." The former Correctional Programs Division Administrator told us that "solitary confinement does not exist within the BOP."

However, in testimony at a congressional hearing on solitary confinement, the former BOP Director acknowledged its use in the BOP, stating, "we believe with solitary confinement for the inmates who pose the most violence and disruption

---

[45] In response to a working draft of this report, the BOP stated that the report cites only research findings with negative outcomes for inmates in restrictive housing. The BOP also said the science in this area is not settled and that credible research with different findings should also be included. The BOP cited as an example a DOJ Office of Justice Programs, National Institute of Justice (NIJ) study on the Colorado Department of Corrections, "One Year Longitudinal Study of the Psychological Effects of Administrative Segregation," https://www.ncjrs.gov/pdffiles1/nij/grants/232973.pdf (accessed June 27, 2017). We note that the NIJ's study states that there may have been other negative consequences of administrative segregation that the study did not evaluate.

within the facility that we utilize it as a deterrent to correct the behavior."[46]  Even the former Attorney General acknowledged in early 2016 that solitary confinement does exist within the BOP, stating that she would require from the BOP an "across-the-board reduction of maximum penalties for punitive segregation to curb excessive use of restrictive housing and solitary confinement as punishment."[47] The Department's 2016 report on the use of restrictive housing used restrictive housing as a "general corrections term" to describe various restrictive conditions of confinement but did not use the term "solitary confinement."[48]  Rather, it described housing inmates in cells alone as "single-celled," such as the case at the ADX. However, we observed inmates, including inmates with mental illness, housed in similar conditions within BOP institutions that we visited.  Research indicates that prolonged exposure to conditions of solitary confinement can result in psychological and psychiatric conditions, such as irritability, anger, aggression, and rage.[49] Inmates could also experience chronic insomnia, loss of control, panic attacks, paranoia, and hypersensitivity to noise, light, and smells.[50]

At the ADX, we observed an RHU that held two inmates on "Range 13," each in his own cell, isolated from other inmates.  The inmates did not engage in recreation with each other or with other inmates and were confined to their cells for over 22 hours a day.  When we asked whether placement on Range 13 could be considered a form of solitary confinement, a Psychologist at the ADX said, "you have no contact, you don't speak to anybody, and it's a form of torture on some level.…  [Inmates] still talk to officers and stuff like that, but they don't really get a chance to see anybody.…  They rec[reate] alone; we don't even have to be back there to rec them.  So, yes, I would say that they are in fact in solitary confinement."  Also, an RHU at U.S. Penitentiary (USP) Terre Haute, known as the Special Confinement Unit, houses "death row" inmates in single-cell confinement for an average of 23 hours a day.  We interviewed two inmates in this unit who were designated at Mental Health Care Level (MHCL) 2 at the time of our visit.  One inmate told us that, since his placement in this RHU 10 years ago, he has been out

---

[46]  Charles E. Samuels, Jr., Director, BOP, before the Subcommittee on Constitution, Civil Rights, and Human Rights of the Committee on the Judiciary, U.S. Senate, concerning "Reassessing Solitary Confinement:  The Human Rights, Fiscal, and Public Safety Consequences" (June 19, 2012).

[47]  Loretta E. Lynch, U.S. Attorney General, Prepared Remarks (presented at the American Correctional Association Winter Conference, New Orleans, Louisiana, January 26, 2016), https://www.justice.gov/opa/speech/attorney-general-loretta-e-lynch-delivers-remarks-american-correctional-association (accessed June 27, 2016).

[48]  The Department's report defines restrictive housing as having three elements:  (1) removal from the general inmate population, whether voluntary or involuntary; (2) placement in a locked room or cell, whether alone or with another inmate; and (3) the inability to leave the room or cell for the vast majority of the day, typically 22 hours or more.  See DOJ, *Report and Recommendations concerning the Use of Restrictive Housing* (January 2016), 3.

[49]  Craig Haney, Professor of Psychology at the University of California, Santa Cruz, before the Subcommittee on Constitution, Civil Rights, and Human Rights, Committee on the Judiciary, U.S. Senate, concerning "Reassessing Solitary Confinement:  The Human Rights, Fiscal, and Public Safety Consequences" (June 19, 2012), 10–11.

[50]  Haney, "Reassessing Solitary Confinement."

of his cell for only 3 hours a week, no more than 1 hour a day, and spends the remaining 4 days alone in his cell, 24 hours a day.[51]  Another inmate, who has been in this RHU since 2010, stated that, due to the nature of his crime, BOP policy restricts him from recreating or participating in leisure activities with other inmates.[52]  Due to these restrictions, he believes that his confinement constitutes solitary confinement.[53]

Further, in five SHUs we observed single-celled inmates, many of whom had a serious mental illness.  One inmate, who Staff Psychologists told us was denied placement at the ADX for mental health reasons, had been single-celled for about 4 years because staff believed he posed a serious threat to other inmates given his violent history.[54]  While we did not observe inmates celled alone in Federal Correctional Complex (FCC) Petersburg's SHU, a Staff Psychologist told us that single-celling inmates does occur in the institution's SHU and that she did not always know why some inmates were single-celled.  She stated that single-celling inmates can be an added risk (to an inmate's mental health) and that, in the past, she has annotated the SHU Application, a computer program, to request that correctional staff refrain from single-celling specific inmates who had mental illness.[55]

Although most inmates in the SMU have a cellmate, inmates, including inmates with mental illness, may also be placed in single-cell confinement and in conditions that may jeopardize their mental health.  At USP Lewisburg, the only remaining SMU institution, we observed infrastructure issues that were particularly concerning in light of the fact that inmates may be placed in these conditions for years.  See the text box below regarding our observations and the concerning conditions of confinement for inmates, including those with mental illness, at USP Lewisburg.

---

[51]  There are three phases of restriction in the Special Confinement Unit, with Phases 1 and 3 representing the most restrictive levels and Phase 2 representing the least restrictive level.  According to BOP policy, inmates will remain at Phase 1 for at least 1 year and may be managed at this level for an indefinite period of time.  BOP policy also states that, in addition to recreation, inmates managed at Phase 2 may also participate in out-of-cell leisure activities with up to two other approved inmates; but this time is considered a privilege that is limited to the availability of the common area.  We do not know what phase(s) the BOP has used to manage this inmate since his arrival to this RHU.  See BOP Institution Supplement THX-5217.01K, Operation and Security of the Special Confinement Unit (June 25, 2015).

[52]  This inmate was convicted with his co-defendant of murdering another inmate while in BOP custody.  BOP policy states that, "Phase 1 inmates will recreate alone" and that "inmates who have committed murder or attempted to kill anyone while incarcerated will not normally be considered for Phase II."  See BOP Institution Supplement THX-5217.01K.

[53]  The inmate also told us that he prefers this unit to the SHU at this institution.  During our fieldwork, BOP officials, staff, and other inmates told us that inmates sometimes prefer to be housed in RHUs, including single-cell confinement, as opposed to placement in the general population.

[54]  Institution staff told us that the inmate had declined to go to the secure residential treatment program, which at that time was pending activation.  However, the institution's mental health staff told us that they did not believe that he was seriously mentally ill and thus he was suitable for ADX placement.

[55]  We discuss the SHU Application later in this report.

**SMU Conditions of Confinement**

We found that the conditions of confinement, including the size and ventilation of cells, could result in harm to SMU inmates with mental illness. For example, an unknown number of SMU cells at USP Lewisburg in Pennsylvania do not meet the American Correctional Association's (ACA) minimum standards for restrictive housing cell sizes. ACA standards stipulate that all restrictive housing cells provide a minimum of 80 square feet, of which 35 square feet is to be unencumbered. According to the BOP, some SMU cells at USP Lewisburg are only 58.5 square feet in size. When we asked BOP officials whether USP Lewisburg's SMU cells met ACA standards, they provided conflicting responses. Additionally, a senior official from the BOP's Program Review Division told us that the ACA standards for restrictive housing cell size are not mandatory.

We observed a lack of air conditioning at USP Lewisburg, which was the only one of the seven institutions we visited that relied on ceiling fans instead of air conditioning to ventilate inmates' cells and cellblocks. This is especially troubling since psychotropic medications can hinder the body's ability to sweat. These conditions can make inmates who take psychotropic medications more prone to heat stroke and heat-related illnesses.

Sources: OIG observations; BOP Program Statement 5217.01, Special Management Units (November 19, 2008), 6–7; ACA, *Standards for Adult Correctional Institutions,* 4th ed. (Lanham, Md.: American Correctional Association 2003), 39; Human Rights Clinic, University of Texas School of Law, *Reckless Indifference: Extreme Heat in Texas Prisons* (March 2015), 20

In addition, most inmates placed in RHUs, including those with mental illness, have limited out-of-cell opportunities.[56] For instance, inmates placed in the SHUs do not have out-of-cell programming opportunities and inmates' participation in general population group therapy would be discontinued during their SHU placement, according to Psychology Services Branch officials.[57] These officials indicated that the BOP is looking to provide inmates in restrictive housing with group therapy opportunities but stated that not every institution has the resources to do so. Also, while BOP policy requires that inmates have the opportunity to exercise outside their individual quarters at least 5 hours per week, ordinarily on different days in 1-hour periods, it also states that inmates, including those in single-cell confinement, may have recreation privileges suspended.[58] According to policy, an institution's Warden can deny exercise privileges for a week at a time if it is determined that an inmate's use of recreation threatens the safety, security, and orderly operation of a correctional facility, or public safety. Further, the BOP does not provide recreation on weekends to inmates in RHUs and, consequently, inmates are confined to their cell for approximately 72 consecutive hours every weekend without any out-of-cell opportunities. The BOP's Correctional Programs Division

[56] After the completion of our fieldwork, the BOP issued a revised SHU program statement in November 2016. Although we did not evaluate this policy, we note throughout this report examples of changes to the SHU policy as they relate to our findings during the course of our review. For example, to enhance inmates' out-of-cell time, the BOP's revised SHU policy requires that staff at each institution locally develop plans for increasing inmates' recreation and that institutions with the necessary resources should do so. See BOP Program Statement 5270.11, Special Housing Units (November 23, 2016), 12.

[57] We further discuss disruptions to inmate's continuity of care later in this report.

[58] BOP Program Statement 5270.10, Special Housing Units (August 1, 2011), 8–9.

(CPD) officials told us that the BOP does not have the correctional staffing resources to offer recreation to inmates during the weekend. Psychology Services Branch officials also recognized this resource limitation but acknowledged that out-of-cell opportunities during the weekend would be beneficial for inmates, including those with mental illness. We recognize the challenges in providing inmates in RHUs with out-of-cell opportunities; however, confining inmates, particularly those in single-cell confinement, in cells for prolonged periods of time with limited human contact, could potentially harm their mental health.

We found a discrepancy between what we observed at BOP institutions and what Department and BOP policies stated regarding single-cell confinement. The former Acting Chief of Staff for the Office of the Deputy Attorney General told us that the Department did not consider specific policies for double-celling or single-celling inmates when developing its report. He added that the corrections and advocacy communities define solitary confinement differently and that in reality restrictive housing and solitary confinement are the same.[59]

While the Department's report does not define solitary confinement, it does reference Civil Rights Division investigations that, in some cases, define solitary confinement more specifically. A May 2013 Civil Rights Division investigation of the Pennsylvania State Institution at Cresson defined "isolation," or "solitary confinement," as "the state of being confined to one's cell for approximately 22 hours per day or more, alone or with other prisoners, that limits contact with others."[60] In February 2014, the Civil Rights Division completed a system-wide investigation of the Pennsylvania Department of Corrections (PDOC) after having found that prisoners with serious mental illness and intellectual disabilities at Cresson were routinely subjected to solitary confinement under conditions that violated their constitutional rights and their rights under Title II of the *Americans with Disabilities Act of 1990.*[61] The February 2014 investigation referred to solitary

---

[59] The Department's report stated that the term solitary confinement is disfavored by correctional officials because, in part, it conjures a specific and in some cases misleading image of the practice. The Department also stated that not all segregation is truly "solitary" because many prisons, including the BOP's, often house two segregated inmates together in the same cell, a practice known as "double-celling." The Department adopted the terms restrictive housing and segregation to avoid this confusion. See DOJ, *Use of Restrictive Housing,* 3.

[60] Thomas E. Perez, Assistant Attorney General, DOJ Civil Rights Division, and David J. Hickton, U.S. Attorney, Western District of Pennsylvania, letter to the Honorable Tom Corbett, Pennsylvania Governor's Office, May 31, 2013, https://www.justice.gov/sites/default/files/crt/legacy/2013/06/03/cresson_findings_5-31-13.pdf (accessed June 27, 2017).

[61] For the purposes of the investigation, the Civil Rights Division used the state's definition of serious mental illness as "a substantial disorder of thought or mood that significantly impairs judgment, behavior, or capacity to recognize reality or cope with the ordinary demands of life."

In April 2016, the Civil Rights Division closed its investigation of the PDOC, noting the significant improvements in the PDOC's policies and practices regarding solitary confinement for those prisoners with serious mental illness or intellectual disabilities. See Vanita Gupta, Principal Deputy Assistant Attorney General, DOJ Civil Rights Division, and David J. Hickton, U.S. Attorney, Western District of Pennsylvania, letter to the Honorable Tom Wolf, Pennsylvania Governor's Office, April 14, 2016, https://www.justice.gov/crt/file/850886/download (accessed June 27, 2017).

confinement as "the state of being confined to one's cell for approximately 23 hours a day or more."[62]

Since BOP and Department policies do not specifically recognize the term solitary confinement, to help us evaluate actual conditions of confinement in BOP institutions, we considered the Civil Rights Division's definition, as well as the United Nations' "Mandela Rules." According to a March 2016 report from the National Institute of Justice, the United Nations passed the Mandela Rules in May 2015, which represented the first modification to the United Nations' standards on the treatment of prisoners in 60 years.[63] The United Nations describes solitary confinement in the Mandela Rules as "confinement of prisoners from 22 hours or more a day without meaningful human contact."[64] (See the text box below.)

[62] Jocelyn Samuels, Acting Assistant Attorney General, DOJ Civil Rights Division, and David J. Hickton, U.S. Attorney, Western District of Pennsylvania, letter to the Honorable Tom Corbett, Pennsylvania Governor's Office, February 24, 2014, https://www.justice.gov/sites/default/files/crt/legacy/2014/02/25/pdoc_finding_2-24-14.pdf (accessed June 27, 2017).

A Civil Rights Division Deputy Chief and a Trial Attorney associated with both the Cresson and PDOC investigations told us that they did not know why the definition of solitary confinement changed between their May 2013 and February 2014 findings letters. They also told us that the Civil Rights Division had not directly decided to change the hours from 22 to 23, but rather had done so in collaboration with the BOP and other DOJ components. In the case of the Cresson and PDOC investigations, and other investigations related to corrections, the Civil Rights Division works with the BOP to ensure it does not conflict with BOP policies or practices and that factual distinctions are made before the findings letters are released publicly. The Deputy Chief told us:

> We couldn't say anything in a blanket way that if you lock people up for 23 hours a day, for months or even years, that that violates the Constitution. We couldn't say that, because BOP locks people up for 23 hours a day for months and years.... So, therefore, we made factual distinctions [between the BOP and Cresson or PDOC], because we had to.

[63] According to an NIJ report, "Rule 43 of the Mandela Rules prohibits both *indefinite* solitary confinement and *prolonged* solitary confinement (defined as lasting more than 15 days)." See NIJ, *Administrative Segregation in U.S. Prisons* (March 2016), 1.

[64] United Nations, Mandela Rules.

**The Mandela Rules**

The United Nations' Standard Minimum Rules for the Treatment of Prisoners, Rule 44 states: "For the purpose of these rules, solitary confinement shall refer to the confinement of prisoners for 22 hours or more a day without meaningful human contact.  Prolonged solitary confinement shall refer to solitary confinement for a time period in excess of 15 consecutive days."  Rule 45 states: "The imposition of solitary confinement should be prohibited in the case of prisoners with mental or physical disabilities when their conditions would be exacerbated by such measures."

According to an official of the U.S. Department of State, the United States "whole-heartedly" endorses all of the United Nations Rules and is proud to have participated in the collaborative process that produced them.

Sources:  United Nations, Standard Minimum Rules for the Treatment of Prisoners, September 29, 2015 (Mandela Rules); Sarah Sewall, Under Secretary for Civilian Security, Democracy, and Human Rights, U.S. Department of State, Prepared Remarks (presented at a High Level Presentation of the Nelson Mandela Rules — the Draft Revised Standard Minimum Rules on the Treatment of Prisoners, October 2015)

While the Department's definition of restrictive housing acknowledges the placement of an inmate in a locked room or cell alone, it does not specify how contacts between staff and inmates housed in such conditions are to take place.[65] During our visits to BOP institutions throughout this review, we found that the BOP houses inmates, including those with mental illness, for long periods of time isolated from other inmates and with limited human contact — conditions of confinement that could constitute solitary confinement according to the Civil Rights Division's definition, as well as the Mandela Rules.[66]  The Office of the Deputy Attorney General's former Acting Chief of Staff told us that it was clear that restrictive housing usually involved someone being in isolation for 22 hours a day without being able to leave and that focusing on the definition of the term solitary confinement detracts from ensuring that inmates housed in restrictive housing for long periods of time receive meaningful contact.  BOP CPD officials told us that meaningful contact was a "pretty broad term" and "hard to define."  Finally, officials with the BOP's Psychology Services Branch told us that the BOP has outlined for staff what meaningful contacts should look like, through training and during rounds; however, the BOP does not have policy to describe meaningful contact or the monitoring of inmates in a cell alone.[67]

While we acknowledge that BOP policies require contacts between staff and inmates, not all contacts are specified in BOP policies nor are they specific for

---

[65]  See DOJ, *Use of Restrictive Housing,* 14.

[66]  For the purposes of our analysis, we considered solitary confinement to be an inmate alone in a cell for 22 hours or more a day with limited human contact.

[67]  Throughout our review, BOP staff and officials described several forms of contact for inmates in SHUs, including rounds made by Correctional Officers every 30 minutes, a supervisor seeing an inmate during every shift, a Captain seeing inmates every week, and regular visits from inmates' unit team, medical team, and a Chaplain.  Also, inmates are fed three times a day and Psychology Services visits each inmate every 30 days.  Though communication is through a small window, a Segregation Review Official sees an inmate every 7 days.  After 30 days, an inmate will have the opportunity to come out of his or her cell to speak to the Lieutenant.

inmates housed in a cell alone. By not acknowledging such conditions in policy and establishing when they may be appropriate procedures for the management and care of these inmates, including appropriate contacts for those with mental illness, all inmates in such conditions are potentially subjected to long periods of time in forms of confinement that could exacerbate existing mental illness or create the onset of mental disorder.

The BOP Needs to Improve Its Tracking of Inmates Placed in Single-Cell Confinement

In addition to finding that the BOP's policies are inadequate to address conditions amounting to solitary confinement, we found that the BOP is unaware of how many of its inmates in RHUs (other than at the ADX or in secure residential mental health treatment programs) are housed alone in a cell (single-cell confinement) because the BOP does not track this information. The former Deputy Assistant Director for the CPD told us that while institution staff review the placement of inmates in the SHU on a weekly basis, there is no national database that identifies inmates who are celled alone or tracks the duration of such placement. He added that there are legitimate reasons why inmates may be single-celled, such as for a contagious disease, disability, protective custody, medical recovery, or because they are a danger to other inmates. Still, in light of mental health concerns, Psychology Services Branch officials told us that they prefer inmates to be double-celled in RHUs; but they acknowledged that some institution staff are not receptive to this practice.

We recognize that some inmates with mental illness may be celled alone for legitimate reasons, such as being too dangerous to house with others. However, we question why the BOP does not separately track inmates who have been in prolonged periods of single-cell confinement because, by most accounts, these inmates are held in conditions of confinement that mirror conditions in the ADX, which can have a detrimental effect on their mental health. Moreover, unlike the ADX, most RHUs are not intended for long-term placement and thus lack the staffing and infrastructure suitable for this type of prolonged confinement. Since the BOP does not specifically track inmates placed in single-cell confinement, BOP officials cannot easily identify inmates celled alone or ascertain the duration of such placement and, consequently, cannot intervene when single-cell confinement may not be necessary or may be unduly harmful to the inmate.

*The BOP Does Not Have Adequate Policy to Address the Needs of Inmates with Mental Illness in All RHUs*

In addition to inadequate policies addressing single-cell confinement, we found that the BOP's SHU policy, issued in 2011, does not differentiate among the various types of RHUs throughout BOP institutions. Also, neither it nor the mental health policy issued in 2014 adequately addresses the mental health needs of inmates housed in these RHUs. The BOP told the OIG that it defines restrictive housing as "those situations when an inmate is placed in confinement, outside of the general population for the safety, security, and orderly operation of our correctional facilities." The former CPD Deputy Assistant Director said that there

are RHUs at all BOP facilities and that the SHU policy sets the standard that all RHU programs have to meet.[68] During our site visits, we found forms of restrictive housing in which inmates with mental illness experience conditions of confinement contrary to the BOP's SHU and mental health policies. (See the text box for an example of an RHU at Federal Medical Center (FMC) Carswell in which the practices appear to be contrary to BOP policies.)

We also observed another RHU at FMC Carswell, the Administrative Unit, with its own SHU that houses inmates, including those with mental illness, with histories of escape, chronic behavioral problems, repeated incidents of assaultive or predatory behavior, or other special management concerns. As of June 2016, this unit housed 17 total inmates, including 6 inmates at MHCL 2 and 1 inmate at MHCL 3 (the remaining 10 inmates were at MHCL 1). Institution staff said they do not consider this unit to be an RHU but rather a "self-contained, open unit."[69]

**Concerns regarding Inmates with Mental Illness in M3**

We found at FMC Carswell a unit, known as "M3," which has been used since at least 1999 to house the most volatile and decompensating female inmates (predominately MHCL 4 inmates), with the intent to eventually return them to a less restrictive environment. The Warden told us that inmates with serious mental illness may be placed in this unit for administrative and disciplinary segregation in lieu of traditional SHU placement. We observed that the majority of inmates in this RHU were single-celled, with no designated recreation area. A Correctional Officer who has worked extensively in this unit told us that he has seen a few inmates housed in this unit for about a year. He also told us that when the institution's SHU is full, SHU inmates may also be housed in this unit.

The BOP's SHU policy states that inmates should "receive the opportunity to exercise outside [their] individual quarters at least five hours per week." The Chief Psychologist told us of the challenges, including Correctional Officer staffing, which have hindered the institution from having an outdoor recreation area for inmates in this unit. While the unit has an indoor recreation cell, the Chief Psychologist told us that it is "important for the mental and physical well-being of a person to get sun and fresh air and you cannot do that indoors." In addition, according to BOP's new mental health policy, all inmates in the SHU must receive an extended placement review every 6 months. We found that although the psychology staff conducts monthly SHU reviews for the inmates in this unit, according to the Chief Psychologist these inmates do not receive extended placement reviews because the unit is not considered to be a SHU. We discuss Extended Restrictive Housing Placement Reviews later in this report.

Sources: OIG observation and analysis, interviews with BOP staff

---

[68] The BOP's SHU Program Statement (5270.10) provides that alternative segregation housing must be proposed by the Warden to the Regional Director, and ultimately approved by the Assistant Director, CPD, before activation. These alternative housing units will be approved only as SHU overflow for inmates in administrative detention or disciplinary segregation status. Operation of such alternative segregation housing requires compliance with all BOP rules, policies, staffing, and post orders for operating SHUs. See also BOP Program Statement 5310.16, Treatment and Care of Inmates with Mental Illness (May 1, 2014).

[69] The Unit Manager told us that all services, including recreation, education, mental health, dentistry, unit team, psychology, and psychiatry, are provided within that unit. The Chief Psychologist told us that in the rare instances when inmates are required to leave the unit, the entire institution is placed on lockdown.

