

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

January 21, 2020

BY ECF and Email

The Honorable Vernon S. Broderick
United States District Judge
Southern District of New York
40 Foley Square
New York, New York 10007

      Re:    *United States v. Stephen Zarsky*,
                  S1 18 Cr. 567 (VSB)

Dear Judge Broderick:

      The Government respectfully submits this letter in advance of the sentencing of Stephen Zarsky, which is scheduled for January 24, 2020. On October 3, 2019, Zarsky pleaded guilty to one count of conspiring to commit securities fraud, in connection with use of material, non-public information regarding Immunotherapeutics Limited ("Innate") to trade and tip others in June 2017. As reflected in the plea agreement between the parties and in the Presentence Investigation Report ("PSR") prepared by the United States Probation Office ("Probation"), the applicable United States Sentencing Guidelines range for the offense to which Zarsky pled guilty is 37 to 46 months' imprisonment. While Zarsky's sentence should not exceed the 26 month sentence that the Court imposed on Christopher Collins, the Government nonetheless believes that a substantial term of incarceration is necessary in order to satisfy the objectives of Title 18, United States Code, Section 3553(a), and in particular to promote respect for the law, to provide just punishment for the offense, and to achieve general deterrence.

## FACTUAL BACKGROUND

      The facts of this case are well known to the Court and are fully laid out in the Presentence Investigation Report ("PSR") and the Government's submission in connection with the sentencing of Christopher Collins (ECF No. 155).

      In brief, in or about the summer of 2016, Zarsky purchased stock in Innate, an Australian biotechnology company that traded on the Australian Stock Exchange and on the over-the-counter ("OTC") market in the United States. (PSR ¶¶ 16, 22.) Zarsky purchased his Innate stock on the recommendation of Cameron Collins ("Cameron"), who was engaged to Zarsky's daughter Lauren. (PSR ¶ 22.)

      Cameron was a substantial shareholder in Innate, owning approximately 2.3% of its shares. (PSR ¶ 19.) Cameron's father, Christopher Collins ("Collins"), owned approximately 16.8% of

Innate's stock and also sat on Innates's Board of Directors, giving him access to material non-public information about the company that he had a duty not to disclose. (PSR ¶¶ 18, 23-25.)

From at least the summer of 2016 up to and including the summer of 2018, Zarsky's friends and relatives also invested in Innate, including his daughter Lauren, his wife Dorothy, his brother, his sister, and a childhood friend. (PSR ¶ 22.)

On June 22, 2017, at 6:55 PM Eastern, Collins received an email from the CEO of Innate letting him and other Innate board members know that MIS416, Innate's only viable drug, had failed its clinical trial. (PSR ¶ 27.) The practical import of this information was that, as soon as the news of the failed drug trial became public, Innate's stock would become virtually valueless. Collins replied to the CEO's email expressing dismay at the news and then, from the White House lawn, tried several times in quick succession to contact Cameron by cellphone. (PSR ¶ 27.) Collins waited approximately one minute after responding to the CEO's email before repeatedly attempting to reach Cameron. (PSR ¶ 27.) After several urgent minutes of phone tag, Collins and Cameron connected. During their call, Collins tipped Cameron about the failed drug trial, and they agreed that Cameron would sell his shares in Innate if it were possible to do so. (PSR ¶ 27.)

The same day that Collins tipped Cameron, Cameron and Lauren Zarsky drove to her parents' house and tipped Stephen and Dorothy Zarsky about the failed drug trial. (PSR ¶ 28.) The date when the drug trial results would be made available to the investing public, as opposed to insiders who had a duty not to disclose material non-public information, was still four days away. (PSR ¶ 33.) Cameron, Lauren, Stephen, and Dorothy agreed that they would sell their shares in Innate, and that Cameron would space out his selling activity in order to avoid depressing the price of the stock before Lauren, Stephen, and Dorothy sold their shares. (PSR ¶ 28.) Dorothy commenced selling her shares that same night in the presence of Cameron, Lauren, and Stephen. (PSR ¶ 28.)

Later on the night of June 22, 2017, Innate issued a press release indicating that the Australian Stock Exchange, where the company was listed, would halt trading pending the announcement of the drug trial results. (PSR ¶ 29.) The company said nothing about whether the results, which remained confidential, were positive or negative. The halt only affected the trading of Innate shares on the Australian Stock Exchange; it had no impact on the OTC markets, where Innate shares were also trading. (PSR ¶ 29.) On June 23, Cameron began selling his Innate shares on the OTC markets. (PSR ¶ 30.) He did not sell all of his shares at once, but rather, as he had discussed with Lauren, Stephen, and Dorothy, spaced out his transactions. He initially sold shares from his own apartment, but later in the morning on June 23 he sold shares from the home of Stephen and Dorothy Zarsky. (PSR ¶ 30.) Stephen and Dorothy Zarsky, meanwhile, sold all of their remaining shares of Innate on the morning of June 23. (PSR ¶ 30.) Lauren Zarsky's shares were also sold that morning; she was at work while Cameron accessed her brokerage account from Stephen and Dorothy's home and placed an order to sell her shares. (PSR ¶¶ 30, 61.)