However, the unit's local policy establishes, among other things, procedures for the placement of inmates in the unit for "Administrative Detention" or "Disciplinary Segregation." Also, the Chief Psychologist told us that the unit "functions like the ADX."[70] Specifically, the institution uses a five-level classification system to manage inmates within the unit and those designated at the highest level are confined to their cells for up to an average of 23 hours per day. The Chief Psychologist told us that although inmates within the unit's SHU receive more frequent clinical contacts from mental health staff than what is required in the SHU policy, none of the inmates in this unit receive SHU reviews, despite the fact that the SHU policy states that all inmates in restrictive housing must be given a SHU review every 30 calendar days to monitor their mental health.

CPD officials told us that the BOP does not maintain a centralized list or otherwise track how many of these other forms of restrictive housing exist. With the exception of SHUs, SMUs, and the ADX, the BOP does not know how many inmates are housed in these units. For example, none of the inmates from FMC Carswell's Administrative Unit, including inmates with mental illness in this unit's SHU, were accounted for in FMC Carswell's SHU population data that the BOP provided to us. However, at time of our visit in August 2015, we observed inmates with mental illness placed in this unit's SHU, including one inmate designated at MHCL 3 and two inmates designated at MHCL 2.

The OIG believes that not recognizing certain types of housing conditions as restrictive housing may prevent inmates with mental illness from receiving appropriate reviews, which has the potential to exacerbate the inmates' mental illnesses. The BOP should identify all forms of restrictive housing throughout its institutions and ensure that all local policies reflect standards established in national policies.[71]

*The BOP Does Not Limit the Length of Time Inmates Spend in Restrictive Housing, Including Single-Cell Confinement, Which May Affect Inmates' Mental Health*

During the scope of our review, in addition to not accounting for the various types of RHU throughout BOP institutions, no BOP policy limited the length of time

---

[70]  In November 2016, the BOP issued a revision to its 1997 Management of Female Offenders policy (see BOP Program Statement 5200.02, Female Offender Manual). We note that this new policy acknowledges this unit and states that, "female offenders will receive mental health screening prior to placement on this unit consistent with the procedures for male inmates referred to the Administrative Maximum Penitentiary (ADX) described in the Program Statement Treatment and Care of Inmates with Mental Illness."

[71]  The Department's "Report and Recommendations concerning the Use of Restrictive Housing:  180-day Status Report" (September 2016) states that in May 2016 the BOP began posting data on restrictive housing on its public website, "Statistics," http://www.bop.gov/about/statistics (accessed June 27, 2017). Our review of data posted to the BOP's public website found that the BOP provides data only on those inmates housed in SHUs, SMUs, and the ADX. The Department also reported that the BOP was implementing new software to better track inmates as they progress through restrictive housing and that testing on this software was expected to begin in the fall of 2016.

inmates can be assigned to an RHU.[72] The BOP's mental health policy states that "inmates referred for extended placement in restrictive housing (i.e., SMU, ADX) must be reviewed by Psychology Services staff to determine whether mental health issues exist that preclude placement in this setting."[73] However, neither the BOP nor the Department defines "extended placement."[74] Rather, the BOP policy requires that an inmate receive an Extended Restrictive Housing Placement Review after being continuously housed in the SHU for 6 months, in the ADX for 12 months, or in the SMU for 18 months.[75] Moreover, these are only minimum intervals, after which the staff must review the inmate's placement. The policy does not limit the amount of time an inmate can ultimately spend in an RHU.

The former CPD Deputy Assistant Director told us that there is no limit to the amount of time an inmate can be placed on extended placement. He further stated that the length of an inmate's placement in restrictive housing depends on the behavior of the inmate and that RHUs are used in an effort to change or regulate negative behavior. According to BOP data, one MHCL 3 inmate was housed in the

[72] The ACA manual defines restrictive housing as "a placement that requires an inmate to be confined to a cell at least 22 hours per day." ACA, *Restrictive Housing Performance Based Standards,* 4th ed. (American Correctional Association, August 2016), 3. In addition, the BOP issued a revised SMU policy in August 2016 that, among other things, restricts all inmates' length of time in the SMU to 24 consecutive months. However, it is important to note that this limit applies only to the SMU and that no BOP policy prohibits inmates' continued placement in other RHUs (SHUs, ADX, etc.) following 24 months of placement in the SMU. See BOP Program Statement 5217.02, Special Management Units (August 9, 2016).

[73] During the scope of our review, BOP policy did not preclude the placement of inmates with serious mental illness in SHUs. While SHU inmates received Extended Restrictive Housing Placement Reviews, BOP policy did not prevent their placement in SHUs. See BOP Program Statement 5310.16, 16, 20–21. We discuss Extended Restrictive Housing Placement Reviews later in Results of the Review.

Since the completion of our fieldwork, the BOP issued a revised SHU policy that prohibits SHU placement for inmates whom mental health staff have designated at MHCL 3 or 4, who have a psychology alert in SENTRY (the BOP's primary mission support database), or who have been identified on the monthly SHU advisory (Hot List) unless the inmate presents an immediate or serious danger to self, staff, or the orderly operation of a facility. In the event that an inmate who meets one of these criteria is placed in the SHU, Psychology Services staff must be notified and must conduct a mental health evaluation within 24 hours of the inmate's placement. See BOP Program Statement 5270.11, 15–16.

[74] The ACA defines extended restrictive housing as "housing that separates the offender from contact with general population while restricting an offender/inmate to his/her cell for at least 22 hours per day and for more than 30 days for the safe and secure operation of the facility." ACA, *Restrictive Housing Performance Based Standards,* 3.

The Department's report briefly discusses Extended Restrictive Housing Placement Reviews, replicating language from the BOP's Program Statement 5310.16; but the Department does not define extended placement. See DOJ, *Use of Restrictive Housing,* 51.

[75] Institution Psychologists complete Extended Restrictive Housing Placement Reviews, which include records reviews, behavioral observations, a clinical interview, and psychological testing if clinically indicated. See BOP Program Statement 5310.16, 16.

SHU for 5 years (1,912 consecutive days).[76]  Another inmate with mental illness, who previously had been designated MHCL 2, had spent over 6 years (2,326 consecutive days) in the SMU and was still there at the time of our site visit.[77]  Additionally, an MHCL 3 inmate had spent about 19 years (6,874 consecutive days) at the ADX before being transferred to a secure residential mental health treatment program in 2014.[78]  These cases show that inmates, including those with mental illness, may in effect be placed in an RHU for an unlimited amount of time.

Not only may inmates be placed in restrictive housing, including in single-cell confinement, for what essentially could amount to an unlimited amount of time; but, equally concerning, inmates may be placed in these conditions for long periods of time and then be released directly into the community, as we discuss in the text box below.[79]  Research shows that "time spent in solitary confinement contributes to elevated rates of recidivism" and that many inmates released into the community from RHUs "come out of these units damaged and functionally disabled," which can be a public safety concern.[80]

---

[76]  According to BOP data, in October 2011 the BOP diagnosed this inmate with Antisocial Personality Disorder and Schizophrenia.  The number of consecutive days in the SHU for this inmate was valid as of October 2012, and he was an MHCL 3 inmate as of September 2012.

[77]  From as early as 2005, the BOP diagnosed this inmate with Oppositional Defiant Disorder, Borderline Intellectual Functioning, Borderline Personality Disorder, Malingering, Antisocial Personality Disorder, and Exhibitionism.  The number of consecutive days in the SMU for this inmate was valid as of September 2015, and he was an MHCL 1 inmate at that time.  However, he had been designated at MHCL 2 from December 2012 until January 2014.

[78]  The inmate's diagnoses date to as early as 2006.  The BOP has since diagnosed this inmate with Borderline Personality Disorder, Antisocial Personality Disorder, Personality Disorder Not Otherwise Specified, Major Depressive Disorder-Recurrent, and Anxiety Disorder Not Otherwise Specified.  At the time of his departure from the ADX, he was designated at MHCL 3 and transferred to a secure residential treatment program.  We discuss these programs later in this report.

[79]  In August 2016, the OIG released a report on the BOP's Release Preparation Program, which seeks to prepare inmates for the challenges they will face when they are released into the community.  DOJ OIG, *Review of the Federal Bureau of Prisons' Release Preparation Program,* Evaluation and Inspections Report 16-07 (August 2016).  Also see DOJ OIG, *Audit of the Federal Bureau of Prisons' Management of Inmate Placements in Residential Reentry Centers and Home Confinement*, Audit Report 17-01 (November 2016).

In November 2016, the BOP issued its revised SHU policy, which stated that, ordinarily, inmates nearing the end of their term of incarceration will not be placed in SHU, except when their presence in the general population threatens the safety, security, or the orderly operation of a BOP institution, and that every effort will be made to prevent inmates' direct release from the SHU into the community.  See BOP Program Statement 5270.11, 16.

[80]  Haney, "Reassessing Solitary Confinement," 15.

**Despite Concerns, the BOP Has Released Mentally Ill Inmates into the Community Directly from RHUs**

Based on a sample of 239 SMU inmates with mental illness, we found that 31 inmates (13 percent) were released directly into the community from the SMU.  We also found that, on average, these 31 inmates had spent nearly 29 months in the SMU prior to their release.  The former CPD Deputy Assistant Director said it is "troubling" to release someone from that status into the community.

Some institution staff told us that they are aware of inmates with mental illness who have been released from their institution's SHU directly into the community.  One Psychologist stated that within the previous 2 years she could recall an MHCL 3 inmate who was in the SHU for at least 6 months and was then released directly into the community.  Both she and the institution's Chief Psychologist told us that releasing inmates from the SHU directly into the community has become increasingly rare in recent years as the BOP has improved its efforts to prevent it.

We did not find that inmates at the ADX had been released directly into the community.  The Deputy Chief Psychologist over the ADX told us that this does not occur and that inmates will be transferred to and released from other institutions.  However, she also stated that until a couple of years ago the BOP used to transfer ADX inmates with upcoming release dates to a U.S. Penitentiary that would then place the inmates in its SHU until they were released into the community.  She stated that this practice was "no different than releasing from the ADX."

Sources:  OIG analysis

*State Departments of Corrections Do Limit the Length of Time that Inmates Spend in Long-term Restrictive Housing*

The OIG found that, unlike the BOP, at least some state departments of corrections do limit the length of time inmates are placed in restrictive housing.  We interviewed officials from eight state departments of corrections (Colorado, Maine, Massachusetts, New York, Virginia, Mississippi, Washington, and Pennsylvania) to better understand their initiatives to limit or prohibit the placement of inmates with serious mental illness in restrictive housing.[81]  Corrections officials from three states (Massachusetts, New York, and Mississippi) told us that their states have at least a 30-day limit on housing inmates with serious mental illness in RHUs.[82]  We also found that three other states (Pennsylvania, Colorado, and Maine) no longer place inmates with serious mental illness in RHUs at all.  We found that states are implementing alternatives to long-term segregation by placing inmates with serious mental illness in residential treatment programs.  We discuss these state programs, as well as the BOP's secure residential mental health treatment programs, later in this report.

---

[81]  We found that each state department of corrections has a different definition of serious mental illness and a different inmate mental health classification system.

[82]  In response to a working draft of this report, an official with Mississippi's Department of Corrections told us that, since the time of our fieldwork in 2015, Mississippi no longer limits the placement of inmates with serious mental illness in restrictive housing.

*The BOP Does Not Monitor Inmates' Cumulative Time in All RHUs*

Inmates' Cumulative Time in the SHU May Be Extensive

As we discussed in the Introduction, studies have shown that the frequency, duration, and conditions of confinement of restrictive housing, even for short periods of time, can cause psychological harm and significant adverse effects on inmates' mental health. While the BOP tracks and monitors inmates' time in SHUs, we found that the BOP does not monitor inmates' cumulative time in SHUs. According to officials with the BOP's Psychology Services Branch, assessing such information could be clinically relevant for some inmates. As a result of the BOP's failure to track such information, the BOP cannot determine the number of inmates who frequent the SHUs in multiple, shorter durations or may have longer overall periods in such conditions of confinement.

BOP policy now requires that all inmates receive an Extended Restrictive Housing Placement Review after 180 consecutive days in the SHU.[83] To assist institutions in meeting this requirement, the BOP developed a dashboard that each month notifies institutions of inmates who have been in the SHU for at least 150 consecutive days and may be due for their review during the upcoming month.[84] However, Psychology Services Branch officials and staff told us that the clock resets if an inmate has a 24-hour break in SHU housing placement.[85] Consequently, an inmate theoretically could spend up to 363 days of the year in the SHU, up to 179 days at any time and, per policy, not warrant an Extended Restrictive Housing Placement Review. In addition, a Staff Psychologist said that when an inmate leaves the SHU, his or her record in the SHU Application is "completely erased."[86] This includes the Psychology Services staff's mental health notes for SHU correctional staff, which can be comprehensive for inmates with serious mental illness. Collectively, these limitations may compromise the BOP's ability to monitor inmates who have been in SHUs for multiple, shorter durations

---

[83] BOP Program Statement 5310.16, 20.

[84] While BOP policy requires that all inmates receive an Extended Restrictive Housing Placement Review after every 180 consecutive days in the SHU, the BOP staff must still check the report to verify which inmates are due for review by the end of each month. For example, the dashboard may identify inmates who have been in the SHU for 9 months but do not require their second Extended Restrictive Housing Placement Review until they reach 1 year in the SHU.

[85] BOP officials told us that while the dashboard is useful, it has limitations and that ultimately it is the responsibility of institutions' SHU staff to ensure that all inmates who require an Extended Restrictive Housing Placement Review receive one, whether or not the dashboard identifies them. For example, institution staff told us of an inmate who had been housed in the SHU for approximately 4 years as of August 2015. Based on our analysis of dashboard reports, at the end of FY 2014 this inmate was reported as having been in the SHU for only 290 days.

[86] As referenced above, the SHU Application is a computer program that the SHU staff uses to manage, record, and track daily activities in the SHU. Although the SHU Application does not preserve the notes mental health staff document for SHU correctional staff once the inmate's placement in the SHU concludes, clinical notes documented by mental health staff in the BOP's mental health system (the Bureau's Electronic Medical Record System and Psychology Data System (BEMR-PDS)) are preserved, regardless of the inmate's housing assignment.

that add up to extensive periods of time and can limit the Psychology Services staff's ability to detect deteriorations in mental health that would make continued SHU placement inappropriate.

Inmates with Mental Illness Are in the ADX Significantly Longer than their Peers

As with the cumulative time that inmates spend in the SHU, the BOP does not monitor the cumulative time in the ADX for inmates, including inmates with mental illness, who have been placed there on multiple occasions. Psychology Services Branch officials told us that they would not normally be aware of an inmate's prior placement in the ADX unless the inmate had previously been removed from the ADX for mental health reasons.[87] Rather than assessing cumulative time, the BOP monitors the number of consecutive days that inmates are placed in the ADX. Based on the most recent data available, from November 2013, the BOP determined that inmates had been confined in the ADX for an average of 1,376 consecutive days (about 45 months, or 3.8 years).[88]

We analyzed data for a judgmental sample of 82 ADX inmates with mental illness to determine the average number of consecutive days they had spent at the facility.[89] We found that 59 inmates from our sample, as of November 23, 2013, had spent an average of 1,906 consecutive days (about 63 months, or 5.25 years) in the ADX. Our analysis showed that inmates with mental illness were housed at the ADX for an average of more than 17 months longer than what the BOP reported for all ADX inmates. (See Table 2.)

**Table 2**

**BOP ADX Statistics vs. OIG ADX Analysis**

| | **BOP Statistics** ADX Inmates | **OIG Analysis** ADX Inmates with Mental Illness |
|---|---|---|
| **Total No. of ADX Inmates** | 415 | 59 |
| **Average No. of Days at the ADX** | 1,376 | 1,906 |
| **Median No. of Days at the ADX** | 941 | 1,213 |

Note: The data in this table was valid as of November 23, 2013.

Sources: BOP Office of Research and Evaluation and OIG analysis of BOP data

87 CPD officials told us that they would be aware of an inmate's previous placement in the ADX but this would not be a consideration for them in deciding whether the inmate should be re-admitted to the ADX.

88 Center of Naval Analysis and Solutions (CNA), *Federal Bureau of Prisons: Special Housing Review and Assessment* (December 2014).

89 Our inmate sample includes all ADX inmates whom the BOP designated at MHCLs 2–4 from the end of FY 2010 through May 30, 2015.

In total, we found that our entire sample of inmates with mental illness had been placed in the ADX for an average of 2,109 consecutive days (about 69 months, or 5.8 years).[90] Thus, our analysis indicates that inmates with mental illness were housed at the ADX significantly longer than their peers.

Inmates with Mental Illness Are in the SMU Significantly Longer than the Program's Intended Duration

We also examined the length of time that inmates with mental illness spent in the SMU. Similar to the ADX, the BOP monitors consecutive days for inmates who are placed in the SMU, but not their cumulative time in such units. We also found that, even focusing on consecutive days in the SMU, inmates with mental illness spend, on average, about 5 to 11 months longer than the program's intended duration of 18 to 24 months.[91] Between FY 2008 and FY 2015, inmates with mental illness averaged about 896 consecutive days, or about 29 months, in the SMU program and 50 percent of stays in a SMU by inmates with mental illness were longer than 24 months.[92] (See Figure 1 below.)

[90] This data was valid as of December 2015.

[91] BOP Program Statement 5217.01, Special Management Units (November 19, 2008), 1.

[92] Our sample included all 239 SMU inmates whom the BOP had designated as MHCL 2–4 at the end of FYs 2012, 2013, or 2014 or on May 30, 2015. "Stay" refers to the number of consecutive days the inmate spent in the SMU. See Appendix 1 for more information.

Although the OIG was able to determine that inmates with mental illness were placed in the SMU significantly longer than the program's intended duration, the OIG could not conduct a similar analysis for inmates with mental illness at the ADX because this RHU does not have an intended duration of placement for its inmates.

**Figure 1**

**Months that Inmates with Mental Illness Spent in the SMU
FY 2008 – FY 2015**



Note:  The sample includes 239 inmates, and statistics are valid as of
September 3, 2015.  Because some sample inmates participated in the SMU
program multiple times, this figure displays the lengths of 263 inmate stays in
the SMU.  The longest length of stay was 2,326 days, or about 76.5 months,
by an inmate still in the SMU.

Source:  OIG analysis of BOP data

From our sample of SMU inmates, we also found that inmates with mental
illness were housed in the SMU for almost 14 months longer than what the BOP
reported for all SMU inmates.  Specifically, in November 2013, the BOP reported
that the average length of stay for all inmates in the SMU, including inmates with
mental illness, was 277 days, or about 9 months.[93]  However, we found that
151 SMU inmates with mental illness from our sample were still in the SMU at that
time and had spent, on average, 698 days, or about 23 months, in the SMU.[94]  (See
Table 3 below.)

---

[93]  The BOP's data was valid as of November 23, 2013, and was reported as part of the CNA's
2014 report on special housing.

[94]  These 151 inmates included all SMU inmates whom the BOP had designated as MHCL 2, 3,
or 4 at the end of FYs 2012, 2013, or 2014 or on May 30, 2015, and who were in the SMU as of
November 23, 2013.  See Appendix 1 for more information.

**Table 3**

**Average Lengths of Stay for Inmates in the SMU**

| | **BOP Statistics** All SMU Inmates | **OIG Analysis** SMU Inmates with Mental Illness |
|---|---|---|
| **Total No. of SMU Inmates** | 1,675 | 151 |
| **Average No. of Days in SMU** | 277 | 698 |
| **Median No. of Days in SMU** | 211 | 628 |

Note: The data in this table was valid as of November 23, 2013.

Source: BOP Office of Research and Evaluation and OIG analysis of BOP data

Perhaps even more concerning is that the most recent analysis from our SMU sample suggests that the length of time for inmates with mental illness who were still in the SMU was increasing. As of September 2015, 65 of the inmates from our SMU sample were still in the SMU and had been there for 935 consecutive days (about 31 months).[95] This is particularly troubling in light of other concerns we address later in this report regarding the mental health treatment provided to SMU inmates at USP Lewisburg, which now houses all SMU inmates.

Misleading Performance Metrics

We also found that misleading performance metrics in SMU program data could suggest that inmates with mental illness complete the SMU program at higher rates than they actually do. For example, CPD officials said that an inmate should be designated as "SMU Complete" in the BOP's program data only if the inmate has progressed through all phases of the SMU program and has returned to the general population. However, when we examined our sample of 239 inmates with mental illness, we found that 138 inmates were identified as SMU Complete, but 15 of the 138 (11 percent) were actually transferred out of the program for mental health reasons, not because they had completed the program.[96]

---

[95] After the completion of our fieldwork, the BOP issued a revised SMU policy, which now restricts all inmates' length of time in the SMU to 24 consecutive months (see BOP Program Statement 5217.02). However, even with the BOP's revised policy, inmates may still spend long periods of time in restrictive housing, without limit, before coming to the SMU or after leaving the SMU. One SHU Lieutenant we interviewed stated that, because of limited SMU capacity, approximately 30 inmates were in the SHU for over a year before finally being transferred to the SMU. Additionally, he stated that two of these inmates were still in the SHU awaiting transfer to the SMU at the time of our visit.

The Department's "180-day Status Report" stated that the BOP had reduced the SMU program to three phases that would take, on average, 9 to 13 months to complete. The report also stated that the BOP had established an incentive program for high-performing inmates to advance through the program on a faster timeline.

[96] During our fieldwork, in September 2015 the BOP stated that, "we are unaware of the existence of any data that would indicate the reason for removal from SMU, beyond the assignments

(Cont'd)

In addition, we found that BOP policy provides that an inmate can be designated as a "SMU Failure" if the inmate continues to exhibit disruptive conduct after spending 30 months in the SMU, 6 months beyond the program's maximum intended duration of 24 months.[97]  The Warden at USP Lewisburg told us that when he arrived in June 2014 there were over 100 inmates designated as SMU Failures.  He said that was no longer the case because inmates were "programming" and progressing through the SMU program's phases.  At the time of our site visit in July 2015, this institution had only five inmates designated as SMU Failures.  However, as discussed above, there were 65 inmates from our sample who were still in the SMU as of September 2015 and had spent, on average, 935 days, or about 31 consecutive months, there.  Despite this, *none* of our sample inmates were designated as SMU Failures, including one inmate who had been in the SMU for almost 77 consecutive months.  This data suggests that, contrary to BOP policy, the BOP may in effect rarely be designating inmates as SMU Failures, even though many inmates appear to meet this criteria and remain in the SMU well beyond the program's maximum intended duration.  In October 2016, a CPD official confirmed that inmates who remained in the SMU 6 months longer than the program's maximum intended duration should be classified as a SMU Failure throughout the remainder of their placement.

Finally, many inmates with mental illness were given new SMU entry dates before ever leaving the program.  We found that 53 of our sample of 239 SMU inmates with mental illness started the program multiple times, and 5 inmates restarted the program within 2 weeks of being designated as SMU Failures.  While some of these inmates completed the program, transferred to other institutions, and were sent back to the SMU, more than half of the inmates who restarted the program did so before they had exited the program.  CPD officials told us that SMU inmates may have received a new entry date when they transferred from different SMU institutions.  However, by giving new entry dates to SMU inmates who restarted the program from the beginning, the BOP could artificially decrease the documented length of stay for these inmates.  Consistent with our findings discussed earlier, this practice could prevent the BOP from accurately tracking inmates as they progress through the SMU program, and inmates with mental illness may linger in multiple iterations of the program much longer than what BOP data indicates.

---

of Complete or Fail."  In response to a working draft of this report, the BOP stated that staff document a unique code in SENTRY for inmates who were removed from the SMU for mental health reasons.

The BOP cited a February 2017 memorandum from the Assistant Director of CPD to the Chief Executive Officers, which reflected the existence of an assignment code in SENTRY with a description for "SMU Removal Mental Health."  While this code may exist today, the fact remains that none of the 15 inmates that we cited above should have been documented as having completed the SMU program.

[97]  See BOP Program Statement 5217.01, 11.  In this revised SMU policy, the BOP has reduced the intended duration of the SMU program to 9 to 13 months.  In addition, the policy states that if an inmate fails to complete the SMU program within 24 consecutive months, which is the maximum amount of time for an inmate to be placed in the SMU, the inmate will be placed in SMU Failure status and the BOP will identify an appropriate institution for the inmate.