In the midst of selling his own shares in Innate on the morning of June 23, 2017, Stephen Zarsky called his brother, his sister, and a friend who owned Innate, and instructed each of them to sell their Innate Stock. Within minutes of receiving Stephen's call, Stephen's brother and friend

sold their shares in Innate. (PSR ¶ 31). Zarsky's sister attempted to sell her shares in Innate, but her broker was unable to execute the trade. (PSR ¶ 31).

On the night of June 26, 2017, Innate released the failed drug trial results to the public. (PSR ¶ 33.) Upon the release of the news, Innate's stock price fell by 92%, subjecting investors who were not able to take advantage of inside information to heavy losses. (PSR ¶ 33.) By contrast, Zarsky and his friends and family avoided the consequences of their investments. Cameron avoided approximately $571,000 in losses, and Zarsky avoided approximately $143,900 in losses. (PSR ¶ 35.) Dorothy Zarsky and Lauren Zarsky avoided losses of approximately $22,600 and $19,440, respectively. (PSR ¶ 35.) Zarsky's brother and his friend avoided losses of $4,200 and $6,700, respectively. (PSR ¶ 35).

On April 25, 2018, FBI agents came to Zarsky's home to ask him questions relating to trading activity in Innate around the time that the failed drug trial results were made public. (PSR ¶ 38.) Zarsky elected to speak with the agents, and to lie to them in order to divert law enforcement from the trail of evidence showing that he had committed insider trading. During the interview, Zarsky asserted falsely that he had invested in Innate on the advice of an unnamed friend who lived in Connecticut, when he learned about the stock from the Collins family. Zarsky claimed not to recall a visit from Lauren Zarsky and Cameron on the evening of June 22, 2017. Zarsky also claimed not to know what affiliation, if any, Collins had with Innate. Zarsky asserted falsely that the decision to sell his shares in Innate was prompted by a general concern about the riskiness of the investment and the management of Innate. He denied that he received any non-public information prior to selling his stock and he claimed falsely that he did not know for certain whether Lauren Zarsky and Cameron sold their shares in Innate around the same time he did.

## APPLICABLE LAW

The advisory Sentencing Guidelines promote the "basic aim" of Congress in enacting the Sentencing Reform Act, namely, "ensuring similar sentences for those who have committed similar crimes in similar ways." *United States v. Booker*, 543 U.S. 220, 252 (2005). Along with the Guidelines, the other factors set forth in Title 18, United States Code, Section 3553(a) must be considered. Section 3553(a) directs the Court to impose a sentence "sufficient, but not greater than necessary" to comply with the purposes set forth in paragraph two. That sub-paragraph sets forth the purposes as:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the defendant; and
>
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

Section 3553(a) further directs the Court to consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

## DISCUSSION

As discussed below, the Government respectfully submits that after applying the sentencing factors set forth in Section 3553(a) to Zarsky's conduct, a substantial term of incarceration is warranted in this case.

### A.     The Need to Provide Just Punishment for the Offense

The need to provide a just punishment for the offense counsels in favor of a substantial term of incarceration here. Zarsky exploited inside information for his own pecuniary benefit and for the benefit of his friends and relatives. As the Court recognized at the sentencing of Christopher Collins, insider trading

> creates [the] perception in the public including, among investors and would be investors, that the market is somehow rigged or, at the very least, that certain individuals who have more access to information have the upper hand in terms of making investment decisions both whether to buy or to sell.

1/17/2020 Tr. at 87-88. The crime is thus a serious one that, as the Court recognized, has negative repercussions not only for Innate, the formal victim of the offense, but also for public perceptions about the fairness of the financial system. While this generalized public harm is "difficult to calculate," 1/17/2020 Tr. at 88, it nonetheless justifies a substantial sentence.

To be sure, some of the aggravating factors that were present in connection with the sentencings of Christopher Collins and Cameron Collins are not present here. Unlike Christopher Collins, Zarsky was not in a position of trust vis-à-vis Innate's other shareholders or the public at large; and Zarsky's financial resources are much more limited than those of Cameron Collins, making his argument that he acted out of concern for his financial need somewhat more plausible. With respect to the latter point, however, it should be noted that Zarsky was more than capable of weathering the financial loss that he would have suffered had he not sold his shares in Innate. The PSR indicates that he and his wife enjoy a positive net cash flow and have assets well in excess of the approximately $165,000 that they avoided losing by engaging in the instant offense.