**Mental Health Staff Do Not Always Document Inmates' Mental Disorders, Leaving the BOP Unable to Accurately Determine the Number of Inmates with Mental Illness and Ensure that It Is Providing Appropriate Care to Them**

We found that the BOP cannot accurately determine the number of its inmates who have mental illness, including inmates in RHUs, because institution staffs do not always document inmates' mental disorders.  This could prevent the BOP from ensuring that it is caring for all of these inmates appropriately.

Based on our analysis of BOP FY 2014 data, 19,034 inmates, or approximately 12 percent of the BOP's total inmate population, had a history of mental illness.[98]  However, this number appears too low to be accurate, according to BOP officials and institution staff.  In 2015, the BOP's Chief Psychiatrist estimated, based on discussions with institutions' Psychology Services staffs, that approximately 40 percent of inmates had a mental illness, excluding inmates with only personality disorder diagnoses.  A Deputy Chief Psychologist estimated that 50 percent of inmates at her institution (which housed 961 total inmates as of May 2015) may have Antisocial Personality Disorder, which, according to staff we spoke with, is one of the most prevalent mental disorders among BOP inmates.  Nevertheless, we found that this disorder was documented for only about 3.3 percent (5,272) of the BOP's total inmate population (157,872).[99]  Psychology Services Branch officials told us that the BOP's mental health policy requires mental health staff to document mental disorders for inmates with an enduring pattern of behavior and for Antisocial Personality Disorder, a pervasive pattern of antisocial behavior may not necessarily be identified during an intake screening evaluation.[100]  However, we believe that the underrepresentation of this disorder could also indicate that a significant number of inmate disorders are not formally documented and may as a result go untreated.

---

[98]  We determined the prevalence of inmates with a history of mental illness by quantifying those inmates who had at least one documented BOP diagnosis — either current, in remission, or resolved — provided in the BOP's data.  This includes both psychotic disorders and personality disorders but excludes chemical dependency (substance abuse).  This does not include inmates who had undergone an initial mental health records review, were given a tentative MHCL designation by the BOP's Designation and Sentence Computation Center, but had yet to be examined, in person, by a mental health clinician.  See Appendix 1 for more information.

As discussed in the Introduction, according to the BOP's *Mental Health Prevalence Project*, approximately 19 percent of federal inmates entering the BOP had a history of mental illness.

[99]  This includes both Antisocial Personality Disorder and Adult Antisocial Personality Disorder.

[100]  In response to a working draft of this report, the BOP stated that an Antisocial Personality Disorder diagnosis would be given as a mental health diagnosis only if the inmate was functionally impaired in prison as a result of the condition (e.g., self-harm, poor emotional regulation, distress).

According to BOP policy, "all current mental health illnesses should be diagnosed in a Diagnostic and Care Level Formulation note in PDS, including personality disorders and intellectual disabilities.  The cumulative effect of the disorders on functioning is taken into account when assigning a mental health care level."  See BOP Program Statement 5310.16, 9.

The BOP's data indicates that approximately 22 percent of inmates in RHUs had a history of mental illness at the end of FY 2014.[101] Specifically, according to our analysis of BOP data, 37 percent of ADX inmates, 27 percent of SMU inmates, and 21 percent of SHU inmates had a history of mental illness.[102] (See Figure 2.)

**Figure 2**

**Inmates with a History of Mental Illness by RHU Type, FY 2014**

ADX
146
251
SMU
331
916
SHU
1,651
6,329
0
1,000
2,000
3,000
4,000
5,000
6,000
7,000
Inmates with a History of Mental Illness
Inmates with No History of Mental Illness

Source: OIG analysis of BOP data

We believe that the BOP data used to determine the above numbers of inmates with mental illness in these RHUs may well be underinclusive. For example, in August 2015, during our site visit to the ADX, we observed a Care Coordination and Reentry (CCARE) meeting. Prior to this meeting, the ADX staff provided us with mental health documentation for 109 inmates whose cases the staff reviewed during the meeting. Based on this documentation, we found that

[101] Using the BOP's unique inmate registration numbers, we cross-referenced SHU, SMU, and ADX population data as of September 30, 2014, with BEMR-PDS data as of September 30, 2014. See Appendix 1 for more information.

[102] The BOP's FY 2014 population data for the ADX included 936 total inmates, 46 of whom were designated at MHCLs 2–4. However, during our site visit to the ADX, the staff provided us with documentation that the ADX's rated capacity is 490 inmates. Further, many of the inmates provided in the BOP's population data had minimum, low, and medium security levels, which is inconsistent with inmates housed in the ADX. According to the BOP, this dataset included inmates housed in the Minimum Security Camp (Camp) as well as ADX inmates because, at the time, the ADX was responsible for the Camp and thus ADX staff counted its inmates. In March 2015, inmates in the Camp were realigned in the BOP's database to fall under FCC Florence's medium security institution. Therefore, we selected all 397 inmates with a high security level designation, which is consistent with inmates at the ADX. See Appendix 1 for more information.

76 (70 percent) inmates had at least 1 mental health diagnosis.  We also found that 71 (93 percent) of these 76 inmates were diagnosed with at least Antisocial Personality Disorder.[103]  However, as of the date of this CCARE meeting, 99 of the 109 inmates (91 percent) were designated at MHCL 1 and the remaining 10 inmates (9 percent) were designated at MHCL 2.

According to BOP policy, all inmates designated at MHCLs 2–4 must have been diagnosed with mental illness along with a Psychologist's rationale for the inmate's diagnosis and assigned care level.[104]  However, based on our analysis of the BOP's FY 2014 data, 968 of 5,542 inmates (17 percent) designated at MHCLs 2–4 across BOP institutions did not have any documented diagnoses of mental illness.  We also found that 74 of these 968 inmates (8 percent) were housed in RHUs.[105]  The BOP's Chief of Mental Health Services told us that she had found a similar percentage of inmates who did not have a documented mental health diagnosis.  Based on her review of a sampling of inmate records in the Bureau's Electronic Medical Record System and Psychology Data System (BEMR-PDS), she stated that BOP staff had not entered any mental health diagnoses in BEMR-PDS for "a few" of the 968 inmates.  She said that the incomplete dataset was caused mostly by diagnoses that were not properly entered.[106]  In response to a working draft of this report, the BOP stated that staff were not documenting diagnoses in the appropriate location in BEMR-PDS.  To reconcile this issue, Psychology Services Branch officials told us that they had alerted institution staff about inmates designated at MHCL 2–4 who did not have a documented diagnosis in the system that was consistent with the *Diagnostic and Statistical Manual for Mental Disorders* (DSM).[107]  In addition, these officials said that the BOP has since made changes in BEMR-PDS to ensure that mental health staff consistently enter DSM diagnoses.

Finally, we found that the BOP could improve its management and oversight of inmates with mental illness if it differentiated inmates at MHCL 1 who have mental illness and inmates who do not.  According to BOP policy, inmates designated at MHCL 1 are not required to have a mental health diagnosis.[108]  According to BOP data, over 90 percent of inmates are designated at MHCL 1,

---

[103]  We included Adult Antisocial Personality Disorder diagnoses into this raw count and excluded chemical dependency (substance abuse).

[104]  See BOP Program Statement 5310.16, 9.

[105]  Of the 74 inmates, 1 inmate was in the ADX, 1 inmate was in the SMU program, and 72 inmates were in SHUs.

[106]  The Chief of Mental Health Services elaborated that while staff entered diagnoses in BEMR-PDS, they either did not enter the appropriate diagnosis code or they manually entered diagnoses as free text rather than selecting diagnoses from a drop-down menu.  As a result, she indicated that these inmates' diagnoses were not included in the data provided to the OIG.  It was beyond our scope to further review them.

[107]  American Psychiatric Association, *Diagnostic and Statistical Manual for Mental Disorders,* 5th ed. (Arlington, Va.:  American Psychiatric Association, 2013).

[108]  BOP Program Statement 5310.16, 8.

including most inmates with documented mental illness. However, as we indicate above, some inmates have undocumented mental illness and, as a result, the BOP cannot differentiate between inmates designated at MHCL 1 who may have undocumented mental health diagnoses and inmates who do not have any mental health diagnoses. To reconcile this issue, the BOP could reassess its MHCL system and use different classifications to differentiate between inmates who have some form of mental illness from inmates who do not have mental illness.

### Since the BOP Adopted Its New Mental Health Policy, BOP Data Shows a 30 Percent Reduction in the Number of Inmates Who Receive Regular Mental Health Treatment

As noted in the Introduction, in May 2014 the BOP issued a new mental health policy intended to enhance the treatment of inmates with mental illness, including those in RHUs.[109] During our review, we found that the BOP has not provided sufficient resources, specifically with regard to the number of mental health staff, to implement the new policy. With no corresponding increase to mental health staff, we believe that mental health staff at institutions may have reduced the number of inmates designated at MHCLs 2–4 to help alleviate the increased work requirements associated with these care levels. Based on our analysis of BOP data, from the end of FY 2010 through April 2014, the number of inmates designated at MHCLs 2–4 remained relatively steady, decreasing by only 1 percent. However, as we describe in detail below, during the year after the new policy was issued, the number of inmates designated at MHCLs 2–4 decreased approximately 30 percent.[110] In addition, we found that the BOP's current mental health staffing challenges could result in some inmates with mental illness, including those in RHUs, not receiving the appropriate treatment for their mental health needs. Finally, we found that mental health staffs disagree on the diagnoses of inmates with mental illness, and even more so for inmates in some RHU programs, which can affect the treatment and continuity of care of inmates with mental illness in RHUs.

#### *Insufficient Resources to Implement the New Policy May Have Affected How Clinicians Determined the Mental Health Treatment Needs of Inmates*

The BOP's new mental health policy requires staff to provide more comprehensive care and treatment for inmates with mental illness, including inmates with mental illness in RHUs. We found that mental health clinicians may have reduced, or been reluctant to increase, some inmates' MHCLs because of a lack of resources to implement the enhanced treatment standards. According to

---

[109] BOP Program Statement 5310.16.

[110] We requested that the BOP provide inmate population data for May 1, 2014. However, due to technical issues, the BOP instead provided us with inmate population data for April 26, 2014. We thus determined the BOP's decline in inmates' MHCLs from April 26, 2014, to May 30, 2015.

Additionally, while we indicate in the Introduction that the BOP reported a slightly smaller decline (about 20 percent) for inmates designated at MHCLs 2–4 from FY 2010 through May 2015, the BOP told us that it also had found a 30 percent reduction from April 2014 to May 2015.

the Senior Deputy Assistant Director of the Reentry Services Division (RSD), which oversees the BOP's mental health services, the BOP's new policy "raised the bar" for the mental health care that the BOP wanted to provide to its inmates.  The Chief of Mental Health Services told us that the BOP had expected to see an increase in inmates designated at MHCLs 2–4 under the new policy, and that its objective in developing the policy was to encourage staff to be "thoughtful and inclusive of the need for treatment when they see it."  For example, the policy introduced the term "serious mental illness," which included personality disorders.[111]  The Chief of Mental Health Services said that, prior to the new policy, mental health staff may not have considered personality disorders to be serious mental illness.[112]  She added that personality disorders are very serious throughout the BOP's inmate population, are more prevalent in restrictive housing, and may require more frequent treatment than under the previous policy.[113]

In light of this information, we believe that the inclusion of personality disorders in the criteria for serious mental illness certainly should have contributed to an overall increase in inmates designated at MHCLs 2–4 after adoption of the new policy in May 2014.  According to BOP data, from the end of FY 2010 through April 2014, the number of MHCL 2–4 inmates had remained relatively steady, decreasing by only 1 percent.[114]  Yet, from the end of April 2014 through May 2015, after the BOP issued its new mental health policy, the number of MHCL 2–4 inmates *decreased* about 30 percent, including a decrease in the number of MHCL 2–4 inmates at USP Hazelton by approximately 81 percent (from 238 to 46 inmates).[115]  Figure 3 below shows the BOP's total number of sentenced inmates designated at MHCLs 2–4 across all BOP institutions from the end of FY 2010 through May 2015.

---

[111]  According to the BOP staff we interviewed, personality disorders are among the most prevalent mental disorders throughout the BOP's inmate population.

[112]  The Coordinator of a secure residential mental health treatment program told us that some mental disorders, such as personality disorders, do not involve psychosis, which may cause some staff to view these disorders as less severe forms of mental illness.  We discuss secure residential mental health treatment programs later in the report and in Appendix 3.

[113]  For example, as we discuss above, in August 2015 ADX staff provided us with mental health documentation for 109 inmates whose cases the staff reviewed during a CCARE meeting. Based on this documentation, we found that 76 (70 percent) inmates had at least 1 mental health diagnosis and that 71 (93 percent) of those were diagnosed with at least Antisocial Personality Disorder.  In addition, a SMU Psychologist told us that approximately 90 percent of SMU inmates have mental illness, if personality disorders are included, and that over 90 percent of SMU inmates exhibit antisocial behavior.

[114]  We based the percentage on the number of MHCL 2–4 inmates (6,853 out of the BOP's total of 154,760 inmates) at the end of FY 2010, compared to the number of MHCL 2–4 inmates (6,761 out of 159,284) as of April 26, 2014.

[115]  We based the percentage on the number of MHCL 2–4 inmates (6,761 out of 159,284 total inmates) in April 2014, compared to the number of MHCL 2–4 inmates (4,768 out of 155,652) in May 2015.  The median for our analysis is an MHCL reduction of approximately 28 percent.

**Figure 3**

**Number of MHCL 2–4 Inmates, September 2010 – May 2015**



Source:  OIG analysis of BOP data

Based on a sample of 688 inmates in RHUs during the period of our review, we found that after May 2014 — when the new policy was implemented — the mental health staff was more likely to decrease and less likely to increase some inmates' MHCLs.[116]  We found that prior to implementation of the new policy, for our sample of 688 RHU inmates, 178 inmates' MHCL increased, compared to 85 inmates whose MHCL decreased.  Since the new policy, 45 inmates' MHCL increased, compared to 110 inmates whose MHCL decreased.  Table 4 and Figure 4 below show the changes in the MHCLs for our sample of inmates in RHUs.[117]

---

[116]  Our analysis is limited to a sample because it was not feasible to assess every inmate's MHCL history.  We selected a sample of RHU inmates designated at all MHCLs and individually assessed the history of changes in their MHCLs before and after the new policy was issued.  Our analysis does not account for every MHCL change that may have occurred between these times, but notes the inmate's MHCL change, when applicable, from FY 2010 through April 2014 and from late April 2014 through August 2015.  See Appendix 1 for more detailed information on our methodology.

[117]  Although the BOP established the MHCL system in December 2009, a few inmates in our sample had MHCLs initiated as early as October 2009, which explains why the scope of Table 4 and Figure 4 (below) predates when MHCLs were officially established.

**Table 4**

**MHCL Changes for Sample RHU Inmates, October 2009 – August 29, 2015**

| BOP Policies | No. of Inmates with Increased MHCL | No. of Inmates with Decreased MHCL | No. of Inmates with the Same MHCL |
|---|---|---|---|
| **Former Mental Health Treatment Policies** (October 2009 – April 30, 2014) | 178 | 85 | 425 |
| **New Mental Health Treatment Policy** (May 1, 2014 – August 2015) | 45 | 110 | 533 |
| **Percent Change (+/-)** | **-74.72%** | **29.41%** | **25.41%** |

Source: OIG analysis of BOP data

**Figure 4**

**MHCL Changes for Sample RHU Inmates, October 2009 – August 29, 2015**

Source: OIG analysis of BOP data

We discussed our analyses with BOP institution officials and staff, as well as Central Office officials.[118] Based on these discussions, we believe that the additional requirements established by the new policy, along with no increase in mental health staffing, resulted in institution mental health staffs reducing the

[118] In May 2015, we asked BOP officials in the Psychology Services Branch to comment on the results of our data analyses showing a decrease in the number of BOP inmates designated at MHCLs 2–4. Both the Senior Deputy Assistant Director and the Chief of Mental Health Services had not anticipated our finding and were unaware of the reduction of inmates' MHCLs BOP-wide. They wanted to review the data to better understand this reduction before commenting. In October 2015, we re-interviewed these officials for their opinions on our results.

number of MHCL 2–4 inmates, who are required to receive more frequent mental health care. A BOP Chief Psychologist told us: "If I have [an MHCL] 2, I've got to see them every month, they have a treatment plan, diagnostic formulation, I've got to update them, I've got to go to a [CCARE] meeting, … that's a lot of dominoes to fall down. So what do you think human nature is? Well, I am going to lower my threshold and have less [MHCL] 2's…. I don't want to lower my threshold but I know that when staff are overwhelmed … there may have been sometime where people are reducing care levels in order to survive." In light of staffing challenges, he suggested that the BOP could add another care level to the MHCL system that would allow Psychologists to treat on a quarterly basis those inmates who do not clinically need monthly treatment. Another Staff Psychologist told us that since the new policy she has encountered more transferred inmates with reduced MHCLs with which she disagreed. She believes that many institutions are pressed for staffing and were making such efforts to meet the new policy's standards.

Other institution mental health staff told us about staffing challenges associated with meeting the requirements established in the new policy. Another Chief Psychologist told us that the new policy has great intentions, but "there are just not enough bodies to carry out the policy." A third Chief Psychologist told us that before the new policy, mental health staff had greater latitude to concentrate resources on inmates with serious mental illness; but, under the new policy, those resources are needed to meet the minimum mental health requirements for inmates who may not clinically need that level of mental health treatment. While many institution mental health staff with whom we spoke described a lack of resources to implement the new requirements, it appears that increased staffing at the ADX may have contributed to the increase in inmate MHCLs at the ADX (see the text box).[119]

**The Increased Mental Health Staff at the ADX May Have Contributed to an Increased Number of Inmates at MHCLs 2–4**

We found that despite decreases in the ADX's overall inmate population since FY 2010, the BOP has significantly increased the ADX's mental health staffing. We found that, as of May 2015, the number of ADX inmates designated at MHCLs 2–4 had increased by nearly 40 percent (from 33 inmates to 46 inmates). According to the Department, between 2012 and 2013, the BOP hired three additional full-time Psychologists, one Psychiatric Nurse, and one Psychology Technician for the ADX while also adding one Deputy Chief Psychologist to help manage mental health services throughout FCC Florence, including the ADX. We found that during this time, the BOP began to decrease the ADX's inmate population, in part due to a number of inmates with serious mental illness who were transferred to the BOP's new mental health residential treatment programs. However, despite the BOP's efforts to reduce the number of inmates with mental illness at the ADX, the number of MHCL 2–4 inmates increased. It appears to us that the increase in mental health staff to treat ADX inmates may have contributed to the increase in the MHCLs of inmates at the ADX.

Source: DOJ, *Use of Restrictive Housing,* and OIG observation and analysis

---

[119] A Deputy Chief Psychologist told us that recent litigation caused the BOP to increase its mental health staffing resources for the ADX. An ADX Psychologist stated that BOP institutions have different thresholds for assigning MHCLs. At the ADX, the staff has a lower threshold for raising an inmate's MHCL because of the scrutiny over the use of restrictive housing and the recent litigation.

When we asked about the sharp overall decrease in the number of inmates designated at MHCLs 2–4 that our analyses showed BOP-wide, the BOP's Chief of Mental Health Services stated that over time it is difficult to determine whether MHCLs have been "rising or falling" because, since the inception of MHCLs, the BOP has changed its guidance on how to assign them.[120] However, she added, "if [MHCLs have] fallen since the new policy, that's a concern.... If the resources aren't there and a psychologist has to make choices about the amount of service they can provide … because they don't have enough time to provide services to everyone on their caseload, they may be [an MHCL] 2 instead of [an MHCL] 3. I am very concerned about that." Psychology Services Branch officials told us that they do not believe the BOP has "adequate staffing to fully implement" the new policy.

While the BOP's new policy was intended to enhance care for inmates with mental illness, we believe that the new policy could have unintended consequences that negatively affect some inmates' treatment. During our review, BOP officials and staff acknowledged the concerns revealed by our analysis of MHCL data after the BOP issued its new policy, including the need to consider assigning additional mental health staff to effectively implement the policy's enhanced standards. We believe that the BOP should regularly monitor trends in inmate MHCLs to further assess how the new policy affects the treatment of inmates with mental illness, particularly those in RHUs. Although Psychology Services Branch officials told us that they monitor trends for MHCL 3 and MHCL 4 inmates, they do not monitor MHCL fluctuations at the institution level for all MHCLs. We believe that by monitoring MHCLs and their relation to RHU populations, the BOP Central Office could identify institutions with unusual MHCL fluctuations and further investigate institution or RHU-specific factors that may be influencing these changes.

*Mental Health Staffing Does Not Support the Treatment Needs of Inmates with Mental Illness, Including Those in RHUs*

The BOP "recognizes that an inmate's mental health may deteriorate during a restrictive housing placement."[121] We found several concerns related to the BOP's mental health staffing that could result in some inmates with mental illness, including those in RHUs, not receiving the appropriate treatment for their mental health needs. A lack of or inappropriate level of resources could impact inmates' treatment and contribute to a decline in some inmates' mental health.

First, the numbers of Psychologists within BOP institutions are below the BOP's base staffing guidelines. According to the RSD Senior Deputy Assistant

---

[120] The RSD Senior Deputy Assistant Director added that mental health staff could have been influenced by program review guidelines that were issued *before* the new policy provided guidance specific to MHCLs. The program review guidance combined treatment standards from the old policy with standards detailed in the new policy, which had not yet been released. For example, under the old policy, MHCL 2 inmates were to be seen at least quarterly; but, under the new policy, they are to be seen monthly. If the staff was influenced by guidance in the old policy, this may have "fuzzied" its understanding of the new policy's guidance on MHCL definitions. However, during our interviews with institution staff, we did not find any evidence to support this concern.

[121] BOP Program Statement 5310.16, 16.

Director, staffing guidelines were "established in 2011 and are based on the mission of the institution and the gender of the inmate."[122]  The BOP's FY 2016 budget submission stated that a significant number of institutions are short Psychologists to the point that they do not meet the baseline standard of a 1:500 Psychologist to inmate ratio.[123]  We observed this shortfall in six of the seven institutions we visited, which at the time of our visits were understaffed by at least one mental health staff position.  A Deputy Chief Psychologist told us that one of those institutions with 1,200 inmates had only a single Staff Psychologist.[124]  Based on data provided by the BOP during our fieldwork, we found that an FMC housing some of the BOP's most seriously mentally ill inmates had filled only 12 of its 21 full-time mental health staff positions as of December 2015.

Likewise, we believe that the ratio of SMU Psychologists to inmates at USP Lewisburg does not meet the BOP's staffing guidelines.  As noted above, the BOP requires a staffing ratio of no fewer than 1 Psychologist per every 350 inmates for high security institutions.  We found that USP Lewisburg was operating with 1 Staff Psychologist per every 582 SMU inmates.[125]  This ratio of Staff Psychologists to inmates was more than four times worse than the 1:138 ratio at the ADX, which may well impact treatment for USP Lewisburg SMU inmates with mental illness.[126]

Just as we noted above that increased mental health staffing at the ADX may have led to increased recognition of higher MHCLs for inmates there, we believe that limited SMU staffing may have led to a decrease in MHCL designations for SMU

---

[122]  According to Psychology Services Branch officials, as of 2011 the BOP's institutions had the following Psychologist to inmate ratios:  Federal Medical Centers (1:100), female institutions (1:250), Detention Centers (1:350), high security institutions (1:350), medium security institutions (1:500), low security institutions (1:600), and camps (1:700).

In response to a working draft of this report, the BOP stated that Staff Psychologists are not the only clinicians counted in these guidelines.  For example, the Chief Psychologist, Resolve Program Coordinator, Internship Program Coordinator, and other Psychologists in the institution contribute to meeting the staffing guidelines.  Some Psychologists are excluded based on their mission, e.g., Drug Abuse Program Coordinators.