Moreover, while there are ways in which Zarsky is differently situated than his co-defendants, some of the most significant aggravators are present here as well. Like Cameron and Christopher Collins, Zarsky had the benefit of time before deciding to sell his Innate shares. Indeed, nearly 10 hours passed from the time that he learned the bad news about Innate until he placed the order to sell his stock. Certainly that was sufficient time for Zarsky to reflect seriously

on the consequence of his actions. Moreover, as the Court noted at the sentencing of Christopher Collins, nothing prevented Zarsky from reversing course and repurchasing his stock in the days before the drug trial results were released to the public. *Cf.* 1/17/2020 Tr. at 90.

Like Christopher and Cameron Collins, Zarsky also ratified his criminal conduct by lying to the FBI when he was questioned about his trading in Innate. Zarsky's lies did not consist simply of denying the conduct. Rather he took affirmative steps to misdirect the investigation by lying about the identity of the person who had recommended the stock to him and proffering a false narrative that he had grown concerned about the management of Innate and was therefore prompted to sell. Courts, including this one, have rightly viewed such conduct deserving of substantial punishment in its own right, both because it reflects the decision to commit a new crime, and because it casts doubt on the claim that the underlying criminal conduct was anomalous or undertaken without reflection. *See* 1/17/2020 Tr. at 89; *United States v. Mui*, 214 F. App'x 40, at *5 (2d Cir. Jan. 18, 2007) (approving district court's consideration of defendant's obstruction of investigation under Section 3553(a) and consequent imposition of higher sentence); *United States v. Vogler*, 763 F. App'x 18, at *19-20 (2d Cir. Feb. 26, 2019) (same); *United States v. Butters*, 588 F. App'x 12, at *13 (2d Cir. Dec. 11, 2014) (approving district court's consideration of defendant's false statements to law enforcement officials as evidence of his dishonesty which the district court viewed as discounting his after-the-fact statements of remorse). Justice requires that these actions be punished with a substantial prison term.

### B. The Need to Promote Respect for the Law and Afford Adequate Deterrence

The need to promote respect for the law and deter criminal conduct of this type also weigh in favor of a significant sentence, as the Court recognized during the sentencing of Christopher Collins. *See* 1/17/2020 Tr. at 92-93. To quote Judge Rakoff, "insider trading is an easy crime to commit but a difficult crime to catch. Others similarly situated to the defendant must therefore be made to understand that when you get caught, you will go to jail." *United States v. Gupta*, 904 F. Supp. 2d 349, 355 (S.D.N.Y. 2012). As the Government has observed in connection with other sentencings in this case, imposing a term of probation, or merely imposing a fine would risk sending the message that prosecutions for insider trading are simply a price of doing business that can be written off by paying a fine. *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006).

### C. A Substantial Term of Incarceration Is Appropriate

Finally, the Court should reject Zarsky's assertion that his personal circumstances make a sentence of incarceration inappropriate in this case. A substantial portion of Zarsky's sentencing submission is devoted to pressing the argument that a term of incarceration would have deleterious consequences for his health. The Government acknowledges and is sympathetic to the ways in which Zarsky's ▬▬▬▬▬▬▬▬▬ have negatively affected his life, and we applaud and are encouraged by his efforts to manage these conditions, along with ▬▬▬▬▬▬▬▬▬ ▬▬▬▬. But the Bureau of Prisons is more than equipped to care for Zarsky. The PSR indicates that Zarsky is not currently receiving medication for ▬▬▬▬▬▬▬▬▬, and ▬▬▬▬▬▬ ▬▬▬▬ is chronic condition that can be treated when symptoms occur. As for ▬▬▬▬▬▬ ▬▬▬▬▬▬▬▬▬, these are common conditions that are prevalent within the prison population and are frequently treated without issue. While the Government does not wish to

minimize the seriousness Zarsky's health issues, nothing about Zarsky's treatment suggests that the Bureau of Prisons would not be able to provide an appropriate level of care. *See, e.g.*, *United States v. Perko*, 694 F. App'x 25, 29 (2d Cir. 2017) (summary order) (affirming an above-Guidelines two-year sentence and concluding that "the District Court took account of [the defendant's] mental health needs and concluded that the Bureau of Prisons, even if not the best provider of mental health services, has the ability and has the resources to give [the defendant] the help that he needs" (alterations and internal quotation marks omitted)); *see also United States v. Walker*, 27 F.3d 417, 419 (9th Cir. 1994) ("Post-arrest emotional trauma is a natural consequence of being charged with a crime. It is irrelevant for sentencing purposes.").

## CONCLUSION

For the reasons discussed above, the Government respectfully submits that a substantial term of incarceration should be imposed on Stephen Zarsky.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney

   /s/
Scott Hartman
Max Nicholas
Damian Williams
Assistant United States Attorneys
(212) 637-2357/1565/2298