[123]  DOJ, *FY 2016 Performance Budget Congressional Submission,* 80, https://edit.justice.gov/sites/default/files/jmd/pages/attachments/2015/02/02/27._federal_bureau_of_prisons_bop_se.pdf (accessed June 27, 2017).

[124]  Based on BOP data, there were 1,548 inmates at this institution as of May 2015.  Of these inmates, 95 of were in the SHU, which means that they require more frequent mental health assessments.  Six of the 95 SHU inmates were at MHCL 2, which further increases their need for mental health assessments.

[125]  Our estimate is based on staff and inmates at USP Lewisburg at the time of our site visit in July 2015.  BOP data provided to us showed that the institution housed 1,163 SMU inmates in May 2015.  When we visited USP Lewisburg in July 2015, two SMU Staff Psychologists were working primarily with SMU inmates.  We were told that the institution had hired a third Staff Psychologist, who had not yet started treating SMU inmates at the time of our visit.

[126]  We believe that the ADX is the most appropriate staffing comparison to USP Lewisburg's SMU because both institutions are MHCL 2 facilities that house disproportionately high concentrations of disruptive inmates who are placed in restrictive housing for prolonged periods of time and have been referred from other BOP institutions due to behavioral issues.

inmates and a possible reluctance to designate new inmates at higher MHCL levels. Based on our sample of 239 SMU inmates with mental illness who had their MHCLs changed at USP Lewisburg during our scope, we found that SMU staff made an equal proportion of MHCL increases and decreases among our SMU inmate sample prior to the BOP's new mental health policy. However, after the new policy, no sample SMU inmates at USP Lewisburg had increased MHCLs and the number of SMU inmates with decreased MHCLs nearly doubled. While the numbers are not high, this pronounced trend is consistent with our MHCL analysis for all SMU inmates, which shows a 56 percent reduction (from 70 to 31 inmates) in the total number of inmates who receive regular mental health treatment in the SMU since the BOP's new policy was issued.[127] In fact, while approximately 11 percent of inmates at the ADX were receiving regular mental health treatment as of May 2015, only about 2.5 percent of inmates in the SMU were.[128] Collectively, these analyses are concerning in terms of the impact of staffing on MHCL designations and, therefore, on the treatment of inmates with mental health needs. Table 5 below shows the MHCL changes by SMU staff at USP Lewisburg for our sample of SMU inmates with mental illness.[129]

[127] We based the percentage on the number of MHCL 2–4 inmates in April 2014 (70) compared to the number of MHCL 2–4 inmates in May 2015 (31). However, during that time in FY 2015, the SMU at USP Florence, which had confined 358 SMU inmates in April 2014, closed. In October 2016, CPD officials told us that some SMU inmates were released from USP Florence's SMU into other institutions' general populations while other inmates were transferred to the SMUs at USP Lewisburg or USP Allenwood. As a result, it appears that the closure of USP Florence's SMU may have contributed to the overall reduction in the total number of SMU inmates who received regular mental health treatment. Although BOP data shows an 11 percent reduction in the overall SMU population during this time, it is important to note that USP Lewisburg's SMU population increased nearly 40 percent (from 844 to 1,163) during this same period.

[128] As of May 2015, we also found that approximately 7 percent of the BOP's SHU population received regular mental health treatment, which is also considerably higher than the rate at USP Lewisburg's SMU.

[129] Based on our sample of SMU inmates with mental illness from October 2009 through August 29, 2015, we also found that SMU staff at USP Allenwood had also increased (four) and decreased a comparable number of inmates' MHCLs (three) prior to the issuance of the May 2014 policy. However, after the new policy was issued, SMU staff did not increase any sample inmates' MHCLs but did decrease the MHCLs of three sample inmates.

**Table 5**

**MHCL Changes at USP Lewisburg for Our Sample of SMU Inmates with Mental Illness, October 2009 – August 29, 2015**

| BOP Policies | MHCL Increases | MHCL Decreases | **Ratio of MHCL** Increases to Decreases |
|---|---|---|---|
| **Former Mental Health Treatment Policies** (October 2009 – April 30, 2014) | 16 | 16 | 1:1 |
| **New Mental Health Treatment Policy** (May 1, 2014 – August 2015) | 0 | 27 | 0:27 |

Note: Although the BOP established the MHCL system in December 2009, a few inmates in our sample had MHCLs initiated as early as October 2009, which explains why the scope of this table predates the official establishment of MHCLs. Additionally, our analysis does not account for every MHCL change that may have occurred during these time periods but notes the inmates' MHCL changes, when applicable, from October 2009 through April 2014 and from April 2014 through August 2015. See Appendix 1 for more details.

Source: OIG analysis of BOP data

Second, we are also concerned about the BOP's challenges in recruiting and retaining Psychiatrists. We discussed this concern in detail in our March 2016 *Review of the Federal Bureau of Prisons' Medical Staffing Challenges*.[130] As of October 2015, the BOP had filled only 28 of 49 (57 percent) of its authorized full-time Psychiatrist positions nationwide. The former Assistant Director of the BOP's Health Services Division told us that the BOP does not have a staffing formula to identify its Psychiatrist-to-inmate staffing ratio. The Senior Deputy Assistant Director of the Health Services Division told us that Care Level 4 institutions (FMCs) are given first priority for Psychiatrists, followed by Care Level 3 institutions.[131] However, we found that as of FY 2015, one FMC had only one Psychiatrist position filled out of seven positions authorized and one FCC, which includes an FMC, had only two Psychiatrist positions filled out of eight positions authorized. Our March 2016 report talked about some of the challenges the BOP has faced in filling these positions, which is a problem that the BOP should continue to address if inmates are to receive the level of psychiatric care indicated by their MHCLs.

Third, as a result of a shortage of Psychiatrists, we found that General Practitioners, without the specialized training normally provided to Psychiatrists, are left to prescribe psychotropic medications to inmates in RHUs. Institution Psychiatrists told us that while General Practitioners have basic training in diagnosing and medicating basic disorders (e.g., depression), they may not be able

---

[130] DOJ OIG, *Review of the Federal Bureau of Prisons' Medical Staffing Challenges,* Evaluation and Inspections Report 16-02 (March 2016).

[131] Similar to how MHCLs delineate the mental health needs of inmates, the BOP also designates institutional care levels to delineate the varying levels of medical and mental health care that can be provided to inmates at its institutions. For example, an MHCL 4 inmate should be housed only at a Care Level 4 institution because only Care Level 4 institutions have the resources needed to address that inmate's intensive mental health needs.

to manage more complex cases and therefore should consult with a Psychiatrist.[132] One FMC Psychiatrist said that General Practitioners can diagnose and treat depression, and likely have the knowledge and skills to assist with MHCL 1–2 inmates, but that more complex cases may be more difficult for a General Practitioner to manage and treat.

Fourth, the BOP has expanded its use of tele-psychiatry, a form of "direct, patient-to-provider, visual interaction" that occurs in a private setting; but we found that not all institutions are supported by this service. A Chief Psychologist told us that her institution was 25th on the BOP's tele-psychiatry waitlist for about a year before the institution filled its tele-psychiatry vacancy. Though the institution is a Care Level 2 facility, the Chief Psychologist's caseload has about eight or nine MHCL 3 inmates who require more complex treatment and could benefit from this service. Conversely, other staff expressed concerns about the treatment provided through tele-psychiatry and it appears that one SMU institution we visited elected to significantly limit tele-psychiatry services for its inmates.[133] (See the text box.)

**USP Lewisburg Has Significantly Limited Tele-Psychiatry Services for SMU Inmates**

While the SMU houses inmates with mental illness at MHCL 2, SMU officials told us that, despite having the capability, the institution has rarely, if ever, offered tele-psychiatry services to inmates since 2013 because the mental health needs of its inmates do not necessitate such services. The Medical Officer at USP Lewisburg told us that tele-psychiatry is problematic because tele-Psychiatrists often prescribe medications based on inmates' self-reported conditions in sessions that last only 15 to 20 minutes. He prefers to observe the inmate over extended periods of time. He added that while the institution still has the capability for tele-psychiatry, staff treat inmates themselves. The Medical Officer told us: "We haven't stopped [tele-psychiatry]. It's still available. It's just that since I've come on-board, it's not utilized because I consider myself pretty adept at treating all these conditions." Five SMU inmates told us they were unable to participate in tele-psychiatry at USP Lewisburg, despite having done so while in SMUs at other institutions. The Health Services Division Senior Deputy Assistant Director told us that she would be "very surprised" if an institution had the capability but did not offer tele-psychiatry and that USP Lewisburg would be a "perfect spot" for tele-psychiatry.

Source: OIG interviews

Finally, inmates told us that they did not think they were receiving the appropriate treatment and care to address their mental health needs. For example, according to the May 2014 policy, individualized treatment plans should be based on collaboration with the inmate and should describe "the inmate's problems and goals, and the interventions planned to assist with goal attainment." Inmates we interviewed indicated that they were generally unaware of their individualized mental health treatment plan, which raises questions as to how collaborative these treatment plans actually are, as well as how they influence the treatment and care of inmates with mental illness in RHUs. Psychology Services Branch officials told us

---

132 The BOP's Chief Psychiatrist told us that there is no issue with general practitioners providing psychotropic medication since it's a practice in the community.

133 We did not evaluate the effectiveness of tele-psychiatry as part of this review.

that clinicians have to document that they discussed the treatment plan with the inmate; however, there is no documentation for the inmate to sign acknowledging discussion of his/her treatment.

The May 2014 policy also requires that "all inmates with mental illness in restrictive housing units (i.e., the SHU, SMU, and ADX) will receive, at a minimum, face-to-face mental health contacts consistent with the type and frequency indicated by their care level, to the extent feasible."  While our review of case files for inmates at MHCLs 2–4 suggests that contacts occur as frequently as policy requires, the policy also states, "Inmates are removed from their cells for private or extended interviews with Psychology and Psychiatry Services staff as a standard procedure."[134]  During our review of inmate case files, we found inconsistent documentation regarding whether inmates were removed from their cells for private or extended interviews.[135]  Specifically, some staff documented the location of private face-to-face interviews with inmates, whereas others did not.  One inmate also told us that psychology is "supposed to [make rounds], but whether they do or not is a whole other question… there's no consistency."[136]

According to Psychology Services Branch officials, documenting whether critical contacts occur inside an inmate's cell or outside of a cell in a private setting is a best practice but it is not required by policy.[137]  Whether the contact takes place inside or outside an inmate's cell, the officials further explained that the May 2014 policy requires that inmates be treated in a private setting.  However, the BOP's inability to track the location in which clinical contacts occur prevents the BOP from assessing the extent to which its policy goal to protect inmate privacy has been achieved and limits its ability to correct practices that are inconsistent with policy, which may limit the appropriate treatment and care afforded to inmates according to MHCL.

Inmates also had concerns regarding their continuity of care.  An inmate at an FMC told us that before she was taken to the SHU she had been participating in one-on-one counseling sessions with a Psychologist but that those sessions stopped after she entered the SHU.  While the May 2014 policy updated and refined

---

[134]  The May 2014 policy includes exceptions to private critical contacts and mental health treatment in cases in which the inmate is behaving in an aggressive manner or when institutional safety and security require an exception.  BOP Program Statement 5310.16, 16.

[135]  The CNA's review and assessment of BOP restrictive housing found that "very few of the monthly mental health assessments occur in private settings on a face-to-face basis."  The CNA recommended that BOP psychology and psychiatry staff completely reevaluate inmates' mental health records every 30 days and include a face-to-face interview in a private setting.  In the BOP's response to the CNA, the BOP did not specifically address private interviews between Health Services staff and inmates.  However, in the CNA's report, the CNA notes that the BOP's 2014 mental health policy addresses critical contacts in a private setting.  CNA, *Special Housing Review and Assessment.*

[136]  The May 2014 policy also states, "During rounds, all staff will make themselves available for brief conversations that demonstrate concern and their availability to provide assistance."  We further discuss institution staff rounds below.

[137]  According to policy, all critical contacts, regardless of an inmate's MHCL, will, to the extent possible, be conducted in a private area.  BOP Program Statement 5310.16, 15.

designation, transfer, and release procedures for inmates with mental illness, with an emphasis on continuity of care both across institutions and in the community, we found that it does not discuss the continuity of care for inmates with mental illness in RHUs.  According to Psychology Services Branch officials, if an inmate is in group therapy while in general population, the inmate can no longer participate in group sessions during his or her time in restrictive housing.  Despite the BOP's efforts to offer group therapy opportunities for inmates in restrictive housing, we found that inmates in restrictive housing may not receive continuous mental health treatment.  See below for more information regarding the BOP's secure residential mental health treatment programs.

*Mental Health Staffs Disagree on the Diagnoses More Often for Inmates with Mental Illness in RHUs, Which Can Affect the Treatment of Those Inmates*

Based on our review, we found that ensuring appropriate mental health treatment for inmates in RHUs is a challenge for the BOP.  Specifically, we found that differing clinical opinions among mental health staff, as well as staff not working collaboratively to diagnose mental disorders, could impact continuity of care.  These issues raise concerns as to whether inmates with mental illness are receiving appropriate care.

BOP policy states that all inmates must undergo an initial screening when they arrive at their designated BOP institution.  The screening is usually conducted by BOP Psychologists and, based on our review of 59 case files from the RHUs that we visited, with a few isolated exceptions, it is generally done in a timely fashion.[138] BOP officials told us that during the screening the mental health staff should identify an inmate's mental health disorders and, based on their evaluation, assess whether the inmate needs regular treatment to determine his or her MHCL.[139]  If the mental health staff disagrees with an inmate's previous diagnosis, BOP policy states that the Mental Health Treatment Coordinator or treating Psychologist attempts to reconcile differences; consults with other treatment providers, including the Health Services staff; performs a clinical interview; and observes the inmate's symptoms and behaviors in making a determination.[140]  The Chief of Mental Health Services told us that if a Psychologist makes a diagnosis that differs from the inmate's previous mental health diagnosis, that Psychologist must explain both the rationale for the new diagnosis and why it is inconsistent with the previous diagnosis.

According to mental health staff we interviewed, BOP providers disagreed with the prior diagnoses of approximately one out of five inmates.  Of the

---

[138]  Program Statement 5310.12, Psychology Services Manual (PSM) (March 7, 1995).  In August 2016, the BOP rescinded Program Statement 5310.12 and issued a revised PSM.  We did not assess the August 2016 PSM as part of this review.  See Appendix 2 for a summary of changes between the March 1995 and August 2016 PSMs.

[139]  One Chief Psychologist also told us that she will continue to monitor an inmate for up to 12 months after their initial screening before potentially changing the inmate's mental health diagnosis and that the screening of inmates does not conclude with the initial screening process.

[140]  BOP Program Statement 5310.16, 9.

29 mental health staff we interviewed, 26 (90 percent) told us they have disagreed with inmates' previous diagnoses that were documented by other institution staff.[141] While staff at every institution we visited reported diagnosis disagreements for inmates with mental illness, staff at the ADX, SMU, and secure residential mental health treatment program institutions reported higher rates of diagnosis disagreements for their inmate populations, with an average reported disagreement rate of 24 percent as opposed to 16 percent by staff from the remaining institutions we visited.[142] More frequent disagreements among the staffs for these inmate populations could negatively affect the continuity of care for these inmates.

Our case file reviews also confirmed instances in which mental health staff disagreed on the prior diagnoses of inmates placed in restrictive housing.[143] In one inmate's case file, the Psychologist had noted that she did not agree that the inmate met the criteria for Bipolar Disorder and reduced the inmate's care level to MHCL 1, thus discontinuing the inmate's treatment. In another inmate's case file, psychology records indicated that the inmate had previously been diagnosed with Psychotic Disorder (Not Otherwise Specified) and Borderline Intellectual Functioning. A different Psychologist did not identify any "significant mental health issues" during a subsequent mental health review and, consequently, reduced the inmate's care level to MHCL 1. Case file documentation for another inmate revealed that although Health Services believed that the inmate should be diagnosed with Schizophrenia (Paranoid Type), Psychology Services found "no evidence" of that disorder at the time and did not adjust the inmate's level of care. However, less than 3 months later, the inmate was transferred to an FMC after Psychology Services elevated the inmate to MHCL 4.[144] We further discuss

---

141 We did not include mental health staff we interviewed who were not qualified to independently diagnose inmates' mental disorders.

142 From the 29 mental health staff we interviewed, we based our calculations on quantifiable responses from 25 mental health staff. We believe that staff responses from ADX, SMU, and secure residential treatment program institutions (which house many former ADX inmates) may have been influenced by the disproportionately high concentrations of disruptive inmates managed under strict controls for prolonged periods of time.

143 Although we reviewed inmate case files, we could not use these documents to determine a reliable rate of conflicting diagnoses by mental health staff for several reasons. First, OIG staff are not professionally trained to determine whether diagnoses are conflicting or complementary. Second, there were institutional inconsistencies in the mental health documentation provided to us and diagnostic disagreements may have been noted in documents we did not receive or request, such as diagnostic reconciliations that may have occurred when the inmate was not in restrictive housing. Third, case file documents indicate the current diagnoses for inmates but generally do not show diagnoses that have been subsequently removed. Last, as we discuss in Appendix 1, we focused our review on case files from January 2014, 4 months before the new mental health policy was issued, until the most recent documentation available to us at the time of our site visit. Thus, we did not review these inmates' entire historical records of diagnosis and treatment while in BOP custody.

144 In response to a working draft of this report, the BOP stated that these are complex cases and that diagnostic discrepancies are common. Additionally, the BOP stated that research on the reliability of the DSM diagnoses finds relatively high rates of diagnostic discrepancies among community treatment providers. Finally, the BOP stated that diagnoses change over time and that

(Cont'd)

differences in clinical opinions between Psychology Services and Health Services later in this report.

Institution staff members offered a number of reasons that could account for some of the disagreements in diagnosis. A Staff Psychologist said that an inmate's Psychology Services Intake Questionnaire, used to screen the inmate upon arrival at a BOP institution, is not very thorough and can be difficult to confirm because information is self-reported. She added that, generally, BOP clinicians tend to over-diagnose inmates because they are not "unpacking the core" of inmates' mental health issues. She stated that large mental health caseloads prevent staff from screening inmates more comprehensively. A Psychology Services Branch official told us that BOP staff are able to identify inmates "where their symptoms are pretty prevalent" but acknowledged that the BOP does not have the resources to do an in-depth mental health evaluation of each inmate entering the BOP. Another Staff Psychologist told us that because mental health is fluid, even an accurate diagnosis could become inaccurate at a later point in time, which we recognize as contributing to clinical disagreements for inmates with mental illness.

We also found that differing clinical opinions between institutions' Health Services, including General Practitioners, Psychiatrists, and Psychology Services, contribute to conflicting diagnoses for inmates with mental illness.[145] Some Psychologists told us that these disagreements may be attributed in part to differences in each profession's education and mental health training.[146] One Psychologist told us that because some Health Services staff may not have extensive mental health training, certain words they hear from an inmate may lead them to conclude that the inmate must have mental illness. Another Psychologist said that Psychologists and Health Services staffs frequently disagree about complicated mental health cases, particularly when inmates are reporting different symptoms to different staff for personal gain (we discuss malingering later in this report).

In addition, we were told that Health Services and Psychology Services staffs do not always work collaboratively to diagnose inmates' mental disorders. A Deputy Chief Psychologist said that she disagrees with Health Services' mental health diagnoses up to 60 percent of the time and that her institution's Psychology

---

modifying a diagnosis is a requirement of good clinical care. Nevertheless, we believe that the level and nature of the discrepancies we found are potentially significant for the BOP in ensuring that it provides an appropriate level of care to inmates.

[145] In the BOP, Psychologists are primarily responsible for diagnosing and treating the mental disorders of inmates. However, Psychologists can share these responsibilities with General Practitioners and Psychiatrists, particularly when an inmate needs medication.

[146] Both General Practitioners and Psychiatrists go to medical school and become medical doctors who are licensed to diagnose mental illness and prescribe medications, including psychotropic medications. Psychiatrists generally receive more extensive and specialized mental health training than do General Practitioners. Psychologists are not medical doctors. They go to graduate school and earn a doctorate degree in psychology. They are trained to apply psychological assessments and testing for mental health diagnoses, but they generally are not licensed to prescribe medications without additional, specialized training.

Services and Health Services staffs were not working collaboratively. A Staff Psychologist at this institution told us, "I don't even know half the time who medical [Health Services] is." The Staff Psychologist added that Health Services was extremely short staffed, which contributed to this problem. A Chief Psychologist at another institution told us that her institution's Psychology Services and Health Services staffs had made no effort to reconcile discrepancies in BEMR-PDS for inmates with conflicting mental health diagnoses.[147] Because the two staffs may disagree on inmates' diagnoses, the treatment that Psychology Services provides may not be complemented with medications that, generally, only a qualified Health Services provider can prescribe. This may result in inmates receiving inadequate care, particularly in RHUs where disagreements may be more prevalent.

**While the BOP Has Taken Recent Steps to Mitigate Mental Health Concerns for Inmates in RHUs, Additional Actions Can Be Taken**

As discussed above, the BOP's 2014 mental health policy, intended to enhance mental health treatment for inmates, has nevertheless led to additional concerns that inmates in RHUs may not be receiving adequate mental health care. Still, during our review period, we found that the BOP has made efforts to mitigate mental health concerns for inmates in RHUs. The BOP has begun diverting inmates with serious mental illness from traditional RHUs into alternative programs such as secure residential mental health treatment programs. The BOP also has reduced the use of SHUs and the length of time that inmates are placed in them. While we believe these are positive steps, we found a number of areas that the BOP needs to further improve, such as by developing formal performance metrics to help measure the effectiveness of secure residential mental health treatment programs, improving the mental health training for RHU correctional staff, increasing the use of alternative sanctions to further prevent inmates with serious mental illness from being placed in restrictive housing, and developing guidance and training to discern and document malingering.

*The BOP Has Started to Implement Secure Residential Mental Health Treatment Programs as Alternatives to Traditional Restrictive Housing*

In October 2013, the BOP began transferring a limited number of inmates with serious mental illness from placement in RHUs, including SHUs, SMUs, and the ADX, to secure residential mental health treatment programs. These programs house inmates in a single-cell, modified therapeutic environment that requires all participants to live on the same unit and engage in treatment together.[148] Inmates have out-of-cell time for recreation or individual and group programming. These

[147] In 2014, the BOP merged the PDS, the system the Psychology Services staff uses, into the BEMR, which the Health Services staff uses. We were told that the BOP merged these systems in part to help facilitate a better working relationship between Psychology Services and Health Services. As a result, both staffs have access to each other's clinical notes and mental health diagnoses for BOP inmates at their institution.

[148] Secure residential mental health treatment programs are designed to reduce psychological symptoms, improve functioning, facilitate institutional adjustment, reduce incidents of misconduct, reduce the need for psychiatric hospitalization, and facilitate successful reentry into society. See DOJ, *FY 2016 Performance Budget Congressional Submission,* 38.

programs are generally viewed as being better environments for the treatment of inmates with mental illness than confinement in traditional RHUs.  In August 2015, the BOP had two such programs:  Secure Mental Health Step Down (Step Down) and Steps Toward Awareness, Growth, and Emotional Strength (STAGES).[149] However, slow inmate progression through these programs and limited resources such as staff and bed space create waitlists and prevent inmates with mental illness from availing themselves of these alternative treatment opportunities.

We found that an inmate with serious mental illness may be on a waitlist for a secure residential mental health treatment program because it could take years for an actively enrolled inmate to complete the program.  For example, Step Down was activated in October 2013 at USP Atlanta and currently operates in two facilities, including USP Allenwood, as a residential treatment program for inmates with serious mental illness and a history of violence.  As of October 2016, no inmate had completed the program despite its target duration of 18 months.[150]  The USP Atlanta staff told us that one of the biggest challenges with the program is identifying the appropriate custodial setting for inmates after they complete it.  The BOP's Chief of Mental Health Services said that the BOP wants to open a secure open unit into which inmates from the high security mental health Step Down program can transition.  Unfortunately, the lack of staffing and resources make it difficult for the BOP to expand this program.

Similarly, the Secure STAGES Program operates at one BOP institution for male inmates with serious mental illnesses and a primary diagnosis of Borderline Personality Disorder.  As of October 2016, Psychology Services Branch officials told us that there are currently 30–40 inmates on the waitlists for both Step Down and Secure STAGES.  The waitlists for these programs are a treatment concern because inmates awaiting placement are not receiving the level of care they would receive if they were enrolled in a mental health program.  BOP officials told us that the BOP's Central Office manages these waitlists on a one-in, one-out basis.

BOP officials told us that the BOP would like to expand its use of residential mental health treatment programs; but, as discussed above, limited numbers of staff and beds — according to BOP, a total of 67 as of November 2016 for the 2 programs — impacts the scalability of these programs.  For example, Step Down at USP Atlanta has the capacity for 30 participants but, as of August 2015, had staff available for only 21.[151]  Similarly, STAGES has the capacity for 18 participants but

---

[149]  BOP Program Statement 5330.11, Psychology Treatment Programs (March 16, 2009), contains policy, procedures, and guidelines for BOP psychological treatment programs, including mental health treatment programs such as Step Down units.  The program statement does not discuss secure residential mental health treatment programs.  See Appendix 2 for more information on psychological treatment programs established within Program Statement 5330.11.  For more information about the secure Step Down and STAGES Programs, see Appendix 3.

[150]  The program's 18-month target completion time assumes perfect inmate progress through each phase.

[151]  During our visit to USP Allenwood, Step Down was not yet fully activated.  As of November 2016, USP Allenwood's program had 30 inmates.

as of August 2015 had staff available for only 12.  The RSD Senior Deputy Assistant Director told us that the Psychology Services Branch considers a variety of factors in the development of these programs, including the recruitment of enthusiastic, highly skilled coordinators.  These programs are staff intensive, which makes it difficult for the BOP to staff them adequately.  For example, at the time of our fieldwork, the Step Down Program at USP Atlanta had a ratio of 4 staff to 21 inmates.  USP Atlanta had a Psychologist vacancy and only 2 Psychologists for the program's 21 inmates.[152]  In addition, a Psychologist told us that inadequate Correctional Officer staffing can affect the scheduling of inmate programming, adding that it is especially problematic due to staffing changes and requirements for many Correctional Officers to move inmates.  Nevertheless, according to the BOP, "these programs have demonstrated [their ability] to significantly reduce misconduct among program participants."[153]

Finally, the BOP does not have formal performance metrics for these programs.[154]  Staff for the Mental Health Step Down Program told us that measuring and tracking behavioral change is a challenge given that behavior is a human, subjective measurement.  BOP officials told us that potential performance measures for the STAGES Program are fewer suicide risk assessments, fewer disciplinary infractions, and a lower number of days of suicide watch.  Despite the inherent challenges, BOP officials told us that the BOP is developing a formal evaluation of these programs.

The expansion of these treatment programs is contingent on funding for mental health positions.  When we requested the costs associated with these programs, the BOP responded that it was "unable to break down the costs of the various programs within the Psychology Services Department (we do not have the capability to capture the cost to that level of detail)."  However, the Department has estimated that it would cost approximately $10 million to expand the programs.[155]  According to the BOP's Chief of Mental Health Services, this would enable the BOP to expand these programs to all security levels and to at least one female institution.  We believe that, in order to make informed decisions regarding the potential increased use and staffing for these alternative housing programs, the BOP needs to develop and implement metrics to assess their performance and cost.

---

[152]  In response to a working draft of this report, the BOP stated that the Step Down Program at USP Atlanta has a ratio of 5 mental health staff to 24 inmates.  There is a Program Coordinator, two Program Psychologists, and two Program Treatment Specialists.

[153]  DOJ, *FY 2016 Performance Budget Congressional Submission,* 36.

[154]  We did not evaluate the effectiveness of the Mental Health Step Down and STAGES Programs as part of this review.

[155]  The Department's January 2016 report on the use of restrictive housing "estimates that the expansion of these programs would cost in its first year approximately $5.843 million for staff and $4 million for building and facilities and modernization."  DOJ, *Use of Restrictive Housing,* 113.

Residential Mental Health Treatment Programs in State Departments of Corrections May Offer Insights to Help the BOP Improve Its Mental Health Treatment Program

As part of our review of the BOP's mental health treatment program, we researched the programs of eight state correctional systems. We found that six of the eight state systems have developed residential mental health treatment programs as alternatives to housing mentally ill inmates in traditional RHUs. Officials with Pennsylvania's Department of Corrections told us that they have Diversionary Treatment Units, which are secure units that provide expanded or personalized mental health services to inmates with serious mental illness who have committed disciplinary infractions. Inmates are allowed 20 hours of out-of-cell time per week, which can include recreation, group therapy, and private consultations with a Psychologist. Officials from the Massachusetts Department of Corrections told us that inmates with serious mental illness may be housed in a Secure Treatment Unit, which allows inmates 15 hours per week of out-of-cell clinical programming in addition to recreation. Four state officials told us that their programs have out-of-cell group therapy for high security inmates for 10–20 hours per week using "program security chairs or tables," which allow inmates to be safely restrained in a classroom setting.[156] Officials with the Washington State Department of Corrections told us that program security chairs were a "game changer" for providing treatment and programming for inmates. In contrast to the state systems that had security chairs, at BOP institutions we observed inmates with serious mental illness participating in out-of-cell group therapy using individual metal enclosures to separate them during group treatment.

*The BOP Has Reduced Its Use of SHUs*

As we discussed above, the frequency, duration, and conditions of confinement of restrictive housing can have significant adverse effects on inmates' mental health. We found that the BOP reduced the overall number of inmates, including but not limited to inmates with mental illness, placed in the SHUs by about 20 percent from FY 2010 to May 2015. The former CPD Deputy Assistant Director told us that the BOP accomplished this reduction through three initiatives. First, the BOP developed an investigative template that reduces the amount of time inmates are held in a SHU pending completion of a protective custody investigation.[157] Second, the BOP developed a daily, automated SHU report to

---

[156] The Department's January 2016 report stated: "In 2016, the Bureau expects to publish a final rule modifying 28 C.F.R. § 552.22(h) (4), thereby permitting the use of secure programming chairs. Once the revised rule is published, the Bureau intends to purchase 610 of these chairs, which would allow inmates to receive in-person educational and mental health programming in a less restrictive manner than currently used. The Bureau estimates that the one-time purchase of security chairs would cost approximately $1.7 million." DOJ, *Use of Restrictive Housing,* 116.

[157] To further reduce the placement of inmates in the SHU for non-punitive reasons, such as protective custody, CPD officials told us that in February 2014 the BOP developed the Reintegration Housing Unit at the Federal Correctional Institution (FCI) in Oakdale, Louisiana, which allows vulnerable inmates to be

(Cont'd)

assist BOP officials and institution Executive Staff, such as the Warden, in monitoring SHU inmate totals by institution. Third, the BOP has been training Disciplinary Hearing Officers (DHO) to consider administrative time served when determining sanctions for inmates who have committed a prohibited act.[158] The former CPD Deputy Assistant Director also told us that the BOP is revising its program statement on the Inmate Discipline Program and is considering whether to significantly reduce the maximum sanction for the greatest severity offenses.[159]

We visited FCC Terre Haute, which emphasized diverting inmates, including inmates with mental illness, from the SHU whenever possible.[160] Institution officials told us that if the Psychology Services staff identifies an inmate with a serious mental illness and a history of self-harming behavior during prior SHU placements, the staff may house the inmate in the general population while the discipline hearing is pending.[161] The institution's DHO said that BOP policy does not restrict him from imposing alternative sanctions if the Psychology Services staff expresses concerns about SHU placement. Rather than placing an inmate in the SHU, the DHO may impose a monetary fine, which he said had been a particularly effective deterrent; confiscate the inmate's property; or restrict the inmate to his cell. At the

---

placed into less restrictive settings through state placement and reintegration into the general population. However, in January 2016, the Department reported that this program does not accept inmates who require "substantial medical or mental health treatment." DOJ, *Use of Restrictive Housing,* 24.

[158] The Department's January 2016 report, *Use of Restrictive Housing,* recommended that the BOP revise its written policies for the Inmate Discipline Program to require that time spent in administrative detention status pending investigation be credited toward any term of disciplinary segregation status imposed for that violation. According to the Department's "180-day Status Report," the BOP revised its internal document to require that all disciplinary investigations be completed within 30 days, absent compelling circumstances.

[159] The BOP stated that this effort was partly in response to the CNA report, which stated that the BOP should "establish by policy that a sanction of restrictive housing time should be issued retroactive to the date of the original admission, providing credit for time served." See CNA, *Federal Bureau of Prisons: Special Housing Unit Review and Assessment* (December 2014).

The Department's January 2016 report, *Use of Restrictive Housing,* also recommended that the BOP reduce its maximum sanction to 60 days for a first offense and 90 days for a subsequent offense. The Department recommended that the BOP provide guidance that, ordinarily, DHOs should impose concurrent sentences for disciplinary violations arising from the same episode and that the BOP should prohibit SHU placement for all low level and first-time moderate level offenses. According to the Department's "180-day Status Report," maximum penalties are codified in the Code of Federal Regulations and any changes would require formal rulemaking. The Department is reviewing a draft Notice of Proposed Rulemaking, which is expected to be issued for public comment in the near future.

[160] According to the BOP's revised SHU policy, the BOP now prohibits SHU placement for inmates whom mental health staff have designated at MHCL 3 or 4, who have a psychology alert in SENTRY (the BOP's primary mission support database), or who have been identified on the monthly SHU advisory (Hot List) unless the inmate presents an immediate or serious danger to self, staff, or the orderly operation of a facility. In the event that an inmate who meets one of these criteria is placed in the SHU, Psychology Services staff should be notified and should conduct a mental health evaluation within 24 hours of placement. See BOP Program Statement 5270.11, Special Housing Units (November 2016), 15–16.

[161] During our site visit, the institution's DHO told us that there were approximately 100 inmates pending a disciplinary hearing who were currently placed in the SHU under administrative segregation status.

time of our visit, only five inmates were in the institution's SHU for disciplinary segregation, which the DHO attributed to his use of alternative sanctions.[162]  The former CPD Deputy Assistant Director said that DHOs have always had the discretion to deny inmate privileges in lieu of imposing SHU time.  Based on our observations and the DHO's statements, we believe that the BOP should consider policies that encourage the use of alternative sanctions when appropriate to further prevent inmates with mental illness from placement in restrictive housing.

Also at FCC Terre Haute, the acting Complex Warden told us that during SHU meetings, which are held to review inmates' continued placement in the SHU, the staff first discusses inmates based on length of time in the SHU rather than in alphabetical order, which is intended and helps to prioritize discussions on whether these inmates can be returned to the general population.  The acting Complex Warden also stated that, for transfer inmates who are routinely placed in SHU on "Holdover Status," staff will work to determine which inmates can be safely released to the general population while pending transfer to their designated institution.

By contrast, we found that the BOP routinely places holdover inmates in SHUs as a standard practice, despite the potential mental health concerns attributed to placing inmates in restrictive housing.  At FCC Petersburg, we observed that holdover inmates were all housed in its SHU while awaiting transfer.[163]  The Chief Psychologist at the time of our visit told us that holdover inmates with mental illness can become particularly problematic for staff and that her institution receives holdover inmates who have serious mental illness.  She estimated that they may be single-celled in the SHU for up to 3 weeks.  Although the staff physically places inmates with serious mental illness at the front of the SHU so they can be monitored more closely, she acknowledged that SHU placement can be detrimental to these inmates' mental health and may also compromise the SHU staff's safety.  She added that her institution receives holdover inmates who are new to the BOP and, as a result, the Psychology Services staff has little information about their mental health and generally does not provide intake screenings for inmates in holdover status.[164]  We believe that the BOP can improve

---

[162]  At the time of our site visit, the USP Terre Haute SHU also housed its FCI SHU inmates due to construction.  This was also a factor that contributed to the DHO's alternative sanctions because the USP's SHU was normally full with both medium and high security inmates.

We note that as of May 30, 2015, this institution had the most MHCL 3 inmates in its SHU compared to all other BOP institutions.  According to BOP policy, MHCL 3 represents inmates with serious mental illness.  At the time of our site visit, we also interviewed multiple inmates who had serious mental illness and were currently in the SHU.  However, as discussed earlier, because we believe that the BOP's new mental health care policy (BOP Program Statement 5310.16) may have affected some inmates' MHCL designations, it is difficult for us to compare and contrast BOP institutions.  We also recognize that FCI inmates placed in the USP's SHU may have skewed the data.

[163]  At the time of our site visit, the SHU Lieutenant stated that there were approximately 35 holdover inmates housed in the institution's SHU.

[164]  BOP policy states that, for individuals in holdover status, a preliminary screening by a Physician's Assistant is sufficient, unless a significant problem is identified.  Inmates referred to Psychology Services following their preliminary medical screening are supposed to be evaluated promptly by a Psychologist.  See BOP Program Statement 5310.12, ch. 4, p. 3.

its handling of holdover inmates to further prevent inmates with mental illness from being placed in restrictive housing when it may not be necessary.

The BOP Has Made Particular Progress in Reducing Lengthy SHU Placements

In addition to reducing overall SHU use by about 20 percent since FY 2010, we found that the BOP has reduced by 58 percent the total number of inmates placed in a SHU for at least 150 consecutive days and these inmates' average number of days housed in the SHU by almost 10 percent. Specifically, 1,862 inmates were housed in SHUs for at least 150 consecutive days, with an average duration of 296 consecutive days, at the end of FY 2010.[165] By the end of FY 2014, the BOP had reduced this population to 780 inmates housed in SHUs for at least 150 consecutive days, with an average stay of 268 consecutive days. (See Table 6.)

**Table 6**

**Inmates in a SHU for at Least 150 Consecutive Days FY 2010 through FY 2014**

| | FY 2010 | FY 2011 | FY 2012 | FY 2013 | FY 2014 | % Change FY 2010 – FY 2014 (+/-) |
|---|---|---|---|---|---|---|
| **No. of Inmates in a SHU for at Least 150 Consecutive Days** | **1,862** | **1,871** | **2,072** | **1,197** | **780** | **-58.11 %** |
| **Average No. of Days in a SHU** | **296** | **280** | **291** | **285** | **268** | **-9.46 %** |

Note: This table includes all inmates who were continuously placed in a SHU for at least 150 days as reported by the BOP's dashboard, which does not specifically identify inmates with mental illness.

Source: OIG analysis of BOP data

In addition to reducing the overall use of SHUs and the incidence of particularly lengthy SHU stays, the BOP has implemented a number of other actions that are directly targeted at helping monitor and mitigate mental health concerns for inmates in RHUs:

- The Psychology Services staff must conduct a Psychology Services Review after every 30 days of continuous SHU placement for every inmate, regardless of MHCL.[166]

---

[165] We requested that the BOP apply its SHU dashboard to previous fiscal years to assess inmates who were in comparably prolonged periods of SHU confinement. As mentioned earlier, the BOP developed this dashboard after the new mental health care policy to notify institutions' staff of inmates who may be due for their required Extended Restrictive Housing Placement Review. We were told that inmates, as detailed in Table 6, from FY 2010 through FY 2013, did not receive these reviews because former BOP policies did not require them.

[166] Based on our case file reviews of inmates with mental illness in RHUs, we found that Psychology Services Reviews were conducted within the timeliness standards detailed by policy. However, contrary to policy, we found that the Psychology Services staff at the ADX did not always document the threat the inmate posed to self, staff, and other inmates. Our case file reviews indicated that the BOP had developed standardized default fields for SHU and SMU reviews to capture this information but ADX reviews did not incorporate these standardized data fields, which we believe contributed to this issue.

- The Psychology Services staff may also place inmates with mental illness on the monthly advisory (Hot List) in the BOP's SHU Application to alert correctional staff of those who "could potentially cause a problem if placed in SHU."[167]

- If restrictive housing appears to affect an inmate's mental health, the Mental Health Treatment Coordinator is required to work with the CCARE team to "mitigate the negative impact or identify an appropriately secure alternative placement."[168]

The BOP distributes among various staff members the responsibility for monitoring inmates in RHUs.[169]  The May 2014 mental health policy states that all staff are required to make themselves available to RHU inmates for brief conversations and demonstrate concern and availability to provide assistance.[170] The former CPD Deputy Assistant Director said that Correctional Officers must make RHU rounds every 30 minutes, a supervisor must visit with each RHU inmate during every shift, and the Captain must visit with each RHU inmate every week.[171] Finally, institution staff told us that the Executive Staff, including the institution's Warden, Associate Wardens, Captain, Chief Psychologist, and Health Services staff, make weekly RHU rounds.[172]

*The BOP Has Taken Steps to Address Mental Health Staffing Shortages*

Despite staffing challenges, we found that the BOP has sought to increase the mental health services it provides to inmates, including those in RHUs.  BOP officials told us about and we observed some steps that the BOP has taken, or is in the process of taking, to meet inmate treatment requirements, including efforts to increase pay for BOP Psychiatrists, hiring regional health service recruiters, as well as program initiatives (detailed below) intended to improve psychology services throughout the BOP.  The BOP's FY 2016 budget submission requested

---

[167] While only the Psychology Services staff may edit the SHU Application's Hot List, all SHU staff members can see it and become aware of potential issues.  Further, the SHU Application includes some information from BEMR-PDS so that the correctional staff can see when the Psychology Services staff last visited with an inmate.  We found that the correctional staff with whom we spoke were aware of the Hot List, and they told us that they are required to review it at least monthly.  They also stated that the Hot List may be distributed to them in an email and may be posted in the applicable RHU.

[168] BOP Program Statement 5310.16.

[169] The Department's "180-day Status Report" stated that the BOP is developing a training program called "Core Correctional Communications," which is intended to enhance communications between Correctional Officers and inmates.  The BOP is conducting pilot training and plans to expand the program to all of its institutions by the end of 2017.

[170] BOP Program Statement 5310.16

[171] We did not review BOP documentation to assess RHU rounds by the correctional staff. However, Correctional Officers told us that they make irregular 30-minute rounds to monitor inmates.

[172] Inmates told us that Executive Staff make rounds on a weekly basis.  Executive Staff rounds are recorded in a logbook that all staff members must sign as they enter the unit.  The RHU logbook records the staff member's name, times of entry and exit, and the reason for the visit.  We could not use the logbook to verify whether or not the Executive Staff walked each RHU range and made themselves available to each inmate on that range because these actions can be verified only through observation.  As a result, we did not review RHU logbooks.

130 additional mental health positions, mostly Psychologists, to address staffing concerns.  However, the BOP did not receive its requested positions and Psychology Services Branch officials told us that the BOP was not anticipating additional funding in FY 2017.[173]  Additional steps taken or underway include:

- **SHU Pilot Program.**  According to BOP officials, the pilot program was initiated at six high security institutions in which a Restrictive Housing Psychologist will be designated to the SHU.  The program was intended "to increase the treatment of SHU inmates and evaluate an inmate's need for placement in SHU" with individualized interventions based on inmate needs.  As of October 2016, the BOP had filled five of six pilot program positions.

- **Psychology Internship Program.**  The Pre-Doctoral Psychology Internship Program allows Pre-Doctoral students to complete their 1 year of internship at a BOP institution.  The program, which the BOP indicates predates and was expanded prior to the May 2014 policy, includes student loan repayment as an incentive for individuals interested in working for the BOP.[174]

Though we acknowledge these positive steps in attempting to address mental health staffing shortages, we believe that the BOP needs to do more to ensure that inmates with mental illness, including those in restrictive housing, receive care consistent with its May 2014 policy.

*The BOP Needs to Improve Mental Health Training for Its Correctional Staff*

As stated above, various staff members, including correctional staff, monitor inmates in RHUs.  During our site visits, BOP Psychology Services staff told us that they provide suicide prevention training to SHU staffs on a quarterly basis, in addition to the annual refresher training on mental health that all staff receive.[175] An ADX Correctional Officer told us that the annual refresher training covers erratic behaviors, changes in behavior, and how to report and document these observations.  However, a SHU Lieutenant suggested that annual refresher training could be improved by incorporating de-escalation techniques to help the correctional staff learn how to calm inmates with mental illness who become distressed.  Further, while all correctional staff we interviewed said they had received annual refresher training, several RHU correctional staff could not speak to any specific information related to the training's mental health content.

---

[173]  See DOJ, *FY 2016 Performance Budget Congressional Submission.*

[174]  We spoke to a Psychologist who started her career with the BOP as a Pre-Doctoral Psychology Intern.  She later became a Staff Psychologist, was promoted to Advanced Care Level Psychologist, and is now an Internship Coordinator.  Several Psychologists told us that the internship program is a good recruitment tool for the BOP.

[175]  The BOP's revised SHU policy mandates that correctional staff must complete quarterly SHU trainings prior to each quarter, regardless of prior completions, and includes training content in dealing with inmates who have mental illness.  See Program Statement 5270.11, 17.

According to BOP policy, additional mental health specialty training will be made available in select MHCL 2–4 and administrative institutions.[176] During our site visits, staff at two BOP secure residential mental health treatment program institutions told us that they had received specialized mental health training to better manage inmates with mental illness in restrictive housing.[177] However, we found that staff at other BOP institutions who work with inmates with serious mental illness in RHUs had not received this specialized training. One Correctional Officer who has worked extensively with MHCL 4 inmates in restrictive housing stated that he has been provided with only RHU-specific suicide training in addition to basic SHU training. A Chief Psychologist at a Care Level 3 complex told us that he was unaware of the specialized mental health training referenced in BOP policy. BOP policy states that "to support this specialized training, adequate Psychology Services staffing must be in place" at these institutions. Despite the policy providing for such training in select MHCL 2–4 and administrative institutions, the BOP's inadequate mental health staffing has affected the Psychology Services Branch's ability to provide specialized training to correctional staffs working in RHUs who are responsible for monitoring the behavior of inmates, including many with mental illness.[178] Psychology Services Branch officials told us that due to the lack of additional funding the BOP has not required that specialty training be provided to any institution staff. As of October 2016, specialty training was offered at some FMCs and MHCL 2 and 3 institutions.

*The BOP Lacks Guidance and Training for Determining and Documenting When an Inmate's Symptoms May Not Be Genuine, Which May Affect Inmates in Restrictive Housing*

We found that the BOP does not have guidance or training for staff in determining and documenting when an inmate's symptoms may not be genuine, a behavior commonly known as malingering.[179] Because malingering is classified as a

---

[176] BOP policy states that the "Mental Health Specialty Training will include 24 hours of specialized mental health training, including suicide prevention, understanding mental illness, cultural diversity and sensitivity, psychiatric medications, behavior management principles, confidentiality, communication skills, de-escalation skills, and building collaborative relationships." See BOP Program Statement 5310.16, 22.

[177] During our site visit to USP Atlanta's secure residential mental health treatment program, a staff member, who had worked in this RHU for nearly 2 years, told us that although additional, specialized mental health training was provided to correctional staff initially assigned to this RHU, this training had not been provided on a recurring basis. As a result, correctional staff who rotate into this RHU did not receive the more extensive, specialized mental health training and, consequently, this staff member did not believe they are adequately trained to work in this RHU.

[178] According to the Department's "180-day Status Report*,"* the BOP has begun training that incorporates the "Guiding Principles," established in the Department's January 2016 report on restrictive housing, into curricula for quarterly and annual training programs for staff assigned to SHUs and to Wardens, Associate Wardens, Captains, Lieutenants, and new Correctional Officers.

[179] Malingering is the intentional production of false or grossly exaggerated physical or psychological problems and, usually, is the result of an individual's external motivations. Malingering is not considered a mental illness but should be suspected when there is a discrepancy between the

(Cont'd)

behavior and not a mental disorder, BOP policy does not require staff to document malingering when they observe it.[180] Consequently, staff use their own discretion to document malingering and inmates with legitimate mental illness may continue to be placed in RHUs for longer periods of time without receiving the treatment they need.

According to BOP data, at the end of FY 2014 there were 430 inmates, or less than 1 percent of the BOP's total inmate population, for whom staff chose to document malingering. But such reporting is not required, as discussed above, and feedback that the OIG received from BOP staff strongly suggests that it may not accurately reflect the prevalence of malingering throughout the BOP. For example, staff at USP Lewisburg told us that malingering is widespread in the SMU inmate population. The text box provides an example of an inmate who staff believed was malingering, who was taken off previously prescribed medications but was later removed from the SMU because of mental health reasons.

**Challenges for SMU Staff in Determining When an Inmate's Symptoms May Not Be Genuine**

According to an inmate's case file, he was diagnosed with three mental disorders when he arrived at the SMU and was prescribed one antipsychotic medication and one medication to reduce the side effects of antipsychotic treatment. The inmate previously had been diagnosed with five mental disorders and prescribed a variety of medications during his incarceration at other BOP institutions.

Nine months after arriving at the SMU, the inmate was removed from his medications after the SMU Psychologist determined that his behavior was malingering rather than genuine symptoms of mental disorder. The Psychologist's notes state, "Despite the litany of diagnoses and psychiatric medications [the inmate's] contacts with psychology staff indicate a clear history of malingering and feigning symptoms to change conditions of his confinement." The inmate "has not exhibited nor reported any mental health symptoms indicative of an acute mental health disorder, although he has repeatedly engaged in disruptive behaviors as well as malingered suicidality in an attempt to regain his medications." Two months later, two of the inmate's three mental disorders were classified as no longer current. Nevertheless, 3 months after the inmate was removed from his medications, and 1 year after the inmate entered the SMU program, the inmate was transferred out of the SMU for mental health reasons.

Source: BOP inmate case file

According to the Administrator of the Psychology Services Branch, mental health staff should be "conservative about attaching that label [malingering] to anyone because once it's in the record, it can really color other peoples' judgment about the inmate." Institution staffs told us that they rely on their prior clinical training, correctional experience, or even a "gut feeling" to determine whether an inmate's symptoms are real or the inmate may be malingering. One Clinical

---

individual's claimed distress and the clinician's objective findings, a lack of cooperation during evaluations and in complying with prescribed treatment, or if the individual has been diagnosed with Antisocial Personality Disorder. See Medscape.com, "Malingering Clinical Presentation," http://emedicine.medscape.com/article/293206-clinical (accessed June 7, 2017).

[180] Therefore, we could not use BOP data to determine the prevalence of malingering throughout the BOP or RHUs or to assess BOP or RHU trends of malingering.

Director told us that it would be useful for the BOP to issue guidelines or training that explains how to deal with malingering inmates because it is a "big problem in the institutions" and many inmates are simply seeking medication.  Yet, BOP officials cautioned us about the risks of providing guidance to staff to assess malingering.  The Chief of Mental Health Services cautioned:

> We want to make sure that our staff [doesn't] find malingering when it's actually not there.  If you're working in a stressful environment with difficult inmates, it can be easy to dismiss someone.  You could be at risk to dismiss someone as malingering so you can get them off your caseload and not have to deal with them.  So, I think what we focus on is making accurate mental health diagnosis for true disorders and recognizing that yes, someone can have a serious mental illness and malinger.

BOP officials offered alternatives to guidance on malingering.  A Senior Deputy Assistant Director from the RSD said that the BOP could provide staff with webinar trainings on using a psychology assessment tool known as the Structured Interview of Reported Symptoms to better accurately assess inmates' symptoms.[181] While training to assess whether mental health symptoms are genuine could assist mental health staff, we question whether, without careful guidance and consideration, inmates with legitimate symptoms of mental illness will be dismissed as malingerers by overworked RHU mental health staff.

---

[181]  The BOP also employs Forensic Psychologists, who are licensed and have more specialized training in malingering because, as part of their job duties, they screen the mental health of defendants in criminal cases who could have a strong incentive to malinger symptoms of mental illness.  However, most BOP Psychologists are not Forensic Psychologists.  According to Psychology Services Branch officials, up to 40 percent of BOP Psychologists are unlicensed.

In response to a working draft of this report, the BOP stated that in order to be hired as a BOP Psychologist, an individual must have a doctoral degree in clinical or counseling psychology from an accredited university, which fully qualifies him or her to diagnose mental disorders regardless of licensing status.  Nevertheless, we believe that many BOP mental health services staffs, both Health Services and Psychology Services staffs, may benefit from receiving more specialized training in screening inmates for genuine mental illness.

# CONCLUSION AND RECOMMENDATIONS

## Conclusion

The BOP's mission is to protect society by confining federal offenders in correctional facilities that are safe, humane, cost-efficient, and secure, and to provide reentry programming to ensure inmates' successful return to the community. While in the BOP's custody, inmates at times may have to be placed in Restrictive Housing Units (RHU) to ensure the safety and security of inmates and staff. However, studies show that the frequency, duration, and conditions of confinement of restrictive housing, even for short periods of time, can have a significant impact on inmates' mental health and can be particularly harmful for inmates with mental illness. The BOP has taken some measures to improve the treatment of inmates with mental illness in its institutions and to monitor all inmates who are housed in RHUs. However, we believe that significant additional steps are required to screen, treat, and monitor inmates with mental illness in these restrictive environments, especially those in single-cell confinement. The lack of policies to adequately address conditions of confinement that amount to solitary confinement may result in inmates having limited human contact and out-of-cell opportunities, which research suggests may negatively affect their mental health. We have identified several areas of concern with regard to the frequency, duration, and conditions of confinement for inmates with mental illness in RHUs.

First, BOP data shows, and we observed, inmates with mental illness housed in traditional RHUs, such as Special Housing Units (SHU), Special Management Units (SMU), and the U.S. Penitentiary Administrative Maximum Security Facility (ADX), as well as other forms of restrictive housing, for long periods of time and in conditions that could constitute solitary confinement. We also found that the BOP cannot determine how many of its inmates are placed in single-cell confinement because it does not track this information.

Moreover, although the BOP monitors all inmates' *consecutive* days in RHUs, it does not monitor inmates' *cumulative* time in RHUs, including the SHUs that house over 80 percent of BOP's restrictive housing population. Also, inmates with mental illness spend disproportionately longer periods of time in restrictive housing than do their peers. The OIG's analysis of BOP data shows that inmates with mental illness at both the SMUs and the ADX spent about 14 to 17 months longer in these RHUs than what the BOP reported for all inmates in these RHUs.

Additionally, we found that the BOP does not sufficiently track or monitor inmates with mental illness, including those in RHUs. BOP mental health officials estimated the percentage of inmates who have mental illness as significantly higher than what BOP data indicates. We believe that the prevalence of mental illness throughout the BOP is likely underreported because institution staffs do not always document inmates' mental health diagnoses. Also, because over 90 percent of BOP inmates are designated at Mental Health Care Level 1 and are not required to have a mental health diagnosis, the BOP cannot differentiate between inmates who may have undocumented mental illness and inmates who simply do not have any mental disorders. Consequently, the BOP cannot accurately determine the number of

inmates, including those in RHUs, who have mental illness or ensure that it is providing appropriate treatment to all inmates with mental illness.

Although the BOP issued a policy in 2014 intended to enhance mental health treatment for inmates, including inmates in RHUs, it does not appear that the BOP has provided sufficient staffing to implement the new policy effectively.  To the contrary, the OIG found that after the new policy was issued, BOP mental health staff reduced the number of inmates required to receive regular mental health treatment by approximately 30 percent.  Based on our analysis of BOP data and feedback from institution staffs, we are concerned that the number of inmates required to receive regular treatment decreased substantially following the BOP's adoption of the 2014 policy and, as a result, the treatment for many inmates with mental illness, including those in RHUs, may have been discontinued.

In addition, shortages of Psychologists and Psychiatrists throughout the BOP may also affect the treatment provided to inmates with mental illness, including those in RHUs.  Staffing challenges can contribute to conflicting mental disorder diagnoses, which can also affect the continuity of care for inmates.

We identified a number of issues with U.S. Penitentiary (USP) Lewisburg's SMU program in particular, which is concerning since this SMU is the BOP's most populated RHU and, as of June 2016, confined over 1,100 inmates.  Among the issues we identified, we found that since the BOP issued its new mental health policy, SMU staff downgraded the level of care for a disproportionate number (56 percent) of SMU inmates and, as a result, some inmates may not receive necessary mental health care.  In addition, inmates with mental illness are in the SMU significantly longer than their peers and longer than the program's intended duration.  Further, misleading SMU performance metrics may compromise the BOP's oversight of the program and inaccurately reflect the circumstances of inmates who have been in the SMU.  Moreover, USP Lewisburg's aged infrastructure, including its undersized cells with poor ventilation that do not meet generally accepted standards, could adversely affect the conditions of confinement for all SMU inmates and may be particularly harmful for inmates with mental illness who can spend years in this SMU.

Finally, while the BOP has taken steps to remove inmates from placement in traditional RHUs and to mitigate mental health concerns for inmates in RHUs, we found a number of areas that continue to need improvement.  The BOP needs to develop meaningful performance metrics to help measure the effectiveness of its secure residential mental health treatment programs.  We found that some state corrections systems have developed variations of residential mental health treatment programs with potential efficiencies that we believe the BOP should consider.  Further, the BOP should improve the mental health training for RHU correctional staff, explore the potential to increase the use of alternative sanctions to further prevent inmates with mental illness from being placed in restrictive housing, and provide additional guidance and training to mental health staff to determine whether mental health symptoms are genuine and to document malingering.

## Recommendations

To ensure that inmates, including those with mental illness, are placed in restrictive housing under conditions of confinement that adhere to specific standards that are applied consistently and sustain appropriate mental health care, we recommend that the BOP:

1. Establish in policy the circumstances that warrant the placement of inmates in single-cell confinement while maintaining institutional and inmate safety and security and ensuring appropriate, meaningful human contact and out-of-cell opportunities to mitigate mental health concerns.

2. Define and establish in policy extended placement in measureable terms.

To ensure that inmates receive appropriate mental health care and are sufficiently tracked and monitored during their placement in restrictive housing, we recommend that the BOP:

3. Track all inmates in single-cell confinement and monitor, as appropriate, the cumulative amount of time that inmates with mental illness spend in restrictive housing, including single-cell confinement.

4. Identify all forms of restrictive housing utilized throughout its institutions and ensure that all local policies are updated to reflect standards for all inmates in restrictive housing consistent with established nationwide policies.

5. Evaluate and limit as appropriate the consecutive amount of time that inmates with serious mental illness may spend in restrictive housing.

6. Ensure that the Psychology Services staff documents inmates' mental illness diagnoses in the Bureau's Electronic Medical Record System and Psychology Data System.

7. Reassess the Mental Health Care Level system to ensure that it fully captures the mental health needs of inmates, including inmates in restrictive housing, and that classifications distinguish between inmates who have some form of mental illness and those who do not have any form of mental illness.

8. Regularly monitor, by institution and type of Restrictive Housing Unit, trends in inmates' designated Mental Health Care Levels to further assess the factors that affect the treatment of inmates with mental illness.

9. Determine what additional steps can be taken to prioritize and incentivize the hiring of mental health staff at institutions that have inmates with mental illness in long-term restrictive housing.

To improve the BOP's efforts to mitigate the placement of inmates with mental illness in traditional RHUs and enhance the effectiveness of secure residential mental health treatment programs, we recommend that the BOP:

10.     Assess the scalability of secure residential mental health treatment programs and develop alternatives to address their potential limitations.

11.     Develop and implement formal performance metrics sufficient to measure the effectiveness of secure residential mental health treatment programs.

12.     Survey institutions and/or take other steps to identify alternative practices that reduce the frequency and duration of the placement of inmates with mental illness in restrictive housing, and implement such alternatives when appropriate.

13.     Provide additional mental health training to correctional staff who are responsible for monitoring the behavior of inmates in restrictive housing.

14.     Provide additional guidance and training to mental health staff on diagnosing mental illness, including guidance on documenting malingering behavior by inmates.

To address concerns regarding inmates with mental illness at USP Lewisburg's SMU, we recommend that the BOP:

15.     Conduct a comprehensive review of U.S. Penitentiary Lewisburg's Special Management Unit that addresses the staffing, treatment, conditions of confinement, and performance metrics of the program.

# METHODOLOGY OF THE OIG REVIEW

## Standards

The OIG conducted this review in accordance with the Council of the Inspectors General on Integrity and Efficiency's *Quality Standards for Inspection and Evaluation* (January 2012).

## Data Analysis

*Inmates with a History of Mental Illness*

The OIG used BOP data from the end of FY 2014 to determine the number of sentenced inmates whom the BOP had diagnosed with mental disorders. The BOP provided us with inmate mental disorders that were documented in the Bureau's Electronic Medical Record System and Psychology Data System (BEMR-PDS) for every BOP inmate within our scope.[182] Each BOP inmate had one data row with corresponding columns that were populated with as many mental disorders as applicable, since many inmates had multiple mental health diagnoses. Table 7 is a condensed version of actual mental illness data for a sample of four anonymous BOP inmates. Based on BOP data in this table, Inmate A did not have any documented diagnoses while Inmate B had one, Inmate C had three, and Inmate D had two.

**Table 7**

**BOP Inmate Mental Illness Data**

| BOP Inmates | MHCL | Mental Health Illness | | |
|---|---|---|---|---|
| | | 1 | 2 | 3 |
| A | 1 | | | |
| B | 2 | Bipolar I Disorder – Most Recent Episode Depressed | | |
| C | 4 | Antisocial Personality Disorder | Psychotic Disorder Not Otherwise Specified | Personality Disorder Not Otherwise Specified |
| D | 2 | Mood Disorder Not Otherwise Specified | Psychotic Disorder Not Otherwise Specified | |

Notes: MHCL = Mental Health Care Level. The BOP data also included the date the BOP diagnosed the inmate with the mental disorder; the status of the diagnosis (current, remission, or resolved); and the date the inmate's status was documented in BEMR-PDS. We did not include these categories in this table.

Source: BOP data

Because we asked the BOP to provide all mental illness diagnoses in a sequential order beginning in the "Mental Health Illness 1" data field, we were able to use this data field to filter out all of the inmates who did not have any documented diagnoses and determine the number of inmates with a documented

[182] We excluded chemical dependency (substance abuse) diagnoses from our data request.

history of mental illness (18,066 inmates).  In doing so, as discussed in the report, we found that there were 968 inmates who were designated at Mental Health Care Levels (MHCL) 2–4 who did not have any corresponding diagnoses documented in the data.[183]  Because these 968 inmates were designated at MHCLs 2–4, we knew they had to have a history of mental illness.  As a result, we added this inmate total to the 18,066 inmates with a documented history of mental illness to determine that at least 19,034 inmates, or approximately 12 percent of the BOP's total inmate population, had a history of mental illness.[184]

*Inmates with a History of Mental Illness by Restrictive Housing Unit Type, FY 2014*

We used BOP mental illness data from the end of FY 2014, as well as BOP population snapshot data, to determine the number of sentenced inmates whom the BOP had diagnosed with mental disorders and who were in Restrictive Housing Units (RHU).  In addition to the mental illness data discussed above, the BOP also provided us with Special Housing Unit (SHU), Special Management Unit (SMU), and U.S. Penitentiary Administrative Maximum Security Facility (ADX) population snapshot data from the end of FY 2010 through FY 2014, as well as for May 30, 2015.  The BOP's mental illness dataset and its SHU, SMU, and ADX population datasets included the inmates' full name, gender, and unique BOP registration number.  Using the BOP's inmate registration numbers, we matched all 397 ADX inmates; all 1,248 SMU inmates; and 94 percent of all SHU inmates (8,166 out of 8,667) who were in these RHUs at the end of FY 2014 to BOP mental illness data from the end of FY 2014.  Using this methodology, we determined that 37 percent of ADX inmates (146 out of 397); 27 percent of SMU inmates (331 out of 1,247); and 21 percent of SHU inmates (1,651 out of 7,980) had a BOP-documented history of mental illness.[185]

---

[183]  As we discussed above, the BOP's Chief of Mental Health Services told us that these inmates did not have diagnoses in the BOP data provided to us because BOP staff did not enter any mental health diagnoses into BEMR-PDS; staff entered diagnoses into BEMR-PDS with different diagnostic codes that were not provided to us; or staff manually entered diagnoses as free text rather than selecting diagnoses from a drop-down menu, which resulted in the diagnoses not being captured when the BOP extracted this information.

[184]  In this report, an inmate with a history of mental illness is defined as any inmate who has at least one BOP diagnosis — either current, in remission, or resolved — documented in BOP data.  Also, as discussed in the report, we did not include inmates in our count who had undergone an initial mental health records review, were given a tentative MHCL designation by the BOP's Designation and Sentence Computation Center, but had yet to be examined, in person, by a mental health clinician.

[185]  Because we were able to match only 94 percent of all SHU inmates (8,166 out of 8,667) at the end of FY 2014, we cannot comment on the prevalence of documented mental illness among the 501 inmates whom we were unable to match.  Additionally, while we successfully matched 8,166 SHU inmates with BOP mental illness data, 186 of these inmates had yet to be examined, in person, by a mental health clinician.  Thus, we also excluded these inmates from our analysis.

Furthermore, while we successfully matched all 1,248 inmates at the SMU, we excluded 1 inmate from our analysis because this inmate had yet to be examined, in person, by a mental health clinician.  We therefore determined the prevalence of documented mental illness among 1,247 SMU inmates.

*Mental Health Care Level Changes for Sample RHU Inmates*

We selected a sample of 688 RHU inmates designated at MHCLs 1–4. This sample included inmates selected from BOP population snapshot data:

- all 239 SMU inmates who were designated at MHCLs 2–4 at the end of FYs 2012, 2013, 2014, and on May 30, 2015;
- 57 ADX inmates who were designated at MHCLs 2–4 or had been at one point during our scope;
- 182 SHU inmates from institutions we visited who were designated at MHCLs 2–4 from the end of FY 2010 through May 30, 2015, or had been at one point during our scope;
- 36 ADX inmates who were designated at MHCL 1 from the end of FY 2010 through May 30, 2015, or had been at one point during our scope; and
- 174 SHU inmates designated at MHCL 1 from the end of FY 2010 through May 30, 2015, or had been at one point during our scope.

In our sample, we included 210 BOP inmates who were designated at MHCL 1 during our scope and who may not have had mental illness. We evaluated whether BOP inmates designated at MHCL 1 may have had their MHCL increased before or after the issuance of the BOP's new mental health policy on May 1, 2014. We believed that if we focused only on inmates who were already designated at MHCLs 2–4, this may have prevented us from recognizing MHCL 1 inmates whose care level may have increased. As mentioned in the report, over 90 percent of BOP inmates, including the majority of inmates with mental illness, are designated at MHCL 1.

Also, as stated in the report, this analysis does not account for every MHCL change that may have occurred for our sample of RHU inmates between FY 2010 and August 29, 2015. Rather, we identified whether or not sample inmates' MHCLs increased or decreased at specific points of time during our scope. More specifically, we assessed sample inmates' initial MHCL assignment (which began in FY 2010 for BOP inmates) and then assessed whether an inmate's MHCL increased, decreased, or remained the same as of April 30, 2014 (the day before the new policy was issued). Likewise, we then again assessed sample inmates' MHCLs as of April 30, 2014, and then assessed whether an inmate's MHCL had increased, decreased, or remained the same as of August 29, 2015 (about 16 months after the new policy was issued).[186] Table 8 below shows BOP data for a sample inmate's MHCL change. Based on the BOP data in this table, we recorded that this inmate's MHCL had increased before the new policy was issued and had decreased after the new policy was implemented.

[186] For some of our 688 sample RHU inmates, we could not determine whether the change to the inmate's MHCL occurred in restrictive housing, such as those who were placed in institution SHUs, or in the general population.

**Table 8**

**One Sample BOP Inmate's MHCL Data**

| Inmate's MHCL | Date Inmate's MHCL Was Assigned | Date Inmate's MHCL Stopped |
|---|---|---|
| **1** | July 7, 2010 | April 21, 2011 |
| **2** | April 21, 2011 | October 21, 2014 |
| **1** | October 21, 2014 | August 29, 2015 |

Note: The inmate in this table was designated at MHCL 1 when the BOP extracted this information on August 29, 2015.

Source: BOP data

### Site Visits

From June 2015 through August 2015, we visited seven BOP institutions designated at Care Levels 2, 3, and 4: U.S. Penitentiary (USP) Allenwood, Pennsylvania; USP Atlanta, Georgia; Federal Medical Center Carswell, Fort Worth, Texas; Federal Correctional Complex (FCC) Florence (ADX), Colorado; USP Lewisburg, Pennsylvania; FCC Petersburg, Hopewell, Virginia; and FCC Terre Haute, Indiana. We selected these seven BOP sites based on their special RHU programs or the large number of inmates with mental illness in their RHUs, as determined by the number of inmates designated at MHCLs 2–4.

### Interviews

We interviewed senior officials from the BOP Central Office's Correctional Programs Division, Reentry Services Division, Health Services Division, and Office of Research and Evaluation.

During site visits, we interviewed Executive Staff, including Wardens, Chief Psychologists, Clinical Directors, and a Chief Psychiatrist. We also interviewed mental health staff who worked or had worked in RHUs, including Staff Psychologists, Staff Psychiatrists, General Practitioners, a Psychiatric Nurse, a Physician's Assistant, a Treatment Specialist, and a Recreation Therapist. In addition, we interviewed other institution staff, including RHU Lieutenants and Correctional Officers, as well as unit team officials and Disciplinary Hearing Officers. At the seven institutions we visited, the OIG team had private interviews with 53 inmates with a history of mental illness. Most of the inmates we interviewed were in restrictive housing at the time of our visit or had recently been released from restrictive housing.

We also interviewed officials with the Office of the Deputy Attorney General regarding the development of the Department's January 2016 report on the use of restrictive housing, the project lead and Psychiatrist from the Center of Naval Analysis and Solutions team that conducted the review and assessment of the BOP's use of restrictive housing, as well as officials from the U.S. Government Accountability Office (GAO) for more information related to the two FY 2013 GAO

reports issued on the BOP's use of SHUs and the BOP's oversight of its mental health treatment programs.  Additionally, we interviewed staff from the Department's Civil Rights Division for more information related to its May 2013 investigation of the Pennsylvania State Institution at Cresson and February 2014 investigation of the Pennsylvania Department of Corrections.

Finally, we interviewed senior officials from eight state departments of corrections that we had selected for their publicized reforms or progressive policy relating to the placement of inmates with mental illness in restrictive housing. These eight states were Massachusetts, Washington, Pennsylvania, New York, Virginia, Mississippi, Maine, and Colorado.

**Inmate Case File Review**

We analyzed the content of case files for 59 inmates with a history of mental illness, most of whom we interviewed during our site visits.  These case files included, but were not limited to, psychology intake screening documents (screening), clinical contacts (treatment), and restrictive housing psychology reviews (monitoring).  Due to the size of the inmate case files, we limited our review from January 1, 2014 (4 months before the BOP issued the new mental health policy) to the most recent documents available at the time of our site visits (June 2015 through August 2015).  We reviewed these documents to assess BOP mental health staffs' compliance with BOP policy, such as timeliness standards, based on document dates, indications of in-cell or out-of-cell contacts with inmates, or other important notes that are relevant to the BOP's screening, treatment, and monitoring of inmates with mental illness in RHUs.

Our analysis featured several important limitations.  The primary limitation was the sample of documents each institution provided.  While some institutions, particularly the ADX, provided us with thousands of inmate records, other institutions provided us with substantially less psychology documentation, which hindered the consistency of our analysis of the institutions.  Therefore, any conclusions drawn from case file reviews about the screening, treatment, and monitoring of inmates with mental illness could be based only on documentation we received from the institutions we visited.  There were also inconsistencies in the psychology forms, such as Psychology Services Reviews, used among the institutions we visited and even within the institutions, which in some cases did not capture all of the information that we had regularly been assessing.  This further hindered the consistency of our analysis of psychology documents.

Finally, we learned that the dates we used to assess timeliness standards were entered by mental health staff and were not automated by BEMR-PDS (other than the date and time the form was completed).  As a result, the dates we used in our report to assess timeliness standards, such as the date Psychology Services staff conducted an intake screening or a Psychology Services Review, result from staff inputs.  Although there are legitimate reasons for this, such as staff not having time to input information into BEMR-PDS for all the clinical contacts they conducted during a single day, we recognize that mental health staff could potentially backdate these documents to artificially meet BOP timeliness standards.  We note

that mental health staff told us that the BOP has greater transparency in BEMR-PDS; can see when a document was created, edited, and completed; and thus may be able to detect any backdating of documents.  Because we did not have access to BEMR-PDS, we were unable to determine whether backdating documents may have occurred for inmates with mental illness in RHUs.

# BOP POLICIES GOVERNING RESTRICTIVE HOUSING AND MENTAL HEALTH SCREENING, TREATMENT, AND MONITORING

This appendix contains a brief description of the requirements established through BOP policies for Restrictive Housing Units (RHU) and mental health care, including the screening, treatment, and monitoring of inmates with mental illness. We describe the BOP's national policies for operating its Special Housing Units (SHU) and its Special Management Units (SMU), as well as local policy for the care and treatment of inmates with mental illness at the U.S. Penitentiary Administrative Maximum Security Facility (ADX). We also describe the BOP's new national policy for the care and treatment of inmates with mental illness; national policy for disciplining inmates, including those with mental illness; and national policies, procedures, and operational guidelines for providing psychology services.

## Restrictive Housing Units

*Program Statement 5270.10, Special Housing Units (August 2011)*

SHUs at BOP institutions confine inmates separately from the general population, either alone or with a cellmate. In a SHU, inmates may be confined to their cells for up to an average of 23 hours each day. Inmates may be placed in a SHU as punishment for having committed a prohibited act (disciplinary segregation) or for a non-punitive purpose (administrative detention).[187] While SHUs are not intended for the long-term housing of an inmate, BOP national policy establishes no limit to the number of times an inmate may be placed in disciplinary segregation, nor does it limit the time an inmate, with or without mental illness, may remain in administrative detention. All inmates placed in administrative detention are to receive a review by a Segregation Review Officer within 3 workdays of their placement, and all inmates placed in the SHU are to receive a formal status review within 7 continuous calendar days of their placement, with subsequent reviews conducted at the same interval thereafter. This policy also states that after every 30 calendar days of continuous placement in the SHU, all inmates are to be examined by mental health staff, including a personal interview. Emergency mental health care must be available to inmates in the SHU.

*Program Statement 5270.11, Special Housing Units (November 2016)*

On November 23, 2016, the BOP issued a revised SHU program statement in response to recommendations cited in the Department's January 2016 report on the use of restrictive housing. According to the revised policy, the BOP now prohibits SHU placement for inmates whom mental health staff have designated at Mental Health Care Level (MHCL) 3 or 4, have a psychology alert in SENTRY (the BOP's primary mission support database), or have been identified on the monthly SHU

[187] Reasons to place an inmate in administrative detention include protective custody; a pending security classification or reclassification; holdover during transfer to another destination; and segregation of an inmate who poses a threat to life, property, self, other inmates, the public, or to the security or orderly operation of the institution.

advisory (Hot List) unless the inmate presents an immediate or serious danger to self, staff, or the orderly operation of a facility.  In the event that an inmate who meets one of these criteria is placed in the SHU, Psychology Services staff should be notified and conduct a mental health evaluation within 24 hours of the inmate's placement.  Further, in an effort to enhance inmates' out-of-cell time, the revised SHU policy requires that staff at each BOP institution locally develop plans for increasing recreation and states that institutions with the necessary resources should increase recreation opportunities for inmates.  The revised SHU policy also states that, ordinarily, inmates nearing the end of their term of incarceration will not be placed in the SHU, except when their presence in the general population threatens the safety, security, or the orderly operation of an institution, and that every effort will be made to prevent inmates' direct release from the SHU into the community.  Last, the SHU policy mandates that correctional staff must complete quarterly SHU trainings prior to each quarter, regardless of prior completions, and includes training content regarding inmates with mental illness.

*Program Statement 5217.01, Special Management Units (November 2008)*

The SMU Program was established in 2008 to provide close management of and programming for inmates referred to the program from other institutions BOP-wide; to ensure the safety, security, and orderly operation of BOP facilities; and to protect the public.  Referral to the SMU program is non-punitive and must be approved by the BOP's Central Office, which may happen when the inmate has:

- participated in or had a leadership role in geographical group/gang-related activity;

- a history of serious and/or disruptive disciplinary infractions;

- committed any 100-Level prohibited act after being classified as a member of a disruptive group;

- participated in, organized, or facilitated any group misconduct that adversely affected the orderly operation of an institution; and/or

- otherwise participated in or been associated with activity such that greater management of interactions with other persons is necessary to ensure the safety, security, or orderly operation of BOP institutions, or to protect the public.[188]

---

[188]   The BOP staff may impose sanctions on inmates who commit prohibited acts, which are categorized by the Greatest severity (100 Level), High severity (200 Level), Moderate severity (300 Level), and Low severity (400 Level).  See Program Statement 5270.09, Inmate Discipline Program (July 8, 2011).  The BOP classifies inmates as members of a disruptive group when they belong to or are closely affiliated with, for example, prison gangs, which have a history of disrupting operations and security.  This also applies to inmates who may require separation from a specific disruptive group.  See BOP Program Statement 5180.05, Central Inmate Monitoring System (December 31, 2007).

By policy, SMUs consist of four program phases, with each phase differentiated by its conditions of confinement, level of interaction with other inmates, delivery of programming, and expected time frame for inmates' progression to the next level.[189]  Inmates are expected to complete a four-phase program within 18 to 24 months.  The four phases of the SMU program are:

- **Phase 1:**  Expected completion time is 4 months, with an initial progress review within 28 days and subsequently every 90 days.  Inmates will normally be restricted to their cells.

- **Phase 2:**  Expected completion time is 6–8 months, with a progress review every 90 days.  Inmates will normally be restricted to their cells, but out-of-cell activities/programming may be increased on a case-by-case behavioral performance basis.

- **Phase 3:**  Expected completion time is 6–8 months, with a progress review every 90 days.  Inmates may be housed and participate in activities together, as necessary to protect the safety, security, and good order of the institution.  There are also increased privileges for inmates who accomplish unit goals and maintain appropriate conduct.

- **Phase 4:**  Expected completion time is 2–4 months, with a progress review every 30 days.  Inmates must be able to demonstrate their sustained ability to coexist and interact appropriately with other individuals and groups in the unit.[190]

Conditions of confinement for SMU inmates are much more restrictive than those for general population inmates, but they become less restrictive as an inmate progresses from phase to phase of the program.  Minimum SMU standards for conditions of confinement include placement in cells that should ordinarily house only the number of inmates for which the cells were designed and opportunities for exercise outside inmates' individual cells for 5 hours each week, ordinarily in 1-hour periods on different days.  Additionally, each inmate in the SMU program is to be evaluated by mental health staff every 30 days, with emergency mental health care always made available either at the institution or from the community.

*Program Statement 5217.02, Special Management Units (August 2016)*

On August 9, 2016, as a result of recommendations in the Department's January 2016 report on the use of restrictive housing, the BOP issued a revised program statement for the SMU program.  The revised SMU policy reduces the phases from four to three and the intended time frame for inmates' completion of

---

[189]  Inmates assigned to the SMU are expected to complete the four-phase SMU program in 18 to 24 months, after which they may be designated to another appropriate facility.  Inmates at SMU Program Phases 2, 3, or 4 who fail to make satisfactory progress may be returned to any previous phase.  If an inmate continues to exhibit disruptive conduct after 6 additional months in the SMU, the inmate may be referred for designation to another appropriate facility, consistent with the orderly operation of BOP institutions.

[190]  BOP Program Statement 5217.01, Special Management Units (November 19, 2008).

the program from an average of 18–24 months to 9–13 months. According to the BOP, the revised SMU policy also requires a greater review of an inmate's mental health records prior to placement in a SMU, as well as at each stage of the program to ensure that mental health needs do not preclude him or her from completing the program. Specifically, the revised SMU policy states that a copy of an inmate's referral to the SMU program will be sent to the Psychology Services Branch, which will review the inmate's mental health record to determine whether mental health concerns preclude SMU program placement. An inmate in the SMU program may be removed if it becomes clear that his or her mental health does not reasonably allow him or her to complete the SMU program. The recommendation is forwarded to the Administrator, Psychology Services Branch, Central Office. If the recommendation is approved, the Psychology Administrator notifies the Warden. Upon successful completion of the SMU program, inmates are placed in the general population or designated to another appropriate facility.

*U.S. Penitentiary, Administrative Maximum, Institution Supplement FLM 5310.16A, Treatment and Care of Inmates with Mental Illness (July 2015)*

This policy supplements BOP national policy and provides institution-specific guidelines for the treatment and care of inmates with mental illness housed at the ADX at Florence, Colorado.[191] The ADX houses inmates who have a history of violent, disruptive behavior, both before and after their incarceration, and/or were escape prone in other correctional institutions. Ordinarily, inmates diagnosed with a serious mental illness will be diverted or removed from the ADX. The placement or continued housing of an inmate with serious mental illness at the ADX may occur only if extraordinary security needs are identified that cannot be managed elsewhere. If an inmate is identified as suffering from a serious mental illness while housed at the ADX, and the Chief Psychologist or ADX psychiatric services provider determines that the inmate does not need inpatient hospitalization, the Mental Health Treatment Coordinator will convene a multidiscipline committee to determine whether extraordinary security needs exist that prevent the inmate from being managed elsewhere.[192] Inmates who are newly identified as suffering from a serious mental illness while at the ADX, but who do not have extraordinary security needs, will be referred to an appropriate treatment program or other setting outside the ADX. Inmates at MHCL 4 are not to be housed at the ADX.

Upon arrival, Health Services staff will conduct inmates' initial intake screenings and assessments and identify whether newly transferred inmates have a current prescription for psychotropic medication. The Health Services intake screening seeks to identify inmates' mental health care problems and needs, which include, but are not limited to psychosis, hallucinations, suicidality, history of self-

[191] The local policy supplements BOP Program Statement 5310.16, Treatment and Care of Inmates with Mental Illness (May 1, 2014).

[192] The multidiscipline committee will ordinarily consist of the Warden, Associate Wardens, Captain, Special Investigative Agent, Case Management Coordinator, Unit Manager, Psychology Services, psychiatric services provider(s), Assistant Health Services Administrator/Supervisory Nurse, Psychiatric Nurse, and Supervisory Attorney. The Warden makes the final determination regarding extraordinary security needs.

injury, mood disorders, disturbance, sexual victimization, and psychotropic medication use.  In addition, a psychology intake evaluation of each inmate will follow within 7 business days of the inmate's arrival at the facility.  At this intake evaluation, a Psychologist conducts a clinical interview of the inmate in a private setting and evaluates the accuracy of the inmate's designated MHCL.  Psychology Services and Health Services staffs ensure that every inmate with a clinically identified need for psychological treatment has access to mental health care.  An inmate's housing status does not affect the level of care he receives.  Inmates will ordinarily have access to in-cell therapeutic activities, including psychology programming, through closed-circuit television.

A Psychologist makes weekly rounds in each ADX housing unit to identify and address mental health and behavioral concerns and conducts a psychological review of each ADX inmate at 30-day intervals.  For inmates designated at MHCL 2 or 3, inmates who have been referred for mental health services, or inmates who demonstrate changes in functioning, both the weekly and 30-day rounds will consist of a face-to-face interaction with the inmate's outer cell door opened and a correctional staff member present, if required.  If clinically indicated, the inmate will be removed from the cell to be interviewed in a private interview space.  Consistent with BOP national policy, inmates also receive Extended Restrictive Housing Placement Reviews when continuously housed in the ADX's SHU for 6 months or elsewhere at the ADX for 12 months, with update placement reviews conducted at the same intervals thereafter.

All inmates are to have reasonable access to "Inmate Request to Staff Member" forms to request mental health services, although such requests are to be accepted in any format.  When a request or referral for mental health services relating to an ADX inmate is received at the Psychology Services Branch, the staff evaluates the referral or request on the same day; classifies it as emergent, urgent, or routine; and responds to it within 4 hours, 24 hours, or no more than 10 business days, respectively.  Tele-psychiatry services are available to ADX inmates as needed when in-person psychiatry services are unavailable.  To ensure continuity of tele-psychiatry care, tele-Psychiatrists will make intermittent onsite visits to the ADX to see inmates in person.  At a minimum, inmates receiving psychiatric medications will be seen by a Psychiatrist, psychiatric midlevel provider, or other qualified provider every 90 days, or more often as clinically indicated, for at least the first year.

The ADX Care Coordination and Reentry (CCARE) team meets weekly to review inmate cases and identify strategies to mitigate the potentially negative effects of the correctional environment on inmates with mental illness.  Each ADX inmate's case is reviewed at least monthly, and the CCARE team reviews and updates inmates' individual treatment plans at 6-month and annual intervals.  The CCARE team, along with the treating clinician, identifies any proposed changes to inmates' treatment plans, and the treating clinician discusses them with the inmate. For inmates with mental illness who are scheduled for release within the following 12 months, staff members involved in their pre-release planning attend CCARE team meetings.  Inmates with mental illness who are pending release into the

community, to home detention, or to a Residential Reentry Center are provided reentry services.

### Mental Health Screening, Treatment, and Monitoring

*BOP Program Statement 5310.16, Treatment and Care of Inmates with Mental Illness (May 2014)*

The BOP issued this national policy to ensure that inmates with mental illness are identified and receive treatment to assist their progress toward recovery while reducing or eliminating the frequency and severity of symptoms and associated negative outcomes of mental illness, such as placement in restrictive housing. The new policy redefines inmate MHCLs and incorporates diagnostic, impairment, and intervention-based criteria that substantially increased the work expected of BOP mental health care staff for inmates at MHCLs 2–4.

Prior to May 2014, Program Statement 5310.13, Institutional Management of Mentally Ill Inmates (1995), and a BOP policy memorandum that defined the BOP's MHCLs (2009) prescribed the BOP's policies and guidance for the care and treatment of inmates with mental illness.[193] Table 9 compares the BOP's former and revised mental health treatment standards.

**Table 9**

**The BOP's Mental Health Treatment Standards**

| Inmate Designations | Former Mental Health Treatment Policies (FY 2010 – April 30, 2014) | New Mental Health Treatment Policy (May 1, 2014 – Present) |
|---|---|---|
| MHCL 1 | **No required** recurring mental health services after the intake screening | **No required** recurring mental health services after the intake screening |
| MHCL 2 | Treatment interventions **at least once every 3 months** after the intake screening | Treatment interventions **at least once per month** after the intake screening |
| | CCARE meetings **not established** | CCARE meetings **at least once per year** |
| | **No required updates** for individual treatment plans | Individual treatment plans updated **at least once per year** |
| MHCL 3 | Treatment interventions provided **at least once per month** after the intake screening | Treatment interventions provided **at least once per week** after the intake screening |
| | CCARE meetings **not established** | CCARE meetings **at least once every 6 months** |
| | **No required updates** for individual treatment plans | Individual treatment plans updated **at least once every 6 months** |

[193] Former mental health treatment policies include Program Statement 5310.13, Institution Management of Mentally Ill Inmates (March 31, 1995), and the Assistant Director of the Correctional Programs Division, policy memorandum, December 16, 2009, which established the BOP's MHCL system.

**Table 9 (Cont'd)**

| Inmate Designations | Former Mental Health Treatment Policies (FY 2010 – April 30, 2014) | New Mental Health Treatment Policy (May 1, 2014 – Present) |
|---|---|---|
| MHCL 4 | **No detailed timeliness** standards for treatment interventions | Treatment interventions **at least once per week** after the intake screening |
| | CCARE meetings **not established** | CCARE meetings **on a case-by-case basis** |
| | **No required updates** for individual treatment plans | Individual treatment plans updated **at least once every 3 months** |

Source: OIG analysis of BOP policies

All inmates at MHCLs 2–4 are to have an individualized mental health treatment plan, which identifies individual and/or group programming needs and describes the inmate's mental health problems and goals, as well as the interventions planned to help the inmate meet those goals. These plans are to be reviewed and updated at a frequency determined by the inmate's MHCL.[194]

Inmates also receive psychosocial interventions with mental health staff, normally Psychologists, at a frequency determined by their MHCL.[195] However, any BOP staff member who observes inmate behaviors that may indicate mental illness is to report these observations to the Chief Psychologist or Mental Health Treatment Coordinator at the institution, which may result in an unscheduled psychosocial intervention with mental health staff. The Psychology Services staff conducts an Extended Restrictive Housing Placement Review when an inmate is housed continuously in the SHU for 6 months, in the ADX for 12 months, or in the SMU for 18 months, to determine whether the inmate has mental health issues that should preclude placement in that setting.

*Program Statement 5270.09, Inmate Discipline Program (July 2011)*

The BOP's inmate discipline program helps ensure the safety, security, and orderly operation of correctional facilities and the protection of the public. It allows BOP staff to impose disciplinary sanctions on inmates who commit prohibited acts, and to do so in an impartial and consistent manner that is neither capricious nor retaliatory. Prohibited acts are divided into four categories based on their respective levels of severity: Greatest (100), High (200), Moderate (300), and Low (400). Each category of prohibited acts includes a range of disciplinary sanctions

---

[194] Individualized mental health treatment plans are to be reviewed and updated every 12 months for inmates at MHCL 2, every 6 months for inmates at MHCL 3, and every 90 days for inmates at MHCL 4.

[195] As described in BOP Program Statement 5310.16, psychosocial intervention consists of a face-to-face mental health contact between an inmate and a Psychologist, in a manner that protects the inmate's privacy to the extent that it does not compromise the safety and security of staff. The contact should be consistent with the goals of the inmate's treatment plan.

that may be imposed upon determination of the inmate's guilt. The discipline process starts when the staff becomes aware of an inmate's involvement in a prohibited act. A staff member completes an incident report describing the inmate's behavior and provides a copy to the inmate.[196] The Warden or a delegated authority appoints a BOP staff officer to investigate the incident. The investigating officer provides an investigative report to the Unit Discipline Committee, which may impose sanctions or refer the case to a Disciplinary Hearing Officer (DHO) to conduct a hearing.[197] The DHO may conduct a hearing on an incident report only if it is referred by the Unit Discipline Committee.[198] Disciplinary segregation is among the sanctions that may be imposed — up to 12 months for a Greatest Level severity prohibited act or up to 6 months for a High Level severity prohibited act. Loss of recreation privileges (exercise periods) may not be imposed on inmates in the SHU. An inmate may be removed from any program or group activity for a specified period of time as a sanction. Finally, consecutive disciplinary sanctions may be imposed on inmates found to have committed multiple prohibited acts.

If it appears at any stage of the discipline process that an inmate is mentally ill, the inmate will be referred to a mental health professional to determine whether the inmate is responsible for his or her conduct and whether he or she is competent. When an inmate is found to be mentally incompetent, the incident report will show as a finding that the inmate should not be disciplined for the prohibited act because he/she was found not mentally competent. If evidence, to include evidence presented by mental health staff, indicates that an inmate cannot understand the nature of the disciplinary proceedings or cannot participate in his or her own defense, disciplinary proceedings may be postponed until the inmate is competent enough to understand the proceedings and assist in his/her defense.

*Program Statement 5310.12, Psychology Services Manual (March 1995)*

The BOP's Psychology Services Manual (PSM) established policies, procedures, and operational guidelines for psychology services within the BOP. The PSM pre-dated the BOP's new program statement for the care and treatment of inmates with mental illness by 19 years. Consequently, the PSM did not reflect current BOP policy and procedures to designate inmates by MHCL. Further, the PSM's definition of mental illness reflected the criteria of an earlier version of the American Psychiatric Association's *Diagnostic and Statistical Manual for Mental Disorders.*[199] The PSM implemented a stratified approach for providing mental health services to inmates with mental illness. Severely disturbed individuals are

---

[196] The incident report should note anything unusual about the inmate's behavior.

[197] All 100 and 200 Level severity charges must be referred to the DHO.

[198] The DHO is an independent officer who conducts hearings and imposes sanctions for incidents of misconduct referred by the Unit Discipline Committee. The DHO is an impartial decision maker who was not a victim, witness, investigator, or otherwise significantly involved in the incident.

[199] The PSM (Program Statement 5310.12) defines mental illness using criteria of the American Psychiatric Association, *Diagnostic and Statistical Manual for Mental Disorders,* 4th ed. (Arlington, Va.: American Psychiatric Association, 1994) (DSM-4). The current version, as of the issuance of this report, is DSM-5, which was published in 2013 and reflects a different definition.

cared for at inpatient treatment facilities, and less disturbed inmates most often receive ongoing care in less restrictive environments.

According to the PSM, psychology services at each BOP institution should be sufficient to ensure that every inmate with a documented need and/or interest in psychological treatment has access to a level of care comparable to that available in the community and consistent with the overall mission of the institution.  All inmates are to have access to direct clinical services from Psychology Services staffs.  These include crisis intervention, brief counseling focused on a specific issue or problem, individual and/or group psychotherapy, and psycho-educational group programs.  Though the provision of psychology services within an institution may vary depending on its mission, security level, staff and inmate characteristics, and availability of resources, the PSM placed the highest priority on the treatment of mentally ill inmates, initial psychological screening evaluations of newly admitted inmates, and detention/segregation unit visits and psychological reporting.

A Physician's Assistant medically screens each inmate for signs of psychological disturbance with 24 hours of arrival at a BOP facility.  When psychological disturbance is suspected, the Physician's Assistant refers the inmate to Psychology Services for prompt and appropriate evaluation.  Psychological Services staff conduct psychological screening of an inmate within the first 14 days of arrival at the facility (30 days for transferred inmates).  This screening includes the inmate's voluntary completion of a Psychology Services Inmate Questionnaire, an interview by Psychology Services staff qualified to conduct a clinical interview, and psychological testing if judged necessary by the Psychologist.[200]  When an inmate's responses to the Psychology Services Inmate Questionnaire indicate suicidal thoughts or feelings or when an inmate requests psychological services, a member of the Psychology Services staff will promptly meet with the inmate.  For an inmate in holdover status, a preliminary screening by a Physician's Assistant is sufficient, unless a significant problem is identified.  An individual referred to Psychology Services as a result of this preliminary medical screening should be evaluated promptly by a Psychologist.

Each Chief Psychologist is responsible to assess the treatment needs of the inmate population on an annual basis and to determine what methods of treatment will best meet these needs.  A treatment plan is to be formulated and executed for each inmate diagnosed with significant mental disturbance.  The PSM refers to the Health Services Manual in recommending that each institution without a full-time Psychiatrist employ a consultant to meet the needs of inmates requiring medication.  Psychotropic medication is not designed for, nor should it be used as, a method of chemical restraint to control behaviors unrelated to mental illness.

The BOP recognizes that extended periods of confinement in the SHU may have an adverse effect on the overall mental status of some individuals.  Therefore,

---

[200]  As time and resources permit, the BOP may enhance the psychological screening through behavioral observations, review of available historical information found in the Central File or through SENTRY (the BOP's primary mission support database), and psychological testing when deemed appropriate by a Psychologist.

any inmate confined in the SHU for 30 consecutive days or longer will be psychologically evaluated. At least one member of the Psychology Services staff will visit the SHU on a weekly basis and document this visit in the SHU visitor's log. An inmate housed in the SHU for 30 days or longer will receive a psychological assessment at 30-day intervals.

*Program Statement 5310.17, Psychology Services Manual (August 2016)*

In August 2016, the BOP rescinded its March 1995 PSM and issued a revised PSM that establishes general procedures, guidelines, and priorities for psychological services.[201] The revised PSM includes a revised mission statement and psychology services priorities, including an increased emphasis on reentry services. The revised PSM also includes previously issued guidance regarding Transfer Intake Screenings, strategies to assess and support the core clinical skills of correctional Psychologists, and guidance for the operation of graduate student practicum programs in psychology services. The revised PSM removes duplicative content addressed in other psychology services program statements and updates guidance regarding the creation and maintenance of professional clinical documentation. Finally, the revised PSM references other psychology services program statements that provide more detailed procedures and guidelines for specific program areas.

In addition, the revised PSM establishes enhanced psychological services offered in restrictive housing settings. For example, restrictive housing Psychologists are assigned to provide direct clinical services such as screenings, evaluations, pre-treatment, and treatment services for inmates in restrictive housing settings, including the ADX, SMU, or at the six institutions participating in the SHU pilot program (discussed in the Results of the Review). A Psychologist also reviews the psychological status of any inmate confined in a SHU, SMU, the ADX, or any other similar housing for more than 30 consecutive calendar days using data from multiple sources, including contact with the inmate, input from unit Correctional Officers, and documentation contained in the Bureau's Electronic Medical Record System and Psychology Data System (BEMR-PDS). The results of the psychological review are documented in BEMR-PDS using an appropriate note, such as ADX Review, SHU Review, or SMU Contact. The revised PSM also describes prevention, diversion, mitigation, intervention, transition, and oversight strategies employed by the Psychology Services Branch to intervene with inmates in restrictive housing settings.

*Program Statement 5330.11, Psychology Treatment Programs (March 2009)*

This program statement establishes policy, procedures, and guidelines for psychology treatment programs and serves as a training device for new Psychologists and treatment specialists, as well as a reference for more experienced

[201] The U.S. Government Accountability Office (GAO) recommended that the BOP Director develop and implement updated program statements to ensure that these statements reflect currently accepted treatment practices and standards related to inmate mental health care. See GAO, *Bureau of Prisons: Timelier Reviews, Plan for Evaluations, and Updated Policies Could Improve Inmate Mental Health Services Oversight,* GAO-13-1 (July 2013).

Psychologists and treatment specialists.  The program statement, also known as the BOP's Psychology Treatment Programs Manual, establishes guidelines for five treatment programs:  (1) drug abuse programs; (2) "Resolve" trauma programs for women; (3) the Bureau Rehabilitation and Values Enhancement Program; (4) the Challenge Program; and (5) mental health treatment programs, including the Habilitation Program, Skills Program, Axis II Program, and Mental Health Treatment Units (or Step-Down Units).

# APPENDIX 3

## BOP RESIDENTIAL MENTAL HEALTH TREATMENT PROGRAMS

### Table 10

| | |
|---|---|
| **Mental Health Step Down Program** | The Mental Health Step Down Program is a residential treatment program offering an intermediate level of care for male and female inmates with serious mental illness. The program is designed specifically to serve inmates who do not require impatient treatment but lack the skills to function in a general population prison setting. The program uses an integrative model that includes an emphasis on a modified therapeutic community cognitive behavioral therapies and skills training. The goal of the Step Down Program is to provide evidence-based treatment to chronically mentally ill inmates in order to maximize their ability to function and minimize relapse and the need for inpatient hospitalization. |
| | Mental Health Step Down Programs operate as modified therapeutic communities and utilize cognitive behavioral treatments, cognitive rehabilitation, and skills training. Criminal thinking is addressed through the identification of criminal thinking errors and engagement in pro-social interactions with staff and peers. The programs work closely with Psychiatry Services to ensure participants receive appropriate medication and have the opportunity to build a positive relationship with the treating Psychiatrist. Program content is designed to promote successful reentry into society at the conclusion of an inmate's term of incarceration, and program staff collaborates with community partners to facilitate reentry. |
| | Inmates with serious mental illnesses, who would benefit from intensive residential treatment, are considered for the program. Male inmates with a primary diagnosis of Borderline Personality Disorder are referred to the STAGES Program (see below). Mental Health Step Down Program participants must volunteer for the program and must not be acutely mentally ill (i.e., they must not meet criteria for inpatient mental health treatment). |
| | The Mental Health Step Down Program is conducted over 12–18 months. Inmates may participate in the program at any point in their sentence. Formal programming is facilitated half-days, 5 days a week with the remaining half-day dedicated to an institution work assignment or other programming, as participants are able. |

Notes: The Step Down Program is available at Federal Correctional Institution (FCI) Butner, North Carolina (medium security); U.S. Penitentiary (USP) Atlanta, Georgia (high security); and USP Allenwood, Pennsylvania (high security). BOP Psychology Services Branch officials told us that a female Step Down Program had been available at FCI Danbury; however, since FCI Danbury is no longer a female institution, the BOP no longer has a Step Down Program for females.

Source: BOP, A Directory of Bureau of Prisons' National Programs, May 22, 2015

**Table 11**

| Steps Toward Awareness, Growth, and Emotional Strength (STAGES) Program | |
|---|---|
| | The STAGES Program is a residential treatment program for male inmates with serious mental illnesses and a primary diagnosis of Borderline Personality Disorder. The program uses an integrative model that includes a modified therapeutic community, cognitive behavioral therapies, and skills training. The program is designed to increase the time between disruptive behaviors, foster living within the general population or community setting, and increase pro-social skills. |
| | The program curriculum is derived from Dialectical Behavior Therapy and takes place in a modified therapeutic community. There is also an emphasis on basic cognitive-behavioral skills consistent with other BOP treatment programs; for example, criminal thinking is addressed through the identification of criminal thinking errors and engagement in pro-social interactions with staff and peers. Program content is designed to prepare inmates for transition to less secure prison settings and promote successful reentry into society at the conclusion of their term of incarceration. Program staff collaborate with community partners to facilitate reentry. |
| | Inmates referred to the STAGES Program have a primary diagnosis of Borderline Personality Disorder and a history of unfavorable institutional adjustment linked to this disorder. Examples of unfavorable institutional adjustment include multiple incident reports, suicide watches, and/or extended placement in restrictive housing. Inmates designated to the STAGES Program must volunteer for treatment and be willing to actively engage in the treatment process. Willingness to engage in the treatment is addressed through a brief course of pre-treatment in which the inmate learns basic skills at the referring institution. |
| | The STAGES Program is conducted over 12–18 months. Inmates may participate in the program at any time during their sentence. Formal programming is facilitated half-days, 5 days a week, with the remaining half-day dedicated to an institution work assignment or other programming. |

Notes: The STAGES Program is available at FCI Terre Haute, Indiana (medium security), and USP Florence, Colorado (high security).

Source: BOP, A Directory of Bureau of Prisons' National Programs

**APPENDIX 4**

## THE BOP'S RESPONSE TO THE DRAFT REPORT

U.S. Department of Justice

Federal Bureau of Prisons

*Office of the Director*

*Washington, DC 20534*

June 23, 2017

MEMORANDUM FOR NINA S. PELLETIER
ASSISTANT INSPECTOR GENERAL
OFFICE OF INSPECTOR GENERAL
EVALUATION AND INSPECTIONS DIVISION

FROM: Thomas R. Kane, Acting Director

SUBJECT: Response to the Office of Inspector General's (OIG) FORMAL DRAFT Report: OIG Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness, Assignment Number A-2015-004

The Bureau of Prisons (BOP) appreciates the opportunity to respond to the open recommendations from the draft report entitled OIG Review of the Federal Bureau of Prisons' Use of Restrictive Housing for Inmates with Mental Illness.

Please find the Bureau's response to the recommendations below:

**Recommendations**

**Recommendation 1:** Establish in policy the circumstances that warrant the placement of inmates in single-cell confinement while maintaining institutional and inmate safety and security and ensuring appropriate meaningful human contact and out-of-cell opportunities.
**Response:** The BOP agrees with this recommendation and will establish in policy factors to be considered when placing/retaining mental health inmates in single-cell confinement.

**Recommendation 2:** Define and establish in policy extended placement in measureable terms.

**Response:** The BOP agrees with this recommendation and will define and establish extended placement in measureable terms.

**Recommendation 3:** Track all inmates in single-cell confinement and monitor, as appropriate, the cumulative amount of time that inmates with mental illness spend in restrictive housing, including single-cell confinement.

**Response:** The BOP agrees with this recommendation as it pertains to mental health inmates, and we will track and monitor inmates with mental health care levels 2, 3, and 4.

**Recommendation 4:** Identify all forms of restrictive housing utilized throughout its institutions and ensure that all local policies are updated to reflect standards for all inmates in restrictive housing consistent with established nation-wide policies.

**Response:** The BOP agrees with this recommendation and will review all forms of restrictive housing, and ensure local, or national, policies are in place to direct their operation.

**Recommendation 5:** Evaluate and limit as appropriate the consecutive amount of time that inmates with serious mental illness may spend in restrictive housing.

**Response:** The BOP agrees with this recommendation and will establish limits, as appropriate, on consecutive placements in restrictive housing as it pertains to mental health inmates.

**Recommendation 6:** Ensure that the Psychology Services staff documents inmates' mental illness diagnoses in the Bureau's Electronic Medical Record System and Psychology Data System.

**Response:** The BOP agrees with this recommendation. The Psychology Services Branch will ensure Psychology Services staff document inmates' mental illness diagnoses in the Bureau's Electronic Medical Record and Psychology Data System.

**Recommendation 7:** Reassess the Mental Health Care Level system to ensure that it fully captures the mental health needs of inmates, including inmates in restrictive housing, and that classifications

distinguish between inmates who have some form of mental illness and those who do not have any form of mental illness.

**Response:**   The BOP agrees with this recommendation.   The Psychology Services Branch will reassess the Mental Health Care Level system to ensure that it fully captures the mental health needs of inmates, including inmates in restrictive housing, and that there is a method to distinguish between inmates who have some form of mental illness and those who do not have any form of mental illness.

**Recommendation 8:** Regularly monitor, by institution and type of Restrictive Housing Unit, trends in inmates' designated Mental Health Care Levels to further assess the factors that affect the treatment of inmates with mental illness.

**Response:**   The BOP agrees with this recommendation.   The Psychology Services Branch will monitor trends in inmates' designated mental health care levels by institution and type of restrictive housing unit.   This will be used to further assess the factors that affect the treatment of inmates with mental illness.

**Recommendation 9:**   Determine what additional steps can be taken to prioritize and incentivize the hiring of mental health staff at institutions that have inmates with mental illness in long-term restrictive housing.

**Response:**   The BOP agrees with this recommendation.   The Psychology Services Branch and Health Services Division will determine what additional steps can be taken to prioritize and incentivize the hiring of mental health staff at institutions that have inmates with mental illness in long-term restrictive housing.

**Recommendation 10:**   Assess the scalability of secure residential mental health treatment programs and develop alternatives to address their potential limitations.

**Response:**   The BOP agrees with this recommendation.   The Psychology Services Branch will assess the scalability of secure residential mental health treatment programs and develop alternatives to address their potential limitations.

**Recommendation 11:**   Develop and implement formal performance metrics sufficient to measure the effectiveness of secure residential mental health treatment programs.

**Response:** The BOP agrees with this recommendation. The Psychology Services Branch will develop and implement formal performance metrics sufficient to measure the effectiveness of secure residential mental health treatment programs.

**Recommendation 12:** Survey institutions and/or take other steps to identify alternative practices that reduce the frequency and duration of the placement of inmates with mental illness in restrictive housing, and implement such alternatives when appropriate.

**Response:** The BOP agrees with this recommendation. The Psychology Services Branch and Correctional Programs Division will survey institutions and/or take other steps to identify alternative practices that reduce the frequency and duration of the placement of inmates with mental illness in restrictive housing, and implement such alternatives when appropriate.

**Recommendation 13:** Provide additional mental health training to correctional staff who are responsible for monitoring the behavior of inmates in restrictive housing.

**Response:** The BOP agrees with this recommendation, though we note it appears to be based on the opinions of a few staff, instead of any adverse event or incident caused by insufficient training. Correctional staff responsible for monitoring the behavior of inmates in restrictive housing currently receive a substantial amount of training, of which OIG may not be aware, but we will identify opportunities to provide additional training, including remedial training.

**Recommendation 14:** Provide additional guidance and training to mental health staff on diagnosing mental illness, including guidance on documenting malingering behavior by inmates.

**Response:** The BOP agrees with this recommendation. The Psychology Services Branch will provide additional guidance and training to mental health staff on diagnosing mental illness, including guidance on documenting malingering behavior by inmates.

**Recommendation 15:** Conduct a comprehensive review of U.S. Penitentiary Lewisburg's Special Management Unit that addresses the staffing, treatment, conditions of confinement, and performance metrics of the program.

**Response:** The BOP agrees with this recommendation. A multi-discipline group from various geographic locations is being assembled to conduct a comprehensive review of U.S. Penitentiary Lewisburg's Special Management Unit that addresses the staffing, treatment, conditions of confinement, and performance metrics of the program.

If you have any questions regarding this response, please contact Steve Mora, Assistant Director, Program Review Division, at (202) 353-2302.

**APPENDIX 5**

# OIG ANALYSIS OF THE BOP'S RESPONSE

The OIG provided a draft of this report to the Federal Bureau of Prisons (BOP). The BOP's response is included in Appendix 4. The BOP agreed with all of the OIG's recommendations. Below, we discuss the OIG's analysis of the BOP's response and actions necessary to close the recommendations.

**Recommendation 1:** Establish in policy the circumstances that warrant the placement of inmates in single-cell confinement while maintaining institutional and inmate safety and security and ensuring appropriate, meaningful human contact and out-of-cell opportunities to mitigate mental health concerns.

**Status:** Resolved.

**BOP Response:** The BOP agreed with this recommendation and will establish in policy the factors to be considered when placing/retaining mental health inmates in single-cell confinement.

**OIG Analysis:** The BOP's actions are at least partially responsive to our recommendation. By October 27, 2017, please clarify whether all inmates, including those with mental illness, will be included in policy, and how it will maintain institutional and inmate safety and security while ensuring appropriate, meaningful human contact and out-of-cell opportunities to mitigate mental health concerns, and provide a copy of the proposed policy language.

**Recommendation 2:** Define and establish in policy extended placement in measureable terms.

**Status:** Resolved.

**BOP Response:** The BOP agreed with this recommendation and will define and establish extended placement in measureable terms.

**OIG Analysis:** The BOP's actions are responsive to our recommendation. By October 27, 2017, please provide the BOP's definition for extended placement in measurable terms and describe how it will be established in policy.

**Recommendation 3:** Track all inmates in single-cell confinement and monitor, as appropriate, the cumulative amount of time that inmates with mental illness spend in restrictive housing, including single-cell confinement.

**Status:** Resolved.

**BOP Response:** The BOP agreed with this recommendation as it pertains to mental health inmates and will track and monitor inmates with Mental Health Care Levels (MHCL) 2, 3, and 4.

**OIG Analysis:**  The BOP's actions are partially responsive to our recommendation.  By October 27, 2017, please clarify whether the BOP will track all inmates in single-cell confinement or only those inmates who have previously needed recurring treatment interventions with mental health staff, as reflected by MHCLs 2, 3, and 4 or otherwise.  Also, please describe how the BOP will track inmates in single-cell confinement and monitor, as appropriate, the cumulative amount of time that inmates with MHCLs 2, 3, and 4 spend in restrictive housing, including single-cell confinement.  Further, please detail how the BOP will use this information in reviewing the placement of all inmates in Restrictive Housing Units (RHUs), including whether this information will be used as an additional metric that can trigger an Extended Restrictive Housing Placement Review.

**Recommendation 4:**  Identify all forms of restrictive housing utilized throughout its institutions and ensure that all local policies are updated to reflect standards for all inmates in restrictive housing consistent with established nationwide policies.

**Status:**  Resolved.

**BOP Response:**  The BOP agreed with this recommendation and will review all forms of restrictive housing and ensure that local or national policies are in place to direct their operation.

**OIG Analysis:**  The BOP's actions are responsive to our recommendation.  By October 27, 2017, please provide the OIG with a list of all forms of restrictive housing, per institution, and describe how the BOP identified these RHUs.  Also, please describe how the BOP will ensure that local or national policies are in place to direct the operation of all RHUs.

**Recommendation 5:**  Evaluate and limit as appropriate the consecutive amount of time that inmates with serious mental illness may spend in restrictive housing.

**Status:**  Resolved.

**BOP Response:**  The BOP agreed with this recommendation and will establish limits, as appropriate, on consecutive placements in restrictive housing as it pertains to mental health inmates.

**OIG Analysis:**  The BOP's actions are responsive to our recommendation.  By October 27, 2017, please provide the OIG with proposed limits for the placement of inmates with serious mental illness in RHUs and describe how these limits will be implemented.  Also, please describe the circumstances that would allow the BOP to exceed these limits in the placement of inmates with serious mental illness in RHUs and how these circumstances will be communicated to institution staff.

**Recommendation 6:**  Ensure that the Psychology Services staff documents inmates' mental illness diagnoses in the Bureau's Electronic Medical Record System and Psychology Data System.

**Status:**  Resolved.

**BOP Response:**  The BOP agreed with this recommendation.  The Psychology Services Branch will ensure that Psychology Services staff document inmates' mental illness diagnoses in the Bureau's Electronic Medical Record System and Psychology Data System (BEMR-PDS).

**OIG Analysis:**  The BOP's actions are responsive to our recommendation. By October 27, 2017, please describe how the BOP will ensure that Psychology Services staff document inmates' mental illness diagnoses in BEMR-PDS.

**Recommendation 7:**  Reassess the Mental Health Care Level system to ensure that it fully captures the mental health needs of inmates, including inmates in restrictive housing, and that classifications distinguish between inmates who have some form of mental illness and those who do not have any form of mental illness.

**Status:**  Resolved.

**BOP Response:**  The BOP agreed with this recommendation.  The Psychology Services Branch will reassess the MHCL system to ensure that it fully captures the mental health needs of inmates, including inmates in restrictive housing, and that there is a method to distinguish between inmates who have some form of mental illness and those who do not have any form of mental illness.

**OIG Analysis:**  The BOP's actions are responsive to our recommendation. By October 27, 2017, please describe how the BOP will ensure that the MHCL system fully captures the mental health needs of inmates and distinguishes inmates who have some form of mental illness.

**Recommendation 8:**  Regularly monitor, by institution and type of Restrictive Housing Unit, trends in inmates' designated Mental Health Care Levels to further assess the factors that affect the treatment of inmates with mental illness.

**Status:**  Resolved.

**BOP Response:**  The BOP agreed with this recommendation.  The Psychology Services Branch will monitor trends in inmates' designated MHCLs by institution and type of RHU.  This will be used to further assess the factors that affect the treatment of inmates with mental illness.

**OIG Analysis:**  The BOP's actions are responsive to our recommendation. By October 27, 2017, please describe how the BOP will monitor trends in inmates'

MHCLs by institution and type of RHU, and how this information will be used to further assess the factors that affect the treatment of inmates with mental illness.

**Recommendation 9:**  Determine what additional steps can be taken to prioritize and incentivize the hiring of mental health staff at institutions that have inmates with mental illness in long-term restrictive housing.

**Status:**  Resolved.

**BOP Response:**  The BOP agreed with this recommendation.  The Psychology Services Branch and Health Services Division will determine what additional steps can be taken to prioritize and incentivize the hiring of mental health staff at institutions that have inmates with mental illness in long-term restrictive housing.

**OIG Analysis:**  The BOP's actions are responsive to our recommendation. By October 27, 2017, please describe the additional steps that the BOP can take to incentivize the hiring of mental health staff at institutions that have inmates with mental illness in long-term restrictive housing, including the length of time that the BOP considers as "long-term restrictive housing" for this purpose.

**Recommendation 10:**  Assess the scalability of secure residential mental health treatment programs and develop alternatives to address their potential limitations.

**Status:**  Resolved.

**BOP Response:**  The BOP agreed with this recommendation.  The Psychology Services Branch will assess the scalability of secure residential mental health treatment programs and develop alternatives to address their potential limitations.

**OIG Analysis:**  The BOP's actions are responsive to our recommendation. By October 27, 2017, please describe how the BOP assessed the scalability of these programs, the outcomes of the assessment, and the BOP's plan to address any limitations that may exist.

**Recommendation 11:**  Develop and implement formal performance metrics sufficient to measure the effectiveness of secure residential mental health treatment programs.

**Status:**  Resolved.

**BOP Response:**  The BOP agreed with this recommendation.  The Psychology Services Branch will develop and implement formal performance metrics sufficient to measure the effectiveness of secure residential mental health treatment programs.

**OIG Analysis:**  The BOP's actions are responsive to our recommendation. By October 27, 2017, please provide the OIG with formal performance metrics for the secure residential mental health treatment programs.  Also, please describe how the performance metrics were implemented and how the BOP will apply these performance metrics in evaluating the effectiveness of these programs.

**Recommendation 12:**  Survey institutions and/or take other steps to identify alternative practices that reduce the frequency and duration of the placement of inmates with mental illness in restrictive housing, and implement such alternatives when appropriate.

**Status:**  Resolved.

**BOP Response:**  The BOP agreed with this recommendation.  The Psychology Services Branch and Correctional Programs Division will survey institutions and/or take other steps to identify alternative practices that reduce the frequency and duration of the placement of inmates with mental illness in restrictive housing, and implement such alternatives when appropriate.

**OIG Analysis:**  The BOP's actions are responsive to our recommendation. By October 27, 2017, please provide the OIG with the results of the survey to institutions and/or describe other steps BOP has taken to identify alternative practices that reduce the frequency and duration of the placement of inmates with mental illness in restrictive housing.  Additionally, please describe how the BOP plans to assess, communicate, and implement alternative practices that can be replicated across its institutions.

**Recommendation 13:**  Provide additional mental health training to correctional staff who are responsible for monitoring the behavior of inmates in restrictive housing.

**Status:**  Resolved.

**BOP Response:**  The BOP agreed with this recommendation, noting that it appears to be based on the opinions of a few staff, instead of any adverse event or incident caused by insufficient training.  Correctional staff responsible for monitoring the behavior of inmates in restrictive housing currently receive a substantial amount of training.  The BOP believes that the OIG may not be aware of this training; but the BOP will identify opportunities to provide additional training, including remedial training.

**OIG Analysis:**  The BOP's actions are responsive to our recommendation. By October 27, 2017, please detail all of the BOP's current training for correctional staff responsible for monitoring the behavior of inmates in restrictive housing. Please also describe additional training opportunities for correctional staff who are responsible for monitoring such inmates, including remedial training, and provide copies of training materials for these identified opportunities.

**Recommendation 14**: Provide additional guidance and training to mental health staff on diagnosing mental illness, including guidance on documenting malingering behavior by inmates.

**Status:** Resolved.

**BOP Response:** The BOP agreed with this recommendation. The Psychology Services Branch will provide additional guidance and training to mental health staff on diagnosing mental illness, including guidance on documenting malingering behavior by inmates.

**OIG Analysis:** The BOP's actions are responsive to our recommendation. By October 27, 2017, please provide copies of training materials and guidance for mental health staff in diagnosing mental illness and documenting malingering. Also, please describe how and when the guidance and training materials will be delivered to mental health staff.

**Recommendation 15**: Conduct a comprehensive review of U.S. Penitentiary Lewisburg's Special Management Unit that addresses the staffing, treatment, conditions of confinement, and performance metrics of the program.

**Status:** Resolved.

**BOP Response:** The BOP agreed with this recommendation. A multi-discipline group from various geographic locations is being assembled to comprehensively review U.S. Penitentiary (USP) Lewisburg's Special Management Unit (SMU) and address the staffing, treatment, conditions of confinement, and performance metrics of the program.

**OIG Analysis:** The BOP's actions are responsive to our recommendation. By October, 27, 2017, please provide the OIG with an update regarding the BOP's review of USP Lewisburg's SMU, including a description of the review's objectives, scope, and methodology.

*The Department of Justice Office of the Inspector General (DOJ OIG) is a statutorily created independent entity whose mission is to detect and deter waste, fraud, abuse, and misconduct in the Department of Justice, and to promote economy and efficiency in the Department's operations. Information may be reported to the DOJ OIG's hotline at www.justice.gov/oig/hotline or (800) 869-4499.*




Office of the Inspector General
U.S. Department of Justice
www.justice.gov/oig